IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JERRY NEAL, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:21-cv-00820-GCS |
| | ) | |
| LOUIS DREYFUS COMPANY | ) | |
| SERVICES LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S APPENDIX OF EVIDENCE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant submits the following evidentiary materials in support of its Motion for Summary Judgment.

| Exhibit | Evidence |
|---|---|
| 1 | Jerry Neal Deposition Excerpts |
| 2 | Declaration of Amy Khatib |
| 3 | Short-Term Disability (STD) and Workers Compensation Policies |
| 4 | May 4, 2017 Written Notice to Jerry Neal |
| 5 | January 3, 2017 STD Claim for Jerry Neal |
| 6 | June 6, 2017 Long-Term Disability (LTD) Claim for Jerry Neal |
| 7 | July 27, 2017 Letter to Jerry Neal approving LTD Benefits |
| 8 | June 26, 2017 Termination Emails |
| 9 | June 28, 2017 Termination Letter |
| 10 | David Stafford Deposition Excerpts |

Dated this 17th day of February 2023.

LOUIS DREYFUS COMPANY SERVICES LLC, Defendant

By:      /s/ Aaron A. Clark

Aaron A. Clark, #20045
Ruth A. Horvatich, #24776
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, NE  68102
Phone:  402-341-3070
Fax:  402-341-0216
aclark@mcgrathnorth.com
rhorvatich@mcgrathnorth.com

-and-

Gregg Kinney
Hepler Broom LLC
211 North Broadway, Suite 2700
St. Louis, MO 63102
314-241-6160
Gregg.Kinney@heplerbroom.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 17th day of February 2023, the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system, which provided notice to the following:

Eric J. Carlson
411 St. Louis Street
P.O. Box 527
Edwardsville, IL 62025
ejc@byroncarlson.com

Jeffrey Ezra
850 Vandalia, Suite 310-320
Collinsville, IL 62234
jeff@ezralaw.com

      /s/ Aaron A. Clark
Aaron A. Clark

# Deposition of:
# **Jerry Neal, Jr.**

**Date:** December 2, 2022

**Case:** Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC

**Reporter:** Nancy Naas Harmon, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

**Exhibit**

**1**

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

---

Page 3

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF ILLINOIS


JERRY NEAL, JR.,               )
                               )
               Plaintiff,      )
                               )
       vs.                     )  No. 3:21:CV-00820-GCS
                               )
LOUIS DREYFUS COMPANY          )
SERVICES LLC,                  )
                               )
               Defendant.      )




                   Deposition of
                   JERRY NEAL, JR.
                   December 2, 2022




                       INDEX
            Questions by:          Page:
            Mr. Clark                5


       REPORTER:  Nancy Naas Harmon, CSR, RPR
                  MO #986, IL #084-003219

               Keefe Reporting Company
                 11 North 44th Street
                 Belleville, Illinois  62226
```

1                  INDEX OF EXHIBITS
2   Defendant's Exhibit Number 2                 Page 10
    Plaintiff's Answers to Defendant's First Set of
3   Interrogatories (10 pages)
4   Defendant's Exhibit Number 3                 Page 14
    Job Description for Operator (3 pages)
5
    Defendant's Exhibit Number 4                 Page 29
6   Letter from Sun Life Financial 7/27/17
7   Defendant's Exhibit Number 5                 Page 42
    Policy Manual Excerpts (3 pages)
8
    Defendant's Exhibit Number 6                 Page 43
9   Policy Manual Acknowledgement (1 page)
10  Defendant's Exhibit Number 7                 Page 48
    Handwritten Statement 1/10/16 (2 pages)
11
    Defendant's Exhibit Number 8                 Page 54
12  SunAdvisor Claim Packet (7 pages)
13  Defendant's Exhibit Number 9                 Page 58
    Doctors' Notes during December 2016-June 2017 (6 pages)
14
15  6/6/17 Completed Long-Term Disability Application to
    Sun Life from LDC (7 pages)        Defendant's Exhibit Number 10   Page 77
16
    Defendant's Exhibit Number 11                Page 60
17  Letter from LDC to Mr. Neal 5/4/17 (2 pages)
18  Defendant's Exhibit Number 12                Page 65
    5/24/17 Emails from Amber Randall and Scott Becker,
19  5/11/17 Letter from Dr. Gornet (2 pages)
20  Defendant's Exhibit Number 13                Page 74
    6/5/17 Email from Dave Stafford to Amy Khatib, etc.,
21  with attachments (5 pages)
22  Defendant's Exhibit Number 14                Page 78
    6/23/17 Sun Life Financial Letter to Mr. Neal (5 pages)
23
    Defendant's Exhibit Number 15                Page 85
24  6/28/17 Letter from Mr. Stafford to Mr. Neal (1 page)
```

---

Page 2

```
1           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF ILLINOIS
2
3
4   JERRY NEAL, JR.,               )
                                   )
5                  Plaintiff,      )
                                   )
6          vs.                     )  No. 3:21-cv-00820-GCS
                                   )
7                                  )
    LOUIS DREYFUS COMPANY          )
8   SERVICES LLC,                  )
                                   )
9                  Defendant.      )
10
11
12
    APPEARANCES:
13
14  For Plaintiff:
                    Eric J. Carlson, Esq.
15                  BYRON CARLSON PETRI KALB, LLC
                    411 St. Louis Street
16                  PO Box 527
                    Edwardsville, IL  62025
17                  ejc@bcpklaw.com
18
    For Defendant:
19                  Aaron A. Clark, Esq.
                    McGRATH NORTH MULLIN & KRATZ, PC LLO
20                  First National Tower, Suite 3700
                    1601 Dodge Street
21                  Omaha, NE  68102
                    aclark@mcgrathnorth.com
22
23
24
```

---

Page 4

1   Defendant's Exhibit Number 16           Page 83
    6/26/17 Email from Scott Becker to Dave Stafford, etc.
2   With Attachment (2 pages)

```
3
4        IT IS STIPULATED AND AGREED by and between
5   counsel for Plaintiff and counsel for Defendant that the
6   deposition of JERRY NEAL, JR., may be taken pursuant to
7   the Federal Rules of Civil Procedure by and on behalf of
8   the Defendant on December 2, 2022, from the law offices
9   of Byron, Carlson, Petri & Kalb, LLC, 411 St. Louis
10  Street, Edwardsville, Illinois, before Nancy Naas
11  Harmon, Certified Court Reporter for the State of
12  Missouri, Certified Shorthand Reporter for the State of
13  Illinois, Registered Professional Reporter; that the
14  issuance of notice is waived; and that this deposition
15  may be taken with the same force and effect as if all
16  Federal Rules had been complied with.
17       IT IS FURTHER STIPULATED AND AGREED that the
18  signature of the deponent is reserved.
19
20       (On the record at 12:42 p.m.)
21
22       JERRY NEAL, JR., produced, sworn, and examined
23  as a witness on behalf of the Defendant, testified and
24  deposed as follows:
```

1 (Pages 1 to 4)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 5

1    DIRECT EXAMINATION
2        BY MR. CLARK:
3
4    Q.    Can you please state your name for the
5    record.
6    A.    Jerry Neal, Jr.
7    Q.    And what's your current address?
8    A.    532 Saint James, Cahokia, Illinois.
9    Q.    How long have you lived at that address?
10   A.    Around 12 years.
11   Q.    Are you currently married?
12   A.    Yes.
13   Q.    Do you have any kids?
14   A.    Yes.
15   Q.    How many kids do you have?
16   A.    I have four kids.
17   Q.    Okay.  Just to give you a little
18   background, my name is Aaron Clark again.  We just met.
19   I represent Louis Dreyfus Company in a lawsuit that's
20   pending that was filed on your behalf.
21   A.    Okay.
22   Q.    I'm going to ask you some questions today
23   that relate to your case and your employment at Louis
24   Dreyfus, okay?

Page 6

1    A.    Okay.
2    Q.    Have you ever had your deposition taken
3    before?
4    A.    No.
5    Q.    Okay.  And your lawyer may have explained
6    it to you a little bit.  I'm going to be asking
7    questions, and then you can answer the questions.  The
8    court reporter here is taking down your testimony, so we
9    have to kind of be careful not to talk over each other,
10   okay?
11   A.    Okay.
12   Q.    And if for some reason you don't understand
13   my question or you want me to rephrase it, I'm happy to
14   to do that.  Just let me know, okay?
15   A.    Okay.
16   Q.    And if you answer it, I'm just going to
17   assume that you understood the question and your answer
18   is true and correct to the best of your knowledge; is
19   that fair?
20   A.    Yes.
21   Q.    And if you need a break at any time, just
22   let me know.  I'm happy to accommodate you.  Let me
23   know.  I'll just ask that you finish the answer to the
24   question before we take a break, okay?

Page 7

1    A.    Okay.
2    Q.    Are you taking any medications today?
3    A.    No.
4    Q.    And have you ever been involved in a
5    lawsuit before this one?
6    A.    Not like -- No.
7    Q.    Okay.
8    A.    No lawsuit.  Never no lawsuit, no.
9    Q.    You've never sued anybody before?
10   A.    No.
11   Q.    Have you ever been sued by somebody else
12   before?
13   A.    No.
14   Q.    Have you ever testified in a trial or
15   anything like that before?
16   A.    No.
17   Q.    Okay.  And have you ever had any claims
18   against employers other than the ones that we have in
19   this case?
20   A.    No.
21   Q.    All right.  And have you ever sought
22   workers' compensation benefits from any other companies
23   other than Louis Dreyfus?
24   A.    No.

Page 8

1    Q.    And I understand that you had two workers'
2    compensation claims with Louis Dreyfus; is that correct?
3    A.    Correct.
4    Q.    So is that all the claims you've ever had
5    relating to work injuries --
6    A.    Yes.
7    Q.    -- as long as you've been working?
8    A.    Yes.
9    Q.    Okay.  Very good.  Have you ever had to
10   file bankruptcy before?
11   A.    No.
12   Q.    Have you ever been arrested or charged with
13   a criminal offense?
14   A.    No.
15   Q.    Did you review any documents before you
16   came here today?
17   A.    Yes.  Not before I got here.  We went over
18   a couple things -- my medical records, some tax forms,
19   things like that.
20   Q.    Okay.  Very good.  Can you give me kind of
21   a brief summary of your educational background?
22   A.    Okay.  I went to -- I attended East St.
23   Louis Senior High School, graduated from there.  I
24   didn't go to any college.  After that I pursued job

2  (Pages 5 to 8)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 9

1  careers after high school.
2  **Q.   Okay.  So have you ever gone to get any**
3  **kind of training or special education after high school**
4  **for anything?**
5      A.   No.
6  **Q.   Do you have any certifications or anything**
7  **like that?**
8      A.   No, not -- No.
9  **Q.   Okay.  And where are you currently working?**
10     A.   St. Louis Water.
11 **Q.   And what's your position at St. Louis**
12 **Water?**
13     A.   Water technician.
14 **Q.   And what do you do as a water technician?**
15     A.   We fix main breaks in the street.  Right
16 now I'm not in that department.  That's what department
17 I started in.  Right now I'm in meter and tap, which we
18 just do meter work, blown meters, leaking meters, things
19 of that nature, blown service lines, so that's what I do
20 at St. Louis Water.
21 **Q.   Okay.  And does that involve going to**
22 **people's houses and residences?**
23     A.   Yes, we do go into residences.  Some
24 residences does have basement meters, and we do have to

Page 10

1  have access to basement meters, so, yes, we do enter
2  homes.
3  **Q.   And I'll probably ask you some more**
4  **questions about your job there, but how long have you**
5  **been working there?**
6      A.   Four years.
7  **Q.   Four years?**
8      A.   Yes.
9  **Q.   Do you remember when you started, what**
10 **month or date?**
11     A.   September 3, 2019.
12 **Q.   2019, okay.  I'm going to show you an**
13 **exhibit.  Today I'll have some documents.  I'll have you**
14 **look at them, and I'll ask you some questions about**
15 **them, so feel free to read through them and make sure**
16 **you understand them and things like that before you feel**
17 **comfortable answering, okay?**
18     A.   Okay.
19 **Q.   The first one I'm going to show you is what**
20 **I've marked as Exhibit 2 for the deposition.**
21          (Defendant's Exhibit Number 2 was marked
22          for identification.)
23 **Q.   And for the record, these are Plaintiff's**
24 **Answers to Defendant's First Set of Interrogatories, and**

Page 11

1  **if you want to flip through it, I'm just going to ask if**
2  **you recall ever seeing this document before.**
3      A.   Okay.
4  **Q.   Do you remember ever seeing this document**
5  **before?**
6      A.   Not before today.
7  **Q.   Okay.  Would this have been a document you**
8  **reviewed before your deposition or just when I presented**
9  **it to you?**
10     A.   Before I reviewed a little bit of it.
11 **Q.   Okay.  And I'm going to be asking some**
12 **questions in your deposition about this, but if you**
13 **could for now turn to page 5 of that document.  And just**
14 **for your background, when we have a lawsuit, we get to**
15 **exchange written discovery where I get to ask questions,**
16 **and then your lawyer will work to respond to those**
17 **questions.  Do you remember ever having to work with**
18 **your lawyer to respond to questions that were presented**
19 **in connection with this case?**
20     A.   No.
21 **Q.   Okay.  So on page 5, there's some**
22 **calculations here that relate to what I would say are**
23 **the damages you're claiming in this case.**
24     A.   Yes.

Page 12

1  **Q.   Did you have any involvement in doing these**
2  **calculations or preparing this?**
3      A.   No.
4  **Q.   All right.**
5      A.   I mean --
6  **Q.   I'm sorry.  Do you recall having any**
7  **involvement in calculating the damages?**
8      A.   Yes, as far as my work, yes.
9  **Q.   For your work, okay.  And would you have**
10 **provided information to your attorneys so you could**
11 **calculate your damages?**
12     A.   Yes.
13 **Q.   Okay.  Did you actually do the numbers,**
14 **though, as far as adding and figuring out what you think**
15 **you're owed?**
16     A.   No.
17 **Q.   Very good.  And you might just want to set**
18 **that aside.  I'll probably ask you some more questions**
19 **about that when we get to them.  But do you remember**
20 **when you were hired by Louis Dreyfus Company?**
21     A.   I don't remember the exact date.
22 **Q.   If I told you it was around August of 2015,**
23 **does that sound about right?**
24     A.   Yes.

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

---

Page 13

1    Q.   And do you know where you worked before you
2  went to Louis Dreyfus Company?
3    A.   Yes.  I was at Sam's Club and Auto Zone
4  before Louis Dreyfus.
5    Q.   And do you remember who at Louis Dreyfus
6  Company would have hired you?
7    A.   Well, Mark Nemechek was the main guy that I
8  dealt with.  I don't know the hiring process of who
9  hired me exactly, but that's who I dealt with every day
10  through the my startup and training.
11    Q.   And was Mark your supervisor or your
12  manager?
13    A.   Yes.
14    Q.   Do you know what his job title was?
15    A.   He was assistant manager for Scott Becker.
16    Q.   Okay.  And Scott Becker, do you know what
17  his job was?
18    A.   Superintendent.  He was the superintendent
19  of the facility.
20    Q.   And that's the Cahokia facility?
21    A.   Yes.
22    Q.   And when you were hired, were you hired for
23  the position of operator?
24    A.   Can you repeat that.

Page 14

1    Q.   Yeah.  When you were hired, what was the
2  job you were hired for?
3    A.   Oh, laborer.  It was a laborer, because we
4  trained for barge work, so I started on that, so I was
5  laborer.
6    Q.   Do you know if they call that position
7  operator or do you know what the title is?
8    A.   Yes, it might be operator.
9    Q.   I'm going to show you what I've marked as
10  Exhibit Number 3.
11    (Defendant's Exhibit Number 3 was marked
12    for identification.)
13    Q.   For the record, this is a Job Description
14  for operator at Cahokia, Illinois.  Do you see that at
15  the top where it says Operator and then it says Location
16  Cahokia?
17    A.   Yes.
18    Q.   Have you ever seen the Job Description
19  before for an operator?
20    A.   No.
21    Q.   I want to go through a little bit with you,
22  but maybe you can just tell me generally what were the
23  things you did as an operator at Cahokia?
24    A.   As an operator, we loaded -- Well, we

Page 15

1  guided the railcars into the rail pit, made sure it was
2  even loaded in the pit.  Once the train stops, depending
3  what type of product that we were dealing with, if we
4  were dealing with the DDG, we'd put the vibrators on the
5  side of the train and we'd take the hopper bottom door
6  openers and we'd open the hopper bottom, let the grain
7  fall out, close it, and go on with the next car.
8    Q.   So those were railcars that came into the
9  facility to unload grain?
10    A.   Yes.
11    Q.   Did you work at all with the barges that
12  came in?
13    A.   Yes.
14    Q.   Was that also part of what you did as an
15  operator?
16    A.   Yes.
17    Q.   And could you describe what you did for
18  that?
19    A.   Barge work, the new barges that came in, we
20  put them on the slide line, empty barges, get them set
21  up to be loaded, moving slide lines, tied down barges,
22  made sure that the barges are secure with the roping,
23  things like that.
24    Q.   So with respect to barges, you were

Page 16

1  actually loading barges.  Were you ever taking grain off
2  barges?
3    A.   No.
4    Q.   And the railcars would bring in the grain;
5  is that fair?
6    A.   Yes.
7    Q.   Okay.  Anything else you did in connection
8  with your job other than the actual loading and
9  unloading of railcars and barges?
10    A.   Well, cleaning, we had to do the necessary
11  cleaning.  Basically that's all we did.  Like we loaded
12  barges all day, just basically loading, moving barges
13  down the slide lines, securing barges.
14    Q.   And did that require working indoors and
15  outdoors?
16    A.   Outdoors.
17    Q.   Mostly outdoors?
18    A.   Mostly outdoors.
19    Q.   Did you ever do any indoor work?
20    A.   No.
21    Q.   Did you ever unload grain from trucks?
22    A.   Yes.
23    Q.   So it would also come in on trucks and
24  vehicles in addition to trains?

4  (Pages 13 to 16)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 17

1    A.    Yes, trucks and trains.
2    Q.    Okay.  And when you were hired to do that
3  job, did you have to fill out any -- do you remember if
4  you had to fill out any information talking about your
5  medical condition or your health or anything like that?
6    A.    Yes.
7    Q.    Did you have to go through a physical or
8  anything like that?
9    A.    Yes.
10   Q.    And do you recall what they made you do or
11 what that process entailed?
12   A.    Basically a body exam, he checked my
13 kidneys area, checked my bladder area, things like that,
14 and my testicles and things like that, made me cough, I
15 guess check you for hernia or something to that nature.
16   Q.    So it was like a physical exam?
17   A.    Yes.
18   Q.    In connection with the job as well, I want
19 you to turn to the second page of this exhibit if you
20 don't mind.  Do you see there's a section there called
21 Working Conditions?  Do you see that kind of in the
22 middle?
23   A.    Yes.
24   Q.    Now, according to this job description, it

Page 18

1  says that the work is physically demanding.  Do you
2  agree with that?
3    A.    Yes.
4    Q.    How is it physically demanding?
5    A.    Physically demanding because everything you
6  do, you have to use your muscles, your strength.
7    Q.    Okay.
8    A.    Demanding, it's just a demanding job, you
9  know.  You have to use your muscles, your strength, and
10 your mind, you know, and you have to be safe also
11 working out there.  So, yes, it's a very demanding job.
12   Q.    And if you go down a little bit under the
13 Working Conditions, it says you have to sometimes lift
14 equipment and materials.  Do you see that?
15   A.    Yes.
16   Q.    And was lifting something you had to do in
17 that job?
18   A.    Yes.
19   Q.    And it says you may have to lift up to
20 75 pounds.  Do you see that?
21   A.    Yes.
22   Q.    And did you have to do some heavy lifting
23 in connection with that job?
24   A.    Yes.

Page 19

1    Q.    And would it be up to 75 pounds?
2    A.    Yes.
3    Q.    Okay.  And it also says you have to be able
4  to stand, walk, crawl, kneel, squat, and stoop as
5  required.  Do you see that?
6    A.    Yes.
7    Q.    And is that something you also have to do
8  as far as the physical requirements of the job?
9    A.    Yes.
10   Q.    How many operators worked at the facility
11 when you were there, do you know?
12   A.    Of all the employees?
13   Q.    Yeah, at the Cahokia facility, if you know.
14   A.    At that time, roughly 40, maybe 50 people.
15   Q.    40 to 50 maybe?
16   A.    Yes.
17   Q.    And were most of those people operators
18 that did the same stuff you did?
19   A.    Yes.  Well, we all had different positions
20 as far as that, but everybody always in the pit was
21 known as a operator, correct.
22   Q.    And when you were working in the job, what
23 kind of -- do you use tools and equipment as part of
24 your job at all?

Page 20

1    A.    Yes.  We use chains, come-alongs.  There
2  was times that doors get stuck, we had to get up under
3  the train and jack the door open.  We lift vibrators to
4  vibrate the grain from the train.  Those were some of
5  them too.  The door openers, we had to use them also to
6  open the train rails or the --
7    Q.    So did you ever use like shovels and
8  brooms?
9    A.    Yes.
10   Q.    Anything else that you would use regularly?
11   A.    We used shovels or brooms on a regular
12 during the cleanup process.  Air hose, sometimes we had
13 to blow the pit down, basically tools like that.  It
14 wasn't nothing like hand tools.
15   Q.    Got you.  Okay.  And when you talked about
16 lifting the vibrators, do you know how much those
17 weighed?
18   A.    Roughly in between 50 to 75 pounds.  They
19 pretty heavy.
20   Q.    Okay.  And would that be something two
21 people would do?  Would that be something one person
22 would do?
23   A.    It's one person, one person can handle it.
24 You can handle it with your strength.

5  (Pages 17 to 20)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 29

1    Q.   Okay.
2    A.   I went straight from there and ended up in
3  this job at St. Louis Water, so . . .
4    Q.   Okay.
5        (Defendant's Exhibit Number 4 was marked
6        for identification.)
7    Q.   I'm going to show you what we've marked as
8  Exhibit 4.  And for the record, this is a letter from
9  Sun Life Financial dated July 27, 2017.  Do you see that
10 at the top?
11   A.   Yes.
12   Q.   And this is a letter that was addressed and
13 sent to you.  Do you see that?
14   A.   Yes.
15   Q.   And it relates to a claim for long-term
16 disability benefits.  Did you apply for long-term
17 disability benefits when you were at Louis Dreyfus?
18   A.   Yes.
19   Q.   And did you receive this letter from Sun
20 Life Financial do you remember?
21   A.   I think so, yes.
22   Q.   And in this letter, it indicates that it
23 looks like in the second paragraph if you see that, it
24 says that they've determined that you have a date of

Page 30

1  disability of December 20 of 2016.  Do you see that?
2    A.   Yes.
3    Q.   Now, was that around the time that you went
4  off work at Louis Dreyfus Company?
5    A.   Yes.
6    Q.   And why did you go off work?  Do you
7  remember?
8    A.   Yes.  When I left -- Why did I leave work?
9    Q.   Yeah.  Why did you go off work around
10 December 20 of 2016?
11   A.   Oh, due to my back pain.  I was having pain
12 in my back.
13   Q.   And did you go to a doctor before that
14 time?
15   A.   Yes, I went to the doctor, yes.
16   Q.   And we're going to talk about that more in
17 a bit, but do you remember the doctor imposed some
18 restrictions on you?
19   A.   Yes.
20   Q.   And this letter indicates that you're going
21 to get your disability benefits; would you agree?
22   A.   Yes.
23   Q.   And it says in the letter in the second
24 paragraph that they would begin to accrue effective

Page 31

1  June 18, 2017.  Do you see that?
2    A.   Yes.
3    Q.   Now, was that around the time that you were
4  separated from employment at Louis Dreyfus, do you know?
5    A.   Yes.  I wasn't working there then, at this
6  time.
7    Q.   All right.  Now, if you jump down a little
8  bit to the second to last paragraph on that first page,
9  it says:  In order to consider your claim for benefits
10 beyond August 31, 2017, you will need your medical
11 records from your next office visit with Dr. Matthew
12 Gornet.  Was Dr. Matthew Gornet your doctor?
13   A.   Yes.
14   Q.   Was that the person who was helping you
15 with your back issues?
16   A.   Yes.
17   Q.   And so did you get long-term disability
18 benefits from June 18, 2017, through the end of August,
19 2017?
20   A.   Yes.
21   Q.   And were those checks that were mailed to
22 you or how did you get paid?  Do you know?  Do you
23 remember?
24   A.   I think they were mailed, yeah.  They were

Page 32

1  paper checks.
2    Q.   Now, when you applied for long-term
3  disability benefits, were you still working at Louis
4  Dreyfus when you applied?
5    A.   When I applied, well, I think so.
6    Q.   Okay.  I guess that's a bad question.  You
7  weren't actually at the facility?
8    A.   No.
9    Q.   But to your understanding, were you still
10 employed?
11   A.   Yes.
12   Q.   That's a good question, and feel free to
13 challenge me on that.  So when you applied for these
14 benefits, did you understand when you applied for
15 long-term disability benefits you're seeking to get
16 payments for being off work?
17   A.   Yes.
18   Q.   And if you look at this last paragraph on
19 the first page of Exhibit 4, it says:  Please be aware
20 that after June 17, 2019, the definition of "total
21 disability" changes.  And it says:  This means that as
22 of this date, you will only continue to meet the
23 definition of "total disability" if you are unable to
24 perform the duties of any gainful occupation.  Do you

8  (Pages 29 to 32)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 37

1   And once I stuck my hand out there, the cable snapped
2   and came up, but it hit the bottom of the leaf blower.
3   That's what saved my hand.
4       Q.   Yeah.  Yeah.  That's pretty dangerous out
5   there on the docks, isn't it?
6       A.   Yes.
7       Q.   Were you there at the time of any other
8   employees being injured out there?
9       A.   A couple, but I know one that got injured,
10  but he passed.  I wasn't there then.
11      Q.   And was that your job at all dealing with
12  those cables or anything like that?
13      A.   Yes.  Anytime we out on the river, yes, all
14  deckhands deal with the slide lines and cables.
15      Q.   And those are used to bring the barges in?
16      A.   Yeah, keep the barges, keep them from
17  floating off the dock into the middle of the river.  So
18  they all were tied together, so we slide them down.  We
19  have cavels, so we have to move it from one side of the
20  cavel to the other side till they continue to slide
21  down.
22      Q.   Now, with respect to that claim, you
23  understand you did file a workers' compensation claim,
24  right?

Page 38

1       A.   Yes.
2       Q.   And did you have any time off work for
3   that?
4       A.   No.
5       Q.   Did you get your medical bills paid by the
6   company for that, do you remember?
7       A.   Yes.
8       Q.   And did you end up getting a settlement for
9   that?
10      A.   Yes.
11      Q.   And do you remember how much the settlement
12  was that you received?
13      A.   It wasn't much, probably like -- what I
14  brought home, maybe 2,500.
15      Q.   That's a good memory.  Yes.  Do you
16  remember the settlement also required you to pay some --
17  there were some attorney's fees that came out of it?
18      A.   Yes.
19      Q.   And then you remember receiving about
20  $2,500?
21      A.   Yes.
22      Q.   And that again was for your right hand
23  based on the injury you had?
24      A.   Yes.

Page 39

1       Q.   Okay.  Now, at any time did the company
2   ever try to deny that claim, do you remember, and say it
3   didn't happen?
4       A.   No.
5       Q.   Did you report it right when it happened?
6       A.   Yes.  Well, because they heard it, so
7   everybody came over.
8       Q.   And that claim was processed through
9   workers' comp, and you got the money, right?
10      A.   Yes.
11      Q.   And you had a lawyer helping you with that?
12      A.   Yes.
13      Q.   Was there anything during that process that
14  made you unhappy with the way the company handled the
15  workers' compensation claim?
16      A.   No.
17      Q.   Okay.  Now we'll talk about the other one
18  you had, which is the one relating to your back
19  I believe.  Do you remember when that issue arose for
20  you?
21      A.   Yes.
22      Q.   When was that?
23      A.   11/26/16.
24      Q.   What do you remember about that date?  What

Page 40

1   happened?
2       A.   It was Saturday.  We had like a
3   hundred-some railcars that come in, but we had to run
4   that train until the train was over.  Throughout the
5   day, we go down and clean after each barge been loaded
6   due to the buildup of grain, so we would just do that
7   periodically throughout the day.  That whole Saturday,
8   that's basically what we was doing.  We was running the
9   trains, cleaning the basement, come back up, you know,
10  run another barge, and that was just repetitive back and
11  forth.  That's what we were doing that Saturday.
12      Q.   And so with respect to that, did you get a
13  workers' compensation settlement payment in that case?
14      A.   For my back?
15      Q.   Yes.
16      A.   Yes.
17      Q.   And do you remember when you got that?
18      A.   I don't remember when I received it.  No, I
19  don't remember when I received it.
20      Q.   If I told you it was around May of 2019,
21  would you disagree with that or do you know?
22      A.   Sounds about right.
23      Q.   Do you know how much money you received in
24  connection with that settlement?

10  (Pages 37 to 40)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

---

Page 41

1      A.   12,000 and some change.
2      Q.   Yeah.  You know, it was around, you know --
3  And I could show you this if you like.  Let me mark
4  this.
5      A.   You mean the total amount?
6      Q.   Yeah.
7      A.   Total amount I think was like 25,000, was
8  it?
9      Q.   Yes.  And then from that, there were some
10 deductions, right?
11     A.   Yes.
12     Q.   And then you ended up getting what was left
13 over, right?
14     A.   Yeah, 12 and some change.
15     Q.   Lawyers take a piece of it, don't they?
16     A.   Yeah.
17     Q.   So it ended up to be about 13; does that
18 sound about right?
19     A.   Yes.
20     Q.   And that, according to this -- And I'm just
21 going to represent that was around May of 2019; does
22 that sound about right?
23     A.   Yes.
24     Q.   Okay.  Thank you.  That saves some time

---

Page 42

1  showing you all this stuff.  All right.  So when you
2  were hired by Louis Dreyfus Company, did you receive
3  some -- Did you receive what they call a policy manual,
4  do you remember?
5      A.   Yeah, I remember.
6      Q.   I'm going to show you this if you don't
7  mind.  I'll show you what's been marked as Exhibit 5.
8          (Defendant's Exhibit Number 5 was marked
9          for identification.)
10     Q.   And this is not a full copy of it because
11 it's pretty thick, but it's a copy of the policy manual
12 index, and it has the attendance policy and short-term
13 disability policy as part of it.  Do you see that?
14     A.   What are you looking at?
15     Q.   Yeah, if you look at the -- It's a
16 three-page document I gave you, which is Exhibit 5,
17 right?
18     A.   5.
19     Q.   And it has an attendance policy and a
20 short-term disability policy.  You indicated you got a
21 policy manual, and I'm just representing that these
22 documents are part of it, but before I ask you any more
23 questions, let me give you this.  I'm showing you what's
24 been marked as Exhibit 6.

---

Page 43

1          (Defendant's Exhibit Number 6 was marked
2          for identification.)
3      Q.   And for the record, this is a Policy Manual
4  Acknowledgement, and I'm just going to ask does that
5  look like your signature on the bottom of Exhibit 6?
6      A.   Yes.
7      Q.   And when you were hired, did you receive
8  some policies and then you signed this form, do you
9  remember?
10     A.   Yes.
11     Q.   And this one indicates at the top:  I have
12 received a copy of Louis Dreyfus Commodities and its
13 subsidiaries policy manual.  Do you see that at the
14 beginning?
15     A.   Yes.
16     Q.   Okay.  And you agree you would have gotten
17 that when you were hired?
18     A.   Yes.
19     Q.   And this signature confirms that you would
20 have gotten it, correct?
21     A.   Yes.
22     Q.   So now when you talked about your injury
23 with respect to your back -- And I believe you indicated
24 was that November 26 of '16?

---

Page 44

1      A.   Yes.
2      Q.   Did you report an injury to your back on
3  that day; do you remember?
4      A.   Wasn't no one there at the end of the day.
5  It was Saturday.  We normally don't work on Saturday.
6  Wasn't no one there at the end of the day.
7      Q.   Did you report it on the Monday after?
8      A.   Yes.
9      Q.   And who did you talk to?
10     A.   Scott Becker and Marcus Dixon.
11     Q.   Now, when you talked to Scott and Mark, did
12 you tell them that your back was hurting you or it was
13 stiff or something like that?
14     A.   Yes.
15     Q.   Do you remember exactly how you described
16 it?
17     A.   Yeah.  I told them that morning, I told
18 them that my back, I was having problems with my back
19 that Sunday when I woke up.  I told them I got out the
20 bed, I was going to try to use the restroom and my back
21 just was hurting.
22     Q.   Was any other part of your body hurting
23 other than your back at that time?
24     A.   My buttocks and my legs.

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

---

Page 53

1    couple days later, right?
2        A.  Yes.
3        Q.  Did you ever tell them that you thought you
4    hurt your back during this incident on November 26?
5        A.  No, not at that time.
6        Q.  Okay.  And at that time you told them you
7    woke up from your bed and you felt that, right?
8        A.  Yeah, when I got out the bed, when I woke
9    up and got out the bed, not when I woke up from the bed.
10       Q.  So during that meeting with Scott and
11   Marcus, at any point did you tell them that this was
12   something that happened at work?
13       A.  I wasn't sure that it was from that.
14       Q.  Okay.  So you wouldn't have told them that
15   at that time?
16       A.  Not at that time.
17       Q.  Okay.  Thank you.  Now, you understand
18   eventually a workers' compensation claim was pursued for
19   that injury, right?
20       A.  Yes.
21       Q.  And we talked about the settlement that you
22   received on that, correct?
23       A.  Yes.
24

---

Page 54

1        (Defendant's Exhibit Number 8 was marked
2            for identification.)
3        Q.  I'll show you what we've marked as Exhibit
4    Number 8.  For the record, this is a document entitled
5    Sun Life Assurance Company, and it's a SunAdvisor Claim
6    Packet.  Do you see that at the top?
7        A.  Yes.
8        Q.  Now, we kind of talked earlier about at
9    some point there was an application for short-term
10   disability benefits made for you, correct?
11       A.  Yes.
12       Q.  And you said some paperwork was filled out
13   for that, right?
14       A.  Yes.
15       Q.  And do you remember if this is the
16   paperwork that related to that?  And if you want to flip
17   toward the back, the second or third last page, there's
18   some signatures there.  Do you see that?
19       A.  Yes.
20       Q.  Is that your signature --
21       A.  At the bottom, yes.
22       Q.  And it's dated December 20, 2016?
23       A.  Yes.
24       Q.  And would you have signed this document on

---

Page 55

1    that day?
2        A.  Yes.
3        Q.  Now, I want to go through some information
4    on this document, first of all.  If you look at the very
5    first page under the second section, which is Diagnosis
6    and History, do you see there's a bunch of filled-in
7    information.  Do you know if your doctor filled this in?
8        A.  Yes.
9        Q.  And you can see on the bottom of the second
10   page it looks like your doctor did sign off on this,
11   right?
12       A.  Yes.
13       Q.  And what's your doctor's name?
14       A.  Shawahin.
15           (Spelling requested by the court reporter.)
16       A.  S-H-A-W-A-H-I-N.
17       Q.  And would you agree your doctor signed it
18   on January 3, 2017?
19       A.  Yes.
20       Q.  And it refers to low back pain and back
21   tenderness, correct?
22       A.  Yes.
23       Q.  And you'll see the doctor -- If you look in
24   that section, it says:  Is condition due to an injury or

---

Page 56

1    sickness arising out of patient's employment?  Do you
2    see that question?
3        A.  Yes.
4        Q.  And your doctor says:  Unknown.  Right?
5        A.  Yes.
6        Q.  Now, did you ever talk to your doctor at
7    this time about how you got injured?
8        A.  He asked how did my back get injured, and I
9    told him -- Basically I was explaining the same thing
10   about how I went out and shoveled the grain, stuff like
11   that, and told him the next day how my back was feeling.
12       Q.  But you agree your doctor is not saying
13   that he knows it's arising out of your employment,
14   right?
15       A.  Say it again.
16       Q.  Would you agree your doctor didn't check
17   the box when it says:  Is condition due to injury or
18   sickness arising out of patient's employment?  It
19   doesn't say yes, right?  It says unknown?
20       A.  Right.
21       Q.  Now, it also says you're getting medication
22   and going through physical therapy; is that correct?
23       A.  Yes.
24       Q.  And were you doing that at the time that

---

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 57

1    this was filled out?
2        A.    Yes.
3        Q.    And on the top of the next page, this
4    references some restrictions; would you agree with that?
5        A.    Yes.
6        Q.    And it says:  No lifting over 10 pounds.
7    Were you subject to a restriction at that time?
8        A.    Yes.
9        Q.    It also says:  No pushing or carrying over
10   10 pounds.  And was that another restriction imposed at
11   that time?
12       A.    Yes.
13       Q.    And would you agree that as an operator,
14   you cannot perform the work we talked about unless you
15   can do these things?
16       A.    Yes.
17       Q.    Now, do you remember calling Scott Becker
18   regarding your short-term disability claim?
19       A.    I think I had reached out to him once
20   before because I think it was somehow stopped, and I
21   think they said my employer had something to do with it,
22   something like that, and I probably called to ask them
23   about it.
24       Q.    Did you ever tell Scott Becker in early

Page 58

1    January that you wanted to move forward with your
2    short-term disability claim?
3        A.    What you mean by that?  What you mean?
4        Q.    Well, did you ever talk to Scott Becker and
5    tell him you wanted to move forward and pursue this
6    claim for short-term disability benefits?
7        A.    Yes, for my short-term, yes.
8        Q.    And do you remember if at the time that you
9    submitted this that they also asked you to fill out this
10   statement that we talked about, Exhibit 7?  Do you
11   remember if that was asked at that point?
12       A.    I don't remember.
13       Q.    Okay.  That's fair.  How are you doing?  Do
14   you want to take a break?
15       A.    I'm all right.
16       Q.    Okay.  We'll keep going.  Just let me know
17   if you need a break.  I'll probably need one shortly
18   anyway.
19            (Defendant's Exhibit Number 9 was marked
20            for identification.)
21       Q.    Let me show you what's been marked as
22   Exhibit 9, and I want you to flip through Exhibit 9 if
23   you don't mind, and these are various doctors' notes
24   during the time frame of December 2016.  And the last

Page 59

1    one is kind of hard to read, but it's dated June 22,
2    2017.
3            MR. CARLSON:  We do have a darker copy of
4    that if you want it.  It was in the medical records.
5            MR. CLARK:  Let's go off the record.
6            (A discussion was held off the record.)
7        Q.    (By Mr. Clark)  Back on.  So just going
8    back on the record, do you agree that Exhibit 9 are
9    various doctors' notes relating to your restrictions?
10       A.    Are you asking me --
11       Q.    Yeah.  Do you agree after looking at
12   Exhibit 9 that these are notes from your doctors about
13   work restrictions?
14       A.    Yes.
15       Q.    And again these are dated from December of
16   '16 through June of '17, agree?  If you look at the
17   first one and the last one.  Is that right?
18       A.    Yes.
19       Q.    So during December when you went off work
20   all the way through June 19 when that separation date
21   happened at the company, do you agree you were subject
22   to these restrictions relating to 10 pounds?
23       A.    Yes.
24       Q.    And do you agree that that didn't change,

Page 60

1    you had those restrictions throughout that time frame?
2        A.    Yes.
3            MR. CLARK:  This might be a good time to
4    take a break if you don't mind.  Five minutes.
5            (A recess was taken from 1:45 p.m. to
6            1:53 p.m.)
7            (Defendant's Exhibit Number 11 was marked
8            for identification.)
9        Q.    (By Mr. Clark)  Moving right along, back on
10   the record, I've got another exhibit I'm just going to
11   show you.  It's Exhibit 11, and this is a letter from
12   the company to you dated May 4, 2017.  Do you recognize
13   this letter?
14       A.    Yes.
15       Q.    And did you receive this letter?
16       A.    Yes.
17       Q.    And if you look at the second page, there's
18   a certified mail receipt that says Date of Delivery,
19   May 10, 2017.  Do you think would that be the day you
20   would have received it you think?
21       A.    Yes.
22       Q.    And that's your signature on that card?
23       A.    Yes.
24       Q.    Okay.  Now, when you got this letter, what

15  (Pages 57 to 60)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 61

1  was your understanding of what it meant to you when you
2  received it? I assume you read it, right?
3      A.  Yeah, but I ain't read it since then.
4      Q.  At the time did you read it too do you
5  think, when you got it?
6      A.  Yeah. I was aware of it, yes.
7      Q.  And did you understand from the letter --
8  And if we look at it, Amy Khatib is the person who sent
9  it to you, right? Do you see her name at the bottom?
10     A.  Yes.
11     Q.  And had you ever heard of Amy Khatib or
12 even know who she was before you got this?
13     A.  No.
14     Q.  And in the letter, it says in the third
15 sentence, it says: We are writing to inform you that
16 pursuant to company policy, your employment and all
17 company-provided benefits will end on June 19, 2017,
18 unless you're able to return to work. Do you see that
19 statement?
20     A.  Yes.
21     Q.  And do you remember reading that at the
22 time you got this letter?
23     A.  Yes.
24     Q.  So what was your understanding when you

Page 62

1  read that, what that meant?
2      A.  Basically that my long-term -- my long-term
3  disability was ending basically.
4      Q.  Did you understand when it said your
5  employment was going to be terminated on June 19?
6      A.  Yes.
7      Q.  So you knew you were going to lose your job
8  on that day?
9      A.  I was aware of it through this letter, yes.
10     Q.  Okay. And then it also says if you're
11 unable to return to work, you can apply for LTD or
12 long-term disability benefits. Do you see that?
13     A.  Yes.
14     Q.  And do you remember reading that when you
15 received it?
16     A.  Yes.
17     Q.  And did you apply for long-term disability
18 benefits?
19     A.  I think I -- No, I did not. I think I
20 tried and got denied, I think. I'm not sure. I'm not
21 sure.
22     Q.  And if you look at the second paragraph, it
23 says: If you believe you are disabled under the
24 Americans with Disabilities Act or other applicable laws

Page 63

1  and would like to discuss potential accommodations that
2  may allow you to return to work and perform the
3  essential functions of your job or otherwise continue
4  your employment, it tells you to contact Amber Randall.
5  Do you see that?
6      A.  Yes.
7      Q.  And did you read that at the time and
8  understand -- Did you understand what that meant I
9  guess?
10     A.  Yes.
11     Q.  And what did you understand that to mean?
12     A.  Basically that I need to get in contact
13 with Amber about my unemployment.
14     Q.  Okay. And it also says after that that
15 you'll need to provide current medical documentation
16 from your physician concerning your return-to-work
17 status, right?
18     A.  Yes.
19     Q.  So did this letter concern you when you got
20 it?
21     A.  Yes.
22     Q.  And why did it concern you?
23     A.  Because I don't know -- First of all, I
24 didn't know what I did wrong, like why am I losing my

Page 64

1  job. That was the first thing, like it was a big shock.
2  I'm thinking I'm in the process to go back to work.
3  When I received this, it was a big shock. It was
4  actually a heartbreaker for me.
5      Q.  Did you understand what she was saying here
6  is the company had a policy that it's kind of like you
7  get terminated if you can't come back to work within a
8  certain time?
9          MR. CARLSON: Object to form.
10     Q.  I don't know if you understood that when
11 you read the letter. Did you understand that?
12     A.  No.
13     Q.  And did you call Amy Khatib when you got
14 the letter?
15     A.  I turned it over to my attorney at the
16 time. I didn't know what to do with it, so I let them
17 handle it.
18     Q.  And was that your workers' compensation
19 attorney?
20     A.  Yes, David Jerome.
21     Q.  Did you do anything else other than go to
22 your attorney, do you remember?
23     A.  As far as this, I went to -- Well, I turned
24 it over to him, and he responded. That was it as far as

16 (Pages 61 to 64)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 65

1 this particular one.
2     (Defendant's Exhibit Number 12 was marked
3     for identification.)
4     Q.   Okay. I'm going to show you what's been
5 marked as Exhibit 12, and I'm going to talk about the
6 letter from your attorney in a little bit, but this is
7 Exhibit 12. I want to -- If you could look at the
8 second page of this Exhibit 12. Do you recognize that
9 medical note?
10     A.   Yes.
11     Q.   And is that from your doctor?
12     A.   Yes.
13     Q.   Is that Dr. Gornet?
14     A.   Yes.
15     Q.   And did you go see the doctor on May 11,
16 2017?
17     A.   Yes.
18     Q.   And do you agree that's the date your
19 doctor filled this out?
20     A.   Yes.
21     Q.   And at the time this was filled out, your
22 doctor indicated there was no change to your status?
23     A.   Right.
24     Q.   And would you agree that means you're still

Page 66

1 subject to those restrictions we talked about earlier?
2     A.   Yes.
3     Q.   And did you take this note anywhere when
4 you got it?
5     A.   This one?
6     Q.   Do you remember?
7     A.   All my notes go up to my job.
8     Q.   And who would you take those two?
9     A.   Mainly Mark Nemechek.
10     Q.   Now, if you look at this first page -- And
11 I know you're not on these emails, but I just want to
12 see if you -- You know, this is an email from Scott
13 Becker on May 24, and he says: Jerry dropped this off
14 today.
15     MR. CARLSON:  It says yesterday.
16     Q.   I'm sorry. It says: Jerry dropped this
17 off yesterday. Do you see that at the bottom email?
18     A.   Oh, right here?
19     Q.   Yeah. Jerry dropped this off yesterday is
20 what it says. Do you see that?
21     A.   Yes.
22     Q.   Do you agree that this note could have been
23 dropped off on May 23, 2017, or do you know?
24     A.   I'm not sure about the date.

Page 67

1     Q.   But you believe you took it to the company?
2     A.   Yes, I know I took it to them, yes.
3     Q.   And you also agree that this note doesn't
4 indicate any change in your condition. We talked about
5 that.
6     A.   Right.
7     Q.   Now, do you agree that the doctor's note,
8 which is the second page of that, does not indicate that
9 you're going to be able to come back to work on or
10 before June 19?
11     A.   Say that again.
12     Q.   Do you agree that this doctor's note does
13 not indicate that you're going to be able to come back
14 to work on June 19, 2017?
15     MR. CARLSON:  I'll object. The document
16 speaks for itself. It says what it says. You can
17 answer.
18     A.   Oh, say that again. I'm sorry.
19     Q.   Yeah, you bet. When you look at that note,
20 does it say anything about you coming back to work on or
21 before June 19?
22     A.   No.
23     Q.   Okay. Now, before that note, did you
24 receive forms for the company to apply for long-term

Page 68

1 disability benefits, do you know?
2     A.   No, I don't remember.
3     Q.   And so you don't know if Sun Life sent
4 forms to you on May 4, 2017, regarding long-term
5 disability benefits?
6     A.   Maybe, because I know I remember the
7 short-term. I was so frustrated when they stopped my
8 short-term, I don't know if I proceeded -- No, I did
9 proceed with long-term.
10     Q.   Okay. Do you know if you got a packet in
11 the mail with some paperwork you could fill out to get
12 long-term disability benefits?
13     A.   I think so.
14     Q.   And do you know when you got it?
15     A.   No.
16     Q.   Could it have been early May of 2017?
17     A.   I don't know.
18     Q.   Okay. Now, when you received the May 4,
19 2017, letter that we talked about, which is Exhibit 11
20 I believe, you said you went to talk to your workers'
21 compensation lawyer, David Jerome, right?
22     A.   Yes.
23     Q.   And do you know if you gave him a copy of
24 this Exhibit 11 letter?

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 69

1    A.  Yes.
2    Q.  Okay.  You would have handed this to him?
3    A.  Yes.
4    Q.  And do you know if he put together any
5    information to send out for you after you met with him?
6    A.  No.  I'm not sure.
7    Q.  I don't want to get into what you guys
8    talked about.  I can't ask you questions about that.
9    But do you know if your attorney, David Jerome, sent out
10   anything on your behalf after you met with him?
11   A.  In response to this letter?
12   Q.  Yes.
13   A.  Yes.
14   Q.  Okay.  And I don't have that document, but
15   it's in a document we already have.  I'll have to show
16   it to you on this computer I think.  I should have
17   printed that one out.  For the record, this document I'm
18   referring to is part of Plaintiff's Exhibit 1, page 42,
19   and it's Neal 366 at the bottom, and I'm going to show
20   it to you.  Have you ever seen this letter before?
21   A.  Yes.  That was a response, yes, because he
22   sent me one also, yes.
23   Q.  So he sent a copy of this May 23, 2017,
24   letter to you as well?

Page 70

1    A.  Yes, I think so.  This was the response
2    from this Exhibit 11.
3    Q.  Okay.  And did you read this letter when
4    you received it?
5    A.  Yes.
6    Q.  And have you reviewed it recently?
7    A.  No.
8    Q.  Now, when you gave the letter to your
9    lawyer, it looks here that he sent a letter to Andrew
10   Kovacs, and do you know who Andrew Kovacs is?
11   A.  Attorney.
12   Q.  Was that an attorney that was working on
13   the workers' compensation case, do you know?
14   A.  Yes, with David.
15   Q.  Do you know if Mr. Kovacs is employed by
16   Louis Dreyfus?
17   A.  I don't know.
18   Q.  So would you agree as of the date that your
19   lawyer sent this letter, which is dated May 23, 2017,
20   that you were still subject to your restrictions at that
21   time?
22   A.  Yes.
23   Q.  And would you agree that you were still not
24   in a position to come back to work and perform the

Page 71

1    duties of an operator based on those restrictions?
2    A.  Yes.
3    Q.  Now, in this letter, the lawyer says that
4    you're currently completing injections to determine
5    whether you'll get released from care or recommended for
6    further treatment.  Do you see that?
7    A.  Yes.
8    Q.  Was that going on at that time when this
9    letter was sent?
10   A.  Yes.
11   Q.  And then it says:  In the meantime, please
12   note that my client does not plan on abandoning his
13   position.  Do you see that?
14   A.  Yes.
15   Q.  And he wishes to return to work once the
16   effects of his injury have remitted, right?
17   A.  Yes.
18   Q.  So when you read that, what does that mean
19   to you?  I mean, what's your understanding of what he's
20   saying?  What do you understand when you read that what
21   that means?
22   A.  You mean the last part that you just read?
23   Q.  That first sentence, yeah, of that second
24   paragraph.  If you need to read it again, feel free.

Page 72

1    A.  Oh, well, I wasn't planning on abandoning
2    my job.  I liked my job, liked the atmosphere, liked the
3    people.  So, no, I wasn't planning on abandoning my job.
4    Q.  And would you agree your lawyer is telling
5    the company that after your work injury or does or taken
6    care of, that would be a time that you could come back
7    to work?
8    A.  Yes.
9    Q.  Now, you agree that this letter doesn't say
10   you're going to be back at work by June 19, correct?
11   A.  It doesn't say that.
12   Q.  And it doesn't talk about any
13   accommodations that you guys are asking for that would
14   allow you to come back to work by June 19, correct?
15   MR. CARLSON:  I object.  The letter speaks
16   for itself on that issue.
17   Q.  Let me ask the question again I guess.  Do
18   you know if in this letter, was your lawyer asking the
19   company to bring you back to work on June 19?
20   MR. CARLSON:  I object to the form.  I
21   think the letter speaks for itself, and you're asking
22   him to interpret the mind of his lawyer.
23   Q.  I'm just asking what your understanding was
24   in this letter.  Is there anything saying you're going

18  (Pages 69 to 72)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 73

1 to come back to work by June 19?
2     A.  It doesn't state it in there.
3     Q.  Okay.  You agree this isn't a medical note,
4 right?
5     A.  No.
6     Q.  Now, at the time this letter was sent in
7 May, you were seeking workers' compensation benefits,
8 correct?
9     A.  Yes.
10     Q.  In fact, you have your lawyer, and he's
11 sending a letter on your behalf at that time, right?
12     A.  Yes.
13     Q.  Okay.  And that was for your back, right?
14     A.  Yes.
15     Q.  And at the time you were getting the
16 workers' compensation claim, did you indicate you also
17 received short-term disability benefits?
18     A.  What you mean?
19     Q.  Well, did you get some short-term
20 disability benefit payments when you were still employed
21 by the company?
22     A.  Short-term?
23     Q.  Yes.
24     A.  Sun Life, yes.

Page 74

1     Q.  And those were being paid to you in early
2 2017?
3     A.  Yes.
4     Q.  And do you know when they stopped?
5     A.  Not exactly, but it wasn't long.  I think I
6 only maybe received three, four checks maybe.
7     Q.  Okay.  Did those come every month or every
8 couple weeks, do you know?
9     A.  Every month.
10     (Defendant's Exhibit Number 13 was marked
11     for identification.)
12     Q.  I'll show you what's been marked as
13 Exhibit 13, and again these are some emails that you
14 didn't get or you were not copied on, but I'm going to
15 show you these just as a point of reference because they
16 refer to things that you would have maybe done.  But for
17 the record, Exhibit 13 is an email from Dave Stafford
18 dated June 5, 2017, and he's forwarding an email from
19 Scott Becker of that same date.  Do you see the June 5,
20 2017, date?
21     A.  Yes.
22     Q.  Now, there's a reference in the email at
23 the bottom that says:  Jerry Neal came into the office
24 today, June 5, requesting that the company fill out the

Page 75

1 attached paperwork.  Okay?  Do you remember going to the
2 company around June 5 and asking to have some paperwork
3 filled out?
4     A.  I think so, yes.
5     Q.  And attached to this email is some
6 paperwork, and it says Long-Term Disability Claim
7 Packet.  Do you see that?
8     A.  Yes.
9     Q.  Now, so on June 5 would you have come in
10 with this paperwork and asked for the company to help
11 fill it out?
12     A.  I don't remember if I asked them to help me
13 with this.
14     Q.  So with respect to the long-term disability
15 application, do you know if the company did help fill
16 this information out and send it on?
17     A.  I don't know.
18     Q.  Okay.  Did you fill out anything or give
19 anything to your doctor at that time to fill out?
20     A.  No, as far as long-term, no.
21     Q.  Now, as of June 5, 2017, when this was
22 happening, did you understand at that time again your
23 workers' compensation claim was pending, right?
24     A.  Yes.

Page 76

1     Q.  And was it granted or was it under review
2 or do you know what the status was of it?
3     A.  On my workers' comp?
4     Q.  Your workers' comp, yeah.
5     A.  Repeat that question.
6     Q.  Sure.  You know, as of June 5, 2017, what
7 was the status of your workers' compensation claim?
8 Were you getting any workers' compensation benefits, do
9 you know?
10     A.  I can't remember the exact date of that
11 when I was receiving it, June 5.
12     Q.  Do you know if there were any issues with
13 your claim and whether they were granting it or were
14 they investigating it?  Do you know what was going on?
15 If you remember.
16     A.  No.
17     Q.  You don't remember?
18     A.  No.
19     Q.  Okay.  So as of June 5, 2017, you remember
20 coming to the plant, you remember asking for some
21 paperwork to be filled out; is that a fair statement?
22     MR. CARLSON:  I'd object to the form,
23 misstating his prior testimony.
24     Q.  I'm sorry.  We talked about June 5.  You

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 77

1   remember coming into the office around that time to have
2   some paperwork filled out?
3       A.   Yes.
4       Q.   Okay.  As of June 5 again in 2017, you were
5   still subject to those restrictions that the doctor
6   imposed, right?
7       A.   Yes.
8       Q.   And as of June 5, 2017, did you believe you
9   were going to be able to come back to work by June 19?
10      A.   Physically, my body, no, the way I felt.
11      Q.   You were having some pain at that time?
12      A.   Yes.
13      Q.   And you were still getting treatment?
14      A.   Yes.
15           (Defendant's Exhibit Number 10 was marked
16           for identification.)
17      Q.   I'm going to show you what's been marked
18   add Defendant's Exhibit 10.  For the record, this is a
19   document dated June 6, 2017, and it's a completed
20   long-term disability application submitted to Sun Life
21   by the company.  My question is have you ever seen this
22   document before to your knowledge?
23      A.   (Shaking head).
24      Q.   You don't remember seeing this?

Page 78

1       A.   No.
2       Q.   And do you know if this is the information
3   that you asked the company to complete for the
4   application information when you came in on June 5?  Do
5   you know if this is it?  If you know.
6       A.   I don't remember right offhand.
7       Q.   Okay.  You agree on the third or fourth
8   page of the document at the top this refers to this
9   document as a Long-Term Disability Claim Packet.  Do you
10  see that?
11      A.   Yes.
12      Q.   Thanks.  You can set that aside.
13           (Defendant's Exhibit Number 14 was marked
14           for identification.)
15      Q.   Showing you what's been marked as
16  Exhibit 14, this is a letter that actually was sent to
17  you, and it's from Sun Life Financial dated June 23,
18  2017.  Do you see that that's addressed to you?
19      A.   Yes.
20      Q.   And do you remember receiving this
21  document?
22      A.   Yes.
23      Q.   Now, it says in the document in the second
24  paragraph that -- Well, in the first paragraph it refers

Page 79

1   to Sun Life and a short-term disability benefit plan,
2   correct?  Do you see that?
3       A.   Yes.
4       Q.   And then it says in the second paragraph
5   that they cannot approve your claim because the
6   information you provided does not demonstrate you were
7   totally disabled after April 20, 2017.  Do you see that?
8       A.   Yes.
9       Q.   So when you were talking earlier about your
10  short-term disability benefits stopping or being denied,
11  was this the letter you got?
12      A.   Yes.
13      Q.   And did you understand that you have the
14  right to appeal this?
15      A.   No, I didn't then, no.
16      Q.   And there is some information in the letter
17  about appealing it.  Do you remember if you ever
18  appealed this decision?
19      A.   No, I didn't.
20      Q.   Did you take this to anybody to help you
21  with it when you got it, do you know?
22      A.   No.  As far as my short-term, I just
23  thought it was over.
24      Q.   Okay.  You know, after this -- Before

Page 80

1   June 23, 2017, the date June 19, 2017, came and went.
2   Now, you understood from the letter you got earlier from
3   the company that that was the date your employment would
4   be terminated if you were unable to return; is that a
5   fair statement?
6           MR. CARLSON:  Object to form, foundation.
7       Q.   Is that what you understood from the letter
8   you got earlier?
9       A.   Yes, for the 19th, yes.
10      Q.   For June 19?
11      A.   Yes.
12      Q.   And would you agree as of June 19, 2017,
13  that other than the medical note on May 11 that you
14  showed which said no change of status that there was no
15  other medical note from a doctor that was provided to
16  the company, do you know?
17          MR. CARLSON:  I would object to form,
18  foundation, also ignores the work comp and what medical
19  records they had as well, so I object to form.
20      Q.   Okay.  Are you aware of any medical
21  paperwork from your doctors that were sent to the
22  company between May 4, 2017, through June 19, 2017,
23  other than that May 11 doctor's note that we talked
24  about?

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 81

1    A. No.
2    Q. And did you provide any information between
3  May 4 through June 19, 2017, from your doctor to the
4  company showing that your status had changed in any way?
5    A. Say that again.
6    Q. Yeah. That's a bad question. Let me try
7  to ask it differently. You know, between May 4, 2017,
8  through June 19, 2017, did you ever advise the company
9  or did you ever provide the company information from a
10  doctor saying you were going to be able to come back to
11  work by June 19?
12    A. No.
13    Q. Okay. And would you agree as of June 19,
14  2017, that you didn't feel like you could come back to
15  work on that day?
16    A. No.
17    Q. You don't believe you could have come back
18  to work on that day?
19    A. Physically the way I was feeling, probably
20  not at that time.
21    Q. Now, eventually did you find out that the
22  company had processed your employment termination?
23    A. At that time, yes. You mean when I found
24  out?

Page 82

1    Q. How did you find out?
2    A. I had to call Dave Schaefer over the phone.
3    Q. Is that Dave Stafford?
4    A. Stafford, I think so.
5    Q. And prior to calling him, did you come to
6  the plant?
7    A. Yes.
8    Q. And do you know what day you came in?
9    A. I know it was on a Monday. It was on a
10  Monday, the following Monday I think.
11    Q. And do you remember who you talked to when
12  you came in?
13    A. On that Monday? Yeah, I talked to Mark
14  Nemechek and -- No, I talked to Scott that morning, that
15  Monday morning, and he gave me Dave Schaefer's number.
16  What's his name? I'm sorry.
17    Q. Dave Stafford?
18    A. Stafford, I'm sorry.
19    Q. That's okay.
20    A. He gave me a number to contact and call
21  Dave Stafford.
22    Q. And did you bring in a medical note that
23  day? Had you seen a doctor around that time?
24    A. Yes.

Page 83

1    (Defendant's Exhibit Number 16 was marked
2    for identification.)
3    Q. Okay. I'm going to show you what has been
4  marked as Exhibit 16. I apologize because this has got
5  that same medical note that you can't read on the second
6  page, but you can kind of read it. I mean, do you agree
7  that the second page of Exhibit 16 has a medical note on
8  it? Go ahead and look at this one on Exhibit 16. At
9  the top of it, can you make out the date that's on
10  there?
11    A. I can see 6/22/17.
12    Q. Yeah. Does it look like it says June 22,
13  2017?
14    A. Yes.
15    Q. And you agree this is your doctor?
16    A. Yes.
17    Q. Dr. Gornet?
18    A. Yes.
19    Q. Okay. Now, if you look at the first page
20  of the email, the email is dated June 26, 2017, at
21  2:23 p.m., and it says: Jerry dropped this off today,
22  Monday, 6/26/2017 at 2:00 p.m. Do you see that?
23    A. Yes.
24    Q. Do you have any reason to dispute that that

Page 84

1  was the day you came to the facility to drop off this
2  note?
3    A. Can you say that last part again? I was
4  reading.
5    Q. No, that's okay. According to the email --
6  and I know you weren't on this email -- Scott Becker is
7  saying that you dropped off this doctor's note on
8  Monday, June 26, correct?
9    A. Yes.
10    Q. And did you come in that day? Is that the
11  day you think you came in?
12    A. Yes.
13    Q. And he says you came in around 2:00 p.m. in
14  the afternoon. Does that sound right to you?
15    A. I'm not for sure what time.
16    Q. Okay. And according to Scott Becker, he
17  said he explained to you that you needed to call Dave
18  Stafford tomorrow at 8:00 a.m. Do you remember him
19  telling you that?
20    A. Yes.
21    Q. So he told you to call Dave?
22    A. Yes.
23    Q. Did he tell you anything about your
24  employment status at that time?

21 (Pages 81 to 84)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 93

1    Q.  It's the third sentence where it says "We
2    are" at the beginning, if you want to read that again.
3    Do you see that sentence?
4        A.  Up here at the top?
5        Q.  Yeah, first paragraph.  And you agree that
6    the company is telling you there that unless you're able
7    to return to work, your employment and company-provided
8    benefits will end on June 19, 2017.  Do you see that?
9        A.  Yes.
10       Q.  And do you see that before that, it says
11   "pursuant to company policy," right, right in the middle
12   of that sentence?
13       A.  Yes.
14       Q.  So you understood when you got this letter
15   the company was telling you that they had a policy that
16   they were enforcing that would end your employment on
17   June 19 unless you were able to come back to work?
18           MR. CARLSON: I object to form, foundation.
19       Q.  Is that what you understand or understood
20   when you got that letter?
21           MR. CARLSON: It also leaves out the second
22   paragraph, so I just object to form and foundation.
23       A.  So are you asking me did I understand it?
24   No, I didn't understand that I was going to be

Page 94

1    terminated.
2        Q.  And we talked about the second paragraph
3    before.  The other thing you could do is contact Amber
4    Randall to talk about accommodations to get back to
5    work.  Would you agree that's also in the letter?
6        A.  Yes.
7        Q.  I'm going to have you look at Exhibit 5.
8    If you go to the very last page of that, and you can see
9    this is a short-term disability policy.  It says that at
10   the very top, correct?
11       A.  Yes.
12       Q.  And did you understand that short-term
13   disability is something that goes for 26 weeks if you're
14   unable to work due to a disability?
15       A.  I know I wasn't aware of the timing of it,
16   of short-term disability.
17       Q.  And if you go to the bottom of that policy
18   in that last paragraph, in the second sentence it
19   says -- Do you see where it says "If you do not"?
20       A.  Yes.
21       Q.  It says: If you do not return to work when
22   your STD leave ends, your employment will be terminated
23   unless you are otherwise entitled to unpaid leave under
24   the Federal Family and Medical Leave policy.  Do you see

Page 95

1    that?
2        A.  Yes.
3        Q.  Okay.  Do you remember ever looking at this
4    policy or reading this policy when you got the policy
5    manual?
6        A.  No.
7        Q.  Okay.  Do you know of any employee at the
8    Cahokia facility who was off work for 26 weeks and did
9    not get terminated?
10       A.  No.
11       Q.  During your employment and prior to
12   June 19, did you ever make any complaints to anybody
13   within the company that you felt you were being treated
14   adversely because you had a workers' compensation claim?
15       A.  That's how I felt.  I probably never stated
16   it to no one in the company, but personal feelings, yes.
17       Q.  Okay.  But you never reported it to anybody
18   in the company?
19       A.  No.  The way that I feel?
20       Q.  Yes.
21       A.  About the workers' comp, no, because I
22   barely had contact with anybody at the company during
23   the time I was off.
24       Q.  You had contact with Mark Nemechek and

Page 96

1    Scott Becker, though, right?
2        A.  Well, Scott -- Well, yes, if I go up there
3    to turn my paperwork in.
4        Q.  Now, in this case, I understand you're
5    claiming some damages, and I have a statement of your
6    damages which are in your responses to interrogatories,
7    Exhibit 2.  Other than the money part of it, are you
8    claiming that you have emotional or mental distress from
9    this?
10       A.  Yes.
11       Q.  What kind of emotional or mental distress
12   are you claiming?
13       A.  I have a lot of emotional distress, not
14   being able to pay my bills, not able to sleep, not
15   knowing where -- like how we gonna go grocery shopping
16   for food, you know, repossession of car, I lost my
17   insurance, I couldn't maintain my automobile insurance,
18   just a lot, just a lot.
19       Q.  Did you ever go to a doctor for any
20   emotional or mental distress issues?
21       A.  No, I didn't ever go to no doctor.  It was
22   just more me and my wife talking.
23       Q.  Okay.  Have you ever been diagnosed as
24   having depression or anything like that?

24  (Pages 93 to 96)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JERRY NEAL, JR.,                           )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )          No. 3:21-cv-00820-GCS
                                           )
LOUIS DREYFUS COMPANY                      )
SERVICES LLC,                              )
                                           )
                    Defendant.             )

## DECLARATION OF AMY KHATIB

COMES NOW the Declarant, Amy Khatib, and declares as follows:

1.      My name is Amy Khatib and I am the Health and Insured Benefits Manager for Louis Dreyfus Company Services LLC (the "Company") in Wilton, Connecticut.  I have been employed with the Company for over 33 years.  I have personal knowledge of the facts set forth in this Declaration and am authorized to submit this Declaration on behalf of the Company.

2.      In my position as Health and Insured Benefits Manager, I maintain policies, plans and records relating to the Company's employee benefit programs including records addressing long-term disability (LTD) and short-term disability (STD) benefits.  I can testify competently as to the content of these policies, plans and records as well as the facts set forth in this Declaration.  The attached documents are recorded and kept as a regular business practice by the Company and I am the custodian of these records.

3.      I am familiar with the Plaintiff Jerry Neal who was employed at the Company's facility in Cahokia, Illinois.  During his employment, Mr. Neal pursued various claims for benefits including workers compensation, STD and LTD benefits.

Exhibit

2

4.      After an injury in late 2016, Mr. Neal commenced a leave of absence on December 20, 2016 that extended through his employment separation effective June 19, 2017.

5.      During his medical leave, Mr. Neal filed claims for STD and LTD benefits and also filed a claim for workers compensation benefits with our insurance carrier.  STD leave is available for up to 26 weeks.  After 26 weeks of leave, the employee is subject to termination and all employee benefits will end unless the employee is able to return to work with or without reasonable accommodations.  Attached as Exhibit 3 is a true and correct copy of the Company's STD Disability and Workers Compensation policies.  The policy which addresses termination after 26 weeks of leave has existed throughout my 33 years of employment with the Company and has been consistently followed.  The 26-week leave policy applies to all employees regardless of whether their leave of absence arises from a work-related injury.

6.      During Mr. Neal's employment with the Company, STD and LTD benefits were administered by Sun Life Financial ("Sun Life"), the Company's third-party administrator.  Sun Life administered the Company's disability plans and communicated directly with employees regarding the approval and payment of benefits.  I facilitate the filing of STD and LTD claims and track the processing and payment of claims.  I am also responsible for sending notices to employees when it appears that their leave of absence may extend beyond 26 weeks.

7.      During Mr. Neal's medical leave, he applied for and received STD benefits. Although STD benefits are generally available to employees with non-occupational injuries, STD benefits may be payable to employees while a workers compensation claim is pending. This allows the employee to receive income during leave and while a determination is being made regarding their workers compensation claim.

8.      On May 4, 2017, I sent a written notice to Mr. Neal informing him of the Company's leave policy and the fact that his employment and all Company benefits would end on June 19, 2017 unless he was able to return to work.  I further advised Mr. Neal that he could apply for LTD benefits if he was unable to return.  In the letter, he was instructed to contact the Company if he was seeking accommodations that would allow him to return to work and perform his essential job functions.  Attached as Exhibit 4 is a true and correct copy of my May 4, 2017 letter to Mr. Neal.

9.      After sending my letter, I was notified that Mr. Neal came to the Cahokia facility in early June 2019 seeking assistance to fill out an application for LTD benefits.  I helped process his application which was approved by Sun Life for the time period of June 18, 2017 through August 31, 2017.

10.      Attached as Exhibits to this Declaration are true and correct copies of the following STD and LTD records relating to Mr. Neal:

| Exhibit | Description |
|---------|-------------|
| 5 | January 3, 2017 STD claim for Jerry Neal |
| 6 | June 6, 2017 LTD claim for Jerry Neal |
| 7 | July 27, 2017 letter to Jerry Neal approving LTD benefits |

11.      On July 26, 2017, I reached out to Dave Stafford, Sr. Regional Human Resources Manager to process Mr. Neal's termination because he was unable to return to work as of June 19, 2017.  Dave Stafford reached out the Cahokia facility and confirmed that Mr. Neal had not contacted anyone about returning to work nor did he request accommodations that would allow him to return to work.  Mr. Stafford then processed Mr. Neal's termination on June 26, 2017 before 10:52 a.m. for the reason that Mr. Neal was "unable to return from leave."  Attached as

Exhibit 8 is a true and correct copy of my email communications with Mr. Stafford during the morning of June 26, 2017.

12.     Mr. Stafford later confirmed Mr. Neal's termination by letter dated June 28, 2017. The termination was effective June 19, 2017.  A true and correct copy of the June 28, 2017 termination letter is attached as Exhibit 9.


I declare under penalty, pursuant to 28 U.S.C. § 1746, that the above statements are true and correct.

Dated this 17th day of February 2023.


_____
Amy Khatib

**SHORT TERM DISABILITY**

Short Term Disability (STD) Insurance is intended to provide income to you for up to 26 weeks if you are unable to work due to a disability.

**QUALIFYING FOR BENEFITS**

If you are a regular full-time employee, you are eligible for STD benefits upon your date of hire. You are eligible to receive STD benefits if you are absent from work and under the care of a physician as the result of a non-occupational illness or injury. STD benefits are not payable until after you have been absent from work for seven consecutive calendar days, unless you are a full-time inpatient in a hospital, in which event STD benefits are payable from the first day of your confinement.

**PROGRAM PAY**

The program will pay you an STD benefit equal to 60 percent of your basic weekly earnings, but not more than $150 per week. Your basic weekly earnings are determined by averaging your weekly earnings (excluding overtime, bonuses or commissions) for eight weeks immediately preceding the pay period in which your disability absence began.

**DURATION OF BENEFITS**

STD benefits are payable up to 26 weeks for any one period of disability. STD benefits will end sooner if you are able to return to work or you begin working elsewhere. If you are covered under the group insurance program, you will continue to be covered during your leave on the same basis as during your active employment. However, while you are on leave, you must make all employee contributions required for any coverage you have elected under the group insurance program. If you participate in a Flexible Spending Account (FSA) plan, your coverage under the FSA plan will be suspended until your contributions are paid.

**LIMITATION ON COVERAGE**

No STD benefits are payable for a day during which you do any work for pay or profit or for an illness or injury for which you are not under the care of a physician. You must have been seen in person or treated by a physician to be deemed under his or her care.

**PROCEDURES**

Contact your Human Resources representative to obtain the proper forms to apply for STD benefits or the Health and Insured Benefits Department in Wilton, Connecticut. If you do not return to work when your STD leave ends, your employment will be terminated, unless you are otherwise entitled to unpaid leave under the Federal Family and Medical Leave policy. Your STD leave runs concurrently with any leave you may be entitled to under the Federal Family and Medical Leave policy. If applicable, you must apply for Family and Medical Leave on separate forms provided by your Human Resources representative.

4.08

Exhibit
3

LDC0038

**WORKERS' COMPENSATION**

In the event that you suffer a work-related injury or illness, the Company's workers' compensation insurance will cover your medical expenses and may provide income replacement benefits during absences. The amount and duration of benefits depend on the nature of your injury or illness.

You must immediately report any on-the-job injury or possible work-related illness, however minor, to your supervisor. This ensures that the Company will be able to assist you in obtaining appropriate medical treatment and benefits and take any measures which may be necessary for the safety of your co-workers. Your failure to follow this procedure may delay payment of benefits under workers' compensation insurance and/or subject an employee to disciplinary action up to and including termination.

If you are unable to work because of such injury or illness and provided you meet the requisite eligibility criteria, you may also be entitled to continued salary under the Paid Time Off policy or partial salary continuation under the Short Term Disability policy. If so, for each week these benefits are paid, the amount of your workers' compensation income benefit will be deducted from the sick pay or disability benefit payable to you. If you are eligible for salary continuation, you are required to submit copies of all workers' compensation checks received to the Payroll Department in Connecticut.

If you are unable to work because of such injury or illness, you may be eligible for compensation from the Company's workers' compensation carrier. In other words, leaves under all applicable policies and programs run concurrently. Your group insurance coverage and other employee benefits will continue as long as you are medically unable to work, up to a maximum of 26 weeks. However, while you are on leave, you must make all employee contributions required for any coverage you have elected under the group insurance program. If your group health insurance coverage ends, you and your family will be offered continued health insurance coverage at your own expense.

Your ability to return to work following a period of injury or illness will be determined in accordance with workers' compensation and other applicable state and federal laws and Company policies.

Questions regarding workers' compensation should be directed to the Company's Insurance Department located in Connecticut.

7.03

LDC0050



Louis Dreyfus Company

Louis Dreyfus Company Services LLC
40 Danbury Road
PO Box810
Wilton, Connecticut
06897-0810
United States

Health and Insured Benefits

May 4, 2017

Mr. Jerry Neal
532 St. James
Cahokia, IL  62206

Dear Mr. Neal:

You have been absent from work since December 20, 2016. During your absence, the Company has continued to provide benefits, including health care coverage, to you and your family. We are writing to inform you that, pursuant to Company policy, your employment and all Company provided benefits will end on June 19, 2017, unless you are able to return to work. If you are unable to return to work, you may be eligible for long-term disability (LTD) benefits. Sun Life has told us that they will be sending you the LTD claim form.

If you believe you are disabled under the Americans with Disabilities Act or other applicable laws and would like to discuss potential accommodations that may allow you to return to work and perform the essential functions of your job or otherwise continue your employment, please contact Amber Randall, at 816 412-2779, on or before June 19, 2017. You will need to provide current medical documentation from your physician concerning your return to work status and any work-related restrictions prior to meeting with her. If you do not contact Amber, the Company will presume that you do not intend to return to work and your employment separation will be deemed effective as of June 19, 2017.

If your group insurance coverage ends, you will receive: (1) a notice describing your right under COBRA to continue health care coverage at your own expense, and (2) applications for life insurance premium waiver and conversion to an individual life insurance policy. You may call 203-761-4702, if you have any questions regarding group insurance coverage.

If you are unable to return to work, you may want to consider applying for Social Security disability benefits.  You may obtain a number for your local Social Security office by calling 800 772-1213.

If you have any questions about this letter, please call me at 203-761-4702 or write to me at the above address.

Sincerely,

Amy A. Khatib
Health and Insured Benefits Manager

cc:  D. Stafford
     J. Murphy
     A. Randall

Exhibit
4

LDC0230

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Jerry Neal
532 St James
Cahokia, IL  62206

9590 9402 1256 5246 6795 55

2. Article Number (Transfer from service label)

7014 3490 0001 2755 7700

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Jerry Neal*   ☐ Agent   ☒ Addressee

B. Received by (Printed Name)   C. Date of Delivery

*Jerry Neal*   5/10/17

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

---

**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL US

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  Jerry Neal
Street & Apt. No., or PO Box No.  532 St James
City, State, ZIP+4  Cahokia, IL  62206

PS Form 3800, July 2014   See Reverse for Instructions

7014 3490 0001 2755 7700

LDC0231

01-03-17;05:38PM;                                           ;16182227281              # 1/ 7

# Sun Life Assurance Company of Canada
## SunAdvisor Claim Packet


Sun
Life Financial®

### Section B: Attending Physician's Statement

**1 Information About the Patient**

Please print clearly

Return to:
SunAdvisor
P.O. Box 81915
Wellesley Hills, MA 02481
Fax: (781) 304-5519

The patient is responsible for any costs associated with the completion of this form.

| Name of Patient (first, middle initial, last)  ☒ M  ☐ F | Social Security number  0655 | Date of birth (m/d/y)  81 |
|---|---|---|
| Jerry Neal | | |
| Name of Employer | Agreement number | Employee phone no. |

**2 Diagnosis and History**

Provide general information about diagnosis and history in this section. Then, please elaborate in section(s) 3 – 6 as appropriate.

Diagnosis including any complications and ICD-9 Codes(s)   Low Back Pain

Objective findings (i.e. x-rays, EKGs, MRIs, laboratory data and any other clinical findings)
Back tenderness

Subjective Symptoms   Low Back Pain

Date symptoms first appeared or date of accident  10/4/16        Date Disability Commenced  X 4/22/16

Has patient ever had same or similar condition? ..... ☐ Yes  ☒ No    If Yes, when:

Is condition due to injury/sickness arising out of patient's employment?..... ☐ Yes  ☐ No  ☒ Unknown

Names and telephone numbers of Other Treating Physicians (if applicable)

If pregnancy, please provide the following information:
• Expected delivery date: _____   • Actual delivery date: _____   • C-Section?  ☐ Yes ☐ No
Describe any complications that would extend this disability longer than a normal pregnancy

**3 Treatment**

Include in description any surgery, therapeutic modalities, psychological intervention and medications prescribed.

| Date of first visit  X 4/22/16 | Date of last visit  1/3/17 | Date of last examination  1/3/17 |
|---|---|---|

Frequency of treatment............ ☐ Weekly  ☐ Monthly  ☐ Other (please specify): 3 WKS.

Description of Treatment
Medication + Physical Therapy.

**4 Progress**

Has patient: ................ ☐ Recovered  ☒ Unchanged  ☐ Improved  ☐ Retrogressed
Is patient: .................... ☒ Ambulatory  ☐ Bed confined  ☐ House confined  ☐ Hospital confined

If unchanged or retrogressed, please explain: Pt will start Physical Therapy.

Has patient been hospital confined?......... ☐ Yes  ☒ No    From:          To:
If yes, provide name and address of hospital

XGR/847   •   SunAdvisor Claim Packet                    Page 3 of 9

Exhibit
5

LDC0153

USSLF RF106 PRD2    1/10/2017 5:33:51 PM    PAGE    37008    Fax Server

01-03-17;05:38PM;    ;'6182227281    # 2/ 7

## 5 Restrictions and Limitations

Restrictions and Limitations should be associated with the Objective and Subjective findings/symptoms noted in section 2.

**Restrictions (what the patient should not do)**
No lifting over 10 I bs,

**Limitations (what the patient cannot do)**
No pushing or carrying over 10 I bs,

Is the patient capable of working within these restrictions/limitations? .................. ☒ Yes ☐ No
Can the patient work an eight-hour day with these restrictions/limitations? .................. ☒ Yes ☐ No
If no, how many hours could he/she work? .................. _____ hours
Is patient capable of working in another occupation?    ☐ Yes - Full-time ☐ Yes - Part-time ☐ No

Indicate class of impairment – As defined in federal dictionary of occupation titles

**Physical Impairment**
☐ Class 1 – No limitation          ☐ Class 4 – Moderate limitation
☐ Class 2 – Slight limitation      ☐ Class 5 – Severe limitation
☒ Class 3 – Medium limitation

**Mental Impairment (if applicable)**          **Current DSM diagnosis**
☐ Class 1 – No limitation
☐ Class 2 – Slight limitation
☐ Class 3 – Moderate limitation
☐ Class 4 – Marked limitation
☐ Class 5 – Severe limitation

Do you believe this patient is competent to endorse checks/direct the use of proceeds? ☐ Yes ☐ No

## 6 Return-to-Work

1. When will patient recover sufficiently to perform duties? (Specify date or check recovery period)
   - Patient's occupation part-time:    unknown.
     Date: _____ -or- ☐ < 3 wks ☐ 3-4 wks ☐ 6-6 wks ☐ 7-8 wks ☐ 2 months or more ☐ Never
   - Patient's occupation full-time:
     Date: _____ -or- ☐ < 3 wks ☐ 3-4 wks ☐ 6-6 wks ☐ 7-8 wks ☐ 2 months or more ☐ Never

2. After reviewing the material and substantial duties of the patient's occupation, would you recommend vocational counseling and/or rehabilitation or job modification? ...... ☐ Yes ☐ No

## 7 Certification and Signature

Remember to provide your full address and Tax ID number.

A stamp or signature of a person other than the examining physician is not acceptable.

I certify that the above statements are true and complete. I have read or had read to me the fraud warning for my state.

| Name of Attending Physician | Degree/Specialty |
|---|---|
| Nidal Shawahin | Internal medicine |

| Street address | City | State | Zip Code |
|---|---|---|---|
| 4600 memorial dr. Ste 300 | Belleville | IL | 62226 |

| Tax ID number | Telephone number | Fax number |
|---|---|---|
| 37-1595406 | (618-322-7280 | (618-322-7281 |

| Attending Physician Signature | Date |
|---|---|
| X _Shawahin_ | 1/3/17 |

LDC0154

# Sun Life Assurance Company of Canada
SunAdvisor Claim Packet


Sun Life Financial®

## Fraud Warnings

State law requires that we notify you of the following:

**General fraud warning:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**AK:** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**AL:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**AR, LA, MA, MN, NM, RI, TX and WV:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**AZ:** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**CA:** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**CO:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**DC:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**DE, ID and IN:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**FL:** Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

## ▌Fraud Warnings continued

**KS:** Any person who knowingly and with intent to defraud any insurance company or other person files an Application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto may be guilty of insurance fraud as determined by a court of law.

**KY:** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**MD:** Any person who knowingly OR willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly OR willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**ME, TN and WA:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**NH:** Any person who, with a purpose to injure, defraud, or deceive any insurance company, files a statement of claim containing any false, incomplete, or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**NJ:** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**OH:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**OK: WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**OR and VA:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may have violated state law.

**PR:** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**VT:** Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

LDC0156

USSLF RF108 PRD2    1/10/2017 5:33:51PM    PAGE    6/008    Fax Server

01-03-17;05:38PM;                                              ;16182227281          # 5/ 7

# Sun Life Assurance Company of Canada


Sun
Life Financial®

**Authorization for Release and Disclosure of Health Related Information**

This Authorization complies with the HIPAA Privacy Rule. It is important for you to read, sign and submit all Authorizations in this packet. Failure to submit all Authorizations could result in a delay during the claims process.

Return to:
Sun Life Assurance Company of Canada
P.O. Box 81915
Wellesley Hills, MA 02481
Fax: (781) 304-5519

I HEREBY AUTHORIZE any physician, health care provider, health plan, medical professional, hospital, clinic, laboratory, pharmacy benefit manager or other medical or healthcare facility that has provided payment, treatment or services to me or on my behalf, to disclose my entire medical record and any other protected health information concerning me to the Claims Department of Sun Life Assurance Company of Canada ("the Company") its subsidiaries, affiliates, third party administrators and reinsurers.

I understand that such information may include records relating to my physical or mental condition such as diagnostic tests, physical examination notes and treatment histories, which may include information regarding the diagnosis and treatment of human immunodeficiency virus (HIV) infection, sexually transmitted diseases, mental illness and the use of alcohol, drugs and tobacco, but shall not include psychotherapy notes.

By my signature below, I acknowledge that any agreements I have made to restrict my protected health information do not apply to this Authorization, and I instruct any physician, health care professional, hospital, clinic, medical facility or other health care provider to release and disclose my entire medical record without restriction.

I understand that the Company will use the information it obtains to: (a) underwrite my application for coverage, (b) make eligibility, risk rating, policy issuance and enrollment determinations; (c) obtain reinsurance; (d) administer claims and determine or fulfill responsibility for coverage and provision of benefits; (e) administer coverage; and/or (f) conduct other legally permissible activities that relate to any coverage I have or have applied for with the Company.

I understand that the Company will not disclose information it obtains about me except as authorized by this Authorization; as may be required or permitted by law; or as I may further authorize. I understand that if information is redisclosed as permitted by this Authorization, it may no longer be protected by applicable federal privacy law.

I understand that: (a) this Authorization shall be valid for 24 months from the date I sign it; (b) I may revoke it at any time by providing written notice to Sun Life Financial, SunAdvisor Claims, SC 4312, One Sun Life Executive Park, Wellesley Hills, Massachusetts, 02481, subject to the rights of any person who acted in reliance on it prior to receiving notice of its revocation; and (c) my authorized representative and I are entitled to receive a copy of the Authorization upon request.

A copy of this Authorization shall be as valid as the original.

| Print Name of Employee or Personal Representative of Employee | Group Policy Number |
|---|---|
| If Representative, description of your authority or relationship to employee | |
| Signature of Employee or Personal Representative<br>X  _Jecus-Kool_ | Date<br>12/20/16 |

LDC0157

USSLF RF106 PRD2    17I0/2017 5:33:51 PM    PAGE    7/008    Fax Server

01-03-17;05:38PM;                                      ;16'82227281        # 6/ 7

# Sun Life Assurance Company of Canada


Sun Life Financial®

**Authorization for Release and Disclosure of Psychotherapy Notes**

This Authorization complies with the HIPAA Privacy Rule. It is important for you to read, sign and submit all Authorizations in this packet. Failure to submit all Authorizations could result in a delay during the claims process,

Return to:
Sun Life Assurance Company of Canada
P.O. Box 81915
Wellesley Hills, MA 02481
Fax: (781) 304-5519

I HEREBY AUTHORIZE any: physician, health care provider, health plan, medical professional, hospital, clinic, or other medical or health care facility that has provided payment, treatment or services to me or on my behalf; to disclose any psychotherapy notes relating to me to the Claims Department of Sun Life Assurance Company of Canada ("the Company") its subsidiaries, affiliates, third party administrators and reinsurers,

By my signature below, I acknowledge that any agreements I have made to restrict my protected health information do not apply to this Authorization, and I instruct any physician, health care professional, hospital, clinic, medical facility or other health care provider to release and disclose all psychotherapy notes relating to me without restriction.

I understand that the Company will use the information it obtains to: (a) underwrite my application for coverage; (b) make eligibility, risk rating, policy issuance and enrollment determinations; (c) obtain reinsurance; (d) administer claims and determine or fulfill responsibility for coverage and provision of benefits; (e) administer coverage; and/or (f) conduct other legally permissible activities that relate to any coverage I have or have applied for with the Company,

I understand that the Company will not disclose information it obtains about me except as authorized by this Authorization; as may be required or permitted by law; or as I may further authorize. I understand that if information is redisclosed as permitted by this Authorization, it may no longer be protected by applicable federal privacy law.

I understand that:  (a) this Authorization shall be valid for 24 months from the date I sign it; (b) I may revoke it at any time by providing written notice to Sun Life Financial, SunAdvisor Claims, SC 4312, One Sun Life Executive Park, Wellesley Hills, Massachusetts, 02481, subject to the rights of any person who acted in reliance on it prior to receiving notice of its revocation; and (c) my authorized representative and I are entitled to receive a copy of the Authorization upon request.

A copy of this Authorization shall be as valid as the original.

| Print Name of Employee or Personal Representative of Employee | | Group Policy Number |
|---|---|---|
| If Representative, description of your authority or relationship to employee | | |
| Signature of Employee or Personal Representative | | Date |
| X *[signature]* | | 12/30/16 |

LDC0158

0'-03-17;05:38PM;                                    ;16182227281        # 7/ 7

Sun Life Assurance Company of Canada
Wellesley Hills, MA 02481
1-888-238-4230


Sun
Life Financial®

## PRIVACY INFORMATION NOTICE

This notice explains why Sun Life Assurance Company of Canada ("the Company") collects personal information about you,
how we use that information, and under what circumstances we disclose it to others.

### COLLECTION OF INFORMATION
We need to obtain information about you to determine whether we can provide the insurance benefits you have requested. As part
of the claims process, we may ask you to undergo a physical examination, submit a statement from your physician, or provide
copies of medical tests or other information relating to your health, finances and activities.

We also may collect information about you from other sources. By signing the Authorization For Release And Disclosure of
Health Related Information and/or the Authorization For Release And Disclosure of Psychotherapy Notes, you authorize us to
obtain medical information about you that we need to underwrite your application or to evaluate your claim. Depending upon
your particular circumstances, we may collect additional information about you from the following sources:
- Physicians, health care providers, medical professionals, hospitals, clinics or other medical or health care related facilities
- Other insurance companies you have applied to for insurance
- Public records, such as Social Security and tax records

### DISCLOSURE OF PERSONAL INFORMATION
When you sign the Authorization For Release And Disclosure of Health Related Information and/or the Authorization For
Release And Disclosure of Psychotherapy Notes, you authorize us to disclose information we have about you:
- To our reinsurers
- As required or permitted by law

In the course of the claims process, we may need to disclose information about you to others. The law permits us to disclose such
information, without obtaining authorization from you, to:
- Companies that help us conduct our business or perform services on our behalf
- Your physician or treating medical professional
- Comply with federal, state or local laws, respond to a subpoena or comply with an inquiry by a government agency or
  regulator

### ACCESS, CORRECTION AND AMENDMENT OF PERSONAL INFORMATION
Upon written request to the Company, you can:
- Obtain a copy of the personal recorded information we have about you in our files (a fee may be charged to cover the cost of
  providing a copy of such information)
- Request that we correct, amend or delete any recorded personal information about you in our possession
- File your own statement of facts if you believe that the recorded personal information we have about you is incorrect

To take any of these actions, please contact us at the following address for further instructions:
Sun Life Assurance Company of Canada
SunAdvisor Claims
P.O. Box 81915
Wellesley Hills, MA 02481

Sun Life Assurance Company of Canada is a member of the Sun Life Financial group of companies.
© 2015 Sun Life Assurance Company of Canada, Wellesley Hills, MA 02481, All rights reserved.
Sun Life Financial and the globe symbol are registered trademarks of Sun Life Assurance Company of Canada.

LDC0159



Louis Dreyfus Company     Telephone 203 761-4702
40 Danbury Road          Fax 203 761-4715
Wilton, Connecticut
06897-0810

*Amy Khatib*
*Health and Insured Benefits*

## Fax Transmittal

| | | | |
|---|---|---|---|
| To | Sun Life<br>LTD | From | Amy Khatib |
| Fax | 781 304-5537 | Date | June 6, 2017 |
| RE | J. Neal<br>Policy Number: 242104 | Pages | 5   Including cover |

Attached is a LTD claim for our insured Jerry Neal. Mr. Neal is currently receiving STD benefits under claim number 040117-02665-00.

Please let us know if we need to provide you with any additional information.

Thank you in advance for your attention to this claim.

Amy Khatib
Health and Insured Benefits Manager

This fax communication is intended of the use of the individual to whom it is addressed and may contain information that is proprietary, confidential, or privileged. If you are not the intended recipient (and/or employee or agent responsible for delivering this communication to the intended recipient), you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender by telephone immediately and return it to the sender by mail. Sender will reimburse you for any expense incurred. Thank you. If any problems occur during transmission please call 203 761-4708 or 203 761-4702.

Exhibit
6

LDC0240

# FAX CONFIRMATION

**Result: Success**

## Sent by:

| | |
|---|---|
| Name: | Walkup |
| Voice Number: | |
| Fax Number: | |
| RightFax ID: | WALKUP |

## Sent to:

| | |
|---|---|
| Name: | Fax User |
| Company: | |
| Number/Address: | 917813045537 |
| Voice Number: | |
| Remote CSID: | USSLF RF106 PRD1 |

---

**LDC.**
Louis Dreyfus Company

Louis Dreyfus Company
40 Danbury Road
Wilton, Connecticut
06897-0810
Telephone 203 761-4700
Fax 203 761-4715

*Amy Khatib*
*Health and Insured Benefits*

Fax Transmittal

| | | | |
|---|---|---|---|
| To | Sun Life LTD | From | Amy Khatib |
| Fax | 781 304-5537 | Date | June 6, 2017 |
| RE | J. Neal Policy Number: 242104 | Pages | 5 including cover |

Attached is a LTD claim for our insured Jerry Neal. Mr. Neal is currently receiving STD benefits under claim number 040117-02665-00.

Please let us know if we need to provide you with any additional information.

Thank you in advance for your attention to this claim.

Amy Khatib
Health and Insured Benefits Manager

This fax communication is intended of the use of the individual to whom it is addressed and may contain information that is proprietary, confidential, or privileged. If you are not the intended recipient (and/or employee or agent responsible for delivering this communication to the intended recipient), you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender by telephone immediately and return it to the sender by mail. Sender will reimburse you for any expense incurred. Thank you. If any problems occur during transmission please call 203 761-4700 or 203 761-4702.

## Details:

| | |
|---|---|
| Type: | FAX |
| Cover Sheet: | does not have a cover page |
| Body Pages: | 6 |
| Billing Code #1: | |
| Billing Code #2: | |
| Unique ID: | WAL5936DEB35FE7 |
| Fax Channel: | 1 |
| Scanning Device: | |
| Scanned at: | 06/06/17 16:56:07 |
| Submitted at: | 06/06/17 16:56:18 |
| Completed at: | 06/06/17 16:56:21 |

LDC0241

## Job Notification
**Success**

**HP Digital Sending Software**

**Page 1**

The following job has been successfully delivered to the specified destinations or intermediate server.

Original Job Details

```
Device Name: HP LaserJet M3035 MFP - 10.10.32.21
User:
Date: Jun/6/2017 4:56:05 PM (-0400 GMT)
Scanned Pages: 6
```

Destination

| | |
|---|---|
| 917813045537 | Success |

Additional Details

No additional details available.

English (United States)

LDC0242

571

# Sun Life Assurance Company of Canada
## Long Term Disability Claim Packet - Employer


Sun
Life Financial®

**Instructions for the Plan Administrator**

Please call our Customer Service Center at 1-800-247-6875 from 8 a.m. to 8 p.m. Eastern Time to report any scheduled or actual return-to-work dates as soon as possible.

Please make sure that the employee initiates the Long Term Disability claim filing process as soon as it first appears that his or her disability will extend beyond the required elimination period. Please refer to your group insurance policy to determine the length of the elimination period.

### Please be sure to submit the Employer's Statement directly to Sun Life Financial.

#### The Employer must:

☐ Attach a copy of the LTD enrollment form if the employee contributes to the premium.

☐ Attach copies of employee's medical information relating to the disability (if available).

☐ Attach a copy of the employee's formal job description or a detailed description of primary duties.

☐ Attach a copy of all payroll documentation and attendance records for the last six months.

☐ If Waiver of Premium claim, attach the Basic and/or Optional enrollment form, payroll record and other required documentation.

#### NOTE:

FOR TRANSITION CLAIMS: If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes on page 4. Then complete the rest of the Employer portion of this claim packet.

FOR NON-TRANSITION CLAIMS: Fill out the entire Employer portion of this packet.

Mail or fax the completed claim form to:

Sun Life Assurance Company of Canada
Group Long Term Disability Claims
P.O. Box 81830
Wellesley Hills, MA 02481
Fax: (781) 304-5537

**Failure to provide complete and accurate information could result in the need for additional claims investigation which could delay the initial benefit payment.**

LDC0243

# Sun Life Assurance Company of Canada
## Long Term Disability Claim Packet - Employer



**Sun**
**Life Financial®**

---

### ▍Fraud Warnings

State law requires that we notify you of the following:

**Fraud warning:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Fraud warning—AK:** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**Fraud warning—AL:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Fraud warning—AR, LA, MA, MN, NM, RI, TX, and WV:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Fraud warning—AZ:** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Fraud warning—CA:** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Fraud warning—CO:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Fraud warning—DC:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Fraud warning—DE, ID, and IN:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**Fraud warning—FL:** Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

**Fraud warning—KS:** Any person who knowingly and with intent to defraud any insurance company or other person files an Application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto may be guilty of insurance fraud as determined by a court of law.

---

LDC0244

574

# Sun Life Assurance Company of Canada
# Long Term Disability Claim Packet - Employer


Sun Life Financial®

## Employer's Statement

### 1 General Information

Please print clearly.

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

Return to:
Sun Life Assurance
Company of Canada
Group LTD Claims,
SC 4328
1 Sun Life Exec. Park
P.O. Box 81830
Wellesley Hills, MA 02481
Fax: (781) 304-5537

| Name of employer | Group policy number | Class |
|---|---|---|
| Louis Dreyfus Company | 242-104 | |
| Street address | City | State | Zip |
| 40 Danbury Rd. | Wilton | CT | 06 897 |

Name and address of division where employee works (if different from above)

Does your company have a formal Return to Work Program? ☐ Yes ☑ No

| Contact Person | Telephone number |
|---|---|

### 2 Employee Information

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

Name of employee (first, middle initial, last)  ☑ M  ☐ F
Jerry Neal

| Social Security number | Date of birth (m/d/y) | Telephone number |
|---|---|---|
| 6655 | 1981 | 618 560-4163 |

| Employee's street address | City | State | Zip Code |
|---|---|---|---|

### 3 Employment and Claim Information

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

| Date hired (m/d/y) | Effective date of coverage | Date last worked (m/d/y) | Hours worked last day |
|---|---|---|---|
| | 8/20/2015 | | |

What was the employee's permanent occupation on his/her last date of work?

| How long had employee been in occupation? | Regularly scheduled work week: |
|---|---|
| Years:        Months: | Days per week:        Hours per day: |

Has the employee's employment been terminated?  ☐ Yes  ☑ No    If yes, provide termination date

Why did employee cease working?

Is the condition due to an injury or sickness arising out of employee's job?
☐ Yes  ☐ No  ☐ Disputed

Has a Workers' Compensation claim been filed? ..................... ☑ Yes  ☐ No
If "yes," please include the initial report of illness/injury and award/denial notice with this claim.

| Name and address of your Workers' Compensation carrier: | Telephone number |
|---|---|
| Zurich North American | 800-987-3373 |

| Was employee covered under prior LTD policy? | Effective date under prior policy (m/d/y) | Termination date under prior policy (m/d/y) |
|---|---|---|
| ☑ Yes  ☐ No | 8/2/15 | 12/31/2015 |

Has employee returned to work?  ☐ Yes  ☑ No  If yes:  ☐ With restrictions  ☐ Full capacity

Date returned (m/d/y)
N/A

---

LDC0245

576

## 7 Physical Aspects of Occupation continued — Complete this section for all claimants.

In a typical work day, the employee must:

| | Occasionally (1/4 – 2 ½ hours) | Frequently (2 ½ – 5 ½ hours) | Continuously (5 ½ – 8 hours) | Never |
|---|---|---|---|---|
| Bend/Stoop | ☐ | ☐ | ☐ | |
| Climb | ☐ | ☐ | ☐ | ☐ |
| Reach above shoulder level | ☐ | ☐ | ☐ | ☒ |
| Kneel | ☐ | ☐ | ☐ | |
| Balance | ☐ | ☐ | ☐ | ☒ |
| Push/Pull | ☐ | ☐ | ☐ | ☐ |
| Crawl/Crouch | ☐ | ☐ | ☐ | |
| Lift _____ lbs. | ☐ | ☐ | ☐ | ☐ |
| Carry _____ lbs. | ☐ | ☐ | ☐ | ☐ |

Check all that apply.

Does the employee use feet for repetitive movements, as in operating foot controls?
Right foot ☐ Yes ☐ No     Left foot ☐ Yes ☐ No     Both feet ☐ Yes ☐ No

What are the major tasks requiring use of one or both hands?

Which of the following describes the employee's working environment?
☐ Working at heights          ☐ Exposure to dust, fumes and gases
☐ Operating heavy machinery   ☐ Changes in temperature or humidity
☐ Precise manual dexterity    ☐ Other hazards (specify): _____

## 8 Non-Physical Aspects of Occupation — Complete this section for all claimants.

Does employee have to answer customer complaints? .................................... ☐ Yes ☐ No
Is employee primarily evaluated on production? ........................................ ☐ Yes ☐ No
Is employee routinely subject to close supervision? .................................. ☐ Yes ☐ No
Does employee work closely with his/her co-workers? .................................. ☐ Yes ☐ No
Is employee responsible for the overall performance of his/her particular department? .......................................................................... ☐ Yes ☐ No
Number of people this employee supervises _____

## 9 Checklist of Required Attachments — Complete this section for all claimants.

**Failure to provide the following information could result in a delay of the initial benefit payment.**

☐ Attach a copy of the LTD enrollment form if the employee contributes to the premium.
☐ Attach copies of employee's medical information relating to the disability (if available).
☐ Attach a copy of the employee's formal job description or a detailed description of primary duties.
☐ Attach a copy of all payroll documentation and attendance records for the last six months.
☐ If Waiver of Premium claim, attach the Basic and/or Optional enrollment form, payroll record and other required documentation.

## 10 Certification and Signature — Complete this section for all claimants.

**Tip:** To certify eligibility, mail or fax the employee's enrollment form with the claim.

**I certify that the above statements are true and complete. I have read or had read to me the fraud warning for my state.**

| Name of person completing this form Amy A. Ichabis | Telephone number: 203 761-4702 Fax Number: 203 761-4716 |
|---|---|
| Title Health & Insual My Benefit | E-mail address: amy.ichabis@ldc.com Company's Website: |
| Signature X | Date signed 6/6/17 |

For more information about Long Term Disability, the claim process and the status of your employees' claims, log onto your plan administrator web portal.

LDC0246



Sun Life Assurance Company of Canada

SC 4328
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699
Tel:  1-800-786-5433 x3122450
Fax:  1-781-304-5537

July 27, 2017

Jerry Neal
532 Saint James
Cahokia, IL 62206

...

Re:   Policy Number:              242104-Long Term Disability
      Claim Number:               050617-05803-00

Dear  Mr. Neal,

We have completed our review of your claim for Long Term Disability (LTD) benefits and are
pleased to inform you that we have approved payment of benefits at this time.

We have determined that your date of disability is December 20, 2016. The Group Policy has an
Elimination Period of 180 days. You have satisfied the Elimination Period with the required
number of days of Total or Partial Disability. Therefore, LTD benefits begin to accrue effective
June 18, 2017.

We have verified your monthly earnings and calculated your benefit as follows:
Total Monthly Earnings: $2662.62
Benefit Percent: 60%
Gross Monthly Benefit: $1597.57

Your first payment for benefits from June 18, 2017 through June 30, 2017 in the amount of
$692.28 has been issued under a separate cover. The amount of your first payment was
calculated based on the gross benefits due, less any required withholding for FICA taxes and any
offsets listed above. If applicable, we have pro-rated the gross benefits and any offsets for less
than a complete month. Benefit checks are issued on a monthly basis subject to ongoing proof of
Total or Partial Disability. Checks are issued at the end of each month.

In order to consider your claim for benefits beyond August 31, 2017, we will need your medical
records from your next office visit with Dr. Matthew Gornet.

Please be aware that after June 17, 2019, the definition of Total Disability changes. This means
that as of this date, you will only continue to meet the definition of Total Disability if you are
unable to perform the duties of any Gainful Occupation. If you continue to be eligible for
benefits under the Policy after this time, benefits will be payable for the maximum benefit
period of up to age 65, subject to any limitations in the Group Policy.

Page 1 of 5

Exhibit

7

LDC0327

At this time, our plan is to follow-up with you to monitor your treatment and progress with your physician(s) so that we can determine whether you continue to meet the definition of Total or Partial Disability on an ongoing basis. If you are improved and receive a release to return to work, you must notify Sun Life immediately. Otherwise, to help you with providing ongoing Proof of Claim, we will periodically send you forms for you or your treatment providers to complete, and may also request other information from you. A prompt reply to our requests will prevent any interruption in your benefits.

Sun Life Financial believes that people are at their healthiest when they are working, whether at their own job or at a new occupation, so long as their medical condition permits a return to work. Therefore, our Vocational Rehabilitation Services Unit will be reviewing your claim to determine if you could benefit from return to work assistance. As part of that review, the Vocational Rehabilitation Services Unit may contact you directly. Any rehabilitation services we offer are provided free of charge to you. While participating in an approved rehabilitation plan, you may be eligible for additional benefit incentives, equal to 10% of your gross monthly benefit for up to 12 months. Participation in a rehabilitation program is voluntary.

Your claim will be reviewed to determine if you are a potential candidate for Social Security Disability benefits. If it is determined that you are a potential candidate, you will be contacted directly by The Advocator Group, a third party group of professionals who specialize in Social Security Disability benefits, and they will assist you beginning with initial application for Social Security Disability benefits through any necessary appeals.

Under the terms of the Group Policy, the amount of benefits you receive may be reduced by Other Income you receive. Sources of Other Income include Social Security Disability, Workers' Compensation, state disability, employer sick leave, salary continuation programs, certain pension benefits and/or income provided in settlement of an employment contract, etc. If you have applied for or do apply for any of these Other Income benefits in the future, the terms of the Group Policy require that you keep us informed about the status of your applications and provide us with a copy of any award showing the benefit amount and period paid within 30 days of any award.

Your disability coverage is offered through your employer. As such, it may be considered a third-party sick pay plan, and the benefits provided may be taxable to you. If you have any questions or concerns in this regard, you should discuss them with a tax professional or the Internal Revenue Service (http://www.irs.gov). We may be able to withhold federal taxes for you upon your written request. The minimum withholding amount is $88.00 per month, per IRS publication 15-A "Employers Supplemental Tax Guide". If you wish to take advantage of this optional withholding service, please send a written request to us indicating the amount to be withheld for federal income taxes. Please include a completed IRS Form W4S with your request.

Additionally, if you would prefer that your LTD benefit be provided to you by direct deposit rather than by check, you may complete and return the enclosed direct deposit authorization, being sure to also include a voided check.

If you are still employed by your employer, please be aware that LTD premium payments are waived during any period LTD benefits are payable under this Policy. Therefore, your LTD premiums can be waived as of the first day of the month following the benefit start date above.

LDC0328

If you have questions about this, please discuss this with your Human Resources department. LTD premium payments for a Totally or Partially Disabled Employee are waived during any period LTD benefits are payable under this Policy. Therefore, premiums for this employee may be waived as of July 1, 2017.

Please refer to the Group Policy and employee booklet for additional information concerning the disability and benefit standards explained in this letter.

Rider Approval or Declination

**RETRO DISABILITY BENEFIT**

Effective January 1, 2016, the following Retro Disability Benefit is added to Group Policy No. 242104-001 Long Term Disability Income Benefit Provision.

**Retro Disability Benefit**

If an Employee is receiving a Total Disability Benefit, an additional Retro Disability Benefit may be payable if Sun Life receives proof that the Employee had a Retro Disability that was due to the same Injury or Sickness that caused Total Disability.

The Retro Disability Benefit is the Employee's Gross Monthly Benefit multiplied by the number of months (each 30 days) in the Elimination Period. This amount is not subject to reduction due to Other Income.

The Retro Disability Benefit will be paid in a single lump sum amount. Sun Life must receive proof that the Employee had a Retro Disability within 90 days following the date the Employee completes the Elimination Period.

Any Long Term Disability Benefits payable after completion of the Elimination Period will be subject to the terms of this Policy, including reductions by any Other Income.

**Retro Disability** means an Injury or Sickness that results in:

1. Hospital Confinement that begins on the date the Employee becomes Totally Disabled or within 48 hours of the date the Employee's Total Disability begins; and
2. such Hospital Confinement continues for at least 14 consecutive days; and
3. the Employee's Total Disability remains continuous throughout the Elimination Period.

**Hospital Confinement** means admission to a Hospital as a registered inpatient due to an Injury or Sickness. The confinement must be on the advice of a Physician and medically necessary according to generally accepted medical standards. Confinement to an emergency room, outpatient treatment room, or observation unit is not considered a Hospital Confinement.

**Hospital** means a facility licensed in the applicable jurisdiction that provides medical care and treatment to sick and injured persons on an inpatient basis with 24 hour nursing service by or under the supervision of a Physician. Hospital does not include a rest home, a place of convalescence, rehabilitative care, custodial care or a place primarily for the treatment of drug addicts or alcoholics.

LDC0329

USSLF RF106 PRD2       8/16/2017 2:39:10 PM   PAGE    5/006   Fax Server

This provision would not apply at this time.

Effective January 1, 2016, the following provision is added to Group Policy No. 242104-001
Long Term Disability Income Benefit Provision.

**The following is added to the Successive Periods provision of the LTD Benefit Section:**

If an Employee received a monthly Total or Partial Disability benefit under the Employer's prior
LTD plan; and
- the Employee returned to work as an active Full-Time Employee prior to July 1, 2016; and
- within 6 months of the Employee's return to active Full-Time employment, he has a recurrence
of the same Total or Partial Disability payable under the prior LTD policy; and
- there are no benefits available for that recurrence under the prior LTD policy;
then the Elimination Period under this Policy will be waived if the recurrent Total or Partial
Disability would have been paid without any further Elimination Period if the prior LTD policy
had remained in force.

This would not apply to your claim.

<u>Right to Appeal</u>

If you disagree with any part of our decision, you may request in writing a review within 180
days after receiving this notice.

You may submit written comments, documents, records or other information relating to your
claim for benefits, and may request free of charge copies of all documents, records, and other
information relevant to your claim for benefits.

We will review your claim on receipt of the written request for review, and will notify you of
our decision within a reasonable period of time but not later than 45 days after the request has
been received. If an extension of time is required to process the claim, we will notify you in
writing of the special circumstances requiring the extension and the date by which we expect to
make a determination on review. The extension cannot exceed a period of 45 days from the end
of the initial review period.

If a period of time is extended because we did not receive information necessary to decide your
claim, the period for making the decision on review is tolled from the date we send notice of the
extension to you until the date on which you respond to the request for additional information.
You will have 45 days to provide the specified information.

If this claim is governed by the Employee Retirement Income Security Act of 1974 (ERISA),
you have the right to bring a civil action under section §502(a) of ERISA following an adverse
determination on review.

Your request for a review should be addressed to:

Sun Life Financial
Appeals Unit
PO Box 81601
Wellesley Hills, MA  02481-0006

Page 4 of 5

LDC0330

Rule 919 of the Rules and Regulations of the Illinois Department of Insurance, requires that our
company advise you that if you wish to take this matter up with the Illinois Department of
Insurance, it maintains a Consumer Division in Chicago at:

Illinois Department of Insurance
Consumer Division
122 S. Michigan Ave., 19th Floor
Chicago, Illinois 60603
or in Springfield at:
320 W. Washington Street
Springfield, IL 62767"

Should you have any questions, please call me at 1-800-786-5433, Extension 3122450.

Sincerely,

Scott Titcomb
Case Manager 2

Louis Dreyfus Commodities LLC
Attn: Amy Khatib
40 Danbury Road
Wilton, CT 06897

LDC0331

## Amy Khatib

| | |
|---|---|
| **From:** | Amy Khatib |
| **Sent:** | Monday, June 26, 2017 10:57 AM |
| **To:** | Dave Stafford |
| **Subject:** | RE: Jerry Neal |

**Tracking:**

| **Recipient** | **Delivery** |
|---|---|
| Dave Stafford | Delivered: 6/26/2017 10:57 AM |

Thank you!



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com

  

**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Monday, June 26, 2017 10:52 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>
**Subject:** RE: Jerry Neal

Over looked that one ☺ Thanks.. it's been keyed.

**From:** Amy Khatib
**Sent:** Monday, June 26, 2017 9:48 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>
**Subject:** RE: Jerry Neal

Unable to return from leave.



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com

  

**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Monday, June 26, 2017 10:44 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>
**Subject:** RE: Jerry Neal

**Exhibit 8**

LDC0465

What reason do we typically use in this situation for termination?

**From:** Amy Khatib
**Sent:** Monday, June 26, 2017 9:40 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>
**Subject:** RE: Jerry Neal

Hi Dave:

Thank you for following up on Mr. Neal. Yes, please return him from leave and then do the termination.

Amy



Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com

  

Louis Dreyfus Company LLC
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Monday, June 26, 2017 10:37 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>
**Subject:** FW: Jerry Neal

Amy,

That's the last contact I was aware of with Mr. Neal too so am going to go ahead and key termination today and not wait on Mark. If he were to come back tomorrow say he had visited with Jerry since June 8 when he dropped off the STD form then I can always reverse the termination but given it's already been a week and Mark is generally the first to tell us of what's going on in Cahokia, I think we are in good shape and have minimal risk in keying term today. That said, do I need to return him from leave prior to keying termination? Please advise.

Thanks

**From:** Scott Becker
**Sent:** Monday, June 26, 2017 8:56 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>
**Cc:** Gene Loffler <GENE.LOFFLER@ldc.com>
**Subject:** RE: Jerry Neal

I have not had any conversations at all with Jerry. He did however come in on 6-5-2017 and drop of a STD form which was forwarded to Amber and yourself. With no conversations .

Mark is out on vacation today, but will double check with him when he returns.

**From:** Dave Stafford
**Sent:** Monday, June 26, 2017 8:36 AM

2

**To:** Scott Becker <Scott.Becker@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>
**Subject:** FW: Jerry Neal

Please see below. As we are well past June 19 I want to confirm that neither of you or anyone else there has been approached or contacted by Jerry or someone on his behalf to discuss return to work and possible accommodations or just indicating a desire to return to work? Would like to know the last time you all heard from him and what that was discussed etc.

**From:** Amy Khatib
**Sent:** Monday, June 26, 2017 7:51 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Amber Randall <AMBER.RANDALL@ldc.com>
**Cc:** Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal

Hi All:

Just wanted to follow up with you regarding Mr. Neal. On June 23rd, Sun Life issued a denial of his STD claim beyond April 20, 2017. He can appeal the denial but we should go head and terminate him as of June 19, unless he has requested an accommodation.

Thank you,

Amy



Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com



**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amy Khatib
**Sent:** Wednesday, May 24, 2017 11:45 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Amber Randall <AMBER.RANDALL@ldc.com>
**Subject:** RE: Jerry Neal

Hi- was just getting back to Amber. I will forward the note on to Sun Life. As you know, we have been paying this claim under STD. I will also check with them on the status of his LTD application. In addition, attached is a copy of his "26 week" letter. I agree it is a matter of waiting to see if he contacts us about an accommodation, it doesn't sound like he will if he is going ahead with the LTD claim. I'll get back to you both after I speak to Sun Life.

Thank you,

Amy



Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com

3


Louis Dreyfus Company

Louis Dreyfus Company
4800 Main St., Suite 600
Kansas City, MO.  64112
United States of America

www.ldc.com

816-756-3560

June 28, 2017

Jerry Neal
532 St. James
Cahokia, IL  66206

### Re:    Employment with Louis Dreyfus Company Services, LLC

Dear Mr. Neal:

This letter will confirm that your employment with Louis Dreyfus Company Services, LLC (the "Company") has been terminated effective June 19, 2017.

You were on a leave of absence with the Company that extended beyond six months. On May 4, 2017, you were advised that you needed to contact the Company on or before June 19, 2017 to discuss your employment status including any potential accommodations that may allow you to return to work.  You were also instructed to submit current medical documentation.  Although you were provided several weeks to comply with this request, you did not contact the Company or see a doctor prior to this deadline.  The medical paperwork you recently provided indicates that you were released to return to work as of June 22, 2017, however, you did not report to work or contact the Company until late in the day on June 26, 2017.

The Company has terminated your employment effective June 19, 2017 based on your failure to timely respond to the May 4, 2017 letter as well as your violation of the Company's Attendance Policy.  As you know, a failure to report to work without notifying the Company for three consecutive work days is considered a job abandonment.

On behalf of the Company, thank you for the services you have provided during your employment.

Sincerely,

R. David Stafford
Sr. Regional Human Resource Mgr.

Exhibit

9

NEAL 0229

# Deposition of:
# **David Stafford**

**Date:** December 1, 2022

**Case:** Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC

**Reporter:** Doris A. Eby, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

Exhibit

10

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JERRY NEAL, JR.,         )
                         )
        Plaintiff,       )
                         )
    -vs-                 ) Case No: 3:21-cv-00820-GCS
                         )
LOUIS DREYFUS COMPANY    )
SERVICES LLC,            )
                         )
        Defendant.       )


VIDEO CONFERENCE DEPOSITION OF DAVID STAFFORD
TAKEN ON BEHALF OF THE PLAINTIFF
ON DECEMBER 1ST, 2022


Reported by
Doris A. Eby
Missouri CCR Number 518
Illinois CSR Number 084-004140

KEEFE REPORTING COMPANY
11 North 44th St.
Belleville, IL 62226
(618)277-0190

---

Page 3

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF ILLINOIS
 2
 3   JERRY NEAL, JR.,        )
                            )
 4           Plaintiff,     )
                            )
 5       -vs-               ) Case No: 3:21-cv-00820-GCS
                            )
 6   LOUIS DREYFUS COMPANY )
     SERVICES LLC,          )
 7                          )
             Defendant.     )
 8
 9
10          DEPOSITION OF DAVID STAFFORD, taken to be
11   used in an action pending in the United States
12   District Court, Southern District of Illinois, State
13   of Illinois, pursuant to agreement between counsel,
14   under the provisions of Rule 26(a) of the Rules of
15   Civil Procedure, taken on the 1st day of
16   December, 2022, between the hours of eight o'clock
17   in the forenoon and six o'clock in the afternoon of
18   that day, all parties appearing remotely by video
19   conference; before Doris A. Eby, CCR, CSR, MO & IL.,
20   in a certain cause now pending in the United States
21   District Court, Southern District of Illinois, on
22   behalf of the Plaintiff.
23                          -o0o-
24
```

---

Page 2

```
 1      I N D E X   O F   E X A M I N A T I O N
 2
 3   WITNESS:  DAVID STAFFORD
 4   Direct Examination by Mr. Ezra              5
     Cross-Examination by Ms. Horvatich        166
 5   Redirect Examination by Mr. Ezra          171
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1            A P P E A R A N C E S
 2   FOR THE PLAINTIFF
 3   BYRON, CARLSON, PETRI & KALB
     411 St. Louis Street
 4   P.O. Box 527
     Edwardsville, IL 62025
 5   By: D. Jeffrey Ezra, Esq.
     Email: jezra@bcpklaw.com
 6
 7   FOR THE DEFENDANT
 8   MCGRATH NORTH MULLIN & KRATZ, PC LLO
     1601 Dodge Street
 9   Omaha, NE 68102
     By: Ruth A. Horvatich, Esq.
10     Aaron A. Clark, Esq.
     Email: Rhorvatich@mcgrathnorth.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 37

1      **Do you recall seeing that?**
2      A  I didn't --
3         MS. HORVATICH: Object to form.
4         Go ahead and answer.
5      **Q  (By Mr. Ezra) You can answer.**
6      A  Yeah. The document I saw was very -- it
7   was illegible, honestly, although it was represented
8   that that's what it said.
9      **Q  Okay. Not withstanding that, on June 22nd**
10  **you understand that he had been released with**
11  **restrictions?**
12     A  That is my understanding, yes.
13     **Q  Okay. In the middle of that paragraph it**
14  **says: (Reading)**
15         **Mr. Neal failed to properly respond**
16         **prior to June 19th regarding his**
17         **return to work status or his**
18         **medical condition.**
19         **Correct?**
20     A  That's my understanding, yes.
21     **Q  And that's your understanding of the**
22  **events?**
23     A  That's correct.
24     **Q  All right. And he was terminated**

Page 38

1   **effective -- the last line of that paragraph:**
2   **(Reading)**
3         **He was terminated effective**
4         **June 19th, 2017 for failing to**
5         **notify the company of his absence**
6         **from work, failing to keep us**
7         **informed as to his ability to**
8         **return to work as requested.**
9         **Correct?**
10     A  That is correct.
11     **Q  And this was a letter, I note, that was**
12  **sent to an Illinois governmental agency on behalf of**
13  **the company; is that correct?**
14     A  That is correct.
15     **Q  And that agency was the Illinois**
16  **Department of Employment Security. True?**
17     A  I -- that would seem logical, yes.
18     **Q  Okay. Whatever -- so whatever agency**
19  **deals with unemployment insurance --**
20     A  That's correct.
21     **Q  -- in Illinois?**
22     A  Right.
23     **Q  Okay. Gotcha.**
24         **All right. Let me show you --**

Page 39

1         (Off-the-record discussion.)
2      **Q  (By Mr. Ezra) Okay, let me show you what is**
3   **marked 65, Neal 0400. And very good -- can you see**
4   **that? Can you see that?**
5      A  Yes, I can.
6      **Q  All right. And at the bottom of that,**
7   **that's your signature, is it not? Well, your**
8   **signature -- your signature line.**
9      A  Yes, that's -- yeah, it's a letter from
10  me.
11     **Q  Okay. And we're not going to -- we're not**
12  **going to haggle over that it's not your letter. It**
13  **is your letter; correct?**
14     A  That's correct.
15     **Q  All right. And this is the letter that**
16  **was dated June 28th, 2017. So this was a letter**
17  **that was sent to Mr. Neal after he had been**
18  **terminated; is that correct?**
19     A  Correct.
20     **Q  All right. And in the second paragraph it**
21  **states: (Reading)**
22         **On May 4th, 2017 you were advised**
23         **that you needed to contact the**
24         **company on or before June 19th to**

Page 40

1         **discuss your employment status,**
2         **including any potential**
3         **accommodations that may allow you**
4         **to return to work.**
5         **Correct?**
6      A  Correct.
7      **Q  And that's your understanding as to what**
8   **was to occur?**
9      A  Right.
10     **Q  All right. And he was to submit current**
11  **medical documentation as well --**
12     A  Correct.
13     **Q  -- during that period of time, between**
14  **May 4th and June 19th, 2017; correct?**
15     A  Correct.
16     **Q  Okay. And it says: (Reading)**
17         **Although you were provided several**
18         **weeks to comply with this request,**
19         **you did not contact the company or**
20         **see a doctor prior to this**
21         **deadline.**
22         **And your -- and -- well, first of all,**
23  **that's what it says and that's your understanding of**
24  **the events; correct?**

10 (Pages 37 to 40)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 41

1      A   Yeah.  To my knowledge at that time,
2   that's my understanding.
3      Q   Okay.  And it says "you were provided
4   several weeks."
5          The several weeks -- you correct me if I'm
6   wrong -- is the May 4th, 2017 to June 19th, 2017
7   period; correct?
8      A   Correct.
9      Q   Okay.  And then the next paragraph:
10  (Reading)
11         The company has terminated your
12         employment effective
13         June 19th, 2017 based on your
14         failure to timely respond to the
15         May 4th, 2017 letter, as well as
16         your violation of the company's
17         attendance policy.
18         And it states:  (Reading)
19         As you know, a failure to report to
20         work without notifying the company
21         for three consecutive workdays is
22         considered job abandonment.
23         Correct?
24     A   That's what's in the letter, yes.

Page 42

1      Q   And is that your understanding with regard
2   to the policy that Louis Dreyfus had concerning
3   abandonment of a job?
4      A   That is how we define job abandonment,
5   yes.
6      Q   All right.  So -- all right.  In this
7   letter, is there an indication of any specific
8   individual that Mr. Neal was to get in contact with
9   during that period of time?
10     A   Not in this letter, no.
11     Q   All right.  At the bottom of the page, is
12  that your writing?
13     A   Yes, it is.
14     Q   Okay.  And so subsequent, I guess -- and
15  it's kind of interesting because the letter's dated
16  June 28, 2017.
17         Do you know whether Mr. Neal or his
18  representative got it on that day?
19     A   Probably not.  He probably -- it wasn't
20  uncommon, he could have called and asked for a
21  letter of termination, and I would have drafted it,
22  and this would have been a copy I retained in the
23  file.
24     Q   Okay.  At 11:40 on 6/28 it says:

Page 43

1   (Reading)
2          Left message for him to call back.
3          Is that an indication that you called him
4   or that he called you?
5      A   It -- basically, what it appears is he
6   called me, left a message on my voice mail.
7          I replied to him at 11:40 a.m. on the
8   28th.  Didn't get ahold of him, so left him a -- we
9   played phone tag.
10     Q   Okay.  Do you know whether he had already
11  been notified that he had been terminated?
12     A   I don't know.
13     Q   Okay.  Because it sounds kind of
14  interesting that your letter's dated the 28th and
15  you get a call on the 28th, or approximately the
16  28th, maybe even earlier.
17     A   Yeah.  Again, it could have been that his
18  voice mail was, Hey, I need a letter of termination.
19         He -- he may have known.  But, as I said,
20  I occasionally got those calls.
21     Q   Why would he need to have a letter of
22  term -- why would he need to have a letter of
23  termination?
24         MS. HORVATICH:  I object to foundation.

Page 44

1      Q   (By Mr. Ezra) Well, let me ask it this way.
2          Do you have any idea as to why an employee
3   would need a letter of termination from you?
4      A   Reasons that I have been given in the past
5   is they need to file through some other insurance
6   carrier, you know, for benefits because of loss of
7   income or, you know, home mortgage, stuff like that.
8   I mean, any number of reasons employees may want a
9   letter saying they were terminated.
10     Q   Okay.  Could you -- and, then, you were
11  able to have a conversation with him on June 29th at
12  10:00; is that correct?
13     A   Yeah.
14     Q   Can you read that for me, please, because
15  I can't really read it?
16     A   Yeah.  I -- can -- let me see if I can
17  move some --
18     Q   Yeah.
19     A   There we go.  (Reading)
20         Jerry called, notified him the
21         company had terminated his
22         employment.  He asked why.  I
23         explained that we had sent letter.
24         And then:  (Reading)