IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JERRY NEAL, JR., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 3:21-cv-00820-GCS |
| | ) |
| LOUIS DREYFUS COMPANY SERVICES LLC, | ) |
| | ) |
|     Defendant. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Now comes the Plaintiff, Jerry Neal, Jr., and for his response to Defendant's Statement of Material Facts in support of its Motion for Summary Judgment states as follows:

**I.    BACKGROUND**

1.    LDC operates a grain elevator in Cahokia, Illinois, where Plaintiff was employed. (Ex. 1, Neal Depo. 13:5-15:7). **Admit.**

2.    Neal was hired as an Operator at the Cahokia facility in April 2015 and was responsible for assisting with loading and unloading grain transported by railcars and barges. (*Id.* at 12:17-24; 13:22-15:16). **Admit.**

3.    Neal was separated from his employment with the Company effective June 19, 2017, when he was unable to return to work after a six-month medical leave of absence. (Ex. 2, Khatib Decl. ¶ 4).

   **Deny. Plaintiff was discharged in retaliation for pursuing a work comp claim and provided pretextual reasons for doing so. Paragraph 3, above, is a new and additional pretextual reason provided following the filing of this retaliatory discharge claim. Please see Plaintiff's Brief in Opposition in his brief in opposition to Defendant's Motion for Summary**

1

Judgment. Additionally, according to Defendant's Answer to Plaintiff's First Amended Complaint, as opposed to being terminated for being unable to return to work after a six-month medical leave of absence, the pretext was that "Plaintiff was terminated from his employment effective June 19, 2017, for failing to respond to the Company's May 4th correspondence and failing to report to work or contact the Company in violation of the Company's attendance policy . . ." (Defendant's Answer to Plaintiff's First Amended Complaint at par. 13.). Similarly, according to its statements to the Illinois Department of Unemployment Security, the pretext was that "Mr. Neal was terminated effective June 19, 2017 for failing to notify the Company of his absence from work, failing to keep us informed as to his ability to return to work as requested. . . . Mr. Neal is unemployed only due to his lack of attention and failure to meet minimally reasonable standard of attendance and communication." (Ex. 1 at 10).

II. MEDICAL LEAVE OF ABSENCE

4. In November 2016, Neal sustained an injury to his back. (Ex. 1, Neal Depo. 43:22-44:21). **Admit.**

5. After sustaining his back injury in late 2016, Neal applied for short-term disability (STD) benefits through the Company. (*Id.* at 54:3-23) (Ex. 5).

**Deny. Following Plaintiff's injury, and his reporting of his injury to his employer, Human Resources at LDC decided to place Neal on STD and provided Jerry with paperwork to be filled out by his physician. (Id. at 13-14). Subsequently, Mr. Neal was requested to fill out an injury report at the request of LDC. (Id.). Mr. Neal was then advised by supervisor, Scott Becker, that the STD claim was to be closed, and only a work comp claim would be filed. (Id. at 22). Thereafter, on January 19, 2017, LDC advised the STD carrier, Sun Life,**

that it wanted to re-open the STD claim. (Id. at 24-25). Additionally, LDC stated that it did not need to inform Mr. Neal of this because he was now represented by counsel in his worker's compensation case. (Id. at 25-26).

6. On the January 3, 2017 application for STD benefits, Neal's doctor referenced his back injury and indicated that it was "unknown" whether the injury arose from Neal's employment. (Ex. 5). Neal's doctor further imposed medical restrictions preventing Neal from lifting, pushing or carrying over 10 pounds. (*Id.*).

**Admit. However, the same document stated that Mr. Neal was capable of working with his restrictions. (Id. at 76).**

7. Neal acknowledges that the job of Operator is physically demanding and requires employees to engage in heavy lifting in excess of 75 pounds and engage in other physical activities that Neal was unable to perform due to his injury and restrictions. (Ex. 1, Neal Depo. 17:24-19:9; 57:3-16).

**Admit. Plaintiff admits that his job was physically demanding as described above. However, on December 16 and December 19, 2016, Plaintiff was allowed to work in the control room at LDC with no lifting or pulling. (Id. at 13). Further, all of Plaintiff's notes from his physicians did not take him off work but rather gave him restrictions that LDC did not accommodate. (Id. at 71).**

8. Neal commenced a medical leave as of December 20, 2016, and remained subject to restrictions preventing him from working as an Operator through the end of his employment in June 2017. (*Id.* at 29:22-30:12; 59:7-60:2).

**Deny. Plaintiff was injured on the job and did not commence a "medical leave". Plaintiff brought in work restrictions and was allowed to work on December 16 and**

3

**December 19, 2016 and then he was advised not to return by LDC. (Id. at 13). LDC determined on January 11, 2017, that Plaintiff's claim would only be a work comp claim and the STD claim would be closed. (Id. at 22, 28) (Ex. 3 at 18-21). Thereafter, LDC determined that it would file both STD and work comp claims and let the work comp and STD claims take their course. (Ex. 1 at 26).**

**Additionally, although all of Plaintiff's notes from his doctors indicated that he could return to work with restrictions, LDC never accommodated him. (Id. at 71). Further, Plaintiff was able to drop off updated paperwork concerning his restrictions to Scott Becker on Monday, June 26, 2017, that would have allowed him to return to light duty until July 2, 2017 full duty on a trial basis on July 3, 2017. (Id. at 45).**

9. During his leave of absence, Neal filed claims for STD and long-term disability (LTD) benefits and also pursued a claim for workers' compensation benefits with the Company's insurance carrier. (Ex. 2, Khatib Decl. ¶ 5).

**Admit in part, and deny in part. Plaintiff was not on a leave of absence. Plaintiff was injured on the job and had a pending work comp case and presented a doctor's note with light duty work restrictions to his employer that was not accommodated. See Plaintiff's Brief in Opposition. Further, LCD opened, then closed, and then re-opened the claim for STD benefits and those STD benefits were approved on March 22, 2017 at the request of Amy Khatib on March 21, 2017. (Id. at 101-106). The STD plan was a self-funded plan and Sun Life was retained by LDC to assist LDC in administering the plan. (Id. at 88). The STD benefits were only approved through April 20, 2017. (Id. at 77). Plaintiff did retain an attorney for his work comp claim, and LDC became aware of this fact on or about January 12, 2017. (Ex. 3 at 22). Sun Life sent paperwork to Plaintiff concerning a LTD claim on or**

4

about May 4, 2017 (Ex. 1 at 79). LDC then sent in a claim to Sun Life for LTD on or about June 6, 2017. (Id. at 80-86).

10. Neal received STD benefit payments while pursuing his claim for workers' compensation benefits. (Ex. 1, Neal Depo. 73:19-74:9).1 STD benefits may be payable through the Company while a workers' compensation claim is pending. (Ex. 2, Khatib Decl. ¶ 7). This allows the employee to receive income during the time a determination is being made regarding the employee's workers' compensation claim. (*Id.*).

**Admit in part, and deny in part. Plaintiff was sent home from work on December 20, 2016 following his injury. However, Plaintiff did not receive approval for payment of STD benefits until March 22, 2017. (Id. at 77-78). This occurred after Amy Khatib requested that Sun Life approve Mr. Neal's STD on March 21, 2017 because work comp is denying Mr. Neal's claim. (Id. at 99-106). The benefits were only approved through April 20, 2017. (Id. at 77). Thereafter, on June 23, the STD benefits were terminated effective April 20, 2017 in a formal letter of June 23, 2017 emailed to Amy Khatib at 3:20 p.m. on Friday, June 23, 2017 and mailed to Plaintiff. (Id. at 57-62). Amy Khatib received an email on June 19, 2017 that advised that Plaintiff was not approved for disability after April 21, 2017. (Id. at 56).**

11. Pursuant to the Company's disability leave policy, employees are subject to termination and their employment benefits will end after 26 weeks (six months) of disability leave. (*Id.*) (Ex. 3). The Company's policy that allows only 26 weeks of disability leave has been in place for decades and applies to all employees, regardless of whether they are injured on the job. (Ex. 2, Khatib Decl. ¶ 5).

**Plaintiff admits that the STD policy as written states that it is limited to 26 weeks and that it further states "if you do not return to work when your STD leave ends, your**

5

**employment will be terminated, unless you are otherwise entitled to unpaid leave under the Federal Family and Medical Leave policy." (Id. at 72). However, the STD policy states nothing about an employee receiving work comp. (Id.).**

**Additionally, LDC's work comp policy <u>does not state</u> that employees are subject to termination after 26 weeks, and further states that "your ability to return to work following a period of injury or illness will be determined in accordance with work comp and other applicable state and federal laws and Company policies." (Id. at 73).**

**Also, according to David Stafford, LDC's corporate designee for the reasons for Plaintiff's termination, testified that on June 26, 2017, after he learned that Plaintiff had seen the doctor, he could have reversed Plaintiff's termination. (Ex. 5, Stafford Depo at 149:6-10). Further, Stafford testified that if an employee on worker's compensation had been unable to work for 26 weeks and had no prospect of returning to work, they would be terminated. (Id. at 165:18-20). He also testified that if a work comp employee is off work at the 26-week period, "we take a look. As I said earlier, if the restrictions are such that, you know, that for one or two weeks they're going to work in a modified make work-type job before they ramp up to full duty, we've done that and gone past the 26 weeks, but not by much." (Id. at 162:22-163:9).**

12. Approximately four months after commencing his leave of absence in December 2016, Neal received a written notice from the Company dated May 4, 2017, which provided as follows:

> We are writing to inform you that, pursuant to Company policy, your employment and all Company-provided benefits will end on June 19, 2017, unless you are able to return to work. If you are unable to return to work, you may be eligible for long-term disability (LTD) benefits…

> If you believe you are disabled under the Americans with Disabilities Act or other applicable laws, and would like to discuss potential accommodations that may allow you to return to work and perform the essential functions of your job or otherwise continue your employment, please contact Amber Randall… on or before June 19, 2017.
> (Ex. 4) (Ex. 1, Neal Depo. 60:9-23).

**Admit that Plaintiff received this letter on May 10, 2017 via certified mail and that the language above is part of the information contained in the letter. (Ex. 1 at 29-30). Plaintiff denies that he "commenced a leave of absence." Plaintiff brought a note that indicated that he could work but that he was subject to medical restrictions. LDC accommodated those restrictions for two days and then sent him home.**

**Additionally, Stafford testified that the letter of May 4, 2017 was not a normal letter that they would send to work comp claimants. (Ex. 5, 46:7-48:4). This letter was sent out because Plaintiff was in the short-term disability program. (Id. at 47:23-48:4). Stafford also testified that Plaintiff's claim was viewed as a workers' compensation claim. (Id. at 60:10-15).**

13.  After receiving this letter, Neal understood that his employment and employee benefits would end on June 19, 2017, unless he was able to return to work. (Ex. 1, Neal Depo. 62:4-9). He also understood that he could apply for LTD benefits if he was unable to return to work. (*Id.* at 62:10-16).

**Plaintiff's testimony speaks for itself with respect to the letter. In addition to the testimony on page 62, on page 63-64, Plaintiff testified as follows with respect to the letter:**

Q.   So did this letter concern you when you got it?

A.   Yes.

Q.   And why did it concern you?

7

A. Because I don't know --- First of all, I didn't know what I did wrong, like why am I losing my job. That was the first thing, like it was a big shock. I'm thinking I'm in the process to go back to work. When I received this, it was a big shock. It was actually a heartbreaker for me.

Q. And did you understand what she was saying here is the company had a policy that it's kind of like you get terminated if you can't come back to work within a certain period of time?

Mr. Carlson: Object to form.

Q. I don't know if you understood that when you read the letter. Did you understand that?

A. No.

Q. And did you call Amy Khatib when you got the letter?

A. I turned it over to my attorney at the time. I didn't know what to do with it, so I let them handle it.

**Further, David Jerome, who responded to the letter on Plaintiff's behalf on May 24, 2017, advised LDC that the Plaintiff was still treating for his work comp injury, that LDC had been unable to accommodate his restrictions, and that Plaintiff desired to return to work once he had recovered from his injuries (Ex. 1 at 71). Further, LDC's attorney acknowledged receipt of the letter and forwarded Jerome's letter to LDC. (Ex. 6 at 1).**

14. On May 11, 2017, Neal visited his doctor and produced a medical note indicating there was no change regarding his medical status or work restrictions. (*Id.* at 65:4-66:2).

**Plaintiff admits that he went to the doctor and provided an updated work note to his employer. (Ex. 1 at 42-43). Plaintiff further states that after receipt of the doctor's note, LDC wrote "This is the employee whose claim was initially Short Term Disability, then Worker's comp & is currently under investigation by Zurich." (Id. at 42).**

8

15.     On May 23, 2017, Neal's workers' compensation attorney also forwarded a letter to the Company's legal counsel in the workers' compensation case advising that his client wished "to return to work once the effects of his injury have remitted." (*Id.* at 69:14-71:17). Neal fully acknowledges that his medical status and restrictions had not changed at the time this letter was sent nor did the letter indicate that he would be able to return to work as of June 19, 2017. (*Id.* at 70:18-71:2; 72:23-73:5).

**Plaintiff admits that the letter speaks for itself and further states that the letter advised that LDC had not yet made any accommodation for Plaintiff's injury within the doctor's work restrictions and that he was still treating for his injury. (Id. at 71). In addition, the legal counsel in the work comp for LDC forwarded a copy of the letter from Jerome to MaryJo Magrone at LDC on May 26, 2017. (Ex. 6 at 1).**

16.     During the timeframe of May 4, 2017 through June 19, 2017, no medical information was provided to the Company indicating any change in Neal's medical status or advising that he would be in a position to return to work as of June 19, 2017. (*Id.* at 80:20-81:12).

**Plaintiff denies that "no medical information was provided to the company" but admits that the release for work with light duty restrictions implemented by Dr. Gornet on February 28, 2017 were continued by Dr. Boutwell on May 11, 2017, and that LDC received this information through its work comp counsel and its facility manager on May 23, 2017. (Ex. 1 at 42-43 (Boutwell)) (Ex. 6 at 3). Further, no accommodation was made for him within the light duty work restrictions provided. According to Stafford, LDC policy would require that each time they received medical restrictions LDC should see if there was work within his restrictions. (Ex. 5 at 73:11-74:2 and 70:4-13). Upon receipt, Amy Khatib provided the updated medical information to Sun Life and asked if the claim had been transitioned to**

9

LTD. (Ex. 1 at 96). In response, Sun Life advised Khatib that it had mailed LTD paperwork to Plaintiff's home on May 4, 2017. (Id.).

Additionally, on June 19, 2017, Sun Life advised Khatib at LDC that it had just received "updated medical referral back for Mr. Neal's claim. Unfortunately, we do not have sufficient clinical support of ongoing Total Disability or reasonable restrictions and/or limitations as of 4/21 (after his current last pay date) through the present. Mr. Neal was not seen by a provider since February and although he did receive an injection on 5/11, we are unable to support disability during the gap 4/21 to 5/11." (Id. at 56).

17. Neal acknowledges that as of June 19, 2017, he was not physically able to return to work due to his back pain and the fact that he was continuing to receive treatment. (*Id.* at 77:8-14; 81:13-20).

Admit, but further states that Plaintiff was released to work with restrictions that LDC did not accommodate. According to Stafford, LDC policy would require that each time they received medical restrictions LDC should see if there was work within his restrictions. (Ex. 5 at 63-67; 73:11-74:2; 70:4-13).

18. In early June 2017, Neal came to the facility requesting assistance to fill out paperwork to receive LTD benefits and an application for LTD benefits was submitted on his behalf. (Ex. 2, Khatib Decl. ¶ 9) (Ex. 6).

Plaintiff admits that he received the application, and provided it to his employer (Ex. 1 at 107-111). Additionally, Plaintiff states that Sun Life sent a letter to Khatib on May 3, 2017 asking if LDC wanted to file a claim for LTD benefits for Plaintiff. (Id. at 87). Plaintiff further states that Khatib filled out the form and submitted it to Sun Life on June 6, 2017. (Id. at 81-86).

19. Neal's claim for LTD benefits was later approved and Neal received LTD benefits for the timeframe of June 18, 2017 through the end of August 2017 after the LTD plan administrator determined that Neal was disabled and unable to perform the duties of any gainful occupation during that timeframe. (Ex. 2, Khatib Decl. ¶ 9) (Ex. 7) (Ex. 1, Neal Depo. 29:7-31:20).

**Plaintiff admits that he was sent a letter approving him for LTD on July 27, 2017, *after he was terminated by LDC*, and that the letter speaks for itself. He further admits that the letter of July 27, 2017 approved him for LTD payments on July 27, 2017 and was advised that he would receive a check for $692.28 for the period of June 18 to June 30, 2017. (Id. at 91). He was also advised that in order to have benefits extended beyond August 31, 2017, Sun Life would need medical records from your next office visit with Dr. Gornet. (Id. at 91-95). Plaintiff states that Sun Life then denied LTD benefits beyond September 7, 2017. (Id. at 89-90).**

III.   **EMPLOYMENT TERMINATION**

20. Neal's termination was processed by the Company on June 26, 2017, noting that Neal was "unable to return from leave" and his termination was effective as of June 19, 2017. (Ex. 2, Khatib Decl. ¶ 11) (Ex. 8). The termination was processed by Dave Stafford, Sr. Regional Human Resources Manager. (Exs. 8 and 9). Prior to processing the termination, Stafford confirmed that Neal had not contacted anyone at the Cahokia facility about returning to work nor did he request accommodations that would allow him to return to work. (Ex. 2, Khatib Decl. ¶ 11) (Ex. 8).

**Plaintiff admits that his termination was "processed by the company" on June 26, 2017. Plaintiff denies that his termination was due to him being "unable to return from leave." According to Stafford's letter dated June 28, 2017, Plaintiff was "terminated" under**

11

**the pretext of Plaintiff's "failure to timely respond to the May 4, 2017 letter as well as your violation of the Company's Attendance Policy. As you know, a failure to report to work without notifying the Company for three consecutive days is considered job abandonment." (Id. at 74-75).**

**Additionally, Plaintiff denies that Stafford confirmed that Plaintiff had contracted anyone at the Cahokia facility about returning to work nor did he request accommodations that would allow him to return to work. Emails from LDC establish that Stafford was advised by Scott Becker at 8:56 a.m. that he had no conversations with Plaintiff but "Mark is out on vacation today, but will double check when he returns." (Id. at 63). In response, Stafford stated "am going to go ahead and key termination today and not wait on Mark." (Id.). Additionally, Plaintiff brought a doctor's note to the Cahokia facility on June 23, 2017 advising that he was released again for light duty through July 2, 2022, and released for a trial of full duty starting July 3, 2017. (Ex. 2, Neal Depo at 88:15-90:3) (Ex. 7, Gornet Records). However, the Plaintiff was told by Mr. Nemechek that Scott Becker was not working, and that he was to come back on Monday. (Ex. 2 at 88:15-90:3).**

21. On June 28, 2017, a termination notice was issued to Neal advising that his employment had been terminated effective June 19, 2017, after "a leave of absence with the Company that extended beyond six months." (Ex. 9). The termination notice referenced that Neal failed to contact the Company or see his doctor prior to June 19, 2017. (Ex. 9). The notice also referenced that Neal had gone to his doctor on June 22, 2017, and did not report to work or contact the Company regarding this doctor's visit until June 26, 2017. (Ex. 9). Stafford believed these facts to be true at the time he issued the termination notice on June 28, 2017. (Ex. 10, Stafford Depo. 39:15-42:5).

**Plaintiff states that the letter speaks for itself and that the letter states that Plaintiff was terminated "effective June 19, 2017 based on your failure to timely respond to the May 4, 2017 letter as well as your violation of the Company's Attendance Policy. As you know, a failure to report to work without notifying the Company for three consecutive work days is considered a job abandonment." (Ex. 3 at 31).**

22. The Company's 26-week policy has been consistently enforced by the Company and Neal is not aware of any other employee who was not terminated after being off work for 26 weeks. (Ex. 2, Khatib Decl. ¶ 5) (Ex. 1, Neal Depo. 95:7-10).

**Plaintiff submits what he knows about LDC's 26-week policy with respect to other employees is irrelevant.**

**Plaintiff admits that the STD policy as written states that it is limited to 26 weeks and that it further states "If you do not return to work when your STD leave ends, your employment will be terminated, unless you are otherwise entitled to unpaid leave under the Federal Family and Medical Leave policy." (Ex. 1 at 72). However, the STD policy as written says nothing about an employee receiving work comp. (Id.).**

**Additionally, LDC's work comp policy does not state that employees are subject to termination after 26 weeks, and further states that "Your ability to return to work following a period of injury or illness will be determined in accordance with workers' compensation and other applicable state and federal laws and Company policies." (Id. at 73).**

**Also, according to Stafford, LDC's corporate designee for the reasons for Plaintiff's termination, testified that on June 26, 2017, after he learned Plaintiff had seen the doctor, he could have reversed Plaintiff's termination. (Ex. 5 at 149:6-10). Further, Stafford testified that if an employee on worker's compensation had been unable to work for 26 weeks and**

had no prospect of returning to work, they would be terminated. (Id. at 165:18-20). However, he also testified that if a work comp employee is off work at the 26-week period, "we take a look. As I said earlier, if the restrictions are such that, you know, that for one or two weeks they're going to work in a modified make work-type job before they ramp up to full duty, we've done that and gone past the 26 weeks, but not by much." (Id. at 162:22-163:9). Additionally, Stafford testified that the letter of May 4, 2017 was not a normal letter that they would send to work comp claimants. (Id. at 46:7-48:4). This letter was sent out because Plaintiff was in the short-term disability program. (Id. at 47:23-48:4). Stafford also testified that Plaintiff's claim was viewed as a workers' compensation claim. (Id. at 60:10-15).

BYRON CARLSON PETRI & KALB, LLC

BY:  /s/ Eric J. Carlson
     Eric J. Carlson, #06228973
     D. Jeffrey Ezra, *Of Counsel,* #06192516
     411 St. Louis Street
     Edwardsville, IL 62025
     (618) 656-0066
     (618) 655-4004 fax
     ejc@bcpklaw.com
     jezra@bcpklaw.com / jeff@ezralaw.com
     *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on March 20, 2023, he caused the foregoing to be filed with the court by electronic filing protocols using the CM/ECF system, and that a copy of the same will therefore be electronically served upon all attorneys of record registered with the court's CM/ECF system.

| | |
|---|---|
| Aaron A. Clark<br>Ruth A. Horvatich<br>McGrath North Mullin & Kratz, PC LLO<br>aclark@mcgrathnorth.com<br>rhorvatich@mcgrathnorth.com<br>*Attorneys for Defendant* | Gregg A. Kinney<br>Practus, LLP<br>Gregg.Kinney@practus.com |

                /s/ Eric J. Carlson