IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JERRY NEAL, JR., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | No. 3:21-cv-00820-GCS |
| ) | |
| LOUIS DREYFUS COMPANY ) | |
| SERVICES LLC, ) | |
| ) | |
|     Defendant. ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.     STATEMENT OF MATERIAL FACTS[1]**

On Saturday, November 26, 2016, Jerry Neal ("Neal") spent the day shoveling and sweeping heavy wet grain at Louis Dreyfus Company ("LDC"). (**Ex. 1, LDC Personnel File, at 1-2; Ex. 2, Neal Depo, 39:17-40:11 and 50:8-24**). Neal started working for LDC in August 2015. (**Ex. 1 at 3-5**). Neal thought that maybe 100 rail cars had arrived that day. (**Ex. 2, 40:2-11**). He was sore, and he felt like he had been working out. (**Id. at 52:10-16**). He was not in pain. (**Id. at 52:10-12**). He did not report an injury because he had not slipped or fallen. (**Id. at 44:2-6 and 51:23-52:9**).

On Sunday, Neal's back was hurting when he got out of bed. (**Id. at 46:20-47:5**). On Monday, he told supervisors Scott Becker and Marcus Dixon how his back was sore when he got out of bed. (**Id. at 44:7-24**). He said he was taking Aleve and he thought the back pain would go away. (**Id. at 45:21-46:13**). Dixon reported Neal told him his stiffness was from his bed. (**Ex. 1 at 55**).

---

[1] Plaintiff sets forth this Statement of Material Facts as Defendant's Statement of Material Facts is woefully incomplete. Additionally, Plaintiff has specifically responded to Defendant's Statement of Material Facts in his Response to Defendant's Motion for Summary Judgment.

1

Neal saw his family physician on Wednesday, December 14, 2016. (**Ex. 1 at 31-32**). Dr. Shawahin noted Neal did heavy lifting at work and could not rule work out as a cause. (**Id.**). Neal told Dr. Shawahin how he shoveled grain and told him how his back felt the next day. (**Ex. 2, 56:6-11**). Dr. Shawahin diagnosed back pain, prescribed baclofen and told Neal that he could not lift or carry anything for two weeks. (**Ex. 1 at 31-33**). Neal provided the doctor's note to his supervisor on December 16, 2016. (**Id. at 13-14**).

Neal's supervisor allowed him to work on a computer with no lifting or pulling on December 16 and 19, 2016. (**Id. at 13**). On December 19, Becker filled out an injury reporting form and sent it to LDC's Human Resources Department ("HR") and Zurich, the worker's compensation insurer. (**Ex. 3, Neal's Personnel File Received Pursuant to Subpoena in Work Comp Case at 8-10**). On December 21, 2016, Becker filled out an "Incident Investigation Report" and emailed it to Gene Loffler. (**Id. at 11-13**). He also filled out an Illinois Form 45: Employer's First Report of Injury (**Ex. 1 at 27**). In the Incident Report, Becker wrote Neal never reported a work injury, and disciplinary action was needed "regarding not reporting injurys." (*sic*) (**Id.; Ex. 3 at 12-13**).

In response, HR placed Neal on short-term disability. (**Ex. 3 at 20**) ("HR was informed on 12/19/2016 and it was decided to place Neal on STD."). Neal was given STD paperwork on 12/20/2016 to be filled out by his doctor. (**Id.**). Neal brought the form to his doctor on January 3, 2017. Dr. Shawahin noted Neal had low back pain. Dr. Shawahin indicated Neal was capable of returning to work, but stated he was not to exceed 10 lbs of lifting. (**Ex. 1 at 15-21**). Dr. Shawahin checked a box stated that it was unknown if the injury arose out of Neal's employment. (**Id.**).

After Neal returned the STD Form, he was asked to fill out an injury statement on January 10, 2016, at Dave Stafford's request. (**Id. at 69-70 and 13-14**). The statement was emailed to

2

Amber Randall, Stafford, and Loffler, and forwarded to Amy Khatib, LDC's Health and Insured Benefits Manager. (**Id. at 22-23**). On January 11, 2017, Khatib emailed HR and stated the STD claim would be closed and this would only be worker's compensation claim. (**Ex. 3 at 18-21; Ex. 1 at 28**).

That morning, Becker spoke with Neal. (**Ex. 3 at 20**). Neal wanted STD benefits until the worker's compensation kicked in because he had been without a paycheck for a while. Becker told Neal it was his fault that there was a delay in him receiving reimbursement because he had changed his story about whether he was hurt at work or not. (**Id.**). Becker told Neal that LDC was closing his STD claim and filing only the worker's compensation claim. (**Ex. 1 at 22**).

LDC learned around January 12, 2017, from Zurich, LDC worker's compensation carrier, that Neal had retained the Brown & Brown law firm for his back injury. (**Ex. 3 at 22**). Brown & Brown also represented Neal in a pending claim where he injured his hand at work at LDC when a barge cable snapped. (**Id. at 23**). Becker wrote "Date of injury depending on what day Neal was asked is now 11-26-2016." (**Id.**).

On January 19, 2017, LDC requested Sun Life re-open the STD claim. (**Ex. 1 at 25**). Khatib stated LDC did not need to contact Neal about this decision since they received notice Neal now had an attorney. (**Id. at 26**). LDC stated after speaking with JoJo Magrone, the Director of Insurance and the Work Comp Examiner, they should file the STD claim and let both the STD claim and the worker's compensation investigations take their course. (**Id.**). Khatib was advised to continue the STD claim by Magrone. (**Ex. 4, Khatib Depo, 39:5-40:4**).

Neal was initially sent to physical therapy by Dr. Shawahin, and was then seen by Orthopedic Surgeon, Dr. Matthew Gornet, on February 28, 2017. (**Ex. 1 at 34-40**). Gornet ordered an MRI that demonstrated an obvious annual tear centrally and to the right at L5-S1. (**Id. at 40**).

3

Gornet released Neal to light duty work with no lifting greater than 10 lbs, must be able to alternate between sitting and standing as needed, and no repetitive bending or lifting. (**Id. at 40-41**). He referred Neal for physical, chiropractic therapy, and an epidural steroid injection. (**Id. at 40**). Neal provided the work restrictions to his supervisor on March 2, 2017. (**Ex. 3 at 38**). According to Stafford, when Neal brought doctor's restrictions to LDC, someone at LDC should have decided to see if Neal could perform a job within those restrictions or if an accommodation could be made. (**Ex. 5, Stafford Depo, 73:11-74:2 and 70:4-13**). Neal was not put back to work. LDC had multiple internal discussions concerning Neal's injury claims:

- On January 23, 2017, Becker stated that "**Zurich have discovered several inconsistencies in several of Neal's statements**". (**Ex. 3 at 24**).
- On February 7, 2017, Magrone wrote to Khatib that Neal's case "**is another problematic claim**." (**Ex. 1 at 64**).
- On February 8, 2017, Magrone wrote to Khatib that Meaka Benton from Zurich "is still investigating . . . . Nothing has been paid to date." She also wrote "**This is a red flag on this case**, so she is doing a thorough investigation." (**Id. at 65**).
- On March 17, 2017, Khatib advised that the STD carrier wrote to LDC and stated "The heavy lifting at work is the only activity that has been cited as potentially being the cause of his back condition, and his provider from a visit on 2/28 opined that **his symptoms are 'causally connected to work related injury as described.**'" (**Ex. 3 at 1**).
- On March 17, Stafford asked Khatib and Magrone to put their heads together for a recommendation going forward. (**Id**.)
- On March 19, 2017, Daniel Murray, wrote that "**My thoughts are that the back claim would likely be ruled as WC** . . . . (**Id. at 2**). In the same email he stated "**On a related note, we recently met with Zurich to discuss suspect and challenging claims**." (**Id**.). He also stated that "**it seems there are case handling decisions to be made**." (**Id**.).
- On March 20, 2017, Loffler wrote "We were surprised when he hooked up with an attorney on this one. Guess I shouldn't be surprised." (**Id. at 3**).
- On April 20, 2016, Becker stated "Also Meaka will be calling Neal's lawyer direct to get more information needed. . . .**Sad to say but in most cases the claimant is just looking for an easy buck**." (**Id. at 6**).

On March 21, 2017, Khatib wrote to Sun Life that "worker's comp is denying Neal's claim. We would like you to go ahead and approve his STD and begin payments." (**Ex. 1 at 54**). Sun Life then approved for STD benefits on March 22, 2017 effective to December 20, 2016. (**Id. at 50-**

4

53). Stafford testified in general the benefits for worker's compensation are better than for STD. (**Ex. 5, 21:16-20**). Stafford testified LDC had a worker's compensation manager in the Wilton office, and at the time of Neal's employment this was Mary Jo or Jo Jo Magrone. (**Id. 22:14-23**). Khatib also works at the Wilton office (**Ex. 4, 5:12-20**).

On May 4, 2017, Khatib sent a certified letter to Neal, as opposed to his attorney, that was received on May 10, 2017. (**Ex. 1 at 29-30**). The letter advised Neal he had been absent from work since December 20, 2016 and his employment and all company benefits would be terminated on June 19, 2017 unless he was able to return to work. (**Id.**). The letter advised Neal if he believed he was disabled under the ADA or other laws and would like to discuss accommodations that may allow him to return to work, he needed to contact LDC prior to June 19, 2017 (**Id.**). The letter advised he needed to provide updated medical information concerning his return-to-work status and any work-related restrictions. (**Id.**).

After the letter, Neal saw Dr. Boutwell on May 11, 2017, and received a steroid injection. (**Id. at 47-48**). Dr. Boutwell provided Neal with an updated note that was consistent with Dr. Gornet's prior orders of February 28, 2017 (**Id. at 43**). Neal provided a copy of the updated restrictions from Dr. Boutwell to Becker on May 23, 2017. (**Id. at 42-43**). Becker forwarded the note to Randall and Loffler. (**Id.**). On May 19, 2017, Meaka Benton from Zurich worker's compensation sent an email to Becker. She wrote: "**He continues to treat and we continue to deny treatment**." (**Ex. 3 at 25**).

Neal gave Khatib's letter of May 4, 2017 to his attorney (**Ex. 2, 64:10-65:1**). Neal noted:

Q. So did this letter concern you when you got it?
A. Yes.
Q. And why did it concern you?
A. **Because I don't know --- First of all, I didn't know what I did wrong, like why am I losing my job. That was the first thing, like it was a big shock. I'm thinking I'm in the process to go back to work. When I received this, it was a big shock. It was actually a heartbreaker for me.**

> **Q.     And did you understand what she was saying here is the company had a policy that it's kind of like you get terminated if you can't come back to work within a certain period of time?**
> **Mr. Carlson:  Object to form.**
> **Q.     I don't know if you understood that when you read the letter. Did you understand that?**
> **A.     No.**
> **Q.     And did you call Amy Khatib when you got the letter?**
> **A.     I turned it over to my attorney at the time. I didn't know what to do with it, so I let them handle it.**

(**Id. at 63:19-64:17**).

On May 23, 2017, Jerome wrote LDC's attorney, Andrew Kovacs, in response to the May 4 letter. (**Ex. 1 at 71**). Jerome advised Kovacs LDC had not accommodated Neal's restrictions from Dr. Gornet and Dr. Boutwell and Neal was completing injections to determine whether he will be released from care or recommended for further medical treatment. (**Id.**). He also advised LDC that Neal does not want to abandon his job and wishes to return to work when the effects of his injury are remitted. (**Id.**). He also asked Kovacs to advise LDC of this letter response, or to let him know if he needed to forward this correspondence directly to LDC. (**Id.**). Kovacs emailed Jerome's letter to Magrone at LDC on May 26, 2017. (**Ex. 6, Jerome Emails at 2**).

On May 24, 2017, in response to the updated information provided by Neal to Becker, Randall wrote "AS FYI . . . Neal provided this note yesterday (dated 5/11/17) indicating no change in his condition . . . remains off work. This is the employee whose claim was initially Short-Term Disability, then Worker's comp & **is currently under investigation by Zurich**." (**Ex 1 at 42**). Shortly thereafter, Stafford wrote to Randall and Khatib "So we sent him the 26 week letter right? And his date is June 19? At this point it's a matter of waiting and seeing if he contacts us about either potential accommodations or other return to work options. We shall see but **my money is on him counting on a W/C settlement and so won't see him again**." (**Id. at 44**).

On Thursday, June 22, 2017, Neal saw Dr. Gornet in Chesterfield, Missouri. Neal left the office about 7 p.m. that evening. (**Ex. 2, 87:18-21**). Gornet's updated work restrictions stated Neal

could work light duty with a 10-pound lifting restriction until July 2, 2017, and Neal could attempt a trial of full duty with no restrictions starting on July 3, 2017. (**Ex. 7, Gornet Record**). Neal brought Gornet's note to LDC on Friday, June 23, 2017. However, Neal was told by Nemechek that Becker was not working and to return on Monday. (**Ex. 2, 88:15-90:3**).

On Friday, June 23, 2017, Sun Life mailed a letter to Neal advising that it had stopped his STD benefits as of April 21, 2017, because its medical review **did not** consider him to be disabled. (**Ex. 1 at 58-62**). Sun Life advised LDC of this decision in emails to Khatib on June 19 and June 23, 2017. (**Id. at 56-57**).

On Monday, June 26, at 7:51 a.m., Khatib emailed Stafford to let him know Sun Life had issued a denial of Neal's STD benefits, and she stated we should terminate Neal unless Neal had requested an accommodation. (**Id. at 63**). Stafford emailed Becker at 8:36 a.m. to ask if he or Mark had spoken with Neal about a possible return to work. Becker stated he had not spoken with Neal, but Mark was on vacation today so he was not able to ask Mark if he spoke with Neal. (**Id.**). In response, at 10:37 a.m., Stafford stated he was not going to wait on Mark and he was going to terminate Neal today. (**Id.**). He wrote he could reverse the termination, but "I think we are in good shape and have minimal risk in keying term today." (**Id.**). At approximately 2:00 p.m., Neal provided the note from Gornet to Becker who emailed it to Stafford at about 2:23 p.m. (**Id. at 45-46**). (A legible copy of Dr. Gornet's note can be found at **Ex. 7**). Becker stated he advised Neal to call Stafford. (**Ex. 1 at 45**). In response, Stafford wrote to Amy Khatib and noted:

> A) Didn't go to the doctor until Monday AFTER his June 19 deadline to contact us as noted in his May letter.
> B) Release effective immediately on the 22nd but was not presented to us until today at noon (1 week later)
> C) Is not a full release, not that matters, and is only a trial basis after July 3.
>
> The site and myself would prefer to hold to the June 19 date given the fact that this appears to only have come about as a result of Sun Life's decision not to pay STD benefits and he didn't even present the release in a timely manner delayed from the 22nd until today and our grain elevators do work weekends.

In response to Stafford, Becker wrote the only work for June 24 and June 25 was on a volunteer basis. (**Ex. 3 at 4**).

On June 28, 2017, at 11:35 a.m., Stafford stated "Heads up. Will be sending the attached letter out to Neal today. Will also return his phone call and let him know of decision to terminate." (**Id. at 5**). Stafford spoke with Neal on June 29, 2017, and advised Neal he had been terminated because he did not respond to the letter of May 4, 2017. (**Id. at 31-32; Ex. 5, 44:10-45:4).** Neal stated he would have his attorney contact LDC. (**Ex. 3 at 31-32**). Neal called Stafford back and advised him his attorney had responded to the letter by writing to Andy Colfax. (*sic)* (**Id.**). Stafford told Neal he had no idea who that attorney was. (**Id.**).

Stafford sent a letter dated June 28, 2017. (**Id. at 31**). It stated:

> You were on a leave of absence with the Company that extended beyond six months. On May 4, 2017, you were advised that you needed to contact the Company on or before June 19, 2017 to discuss your employment status including any potential accommodations that may allow you to return to work. You were also instructed to submit current medical documentation. Although you were provided several weeks to comply with this request, you did not contact the Company or see a doctor prior to this deadline. The medical paperwork you recently provided indicates that you were released to return to work as of June 22, 2017, however, you did not report to work or contact the Company until late in the day on June 26, 2017.
>
> The Company has terminated your employment effective June 19, 2017 based on your failure to timely respond to the May 4, 2017 letter as well as your violation of the Company's Attendance Policy. As you know, a failure to report to work without notifying the Company for three consecutive work days is considered a job abandonment.

Stafford was involved in the decision to terminate Neal. (**Ex. 5, 45:11-16**). He was also LDC's 30(b)(6) corporate designee most knowledgeable of Neal's termination. (**Id. 12:23-14:19**). He also stated Becker and outside counsel for LDC, Mr. Clark, were involved. (**Id. 45:17-21**). Stafford testified Khatib's May 4, 2017 letter was not a normal letter they would send to work comp claimants. (**Id. 46:7-48:4**). This letter was sent out because Neal was in the STD program. (**Id. 47:23-48:4**). LDC nevertheless viewed Neal's claim as a worker's compensation claim. (**Id. 60:10-15**). Neal's attorney contacted the LDC's attorney Kovacs, on June 29, 2017. Kovacs

8

responded by sending him an email that demonstrated his May 23 letter had been forwarded to Magrone at LDC. (**Ex. 6 at 1**). Kovacs stated he was not getting into hot water over this and there was nothing he could do. (**Id.**).

Jerome sent a letter directly to LDC on July 14, 2017. The letter stated he had informed LDC of Neal's medical condition and his work status in his letter of May 23, 2017. (**Ex. 3 at 26-27**). Jerome requested Neal be reinstated to his job, or LDC's action would be considered retaliation for the filing of Neal's worker's compensation claim. (**Id. at 27**). In response to Jerome, Stafford wrote "No need for call . . . will send to legal and Jo Jo . . . this is the result of his w/c claim and his attorney communicating with Zurich attorney and not us. We sit tight. Will advise after visiting with our attorneys." (**Id. at 28**). (Emphasis added).

Stafford testified he had the ability to reverse Neal's termination on June 26 for good cause. (**Ex. 5 at 145:13-147:24**). He had the ability to reverse Neal's termination knowing Neal had gone to the doctor on June 22. (**Id. 149:6-10**). In other cases where the 26-week period passes, and the restrictions are such that the employee will have to work in a modified make work type job for one or two weeks LDC has not terminated that employee and allowed them to return to work. (**Id. 162:22-163:9**).

After he was terminated, Neal applied for unemployment benefits. (**Ex. 1 at 8-12**). LDC protested the requested benefits. (**Ex. 1 at 12**). LDC stated "Neal was terminated effective June 19, 2017, for failing to notify the Company of his absence from work, failing to keep us informed as to his ability to return to work as requested." (**Id.**). Following a hearing, the Illinois Department of Employment Security found that LDC was chargeable with the unemployment benefits. (**Id. at 6-7**). The Department noted "The evidence shows that the claimant was discharged . . . because he did not response to employer's request for information regarding his off-work status in a timely

manner. However, correspondence from the claimant's attorney demonstrated that such documentation was provided in a timely manner." (**Id.**). Stafford testified that Neal did provide information about his medical condition and this representation was incorrect. (**Ex. 5 at 109:9-110:1 and 102:16-24**).

Neal's back injury work comp claim with LDC settled in May 2019 for $25,578.91. (**Ex. 8, WC Settlement Contract**). The work comp claim for his right hand was resolved on July 5, 2017. (**Ex. 1 at 67-68**). In its answer to Plaintiff's retaliatory discharge claim, LDC stated as follows:

> 13. Defendant admits that Plaintiff was terminated from his employment with the company effective June 19, 2017 for failing to respond to the Company's May 4th correspondence and failing to report to or contact the Company in violation of the Company's attendance policy, but denies the remaining allegations in paragraph 13.
> (**Doc 24, Answer to First Amended Complaint**).

## II. LAW AND ARGUMENT: SUMMARY JUDGMENT SHOULD NOT BE GRANTED AS QUESTIONS OF FACT EXIST CONCERNING LDC'S MOTIVES

Illinois forbids an employer to retaliate against an employee because he filed a claim under the Worker's Compensation Act. 820 ILCS 305/1 et seq; Kelsay v. Motorola, Inc., 74 Ill.2d 172 (Ill. Sup. Ct. 1978). To state a cause of action for the tort of retaliatory discharge based on the filing of a worker's compensation claim, an employee must prove: (1) that he was an employee before the injury; (2) that he exercised a right granted by the Act; and (3) that he was discharged and that the discharge was causally related to his filing a claim under the Act. Clemons v. Mechanical Devices Co., 184 Ill.2d 328, 339 (Ill. Sup. Ct. 1998).

The element of causation is usually the key component of dispute in retaliatory discharge cases. When deciding the element of causation in a retaliatory discharge case, the ultimate issue to be decided is the employer's motive in discharging the employee. Hubert v. Board of Education

of Chicago, 169 N.E.3d 831, 836 (Ill. App. 1st Dist. 2020). The issue of an employer's motive or intent is a question of material fact, not normally subject to summary judgment. Palmeateer v. International Harvester Co., 489 N.E.2d 474, 476 (Ill. App.1986). A plaintiff may rely on direct evidence or circumstantial evidence of a retaliatory intent to provide a basis for inferring retaliation and causality. Jackson v. Bunge Corp., 40 F.3d 239, 243 (7th Cir. 1994).

LDC argues it is entitled to summary judgment. LDC's recitation of facts would lead this Court to believe that Neal or any other employee who is unable to return to work after 26 weeks is terminated. However, the record demonstrates questions of material fact exist as to the actual reason that Neal was terminated as well as LDC's motives for terminating Neal. LDC's motion premised on the 26-week policy simply adds another pre-textual basis for Neal's retaliatory discharge.

First, Neal's Material Facts of Record makes it clear that LDC has "cherry picked" facts and deposition testimony to support its Motion for Summary Judgment and ignored a multitude of contrary facts. Second, the record demonstrates LDC never previously suggested to Neal he was being terminated based on a purported "26 week" rule. Third, its actions showed a retaliatory animus as opposed to the application of a blanket rule. Fourth, LDC's representations to this Court are in direct contravention to its Answer to Plaintiff's Complaint and did not appear until depositions took place 17 months later.

    A.    **LDC's Admission**

This case was filed on June 3, 2021. On September 8, 2021, in response to Paragraph 13 of Neal's First Amended Complaint where Plaintiff alleged he was fired for the pretextual reasons of failing to respond to a letter and violating its attendance policy, LDC stated,

> 13.    Defendant admits that Plaintiff was terminated from his employment with the Company effective June 19, 2017 for failing to respond to the

> Company's May 4th correspondence and failing to report to work or contact the Company in violation of the Company's attendance policy, but denies the remaining allegations in Paragraph 13.

LDC admitted that it fired Neal for failing to respond to its letter of May 4, 2017, and violating its attendance policy. It only denied that those reasons were "pretextual." Now, to argue for summary judgment, LDC claims that it terminated Neal based on its STD "26 week" rule. LDC's motion and affidavit are in direct contradiction to that answer.

In federal court, as well as in Illinois, an answer to a complaint admitting a fact constitutes a binding judicial admission and withdraws that question from contention for purposes of summary judgment. Crest Hill Land Development, LLC v. City of Joliet, 396 F.3d 801, 805 (7th Cir. 2005). A party is "bound by what it states in its pleadings." Soo Line R. Co. v. St. Louis SW Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997). Judicial admissions "are formal concessions in the pleadings in the case or stipulations by a party or its counsel that are binding upon the party making them." Keller v. United States, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). They "may not be controverted at trial or on appeal, and indeed, they are not evidence at all but rather have the effect of withdrawing a fact from contention." Id. Judicial efficiency "demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." Soo Line R. Co., 125 F.3d at 483.

Trying to controvert its answer is EXACTLY what LDC is attempting. It admitted Neal was fired for purportedly failing to provide information it requested, and failing to show up to work for three days. It just denied those were pretextual reasons. Now, LDC has decided it cannot defend those grounds because the record shows Neal did respond to the letter and did not violate the attendance policy. LDC now claims Neal was terminated under a uniform 26-week policy.

12

Even if LDC's admission is not a judicial one, but evidentiary, LDC representations has created a genuine issue of material fact.

> **B.    LDC's Animosity and Actions Towards Neal's Claim were Retaliatory and Show its Real Motives for Firing Him**

The crux of the LDC's position is that no retaliatory motive was directed at Neal because it claims a blanket policy that terminates all employees who were unable to return to work within 26 weeks. Yet, everything LDC did after finding out that Neal had a claim was exactly, and almost diametrically, opposed to that notion. In fact, LDC went out of its way to assert Neal's worker's compensation injury claim was a fraud or not legitimate, he should be treated differently, and LDC should work to terminate him. Further, LDC's reliance on a "26 week" policy is just an additional pretextual retaliatory tool to discharge Neal.

The following are just a few of the actions by LDC which shows the animosity and retaliatory practices which undermines its defense:

1. After Neal filled out an injury report, he was informed by his supervisor that his case would be transferred from a short disability claim to a workers' compensation claim. That never happened. (**Ex. 1 at 22**).

2. After telling Neal his claim would be for work comp, LDC re-opened the STD claim and stated Neal need not be informed as he was represented by counsel. (**Id. at 25-26**).

3. On January 11, 2017, LDC determined that Neal's Claim would be one grounded in work comp and that his short-term disability claim would be closed. On January 12, 2017, it was made aware that Neal was represented by counsel. On January 19, 2017, LDC decided it was going to re-open the application for short-term benefits. (**Ex. 3 at 22-23; Ex. 1 at 25-26**).

4. LDC knew that STD would be less than those Neal would receive from worker's compensation, but never paid Neal TTD benefits despite its own internal emails and testimony that:

    a. The lifting "has been cited as being potentially being the cause of his back condition" (**Ex. 3 at 1**);

      b.    Neal's provider "from a visit on 2/28 opined that his symptoms are 'causally related to work related injury as described'" (**Id.**)

      c.    Their "thoughts that the back injury claim would likely be ruled WC" (**Ex. 3 at 2**); and

      d.    Neal's claim was viewed as worker's compensation claim) (**Ex. 5 60:10-15**).

5.    That Neal was a liar and his claim a fraud by asserting:

      a.    "Zurich have discovered several inconsistencies in several of Neal statements (**Ex. 3 at 24**):

      b.    Neal's case is "another problematic claim." (**Ex. 1 at 64**)

      c.    That "this is a red flag on this case." (**Id. at 65**)

      d.    "We were surprised when he hooked up with an attorney on this case. Guess I shouldn't be surprised." (**Ex. 3 at 3**)

      e.    "Sad to say but in most cases the claimant is just looking for an easy buck." (**Id. at 6**)

      f.    This is the employee "currently under investigation by Zurich". (**Ex. 1 at 42**).

Four additional points demonstrate the retaliatory nature and the motive. First, in its May 4 letter, LDC stated that Neal needed to provide updated medical information concerning his return-to-work status by June 19, 2017. Neal saw Dr. Boutwell on May 11, 2017. Neal provided a copy of Dr. Boutwell's new medical restrictions to LDC personally on May 23, 2017. (**Id. at 42-43.**) Neal's attorney also sent those updated restrictions to LDC. Additionally, Neal's attorney advised LDC about the type of Neal's treatment, that LDC had refused to accommodate Neal's restrictions, and that Neal had every intention of coming back to work. (**Id. at 71**).

Neal was nonetheless terminated in a letter dated June 28, 2017. LDC wrote:

> You were on a leave of absence with the Company that extended beyond six months. On May 4, 2017, you were advised that you needed to contact the Company on or before June 19, 2017 to discuss your employment status including any potential accommodations that may allow you to return to work. You were also instructed to submit current medical documentation. Although you were provided several weeks to comply with this request, you did not contact the Company or see a doctor prior to this deadline. The medical paperwork you recently provided indicates that you were released to return to work as of June 22, 2017, however, you did not report to work or contact the Company until late in the day on June 26, 2017.
>
> The Company has terminated your employment effective June 19, 2017 based on your failure to timely respond to the May 4, 2017 letter as well as your violation of the Company's Attendance Policy. As you know, a failure to report to work without notifying the Company for three consecutive work days is considered a job abandonment.

LDC's letter does not inform Neal he was fired pursuant to a "26-week" policy. To the contrary, it states Neal was terminated based on his failure to "timely respond" to the May 4 letter and a violation of LDC's attendance policy. (**Ex. 3 at 31-32**). Of course, Neal did provide LDC with the requested information, and he also did not violate the attendance policy.

Second, to avoid being charged with Neal's attempt to collect unemployment benefits, LDC stated:

> Mr. Neal began employment on August 20, 2015 as a Grain Elevator operator at our Cahokia, Illinois facility. On December 20, Mr. Neal was taken off work by his Health Care provider due to a back injury. He remained in a leave status collecting Short Term disability benefits until April 20th when it could not be substantiated that he was in fact 'totally disabled' as required by the terms of the plan.
>
> On May 4th, Mr. Neal was sent a letter notifying him that his employment would be terminated on June 19 unless prior to that date he contacted the Company to discuss his employment status including possible accommodations that may allow him to return to work. The Company also requested Mr. Neal to provide updated medical documentation prior to June 19th. Mr. Neal did not bother to provide an update until June 26 at 2:00 PM CDT when he appeared at the facility with a note from his physician stating he was examined and released on June 22nd with restrictions. The note went on to state that he could resume full duties on July 3.
>
> Although Mr. Neal had been released to return to work as of June 22, he did not notify the Company of his absence for his scheduled shifts on the 22nd, 23rd. or the 26th and did not show up for work on any of those dates. Such conduct violates the Company's attendance policy. Furthermore, Mr. Neal failed to properly respond prior to June 19th regarding his return to work status or his medical condition. The Company had already taken actions to fill his position based on the assumption that Mr. Neal was not interested in returning to work. Mr. Neal was terminated effective June 19, 2017 for failing to notify the Company of his absence from work, failing to keep us informed as to his ability to return to work as requested.
>
> Mr. Neal is unemployed only due to his lack of attention and failure to meet minimally reasonable standards of attendance and communications.

15

(**Id. at 33-37**). LDC did not state that Neal was terminated pursuant to a uniform 26-week policy. Instead LDC stated Neal was terminated "for failing to notify the company of his absence from work, failing to keep us informed as to his ability to return to work as requested." These statements are, of course, inaccurate. It is here where LDC's attempt to claim it had no retaliatory intent or motive falls apart. If LDC did indeed have a 26-week policy, then it would have no basis to claim fault on Neal's part and oppose Neal's right to unemployment benefits.[2]

Third, the attempt by LDC to use the 26-week policy as substantiation for firing Neal is, in and of itself, a pretext. The company kept Neal on STD when it had numerous internal indications and admissions, including an actual filing, that Neal's claim was for work comp. This way it was able to limit its exposure by not paying the higher benefits to which he was entitled. Further, by placing him in the STD program as opposed to work comp, it allowed LDC another pretext to fire him. This is because under the umbrella of the STD provision in the employee handbook an employee could be terminated after 26 weeks of short term disability. (**Ex. 1 at 72**). To the contrary, the employee handbook in the worker's compensation section says nothing about a 26-week termination policy. (**Id. at 73**). Keeping Neal's claim as STD allowed LDC to use its policy as a sword to fire him. LDC's corporate representative stated Khatib's letter of May 4, 2017 was **<u>not</u>** sent to employees with work comp claims.

Lastly, Khatib's assertion in her affidavit that, "the 26-week policy applies to all employees regardless of whether their leave of absence from a work-related injury" is, contradicted by LDC's corporate designee. Stafford testified he had the right to not apply or circumvent the 26-week rule

---

[2] LDC contested Neal's unemployment pursuant to 820 ILCS 405/602(a). (**Ex. 1 at 6**).This provides the individual is ineligible for benefits if they were discharged for misconduct. Importantly, under 820 ILCS 405/601, an employee is eligible for unemployment benefits if they left work voluntarily because they are physically unable to perform the work.

16

and had actually done so where the restrictions on the employee were such that he/she would have returned to work in a modified "make-work" type of job for one or two weeks and then allow them to return to full duty. Stafford also testified that he could "reverse" a termination for good cause.

This is exactly the situation Neal presented to Stafford. Neal saw his doctor again on June 22 and took the work note to LDC. Stafford had these new restrictions on June 26. The new restrictions allowed for Neal to work light duty until July 2, 2017, and then start a trial of full duty. Despite this, Stafford spoke with Neal and then sent him a termination letter dated June 28. Stafford had the ability and opportunity to allow Neal to return to work but refused to do so. Further, after being requested by Neal's worker's compensation attorney to reinstate Neal or allow him to return to work, LDC again refused. LDC's actions demonstrate that this was not a case where some "regular" non-retaliatory policy was applied. Instead, the facts demonstrate a clear pattern of hostility, animus and retaliatory actions against Neal for exercising his rights under the Illinois Workers' Compensation Act.

Under Illinois law, an employer may not discharge an employee on the basis of a dispute about the extent or duration of a compensable injury. Clark v. Owens-Brockway Glass Container, 697 N.E.2d 743,746-747 (Ill. App. 5th Dist. 1998). In Clark, the employee was fired because she filed for worker's compensation benefits but the employer, "believed that her claim for benefits was exaggerated", that she was malingering and guilty of fraud. Id. at 746. After cross motions for summary judgment were made and the trial court found for Clark, the court upheld the judgment finding the fact the employer did not like the claim, or even thought it fraudulent, was specifically related to the claim itself and could not be the basis for termination. Id. Here, the record establishes that LDC thought that Neal's claim was problematic, inconsistent, a red flag, and he was simply

17

looking for an easy buck. In response, Neal was terminated with other claimed pretextual reasons to hide its disdain for him.

In Jones v. Burkart Foam, Inc., 596 N.E.2d 882 (Ill. App. 5th Dist. 1992), a plaintiff injured his right hand on a laminator machine. His physician then excused him from work. The plaintiff then filed a worker's compensation claim. During his recovery, the plaintiff signed an agreement with his employer that he would return to work on August 28, 1989. Id. at 882. However, the plaintiff thought the agreement was only effective if his doctor released him for light duty. When the plaintiff did not show up to work on August 28, 29 or 30, pursuant to a three day no show policy, the plaintiff was terminated. Id. The plaintiff then presented a note from his physician on September 1st that would allow him to return to work on September 9th. However, his employer refused to reinstate his job. The trial court granted summary judgment. The appellate court reversed. It noted:

> Termination seems a rather harsh punishment for an employee's mere failure to inform the employer of his continued unavailability to work until only a few days beyond a disputed deadline. Such a drastic measure for a minor infraction could suggest an inference that defendants had a motive different than that which they professed…… (citation omitted)
>
> There is no dispute that defendants were aware that plaintiff had filed his workers' compensation claim only three months earlier, and it is also undisputed that defendants became aware of plaintiff's continued work release by September 1, 1989. Defendants' refusal to rescind plaintiff's termination suggests that defendants' purported motive for the second discharge may have been, in fact, a pretext for a retaliatory discharge.

Jones, Id. at 883-884. LDC engaged in the exact same behavior. LDC's purported motives for terminating Neal remain a question of fact.

LDC relies on cases that note that employers may terminate an employee for excessive absenteeism even if the absenteeism is caused by a compensable injury and argue that Neal was terminated consistent with a "26 week" policy. Finnerty v. Personnel Bd. Of Chicago, 700 N.E.2d

18

600, 606 (Ill. App. 1st Dist. 1999); Hartlein v. Illinois Power Co., 601 N.E.2d 720, 728 (Ill. 1992). However, as noted above, the factual record demonstrates questions of fact as to why and what motive LDC had for Neal's termination.

### C. Punitive Damages

Finally, LDC argues punitive damages are not warranted claiming there is no evidence that his discharge was causally related to his work comp case. However, the record and reasonable inferences support that Neal was terminated for exercising his rights under the Illinois Worker's Compensation Act. When this occurs, punitive damages must be permitted, otherwise there would be nothing to discourage the practice of retaliatory discharge which mocks the public policy of the State of Illinois. Kelsay v. Motorola, Inc., 384 NE.2d 353, 359-360 (Ill. Sup.; Ct. 1978).

### III. Summation and Conclusion

Questions of material fact exist as to LDC's motives in the termination of Neal. LDC claims it terminated Neal based on a uniform 26-week policy. The evidence of record suggests this claim is nothing but an after-the-fact pretextual explanation. Direct and circumstantial evidence in this case provides an overwhelming basis for inferring retaliation and causality.

For all the reasons set forth herein, the Plaintiff, Jerry Neal, Jr., prays this Court deny LDC's Motion for Summary Judgment.

                                            BYRON CARLSON PETRI & KALB, LLC

                                            BY: */s/ Eric J. Carlson*
                                                  Eric J. Carlson, #06228973
                                                  D. Jeffrey Ezra, *Of Counsel,* #06192516
                                                  411 St. Louis Street
                                                  Edwardsville, IL 62025
                                                  (618) 656-0066
                                                  (618) 655-4004 fax
                                                  ejc@bcpklaw.com
                                                  jezra@bcpklaw.com / jeff@ezralaw.com
                                                  *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

      The undersigned attorney hereby certifies that on March 20, 2023, he caused the foregoing to be filed with the court by electronic filing protocols using the CM/ECF system, and that a copy of the same will therefore be electronically served upon all attorneys of record registered with the court's CM/ECF system.

| | |
|---|---|
| Aaron A. Clark<br>Ruth A. Horvatich<br>McGrath North Mullin & Kratz, PC LLO<br>aclark@mcgrathnorth.com<br>rhorvatich@mcgrathnorth.com<br>*Attorneys for Defendant* | Gregg A. Kinney<br>Practus, LLP<br>Gregg.Kinney@practus.com |

                                                                 */s/ Eric J. Carlson*