IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JERRY NEAL, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:21-cv-00820-GCS |
| | ) | |
| LOUIS DREYFUS COMPANY | ) | |
| SERVICES LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S APPENDIX OF EVIDENCE

Plaintiff submits the following evidentiary materials in support of his Response to Defendant's Statement of Material Facts and his Brief in Opposition of Defendant's Motion for Summary Judgment:

| Exhibit | Evidence |
|---|---|
| 1 | Louis Dreyfus Company ("LDC") Personnel File of Jerry Neal, Jr. received in discovery in instant case |
| 2 | Deposition of Jerry Neal, Jr. |
| 3 | Jerry Neal, Jr's Personnel File received pursuant to subpoena in workers' compensation case |
| 4 | Deposition of Amy Khatib |
| 5 | Deposition of David Stafford |
| 6 | Jerome Emails |
| 7 | Gornet Record |
| 8 | WC Settlement Contract |

1

BYRON CARLSON PETRI & KALB, LLC

BY:  /s/ Eric J. Carlson
　　　　Eric J. Carlson, #06228973
　　　　D. Jeffrey Ezra, *Of Counsel,* #06192516
　　　　411 St. Louis Street
　　　　Edwardsville, IL 62025
　　　　(618) 656-0066
　　　　(618) 655-4004 fax
　　　　ejc@bcpklaw.com
　　　　jezra@bcpklaw.com / jeff@ezralaw.com
　　　　*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on March 20, 2023, he caused the foregoing to be filed with the court by electronic filing protocols using the CM/ECF system, and that a copy of the same will therefore be electronically served upon all attorneys of record registered with the court's CM/ECF system.

Aaron A. Clark
Ruth A. Horvatich
McGrath North Mullin & Kratz, PC LLO
aclark@mcgrathnorth.com
rhorvatich@mcgrathnorth.com
*Attorneys for Defendant*

Gregg A. Kinney
Practus, LLP
Gregg.Kinney@practus.com

　　　　　/s/ Eric J. Carlson

2

**Education/Professional Certifications/Licenses**
The following are the basic qualifications:
- High school graduate or equivalent


**Experience**
The following are the basic qualifications:
- Basic knowledge about barges

The following are the preferred qualifications:
- 2+ years of experience working on barges on in a barge related industry

**Knowledge/Skills/Abilities** *(including any physical demands)*
The following are the basic qualifications:
- Good balance and agility
- Able to lift up to 75 lbs
- Outside work in all weather conditions

The following are the preferred qualifications:
-

**Equipment Used**
-radios, pumps, blowers, barge ropes/cables. brooms, shovels, hand tools, winches, come-a-longs

**Working Conditions**
- Work is physically demanding, dirty and exposed to outside elements. Shifts of 8,10 or 12 hours consisting of days, night, & weekends.
- External environment exposed to variety of weather conditions.
- Exposure to agricultural commodities resulting in dusty conditions.
- Working at heights may be required.
- Lifting of equipment and materials up to 75 pounds.
- Standing walking, crawling, kneeling, squatting and stooping are required.
- Walking on barges and on catwalks over the river

**Employee Supervision**

- This is a non- supervisory position


**Decision Making/Accountability**
- -accurately reading barge drafts
- -properly securing and monitoring barges

**JOB DESCRIPTION**         **OPERATOR 1**

*This document is not to be construed as an exhaustive list of all responsibilities, duties and skills required of employees assigned to this job. All employees may be required to perform duties outside of their normal responsibilities from time to time, as needed. The Company reserves the right to modify responsibilities to respond to changing business demands.*

EXHIBIT

1

1

LDC0061

**Approvals**

| | |
|---|---|
| Completed by | Date |
| Approved by | Date |

**HR/ER Use Only**        Reviewed by                                    Date

EEO/AAP Code        Census Code/SOC Code
XXX                        XXX/XX-XXXX

*This document is not to be construed as an exhaustive list of all responsibilities, duties and skills required of employees assigned to this job. All employees may be required to perform duties outside of their normal responsibilities from time to time, as needed. The Company reserves the right to modify responsibilities to respond to changing business demands.*

2
LDC0062

**Louis Dreyfus Commodities**

LD Commodities LLC
46 Cargill Elevator Rd
PO Box 1656
Cahokia, IL
62206
United States

T +1 618 857 7330
F +1 618 857 7360

www.ldcahokia.com

08/12/2015

*PERSONAL & CONFIDENTIAL*

Mr. Jerry Neal Jr.
532 St. James
Cahokia, IL 62206

Dear Jerry:

I am pleased to confirm the terms on which LD Commodities Services, LLC (the "Company") offers to employ you at its Cahokia, IL terminal (the "Site"). This entity, together with its respective present and future affiliates and subsidiaries, are together referred to herein as the "Group." This offer is conditioned upon a favorable reference check and any other pre-employment screening that may be required. To be clear, you will not be permitted to begin working until all of the above pre-employment requirements have been met.

1.  <u>Position</u>. You will serve as an Operator, reporting to Scott Becker, or such other employee of the Company as may be designated. Your employment will be strictly "at will," which means that it may be terminated by you or the Company for any or no reason, with or without advanced notice or cause.

2.  <u>Timing regarding offer</u>. If you accept this offer, you will start employment on or about 08/17/2015.

3.  <u>Compensation</u>. You will be paid at the hourly rate of $12.00, less tax withholdings and any other deductions required by law, payable to you biweekly. You will be paid on a biweekly basis on Fridays (in arrears). You will be paid one and one-half times your standard hourly wage for all hours worked over 40 in any workweek, however all overtime <u>must</u> be authorized in advance by your supervisor.

4.  <u>Employee benefits</u>. You will be eligible for all employee benefits that are generally available to employees at the Site, which at this time include life and contributory health insurance, a 401(k) plan with employer matching and other benefits and privileges which are described in the employee benefits information and a personnel policy manual which will be given to you, and which are subject to change from time to time at the Company's discretion. During your first year of employment, you will be eligible for 3 days of Paid Time Off, which you can use after a waiting period of 60 days. After your first year of employment, you will be eligible to receive 15 days of Paid Time Off per year.

5.  <u>Duty to prior employer</u>. By accepting this offer, you warrant that your employment with the Company will not violate or be in conflict with any obligations you may have to any prior, current or prospective employer or business venture. You warrant that you are not subject to any previous employment agreement or other conflict of interest with the Company or any of the Group's present affiliates and subsidiaries. In performing services for the Group, you will not disclose, publish or use any nonpublic proprietary or confidential information that you may have obtained in the course of any previous employment.

6.  <u>Confidential information</u>. By signing below, you acknowledge and agree that:

    a.  all proprietary or confidential information not publicly available outside of the Group that you may acquire, that may be disclosed to you or that you may participate in developing

Page 1 of 3

**3**

LDC0063

during the course of your employment with the Company, including, but not limited to all trade secrets, investment strategies, fundamental balance sheets, risk management techniques and procedures, mathematical equations used in the development of trading strategies, contracts, processes and strategies concerning customers, potential customers, suppliers, potential suppliers, sales and purchases, modeling, merchandising, pricing strategies, business objectives, plans and strategies, corporate finances and business of the Group, or any other information concerning or used in the Group's business, its manner of operations, its plans, processes or other data (collectively, the "Confidential Information"), no matter in what form it is contained, is and shall be and remain the property of the Group;

b. at all times, during your employment and at any time thereafter, except in connection with the Group's business while you are employed by the Company and except insofar as the Confidential Information is generally available to the public or generally known in the industry in which the Group is or may become engaged (other than as a result of a violation of your obligations under this letter), you will (i) preserve and protect the confidentiality of Confidential Information; (ii) take all actions necessary to avoid unauthorized disclosure and otherwise maintain the confidential or proprietary nature of Confidential Information; (iii) not, directly or indirectly, divulge, disclose or communicate any Confidential Information to any person or entity except pursuant to compulsion of legal process or other requirement of law; (iv) not solicit or contact any existing or prospective customer or business partner of the Group with the intent of using or exploiting such Confidential Information, and (v) not otherwise use any Confidential Information for your own benefit or the benefit of anyone or any entity outside of the Group;

c. to the extent the Group is obligated to hold confidential information of third parties (by agreement or otherwise), you will also hold all such Confidential Information in the strictest confidence and not disclose it to anyone or use it except as necessary in carrying out your work for the Group consistent with the Group's agreement with such third party and (ii) you will take all reasonable precautions to prevent any unauthorized disclosure of any third party information described in this subsection (c);

d. you are not now party to nor will you enter into any oral or written agreement in conflict with this section 6; and

e. you are strictly forbidden from possessing, using, disclosing or drawing knowledge or information from Confidential Information and/or proprietary information obtained from a prior employer including, but not limited to, Cargill Incorporated or any other previous operator or contractor at the Site.

7. <u>Nonsolicitation</u>. By signing below, you acknowledge and agree that during your employment with the Company and for two years after your separation, for any reason, from employment with the Company, you will not, directly or indirectly, on your own behalf or on behalf of a third party, recruit, solicit, employ or engage the services of (as employee, consultant or agent) any officer, director or employee of the Group or solicit or encourage such person to terminate his or her employment and/or engagement with the Group to become employed by or engaged in any other business activity.

8. <u>Equitable relief</u>. You recognize that if you accept the position being offered to you, you may participate in and be privy to strategic plans, decisions and negotiations, and that the breach of your obligations under sections 6 or 7 would likely cause irreparable and continuing injury to the Group. Accordingly, you understand and agree that any breach by you of any such provision will cause the Group irreparable injury and damage for which money damages may not be adequate. In addition to all other remedies that are available to it, the Group shall be entitled to preliminary and permanent injunctive and equitable relief without posting a bond to prevent or remedy such a breach by you.

Page 2 of 3

4

LDC0064

9. **Assignment.** You acknowledge and agree that (a) the Company has the right to assign any or all of its rights, obligations and benefits under this letter to any other entity within the Group, and that such assignment may result in you being employed by such other entity; and (b) upon any such assignment, the assignee will have the right to enforce any right or benefit assigned to it as if it had initiated and/or signed this letter itself.

10. **Severability.** If any term in this letter is deemed invalid or illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other terms or provisions, which shall remain fully enforceable and the letter shall be construed as if such invalid, illegal or unenforceable provision had never been included in the agreement.

11. **Governing law.** The terms of this letter shall be enforced and construed under and in accordance with the laws of the state of Illinois, without giving effect to any choice of laws principles that would result in the application of the law of any other jurisdiction. Any action to enforce the terms of this letter shall be brought in a state or federal court situated in Illinois.

12. **Amendments; Representations.** Nothing contained in this letter may be changed or waived except in a writing signed by you and the Company. By signing below, you acknowledge and agree that this letter agreement supersedes all prior representations, promises, agreements and understandings between you and the Group and that other then what is set forth in this letter agreement that there are no other representations, promises or commitments concerning your employment, whether written or oral, that may have been made to you by any Group representative if different from what is expressly stated herein or in the documentation referred to herein.

We will arrange for an orientation for you on or about your first day of work. You are expected to follow policies and procedures of the Group and the Site. Also, have available your bank name, account number and routing number and, if a checking account, a voided check or photocopy of a check, as we encourage direct deposit of paychecks.

Finally, you are required by federal law to provide documentary proof of your identity and eligibility to work in this country within 72 hours of beginning your employment. A list of acceptable documents is enclosed with the Form I-9. Regardless of which form(s) of identification you choose to produce, we will also need to see your original Social Security card.

Please indicate your acceptance of this offer by signing the originals of this letter and returning it to me.

Feel free to call Jacky Murphy at (816) 218-2377 if you have any questions about the Company, its policies and benefits or this offer of employment.

Sincerely,

Scott Becker
Superintendent

I accept and agree to the offer of employment under, and subject to, all of the terms and conditions set forth in this letter.

_____     8-14-15
Signature                            Date

Page 3 of 3

5

LDC0065

5240-0099

Illinois Department of Employment Security

P.O. Box 19509
Springfield, IL  62794
Phone: (800) 244-5631 · TTY: (800) 244-5631
Fax: (217) 557-4913
www.ides.illinois.gov

|||....||.|.|.||.|.|...|.|.|.||.|.||.||.|..|||.|.||.|.||.|

LD COMMODITIES SERVICES LLC
40 DANBURY RD
WILTON, CT  06897-4441

Date Mailed:  08/18/2017
Employer Account Number:  4615866
Claimant SSN:  ▓▓▓▓▓▓0655
Claimant Name:  JERRY L. NEAL

## Determination

The following determination has been made in connection with the claim for unemployment insurance benefits.

Issue 008 602A - Misconduct
Allow  Effective 07/09/2017 - 12/31/9999
Was the claimant discharged for misconduct connected with the work? The evidence shows the claimant was discharged from LD COMMODITIES SERVICES LLC because because he did not respond to employer's request for information regarding his off work status in a timely manner. However, correspondence from the claimant's attorney demonstrates that such documentation was provided in a timely manner.. Since the claimant's action, which resulted in his discharge was not deliberate or willful, the claimant is not ineligible for benefits from 07/09/2017 in regard to this issue.

The claimant cannot be held ineligible for benefits under Section 601A of the Illinois Unemployment Insurance Act since after investigation it has been determined that the correct issue raised was Section 602A of the Act.

If you require further details concerning the information in this letter, please contact the Agency at the phone number listed above.

Please see appeal rights listed below and additional information regarding this determination.

008 602A - Misconduct - 820 ILCS 405/602A provides that an individual shall be ineligible for benefits for the weeks in which he has been discharged for misconduct connected with his work and, thereafter, until he has become re-employed and has had earnings equal to or in excess of his current weekly benefit amount in each of four calendar weeks. The term "misconduct" means the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit. The previous definition notwithstanding, "misconduct" shall include any of the following work-related circumstances: 1. Falsification of an employment application, or any other documentation provided to the employer, to obtain employment through subterfuge. 2. Failure to maintain licenses, registrations, and certifications reasonably required by the employer, or those that the individual is required to possess by law, to perform his or her regular job duties, unless the failure is not within the control of the individual. 3. Knowing, repeated violation of the attendance policies of the employer that are in compliance with State and federal law following a written warning for an attendance violation, unless the individual can demonstrate that he or she has made a reasonable effort to remedy the reason or reasons for the violations or that the reason or reasons for the violations were out of the individual's control. Attendance policies of the employer shall be reasonable and provided to the individual in writing, electronically, or via posting in the workplace. 4. Damaging the employer's property through conduct that is grossly negligent. 5. Refusal to obey an employer's reasonable and lawful instruction, unless the refusal is due to the lack of ability, skills, or training for the individual required to obey the instruction or the instruction would result in an unsafe act. 6. Consuming alcohol or illegal or non-prescribed prescription drugs, or using an impairing substance in an off-label manner, on the employer's premises during working hours in violation of the employer's policies. 7. Reporting to work under the influence of alcohol, illegal or non-prescribed prescription drugs, or an impairing substance used in an off-label manner in violation of the employer's policies, unless the individual is compelled to report to work by the employer outside of scheduled and on-call working hours and informs the employer that he or she is under the influence of alcohol, illegal or non-prescribed prescription drugs, or an impairing substance used in an off-label manner in violation of the employer's policies. 8. Grossly negligent conduct endangering the safety of the individual or co-workers. For purposes of paragraphs 4 and 8, conduct is "grossly negligent" when the individual is, or reasonably should be, aware of a substantial risk that the conduct will result in the harm sought to be prevented and the conduct constitutes a substantial deviation from the standard of care a reasonable person would exercise in the situation. Nothing in paragraph 6 or 7 prohibits the lawful use of over-the-counter drug products as defined in Section 206 of the Illinois Controlled Substances Act, provided that the medication does not affect the safe performance of the employee's work duties.

If you disagree with this determination, you may complete and submit a request for reconsideration/appeal. A letter will suffice if you do not have an agency form.  Your request must be filed with the Illinois Department of Employment Security within thirty (30) calendar

6

LDC0093

LD COMMODITIES SERVICES LLC                                    08/18/2017

days after the date this notice was mailed to you. If the last day for filing your request is a day that the Department is closed, the request may be filed on the next day the Department is open.   Please file the request by mail or fax at the address or fax number listed above. Any request submitted by mail must bear a postmark date within the applicable time limit for filing.   If additional information or assistance regarding the appeals process is needed, please contact the Agency at the phone number listed above.

**Important Notice**
IDES contracts with private law firms to provide limited free legal services (consultation and/or representation at IDES administrative hearings) to claimants and small employers who are eligible for this service. These independent law firms are not part of IDES. Representation at your hearing is not automatic and depends, in part, upon the facts in your case.

Note: A small employer is an employer which reported wages paid to less than twenty individuals, whether part time or full time, for each of any two of the four calendar quarters preceding the quarter in which its application for legal assistance is made.   .

If you are interested in this legal service, call the applicable telephone number right away after receiving a ruling against you or notice of an appeal. Any delay in calling could result in your not being able to obtain this service. Normal working hours are from 8:30 a.m. until 5:00p.m., Monday through Friday.

Claimants:
(SSN ending with 0-4)
Toll-Free:        (800) 884-6591
Out of State:     (847) 991-9240
TTY:              (866) 848-5609

(SSN ending with 5-9)
Toll-Free:        (888) 430-1776
Phone:            (847) 251-1776
TTY:              (847) 251-6985

Small Employers:
If your account number for unemployment insurance ends in 0 to 9, call:
(866) 641-4288
(312) 641-6403 TTY (not toll-free)

J04L                          Page 2 of 2                    ADJ004L    275/134.x, 276/136, 137.xx

7

LDC0094

5240-0115

Illinois Department of Employment Security

P.O. Box 19509
Springfield, IL 62794
Phone: (800) 244-5631 · TTY: (800) 244-5631
Fax: (217) 557-4913
www.ides.illinois.gov



1059617771

LD COMMODITIES SERVICES LLC
40 DANBURY RD
WILTON, CT  06897-4441

Date Mailed:    07/14/2017
Employer Account Number:    4615866
FEIN:    273305101
Claimant SSN:    ▓▓▓-0655
Reply Due Date:    07/24/2017

## Notice of Claim to Benefit Chargeable Employer

The claimant listed below has filed a claim for Unemployment Insurance. Please review the information carefully.
If you wish to protest the claimant's right to benefits for any reason other than the claimant's involvement in a Labor Dispute, you must do so in writing by attaching a signed letter to this notice which includes the claimant's name and Social Security Number.  Provide a detailed and complete statement of facts supporting your allegation and mail or fax  the statement  by 07/24/2017 to  the Agency at the address listed above.

IF YOU ARE RESPONDING TO THIS NOTICE, PLEASE PLACE ADDITIONAL DOCUMENTS BEHIND ANY BAR-CODED PAGE.

If you are registered as a SIDES Employer, and you also received an E-mail notification regarding this notice, please respond using the SIDES E-Response process by logging into https://uisides.org/sew-s/views/login.

If you would like to begin receiving or responding to Notices of Claims electronically, you may register with SIDES at https://taxnet.ides.state.il.us. Once you have registered with SIDES E-Response you will start to receive E-mail notifications that you have requests pending.  Only at this time will your SIDES account be activated and you can begin responding to Notice of Claims electronically. If at the time you receive this notice you are not registered for SIDES, you cannot respond electronically to this notice.

IMPORTANT INFORMATION: If you DO NOT wish to protest this claim, no response is necessary.
HOWEVER: If you do respond to this notice please submit your response only once. If you respond electronically via SIDES then please DO NOT fax or mail your protest or response as well.

| Last Name: NEAL | Suffix: | Other Last Name: | |
|---|---|---|---|
| First Name: JERRY | Middle Initial: L | Benefit Year Begin Date: 07/09/2017 | |
| Date of Claim: 07/09/2017 | Claim ID:15017608 | Claim Type: New | Program: Regular |
| First Day Worked: 09/01/2015 | Last Day Worked: 12/19/2016 | Reason for Separation: Laid-Off (Lack of Work) | |
| Return to Work Date: Unknown | Claimant Resides In: IL | State Worked In: IL | Dependent:Dependent Under 18 |

The wages shown represent earnings the claimant received from you during the base period. A worker's base period consists of the first four of the last five completed calendar quarters immediately preceding the month in which the benefit year begins. The alternate base period is the last four completed calendar quarters immediately preceding the benefit year.

Benefit Year Begin Date: 07/09/2017                              Total Base Period Wages: $39,367.46
Base Period Qtr: 2        Base Period Year: 2016              Wages: $12,514.96
Base Period Qtr: 3        Base Period Year: 2016              Wages: $12,707.48
Base Period Qtr: 4        Base Period Year: 2016              Wages: $13,941.24
Base Period Qtr: 1        Base Period Year: 2017              Wages: $203.78

J30F                                      Page 1 of 2                          ADJ030F              BIS 32          8

LDC0100



LD COMMODITIES SERVICES LLC   07/14/2017
Claimant Name: JERRY L. NEAL   SSN: ████0655

This notice is being sent to you because you are the Chargeable Employer for whom the claimant worked for 30 days (not necessarily consecutively) from the beginning of the claimant's Base Period to the "Date of Claim." You will be charged for any benefits paid to him/her. There is no connection between the amount that you paid the claimant and the amount you will be charged. The claimant's benefits are based on his/her wages during the first four of the last five completed calendar quarters (Base Period) prior to the claimant's "Benefit Year Begin." You will be charged for the benefits paid even if the wages you paid the claimant are not used in calculating his/her benefits. If the claimant worked for you for less than 30 days, you can be charged because you were the single employer that paid the claimant enough wages to requalify the claimant after a disqualifying separation from a previous employer. Rules on charging can be found at 56 Ill. Adm. Code 2765.325 et seq. [See www.ides.illinois.gov under rules.]

**FOR INFORMATION REGARDING YOUR RIGHTS UNDER ILLINOIS' UNEMPLOYMENT INSURANCE ACT, INCLUDING INFORMATION ON HOW TO OBTAIN FREE LEGAL SERVICES, AND THE EXACT LANGUAGE OF THE ACT AND IDES RULES, PLEASE VISIT THE AGENCY'S WEBSITE AT www.ides.illinois.gov/UIRights.**

If you wish to protest the claimant's right to benefits because he/she received vacation pay in connection with his/her separation. In your response, you must indicate the period covered by the vacation pay and the amount of the pay. Your protest must be filed by the "Reply Due Date" or within 10 days of the date that the vacation pay is paid or becomes payable. If the payment was made for an announced period of vacation or inventory shutdown, it is not necessary to make this designation.

Appeal Rights
If your protest is not postmarked, faxed, or successfully submitted via SIDES by the "Reply Due Date", you will not have the right to appeal a determination that is not in your favor. However, you can protest at any time that the claimant was not able, available or actively seeking work, giving details. You can also protest anytime that the claimant was not unemployed or that the claimant is receiving a retirement pension. In those cases, you would have the right to appeal a determination for periods after the date that you filed your protest. Even if your protest is late, we will still consider any information that you provide. However, you will not be able to appeal our determination.

If you wish to request a change of address for forms such as Notice of Claims (ADJ030F), Employer Contribution and Wage Report (UI-3/40), Statement of Benefit Charges (BEN 118), send a written request to Illinois Department of Employment Security (IDES) Revenue-Employer Account Analysis at 33 S. State St 10th Floor, Chicago, IL 60603 or fax to (312) 793-5009. NOTE: All agents must have power of attorney on file to request a change of address.

Please complete, sign and return this form by 07/24/2017, to the Agency at the address listed above.
NOTE: If you choose to fax your protest, it is not necessary to mail as well.

IF YOU ARE RESPONDING TO THIS NOTICE, PLEASE PLACE ADDITIONAL DOCUMENTS BEHIND ANY BAR-CODED PAGE.

| Please select one of the following and complete all other related information: |
|---|

☐ I did not employ the claimant for 30 days

Start Date: __ __ / __ __ / __ __ __ __    End Date: __ __ / __ __ / __ __ __ __

Total Number of Days Worked: _____

☐ Leased employee (Please identify leasing Agency Name and Address)

Agency Name

| Address 1 | Address 2 (Apt., Floor, Suite, etc.) |
|---|---|
| City | State | Zip Code |

☐ Claimant never worked for me    ☐ Claimant is not unemployed   *NOTE: Claimant may still be eligible if working part-time

I certify that the information contained herein is true and correct.

| Name (printed): | | Signature: | |
|---|---|---|---|
| Title: | | Contact Name (if different): | |
| Date: | | Telephone Number: | |

J30F                    Page 2 of 2                    ADJ030F        BIS 32         9

LDC0101

LD COMMODITIES SERVICES LLC 07/14/2017
Claimant Name: JERRY L. NEAL SSN: ████0655

Employer's Response to UI Claim:

Mr. Neal began employment on August 20, 2015 as a Grain Elevator operator at our Cahokia, Illinois facility. On December 20, Mr. Neal was taken off work by his Health Care provider due to a back injury. He remained in a leave status collecting Short Term disability benefits until April 20th when it could not be substantiated that he was in fact 'totally disabled' as required by the terms of the plan.

On May 4th, Mr. Neal was sent a letter notifying him that his employment would be terminated on June 19 unless prior to that date he contacted the Company to discuss his employment status including possible accommodations that may allow him to return to work. The Company also requested Mr. Neal to provide updated medical documentation prior to June 19th. Mr. Neal did not bother to provide an update until June 26 at 2:00 PM CDT when he appeared at the facility with a note from his physician stating he was examined and released on June 22nd with restrictions. The note went on to state that he could resume full duties on July 3.

Although Mr. Neal had been released to return to work as of June 22, he did not notify the Company of his absence for his scheduled shifts on the 22nd, 23rd. or the 26th and did not show up for work on any of those dates. Such conduct violates the Company's attendance policy. Furthermore, Mr. Neal failed to properly respond prior to June 19th regarding his return to work status or his medical condition. The Company had already taken actions to fill his position based on the assumption that Mr. Neal was not interested in returning to work. Mr. Neal was terminated effective June 19, 2017 for failing to notify the Company of his absence from work, failing to keep us informed as to his ability to return to work as requested.

Mr. Neal is unemployed only due to his lack of attention and failure to meet minimally reasonable standards of attendance and communications.

10

LDC0102

**LouisDreyfus⊞**

Louis Dreyfus Corporation
Kansas City Board of Trade
Suite 274
Kansas City, Missouri
64112-2505

Telephone  816 756-3560

## Fax Transmittal

To   Ill. Dept Empl. Sec.

From   LDC

Date   7/21/17

Pages   including this page   4

cc

Fax   217·557·4913

This fax communication is intended for the use of the individual to whom it is addressed and may contain information that is proprietary, confidential or privileged. If you are not the intended recipient (and/or employee or agent responsible for delivering this communication to the intended recipient), you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender by telephone immediately and return it to the sender by mail. Sender will reimburse you for any expense incurred. Thank you. If any problems occur during transmission, please call 816 756-3560.

11

LDC0103

# FAX CONFIRMATION

**Result: Success**

## Sent by:

Name:                  Walkup
Voice Number:
Fax Number:
RightFax ID:           WALKUP

## Sent to:

Name:                  Fax User
Company:
Number/Address:        912175574913
Voice Number:
Remote CSID:           State of IL 841

## Details:

Type:                  FAX

Cover Sheet:           does not have a cover page
Body Pages:            4

Billing Code #1:
Billing Code #2:

Unique ID:             WAL5977015D5FAC
Fax Channel:           0

Scanning Device:

Scanned at:            07/25/17 08:29:05
Submitted at:          07/25/17 08:29:16
Completed at:          07/25/17 08:46:55

12

LDC0104

## Amy Khatib

| | |
|---|---|
| From: | Amy Khatib |
| Sent: | Tuesday, January 10, 2017 12:18 PM |
| To: | Amber Randall |
| Cc: | Jacky Murphy; Charise Twyne-Stokes; Dave Stafford |
| Subject: | RE: J. Neal |

| Tracking: | Recipient | Delivery |
|---|---|---|
| | Amber Randall | Delivered: 1/10/2017 12:18 PM |
| | Jacky Murphy | |
| | Charise Twyne-Stokes | |
| | Dave Stafford | |

Hi Amber:

I appreciate the information. At this point, it appears he is moving forward with the STD claim as he has filed it directly with Sun Life. We have asked them for confirmation that he has signed that this claim is not work related. Will keep you posted. I would suggest that we go ahead and place him out on STD so we can track his leave.

Thank you,

Amy

**LDC.**
Louis Dreyfus Company

Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amber Randall
**Sent:** Tuesday, January 10, 2017 12:09 PM
**To:** Amy Khatib <AMY.KHATIB@LDCOM.COM>
**Cc:** Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@LDCOM.COM>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Subject:** RE: J. Neal

This is kind of a tricky situation, but here are the facts:

- Wednesday, December 14- Jerry Neal advised that he was going to the doctor due to a stiff back. He told his supervisor that it was <u>not</u> work related.
- Friday, December 16- Jerry presented doctor's note restricting him from lifting, pushing or pulling anything for 2 weeks. On 12/16 & part of 12/19, Jerry worked in the control room on the computer (no lifting required)
- Monday, December 19- we were notified about the situation & provided Cahokia superintendents with STD & ADA paperwork for Jerry & physician to complete
- Wednesday, December 21- Jerry went to his doctor to complete the paperwork & doctor advised that this injury could have been work related. Site filed a claim with Zurich- Zurich has been provided all of these details.

1

**13**
LDC0160

- Monday, January 9- Jerry called Scott Becker to say he'd like to move forward with a Short Term Disability Claim. Per Dave Stafford advise, we have asked Jerry to provide a written statement of injury indicating how he hurt his back. Once we receive the written statement of injury, we will determine how to proceed.

Please let me know if questions.



**Amber Randall**
**Human Resources Generalist**
Phone: +1 816 412 2779 | Fax: +1 816 218 2389 | Email: Amber.Randall@ldcom.com
**Louis Dreyfus Company Services LLC**
4800 Main Street Suite 600 Kansas City, MO 64112 / USA

---

**From:** Amy Khatib
**Sent:** Monday, January 09, 2017 3:14 PM
**To:** Amber Randall <AMBER.RANDALL@LDCOM.COM>
**Cc:** Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@LDCOM.COM>
**Subject:** J. Neal

Hi Amber:

We just received a notification from Sun Life that they have received a STD physician's statement for Jerry Neal. Is he planning on going out on leave?

Thank you for looking into this for us.

Best,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

14
LDC0161

# Sun Life Assurance Company of Canada

SunAdvisor Claim Packet



Sun
Life Financial®

## Section B: Attending Physician's Statement

### 1 Information About the Patient

Please print clearly

Return to:
SunAdvisor
P.O. Box 81915
Wellesley Hills, MA 02481
Fax: (781) 304-5519

The patient is responsible for any costs associated with the completion of this form.

| Name of Patient (first, middle initial, last) ☒ M ☐ F | Social Security number | Date of birth (m/d/y) |
|---|---|---|
| Jerry Neal | 0655 | 81 |

| Name of Employer | Agreement number | Employee phone no. |
|---|---|---|
| | | |

### 2 Diagnosis and History

Provide general information about diagnosis and history in this section. Then, please elaborate in section(s) 3 – 6 as appropriate.

Diagnosis including any complications and ICD-9 Codes(s) Low Back pain

Objective findings (i.e. x-rays, EKGs, MRIs, laboratory data and any other clinical findings) Back tenderness

Subjective Symptoms Low Back pain.

Date symptoms first appeared or date of accident 10/14/16     Date Disability Commenced X 4/22/16

Has patient ever had same or similar condition? ..... ☐ Yes ☒ No   If Yes, when:

Is condition due to injury/sickness arising out of patient's employment?..... ☐ Yes ☐ No ☒ Unknown

Names and telephone numbers of Other Treating Physicians (if applicable)

If pregnancy, please provide the following information:
• Expected delivery date: _____    • Actual delivery date: _____    • C-Section? ☐ Yes ☐ No

Describe any complications that would extend this disability longer than a normal pregnancy

### 3 Treatment

Include in description any surgery, therapeutic modalities, psychological intervention and medications prescribed.

| Date of first visit | Date of last visit | Date of last examination |
|---|---|---|
| X 4/22/16 | 1/3/17 | 1/3/17 |

Frequency of treatment............☐ Weekly   ☐ Monthly   ☐ Other (please specify): 3 w/Cs.

Description of Treatment Medication + Physical therapy.

### 4 Progress

Has patient: ................ ☐ Recovered   ☒ Unchanged   ☐ Improved   ☐ Retrogressed

Is patient: ................... ☒ Ambulatory   ☐ Bed confined   ☐ House confined   ☐ Hospital confined

If unchanged or retrogressed, please explain: It will start physical therapy.

Has patient been hospital confined?.........☐ Yes ☒ No   From:         To:

If yes, provide name and address of hospital

XGR/847   •   SunAdvisor Claim Packet                    Page 3 of 9

## 5 Restrictions and Limitations

Restrictions and Limitations should be associated with the Objective and Subjective findings/symptoms noted in section 2.

**Restrictions (what the patient should not do)**

No lifting over 10 I lbs.

**Limitations (what the patient cannot do)**

No pushing or carrying over 10 I lbs.

Is the patient capable of working within these restrictions/limitations? ....................☒Yes ☐No
Can the patient work an eight-hour day with these restrictions/limitations? ..............☒Yes ☐No
If no, how many hours could he/she work? ....................................................._____ hours
Is patient capable of working in another occupation?     ☐Yes – Full-time ☐Yes – Part-time ☐No

Indicate class of impairment - As defined in federal dictionary of occupation titles

**Physical Impairment**

☐ Class 1 – No limitation          ☐ Class 4 – Moderate limitation
☐ Class 2 – Slight limitation      ☐ Class 5 – Severe limitation
☒ Class 3 – Medium limitation

**Mental Impairment (if applicable)**          **Current DSM diagnosis**

☐ Class 1 – No limitation
☐ Class 2 – Slight limitation
☐ Class 3 – Moderate limitation
☐ Class 4 – Marked limitation
☐ Class 5 – Severe limitation

Do you believe this patient is competent to endorse checks/direct the use of proceeds?  ☐Yes ☐No

## 6 Return-to-Work

1. When will patient recover sufficiently to perform duties? (Specify date or check recovery period)
   • Patient's occupation part-time:   unknown.
     Date: _____  -or- ☐<3 wks ☐3-4 wks ☐5-6 wks ☐7-8 wks ☐2 months or more ☐Never
   • Patient's occupation full-time:
     Date: _____  -or- ☐<3 wks ☐3-4 wks ☐5-6 wks ☐7-8 wks ☐2 months or more ☐Never

2. After reviewing the material and substantial duties of the patient's occupation, would you recommend vocational counseling and/or rehabilitation or job modification? ...... ☐Yes ☐No

## 7 Certification and Signature

Remember to provide your full address and Tax ID number.

A stamp or signature of a person other than the examining physician is not acceptable.

I certify that the above statements are true and complete. I have read or had read to me the fraud warning for my state.

| Name of Attending Physician | Degree/Specialty | | |
|---|---|---|---|
| Nidal Snawahin | Internal medicine | | |
| **Street address** | **City** | **State** | **Zip Code** |
| 4600 memorial dr. Ste 3100 | Belleville | IL | 62226 |
| **Tax ID number** | **Telephone number** | **Fax number** | |
| 37-1595406 | 618-222-7280 | 618-222-7281 | |
| **Attending Physician Signature** | | **Date** | |
| X | | 1/3/17 | |

16

LDC0164

01-03-17;05:33PM;                                    ;16182227281           #  3/ 7

# Sun Life Assurance Company of Canada

## SunAdvisor Claim Packet


Sun Life Financial®

---

### Fraud Warnings

State law requires that we notify you of the following:

**General fraud warning:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**AK:** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**AL:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**AR, LA, MA, MN, NM, RI, TX and WV:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**AZ:** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**CA:** For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**CO:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**DC:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**DE, ID and IN:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**FL:** Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

17

LDC0165

01-03-17;05:38PM;                                     ;'6182227281        # 4/ 7

**▌Fraud Warnings continued**

**KS:** Any person who knowingly and with intent to defraud any insurance company or other person files an Application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto may be guilty of insurance fraud as determined by a court of law.

**KY:** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**MD:** Any person who knowingly OR willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly OR willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**ME, TN and WA:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**NH:** Any person who, with a purpose to injure, defraud, or deceive any insurance company, files a statement of claim containing any false, incomplete, or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**NJ:** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**OH:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**OK:** WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**OR and VA:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may have violated state law.

**PR:** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**VT:** Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

18

LDC0166

01-03-17;05:38PM;                                                    ;16182227281        #  5/  7

# Sun Life Assurance Company of Canada



Sun
Life Financial®

**Authorization for Release and Disclosure of Health Related Information**

This Authorization complies with the HIPAA Privacy Rule. It is important for you to read, sign and submit all Authorizations in this packet. Failure to submit all Authorizations could result in a delay during the claims process.

Return to:
Sun Life Assurance Company of Canada
P.O. Box 81915
Wellesley Hills, MA 02481
Fax: (781) 304-5519

I HEREBY AUTHORIZE any physician, health care provider, health plan, medical professional, hospital, clinic, laboratory, pharmacy benefit manager or other medical or healthcare facility that has provided payment, treatment or services to me or on my behalf, to disclose my entire medical record and any other protected health information concerning me to the Claims Department of Sun Life Assurance Company of Canada ("the Company") its subsidiaries, affiliates, third party administrators and reinsurers.

I understand that such information may include records relating to my physical or mental condition such as diagnostic tests, physical examination notes and treatment histories, which may include information regarding the diagnosis and treatment of human immunodeficiency virus (HIV) infection, sexually transmitted diseases, mental illness and the use of alcohol, drugs and tobacco, but shall not include psychotherapy notes.

By my signature below, I acknowledge that any agreements I have made to restrict my protected health information do not apply to this Authorization, and I instruct any physician, health care professional, hospital, clinic, medical facility or other health care provider to release and disclose my entire medical record without restriction.

I understand that the Company will use the information it obtains to: (a) underwrite my application for coverage, (b) make eligibility, risk rating, policy issuance and enrollment determinations; (c) obtain reinsurance; (d) administer claims and determine or fulfill responsibility for coverage and provision of benefits; (e) administer coverage; and/or (f) conduct other legally permissible activities that relate to any coverage I have or have applied for with the Company.

I understand that the Company will not disclose information it obtains about me except as authorized by this Authorization; as may be required or permitted by law; or as I may further authorize. I understand that if information is redisclosed as permitted by this Authorization, it may no longer be protected by applicable federal privacy law.

I understand that: (a) this Authorization shall be valid for 24 months from the date I sign it; (b) I may revoke it at any time by providing written notice to Sun Life Financial, SunAdvisor Claims, SC 4312, One Sun Life Executive Park, Wellesley Hills, Massachusetts, 02481, subject to the rights of any person who acted in reliance on it prior to receiving notice of its revocation; and (c) my authorized representative and I are entitled to receive a copy of the Authorization upon request.

A copy of this Authorization shall be as valid as the original.

| Print Name of Employee or Personal Representative of Employee | Group Policy Number |
|---|---|
| If Representative, description of your authority or relationship to employee | |
| Signature of Employee or Personal Representative<br>X  *Jews Koal* | Date<br>12/20/16 |

XGR/647  ·  SunAdvisor Claim Packet                    Page 7 of 9

19
LDC0167

01-03-17;05:39PM;                                        ;16'82227281        # 8/ 7

# Sun Life Assurance Company of Canada


Sun
Life Financial™

**Authorization for Release and Disclosure of Psychotherapy Notes**

This Authorization complies with the HIPAA Privacy Rule. It is important for you to read, sign and submit all Authorizations in this packet. Failure to submit all Authorizations could result in a delay during the claims process.

Return to:
Sun Life Assurance
Company of Canada
P.O. Box 81915
Wellesley Hills, MA 02481
Fax: (781) 304-5519

I HEREBY AUTHORIZE any: physician, health care provider, health plan, medical professional, hospital, clinic, or other medical or health care facility that has provided payment, treatment or services to me or on my behalf; to disclose any psychotherapy notes relating to me to the Claims Department of Sun Life Assurance Company of Canada ("the Company") its subsidiaries, affiliates, third party administrators and reinsurers.

By my signature below, I acknowledge that any agreements I have made to restrict my protected health information do not apply to this Authorization, and I instruct any physician, health care professional, hospital, clinic, medical facility or other health care provider to release and disclose all psychotherapy notes relating to me without restriction.

I understand that the Company will use the information it obtains to: (a) underwrite my application for coverage; (b) make eligibility, risk rating, policy issuance and enrollment determinations; (c) obtain reinsurance; (d) administer claims and determine or fulfill responsibility for coverage and provision of benefits; (e) administer coverage; and/or (f) conduct other legally permissible activities that relate to any coverage I have or have applied for with the Company.

I understand that the Company will not disclose information it obtains about me except as authorized by this Authorization; as may be required or permitted by law; or as I may further authorize. I understand that if information is redisclosed as permitted by this Authorization, it may no longer be protected by applicable federal privacy law.

I understand that: (a) this Authorization shall be valid for 24 months from the date I sign it; (b) I may revoke it at any time by providing written notice to Sun Life Financial, SunAdvisor Claims, SC 4312, One Sun Life Executive Park, Wellesley Hills, Massachusetts, 02481, subject to the rights of any person who acted in reliance on it prior to receiving notice of its revocation; and (c) my authorized representative and I are entitled to receive a copy of the Authorization upon request.

A copy of this Authorization shall be as valid as the original.

| Print Name of Employee or Personal Representative of Employee | Group Policy Number |
|---|---|
| If Representative, description of your authority or relationship to employee | |
| Signature of Employee or Personal Representative<br><br>X _Jerry Neal_ | Date<br><br>12/20/16 |

XGR/647   •   SunAdvisor Claim Packet                    Page 8 of 9

20
LDC0168

01-03-17;05:38PM;                                        :16182227281        # 7/ 7

Sun Life Assurance Company of Canada
Wellesley Hills, MA 02481
1-888-238-4230



Sun
Life Financial®

## PRIVACY INFORMATION NOTICE

This notice explains why Sun Life Assurance Company of Canada ("the Company") collects personal information about you, how we use that information, and under what circumstances we disclose it to others.

### COLLECTION OF INFORMATION

We need to obtain information about you to determine whether we can provide the insurance benefits you have requested. As part of the claims process, we may ask you to undergo a physical examination, submit a statement from your physician, or provide copies of medical tests or other information relating to your health, finances and activities.

We also may collect information about you from other sources. By signing the Authorization For Release And Disclosure of Health Related Information and/or the Authorization For Release And Disclosure of Psychotherapy Notes, you authorize us to obtain medical information about you that we need to underwrite your application or to evaluate your claim. Depending upon your particular circumstances, we may collect additional information about you from the following sources:

*   Physicians, health care providers, medical professionals, hospitals, clinics or other medical or health care related facilities
*   Other insurance companies you have applied to for insurance
*   Public records, such as Social Security and tax records

### DISCLOSURE OF PERSONAL INFORMATION

When you sign the Authorization For Release And Disclosure of Health Related Information and/or the Authorization For Release And Disclosure of Psychotherapy Notes, you authorize us to disclose information we have about you:

*   To our reinsurers
*   As required or permitted by law

In the course of the claims process, we may need to disclose information about you to others. The law permits us to disclose such information, without obtaining authorization from you, to:

*   Companies that help us conduct our business or perform services on our behalf
*   Your physician or treating medical professional
*   Comply with federal, state or local laws, respond to a subpoena or comply with an inquiry by a government agency or regulator

### ACCESS, CORRECTION AND AMENDMENT OF PERSONAL INFORMATION

Upon written request to the Company, you can:

*   Obtain a copy of the personal recorded information we have about you in our files (a fee may be charged to cover the cost of providing a copy of such information)
*   Request that we correct, amend or delete any recorded personal information about you in our possession
*   File your own statement of facts if you believe that the recorded personal information we have about you is incorrect

To take any of these actions, please contact us at the following address for further instructions:
Sun Life Assurance Company of Canada
SunAdvisor Claims
P.O. Box 81915
Wellesley Hills, MA 02481

Sun Life Assurance Company of Canada is a member of the Sun Life Financial group of companies.
© 2015 Sun Life Assurance Company of Canada, Wellesley Hills, MA 02481. All rights reserved.
Sun Life Financial and the globe symbol are registered trademarks of Sun Life Assurance Company of Canada.
XGR/647  -  SunAdvisor Claim Packet                    Page 9 of 9                                      7/15

LDC0169

**Amy Khatib**

| | |
|---|---|
| **From:** | Amber Randall |
| **Sent:** | Wednesday, January 11, 2017 2:03 PM |
| **To:** | Amy Khatib; Dave Stafford |
| **Cc:** | Jacky Murphy; Charise Twyne-Stokes |
| **Subject:** | RE: Jerry Neal Statement |

Thanks, Amy. Cahokia Superintendent Scott Becker talked to Jerry this morning & made it clear we were closing his STD claim & filing only the WC claim.



Amber Randall
**Human Resources Generalist**
Phone: +1 816 412 2779 | Fax: +1 816 218 2389 | Email: Amber.Randall@ldcom.com
**Louis Dreyfus Company Services LLC**
4800 Main Street Suite 600 Kansas City, MO 64112 / USA

**From:** Amy Khatib
**Sent:** Wednesday, January 11, 2017 9:12 AM
**To:** Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Amber Randall <AMBER.RANDALL@ldc.com>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal Statement

Hi Dave:

Sun Life sent us the APS that was filed for Mr. Neal. To the question is the condition due to injury/sickness arising out to patients employment, the doctor checked unknown. Before we close this claim with Sun Life, I just want to confirm that Jerry understands that we will be closing the STD claim and filing only the WC claim.

Thank you,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Tuesday, January 10, 2017 4:08 PM
**To:** Amy Khatib <AMY.KHATIB@LDCOM.COM>
**Cc:** Amber Randall <AMBER.RANDALL@LDCOM.COM>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>
**Subject:** FW: Jerry Neal Statement

1

22
LDC0170

**From:** Mark Nemechek
**Sent:** Tuesday, January 10, 2017 1:40 PM
**To:** Amber Randall <AMBER.RANDALL@LDCOM.COM>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Scott Becker <Scott.Becker@ldcom.com>; Gene Loffler <GENE.LOFFLER@LDCOM.COM>; Marcus Dixon <Marcus.Dixon@ldcom.com>
**Subject:** Jerry Neal Statement

All,
   Jerry Neal came into the office today and filled out a statement on his back. Please see attached.
Mentioned to Jerry, that HR would have to review his statement before we decide on how to proceed.


Thanks,
Mark Nemechek





**Mark Nemechek**
Assistant Superintendent
Phone: +1 618-857-7337

Mobile: +1 515-230-7678 Email:mark.nemechek@ldcom.com
Louis Dreyfus Company River Elevators LLC
46 Cargill Elevator Road
Cahokia, Illinois 62206

2

23
LDC0171

**Amy Khatib**

| | |
|---|---|
| **From:** | MaryJo Magrone |
| **Sent:** | Thursday, January 19, 2017 3:25 PM |
| **To:** | Amy Khatib |
| **Subject:** | Claimant: Jerry Neal |

Amy,

**Per our conversation and for your records, adjuster is still investigating this claim.**

**St. Louis (Cahokia)**
Jerry Neal #1
Date of injury 11-23-2015
Injury was caused by our barge cable hitting a leaf blower which Jerry was holding in his left hand. Possible injuries were his left hand and left Shoulder
Taken to Memorial Hospital in Belleville Illinois by yourself. No injuries were found and was released back to full duty on restrictions.
Zurich was notified, and Meaka Benton was assigned the claim. Meaka's telephone number is 847-706-2211. Claim number 2240293180
4-7-2016 received a letter from Jerrys attorney Brown & Brown filing suit against Louis Dreyfus for injury's resulting from the above injury date. This was forwarded to Zurich.
Jerry had went back to the doctor and was getting medical treatment without us knowing. After a conversation with Meaka Benton, Jerry has continued to receive treatment for this injury and just recently was released by the attending Doctor. Meaka was going to contact Jerrys attorney and request a settlement agreement.

Jerry Neal #2
Date of injury depending on what day Jerry was asked is now 11-26-2016
Lower back strain
Reported to LDC 12-16-2016
No mention of this injury happening at work until 12-21-2016
Zurich was notified 12-22-2016
Carol Pongo was first to handle this claim, Claim # 2240308214, as of 1-12-2017 this claim has now been handed over to Meaka Benton , phone number again is 847-706-2211
Carol also added Jerry has again contacted the Brown & Brown law firm to handle this claim.



**Mary Jo Magrone**
Director of Insurance
Phone: 203-761-2216 | Mobile: 203-451-5611
Email: maryjo.magrone@ldcom.com
**Louis Dreyfus Company LLC** 40 Danbury Road  Wilton CT  06897

24
LDC0190

## Amy Khatib

| | |
|---|---|
| **From:** | Amy Khatib |
| **Sent:** | Thursday, January 19, 2017 3:31 PM |
| **To:** | 'std.rcc10@sunlife.com'; Charise Twyne-Stokes |
| **Subject:** | RE: Claim Inquiry: 242104 – Jerry Neal |

**Importance:** High

**Tracking:**

| Recipient | Delivery |
|---|---|
| 'std.rcc10@sunlife.com' | |
| Charise Twyne-Stokes | Delivered: 1/19/2017 3:31 PM |

Hi Karen:

We would like to reopen this claim asap. In speaking with our team, we feel it is best to allow him to file both claims and let our carriers make the appropriate determination.

Please let me know if I need to provide you with any additional information to continue the processing of this claim.

Thank you again for contacting me.

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Karen.Cue@sunlife.com [mailto:Karen.Cue@sunlife.com] **On Behalf Of** std.rcc10@sunlife.com
**Sent:** Thursday, January 19, 2017 2:31 PM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** Claim Inquiry: 242104 – Jerry Neal

Hi there,

I just wanted to confirm that the STD claim for Mr. Neal should still be closed?  Mr. Neal called us today looking for a status update, so I wasn't sure if he was aware that the claim was being closed or if I should continue my review.

Thank you!

Karen
**Short Term Disability Claims – RCC 10 | SunAdvisor National Accounts**
Sun Life Financial | One Sun Life Executive Park, Wellesley Hills, MA 02481
Customer Service: 1-855-629-8811, Option 3 | STD.RCC10@sunlife.com

Claim related document submissions: USHO_Group_AdviceToPay@sunlife.com

*Wake up to the benefit of benefits - sunlife.com/wakeup*
Join **Sun Life Financial** on Facebook, LinkedIn, Twitter and YouTube.

1

25
LDC0191

## Amy Khatib

| | |
|---|---|
| **From:** | Amy Khatib |
| **Sent:** | Thursday, January 19, 2017 3:38 PM |
| **To:** | Amber Randall; Dave Stafford |
| **Cc:** | Jacky Murphy; Charise Twyne-Stokes |
| **Subject:** | RE: Jerry Neal Statement |

**Tracking:**

| Recipient | Delivery |
|---|---|
| Amber Randall | Delivered: 1/19/2017 3:39 PM |
| Dave Stafford | Delivered: 1/19/2017 3:39 PM |
| Jacky Murphy | Delivered: 1/19/2017 3:39 PM |
| Charise Twyne-Stokes | Delivered: 1/19/2017 3:39 PM |

Hi All:

As a follow up to my call with Amber- We do not need to contact Mr. Neal. I spoke with JoJo and the WC examiner who said they received notice yesterday that he is being represented. The recommendation was to file the STD claim and let both investigations take their course. We have contacted Sun Life to continue the processing of his claim.

We will keep you posted.

Thank you,

Amy

**LDC.**
Louis Dreyfus Company

**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

---

**From:** Amy Khatib
**Sent:** Thursday, January 19, 2017 2:40 PM
**To:** Amber Randall <AMBER.RANDALL@ldc.com>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal Statement
**Importance:** High

Hi All:

Sun life contacted us today saying the Mr. Neal called them regarding the status of his STD claim. There seems to be some confusion on his part that his claim is workers comp and not STD. Can you please contact him again and make sure he understands the situation.

Thank you,

Amy

1

**26**

LDC0192

## ILLINOIS FORM 45: EMPLOYER'S FIRST REPORT OF INJURY
*Please type or print.*

| Employer's FEIN<br>273305101 | Date of report<br>12/22/16 | Case or File #<br>2240308214 | Is this a lost workday case?<br>X Yes        No |
|---|---|---|---|

| Employer's name<br>Louis Dreyfus | Doing business as |
|---|---|

| Employer's mailing address<br>46 Cargill Elevator Rd          East Saint Louis          IL    62206 | Employer's email address |
|---|---|

| Nature of business or service | SIC code |
|---|---|

| Name of workers' compensation carrier/admin.<br>American Zurich Ins | Policy/Contract #<br>WC    5095751 | Self-insured?<br>Yes          No  X |
|---|---|---|

| Employee's full name<br>Neal, Jerry | Birthdate<br>XX/XX/XX |
|---|---|

| Employee's mailing address<br>532 St James          East Saint Louis          IL    62206 | Employee's e-mail address |
|---|---|

| Gender<br>X Male      Female | Marital status<br>X Married      Single | # Dependents<br>5 | Employee's average weekly wage<br>700 |
|---|---|---|---|

| Job title or occupation<br>Laborer | Date hired<br>08/20/2015 |
|---|---|

| Time employee began work<br>: | Date and time of accident<br>12/16/2016          12:00:AM | Last day employee worked<br>12/19/2016 |
|---|---|---|

| If the employee died as a result of the accident, give the date of death. | Did the accident occur on the employer's premises?<br>Yes          No |
|---|---|

| Address of accident<br>Unknown          IL |
|---|

| What was the employee doing when the accident occurred? |
|---|

| How did the accident occur?<br>Went to a doctor on 12-16-2016 with sore lower back. Jerry never reported that he had injured at work or that he could |
|---|

| What was the injury or illness? List the part of body affected and explain how it was affected.<br>Sore Lower Back<br>All Other Specific Injuries Noc          Low Back Area |
|---|

| What object or substance, if any, directly harmed the employee?<br>Unknown |
|---|

| Name and address of physician/health care professional<br>Nidal  Shawahin          Belleville          62226 |
|---|

| If treatment was given away from the worksite, list the name and address of the place it was given.<br>Internal Medicine          4600 Memorial Dr,Suite 360          Belleville          IL    62226 |
|---|

| Was the employee treated in an emergency room?<br>Yes          No | Was the employee hospitalized overnight as an inpatient?<br>Yes          No  X |
|---|---|

| Report prepared by<br>Scott Becker | Signature | Title and telephone #<br>618   578-0541 | Email address |
|---|---|---|---|

Please send this form to: ILLINOIS WORKERS' COMPENSATION COMMISSION 4500 S. SIXTH ST. FRONTAGE RD SPRINGFIELD, IL  62703
By law, employers must keep accurate records of all work-related injuries and illness (except for certain minor injuries). Employers shall report to the Commission all injuries resulting in the loss of more than three scheduled workdays. Filing this form does not affect liability under the Workers' Compensation Act and is not incriminatory in any way. This information is confidential.  IC45  8/12

GRA016

27

LDC0200



Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amy Khatib
**Sent:** Wednesday, January 11, 2017 2:12 PM
**To:** Amber Randall <AMBER.RANDALL@ldc.com>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal Statement

Thank you Amber. We will contact Sun Life and have them close the claim.



Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amber Randall
**Sent:** Wednesday, January 11, 2017 2:03 PM
**To:** Amy Khatib <AMY.KHATIB@LDCOM.COM>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal Statement

Thanks, Amy. Cahokia Superintendent Scott Becker talked to Jerry this morning & made it clear we were closing his STD claim & filing only the WC claim.



Amber Randall
**Human Resources Generalist**
Phone: +1 816 412 2779 | Fax: +1 816 218 2389 | Email: Amber.Randall@ldcom.com
**Louis Dreyfus Company Services LLC**
4800 Main Street Suite 600 Kansas City, MO 64112 / USA

**From:** Amy Khatib
**Sent:** Wednesday, January 11, 2017 9:12 AM
**To:** Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Amber Randall <AMBER.RANDALL@ldc.com>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal Statement

Hi Dave:

Sun Life sent us the APS that was filed for Mr. Neal. To the question is the condition due to injury/sickness arising out to patients employment, the doctor checked unknown. Before we close this claim with Sun Life, I just want to confirm that Jerry understands that we will be closing the STD claim and filing only the WC claim.

28
LDC0213



Louis Dreyfus Company

Louis Dreyfus Company Services LLC
40 Danbury Road
PO Box810
Wilton, Connecticut
06897-0810
United States

Health and Insured Benefits

May 4, 2017

Mr. Jerry Neal
532 St. James
Cahokia, IL 62206

Dear Mr. Neal:

You have been absent from work since December 20, 2016. During your absence, the Company has continued to provide benefits, including health care coverage, to you and your family. We are writing to inform you that, pursuant to Company policy, your employment and all Company provided benefits will end on June 19, 2017, unless you are able to return to work. If you are unable to return to work, you may be eligible for long-term disability (LTD) benefits. Sun Life has told us that they will be sending you the LTD claim form.

If you believe you are disabled under the Americans with Disabilities Act or other applicable laws and would like to discuss potential accommodations that may allow you to return to work and perform the essential functions of your job or otherwise continue your employment, please contact Amber Randall, at 816 412-2779, on or before June 19, 2017. You will need to provide current medical documentation from your physician concerning your return to work status and any work-related restrictions prior to meeting with her. If you do not contact Amber, the Company will presume that you do not intend to return to work and your employment separation will be deemed effective as of June 19, 2017.

If your group insurance coverage ends, you will receive: (1) a notice describing your right under COBRA to continue health care coverage at your own expense, and (2) applications for life insurance premium waiver and conversion to an individual life insurance policy. You may call 203-761-4702, if you have any questions regarding group insurance coverage.

If you are unable to return to work, you may want to consider applying for Social Security disability benefits. You may obtain a number for your local Social Security office by calling 800 772-1213.

If you have any questions about this letter, please call me at 203-761-4702 or write to me at the above address.

Sincerely,

Amy A. Khatib
Health and Insured Benefits Manager

cc: D. Stafford
    J. Murphy
    A. Randall

29





30

LDC0231



**MEMORIAL MEDICAL GROUP**

**NEAL, JERRY L**
35 Y old Male, DOB: ███ 1981
Account Number: ███
532 ST JAMES DR, CAHOKIA, IL-62206-1729
Home: 618-337-6246
Guarantor: NEAL, JERRY L   Insurance: Aetna Health Plans
Payer ID: ███
PCP: KRISTEN NICOLE MASSEY
Appointment Facility: MMG Internal Medicine Belleville 360

12/14/2016

Progress Notes: NIDAL SHAWAHIN, MD

## Current Medications
Taking
• Aleve PM(Naproxen Sod-Diphenhydramine) 220-25 MG Tablet
• Medication List reviewed and reconciled with the patient

## Past Medical History
No Medical History.

## Surgical History
Denies Past Surgical History

## Family History
Mother: alive.
Father: alive

## Social History
Tobacco Use:
Tobacco Use/Smoking
  Are you a *current smoker*
  How many cigarettes a day do you smoke?
  11-20

## Allergies
N.K.D.A.

## Hospitalization/Major Diagnostic Procedure
Denies Past Hospitalization

## Review of Systems

General/Constitutional:
  Denies Change in appetite. Denies Fever.

Ophthalmologic:
  Denies Discharge. Denies Red eye.
Denies Eye problems.
ENT:
  Denies Difficulty swallowing. Denies Ear problems. Denies Nose/Throat problems.
Endocrine:
  Denies Cold intolerance.
Denies Dizziness. Denies Heat intolerance.
Denies Weight loss.
Respiratory:

## Reason for Appointment
1. C/o lower back pain that radiates down rt legx 2 weeks

## History of Present Illness
Depression Screening:
  PHQ-2 In last 2 weeks have you been bothered by
    Little interest or pleasure in doing things *No*
    Feeling down, depressed, or hopeless *No*
HPI:
  The patient complains of lower back pain of 2 weeks' duration with radiation down the right buttock area, it is sharp and about 7 in a scale of 1-10 and persistent. He takes Aleve with slight relief. He denied numbness in the lower extremities and no incontinence. The patient does not recall certain injury or trauma but he said that he does heavy lifting sometimes at work and he cannot rule that out as a possible cause.

## Vital Signs
Temp 97.4 F, HR 72 /min, BP 122/80 mm Hg, Wt 221 lbs, BMI 28.37 Index, Ht 74 in, RR 18 /min, Ht-cm 187.96 cm.

## Examination
General Examination:
  GENERAL APPEARANCE: Pleasant, well-nourished, well-developed, in no acute distress.
  EYES: Pupils equal, round, reactive to light and accommodation PERRLA, extraocular movement intact (EMOI).
  EARS: Tympanic membrane intact, translucent, auditory canal clear.
  NOSE: Nares patent.
  ORAL CAVITY: Good dentition, gums normal, no lesions, mucosa moist, oropharynx clear.
  THROAT: No erythema, no exudate.
  NECK/THYROID: Neck supple, full range of motion, no lymphadenopathy, thyroid nontender.
  SKIN: No rashes, no suspicious lesions, palpation without induration.
  HEART: Regular rate and rhythm, no murmurs, rubs, gallops, clicks.
  LUNGS: Clear to auscultation bilaterally, unlabored breathing

31
LDC0271

Denies Cough. Denies Wheezing. Denies Shortness of breath.
Cardiovascular:
Denies Dizziness. Denies Chest pain. Denies Swelling in hands/feet. Denies High blood pressure.
Gastrointestinal:
Denies Constipation. Denies Diarrhea. Denies Nausea. Denies Vomiting.
Hematology:
Denies Easy bruising. Denies Bleeding problems.
Genitourinary:
Denies Blood in urine. Denies Frequent urination. Denies Painful urination. Denies Incontinence.
Musculoskeletal:
Denies Painful joints. Denies Joint stiffness.
Peripheral Vascular:
Denies Decreased sensation in extremities. Denies Painful extremities.
Skin:
Denies Rash. Denies Discoloration.
Neurologic:
Denies Memory loss. Denies Seizures. Denies Tingling/Numbness. Denies Fainting.
Psychiatric:
Denies Anxiety. Denies Depressed mood. Denies Difficulty sleeping. Denies Stressors.

without retraction.
ABDOMEN: Soft, nontender, nondistended, bowel sounds present, no hepatosplenomegaly, no masses palpable.
BACK: Localized tenderness in the lower lumbar area and the right buttock area, no muscle spasm, lumbar flexion limited to 100?, negative leg raising test bilaterally.
MUSCULOSKELETAL: Normal gait and station, no swelling or deformity, full range of motion.
EXTREMITIES: No clubbing, cyanosis, or edema.
NEUROLOGIC: Cranial nerves II through XII grossly intact, deep tendon reflexes 2+ symmetrical, sensory exam intact.

## Assessments
1. Low back pain - M54.5 (Primary)

## Treatment
### 1. Low back pain
Start Baclofen Tablet, 10 MG, 1 tablet with food or milk, Orally, Three times a day, 10 days, 30 Tablet
Start Mobic Tablet, 15 MG, 1 tablet, Orally, Once a day, 30 day(s), 30
Notes: The patient complains of lower back pain of 2 weeks' duration which sounds like muscular. He was started on baclofen and Mobic and side effects including dizziness and tiredness explained to the patient and he was given a note for no lifting or carrying for 2 weeks and we advised him to apply ice to the area and we well see him again for follow-up in 2 weeks ,Back Pain: Care Instructions material was printed.

**Follow Up**
2 Weeks

N. Shawahin

**Electronically signed by NIDAL SHAWAHIN , MD on 12/16/2016 at 09:32 AM CST**

**Sign off status: Completed**

MMG Internal Medicine Belleville 360

Patient: NEAL, JERRY L   DOB: ████ 1981   Progress Note: NIDAL SHAWAHIN, MD   12/14/2016
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

# Internal Medicine Specialists of Southern Illinois
## Nidal Shawahin, M.D. • Kristen N. Massey, NP

Date 12/14/16

Jerry Neal _____ was seen in my office

on 12/14/16 _____, for the following condition:

_____

This individual:

    May return to work, school, gym, sports participation

on _____, with the following restrictions:

_____ None

_____ Participation based on level of comfort

Patient can't lift, push or pull anything for 2 weeks.

_____ May not return to work, school, gym or sports until

_____

Dr. Shawahin

33
LDC0282



**MEMORIAL HOSPITAL**

**MEMORIAL REHAB SERVICES**

REHABILITATION SERVICES
4700 Memorial Drive, Suite 150
Belleville, IL, 62226
- Physical Therapy (618) 257-5250
- Occupational Therapy (618) 257-5758
- Speech Pathology (618) 257-5255
Rehab Services Fax #: (618) 257-6929

# Fax

Date: 01/09/17

Confidentiality note: The information contained in this facsimile transmission is privileged and confidential. It is intended only for the use of the individual or entity named below. If the reader of this transmission is not the intended recipient, please note that any dissemination, distribution, or copying of this transmission is strictly prohibited. If you have received this transmission in error, please immediately notify us by collect telephone call to the number above, and return the original transmission to us at the above by U.S. Mail. Thank you!

To: Dr. Nidal Shawahin     From: JAN

Fax #: 222-7281          # of Pages: (including cover sheet)  5

Re: PT — Jerry L. Neal, Jr

Urgent ☐    For Physician Review ☒    EMG/NCV Test Results ☐    Please Reply ☐

Comments:

_____

_____

_____

_____

_____

Revised 01/2015

FAXED
1-10-17
pm/Rma

34
LDC0283

```
Memorial Hospital                                                    Page: 1
Memorial Hospital East          PT OP Evaluation Visit Report       Date: 01/06/17 38:55
Memorial Care Center
NEAL, JERRY L JR
 Fac: Belleville Memorial Hospital    Loc:Physical Therapy - MOB 3      Bed:-
 35 M          981         Med Rec Num:                            Visit:H00304502487
     Attending:Nidal M Shawahin                                   Reg Date:01/06/17
     Reason:LOWER BACK PAIN  M54,5
```

---

### PT OP Evaluation Visit Report

**01/06/17 08:05**

PT Out-Pt Evaluation Visit Report                          Start:  01/06/17 07:56
Freq:                                                      Status: Active
Document     JAM  (Rec: 01/06/17 08:26  JAM  PTLPTLT09)
Date of Treatment
    Date of Treatment
    Diagnosis                                low back pain
    Date of Initial PT Evaluation            01/06/17
Visit Report
    Evaluation Performed
    Type                                     Initial PT Evaluation
    Is This A Medicare or Medicare           No
    Replacement Patient
    Subjective
    Onset Date                               11/26/16
    Subjective                               patient states at work ,
                                             cleaning basement , shoveling
                                             grain . next day, inc pain in
                                             low back -- extreme pain.
                                             does bending , pushing and
                                             twisting. to dr -- had
                                             antiinflammatory and mm
                                             relaxant.  little better ,
                                             less w/o activities.
                                             went to work x 1 1/2 weeks--
                                             now off since 12/19/16.
    Primary Area Affected                    bil.lower back into sacrum ,
                                             lower ribs and lower thoracics
    Reviewed Past Medical History, Home Meds Yes
    , Allergies, & Problems
    Pain Scale
    Pain Scale Used                          0-10 Pain Scale
    Pain Assessment
    Bilateral Posterior Lower Back           -
    Pain Intensity at Present                6
    Description                              Aching
                                             Dull
                                             Sharp
                                             Tightness
                                             Tingling
    Radiates To                              lower thoracics and sacrum
    Alleviating Factors                      Heat
                                             Medication
    Aggravating Factors                      ADLs
                                             Bending
                                             Exercise/Activity
                                             Walking
    Comment                                  inc pain ; occ spasm in low
```

Continued on Page 2

35
LDC0284

Page: 2

NEAL, JERRY L JR

Fac: Belleville Memorial Hospital          Loc: Physical Therapy - MOB 3          Bed:-

35 M [redacted] 1981          Med Rec Num: [redacted]          Visit: H00304502487

back if walking too long 5 min , w/sharp pains, restrictions: no bending, pushing or pulling per physician

meds: baclofen, meloxicam

**Summary of Objective Findings**

Examination

1) posture: inc lordosis, post pelvic rotation right > left, right iliac high, inc upper thoracic kyphosis
2) arom: trunk flex to ankles w/LB extended, ext: 30%, sidebending : left 100%, right 45%, rotation: left 85% w/ pain, right 85%
3) arom /MMT: WNL bil l/ext's, pain with repetitive motions
4) flexibility: hams bil -5 deg w/pulling into low back; piriformis tightness : right > left
5) mobility: dec x 4 , lumbar/ sacral and pelvis, sarom performed with good results
6) palpation: mod swelling along the left ILA and lumbar paraspinals/facet joints
7) TTP: right lumbar paraspinals

Standardized Tests & Measures          #2,3,5

Assessment

Clinical Decision Making

Patient requires continued outpatient skilled therapy services for: resolution of low back pain, inc mobility, inc flexibility and return to work at home and job.

Rehab Potential          Good

Short Term Goal Date          02/06/17

Short Term Goals

1) teach hep to improve mobility in lower back
2) dec pain by 50%
3) eliminate somatic dysfunctions
4) RTW

Long Term Goal Date          03/06/17

Long Term Goals

1) indep hep
2) dec pain to itt and minimal
3) adls for 8 hrs w/o difficulty or inc symptoms
4) sleep all night

Patient/Family Goals

patient goals: get my back pain resolved and get back to

Continued on Page 3

36

LDC0285

Page: 3

NEAL, JERRY L JR
Fac: Belleville Memorial Hospital        Loc:Physical Therapy - MOB 3        Bed:-
35 M              1961              Med Rec Num:                              Visit:H00304502497
                                                         work

    Treatment Performed This Date
      Treatment Details                   See Details Below
      Tolerance                           Good
      Comment                             evaluation, ther ex, modality
    Plan of Care
      Plan of Care                        1) therapeutic exercise
                                          2) modality
                                          3) hep

Evaluation
    Complexity
      Level                               Low Complexity
Unit-Based Treatments
    Electric Stim Unattended
      Type                                Interferential Stim
                                          With Hot Pack
      Treatment Units                     1 Unit
      Billing Units                       Bill 1 Unit
       Query Text:1 Unit/Day Max Charge
Minute Based Therapy
    Therapeutic Exercise
      Worksheet Used                      See Exercise Worksheet
      HEP Performance                     Home Exercise Program Reviewed
      Type                                Active Assistive Exercises
                                          Active Exercises
                                          Back Exercises
      Total Minutes                       23
      Total Units                         2
    Sum Total of Treatment Minutes
      Sum of Total Treatment Minutes      23
Treatment Plan
    Discharge Plan
      Discharge Plan                      Upon Goal Completion
                                          Per Physician Orders
      Home Education Recipient            Patient
      Home Education Provided             Home Exercise Program
                                          Functional Level
                                          Precautions
                                          Protection
      Instruction Recipient               Patient
      Pain Relief Instructions            Ice
                                          Heat
                                          Positioning
                                          Home Ex Program
      Agreement To Instructions           Patient
      Agreement Received                  Yes
      Knowledge Demonstration             Treatment Plan
                                          Goals
                                          Risks
                                          Benefits
    Plan
      Continue Physical Therapy           Yes
      Number of Visits Per Week           3
      Number of Weeks                     3

Continued on Page 4

37
LDC0286

NEAL,JERRY L JR
Fac: Belleville Memorial Hospital        Loc:Physical Therapy - MOB 3        Bed:-
35 M      1981                  Med Rec Num:                                Visit:H00304502487
          Physical Therapist
          Electronically Signed By (choose          Joyce McDaniel
          therapist name)
          Physician
          Referring Physician                        Dr. Nidal M Shawahin

By signing this re-certification, I am authorizing continuation of the above mentioned services.

Physician Signature                              Date  1/9/17

**User Key**

| Monogram | Mnemonic | Name | Credentials | Provider Type |
|---|---|---|---|---|
| JAM | 03034 | McDaniel,Joyce A | | Physical Therapist |

38
LDC0287

# THE ORTHOPEDIC CENTER OF ST. LOUIS

14825 N. Outer Forty Road, Suite 200
Chesterfield, MO 63017

*Matthew F. Gornet, M.D.*

**02/28/2017  NEAL, JERRY L**
Account #
DOB:      1981

## Initial Spine Examination

<u>History of Present Illness</u>: This is the first visit and spinal examination for Jerry Neal. The patient is a 35-year-old referred by Dr. Mall who is seeing him for a finger issue. His main complaint is low back pain to both sides to his right buttock, right hip and upper thigh.

He states his current problem began on or about 11/26/16. He was working for Lewis Dreyfus. He was cleaning and shoveling grain in the basement of a storage facility called a "rail pit". He stated that the grain was wet that day and he noticed increasing pain and stiffness in his back at the end of the day. It was a Saturday. The next day, it was much more severe and it was reported on Monday when the office opened. He saw his medical doctor, Dr. Shawahin. He was placed on light duty and physical therapy was ordered for three weeks. He was told no light duty was available, so he has been off work. He continued to have pain and Dr. Shawahin recommended further physical therapy, but this was denied.

He has had no previous problems of significance with his back that he can recall. He has had no previous MRIs. His symptoms are constant and made worse with prolonged sitting, standing, bending or lifting and is better with a change in position. At this point, he has occasional intermittent right leg pain.

<u>Past Medical History</u>: Negative.

<u>Past Surgical History</u>: None.

<u>Allergies</u>: None.

<u>Medication</u>: None.

<u>Family History</u>: Unremarkable.

<u>Social History</u>: He is married and has four children. He smokes one pack per day. He has been at Lewis Dreyfus for a year and a half.

<u>Review of Systems</u>: Unremarkable.

<u>Physical Examination</u>: The patient motions pain in his low back, right buttock, right hip and upper thigh. He is able to bend and forward flex with his hands to mid lower legs. He returns to standing with a smooth rhythm.

His current motor exam reveals 5/5 strength in all groups.

LDC0288

RE: Neal, Jerry L.
02/28/2017
Page 2

DTRs are trace knees, trace ankles.

Sensation is normal.

**Radiographs and Tests:**
**Name: Neal, Jerry**
**DOB:** ▮▮▮▮1981
**Referred for Radiographs by: Dr. Matthew Gornet**
**Type of Exam: Lumbar spine six views - AP, lateral, coned down, Ferguson, flexion/extension views**
**Working Diagnosis: Low back pain**
**Date/Time of Exam: 02/28/2017**
**Physician Interpreting Films: Dr. Matthew Gornet**

**Clinical Findings: Lumbar spine films reveal normal hips and normal coronal alignment. He has well-preserved disc height at all levels. I see no evidence of instability on flexion/extension.**

**MRI scan evaluated from today is of diagnostic quality. For the most part, his spine appears to be normal. There is an obvious annular tear centrally and slightly more to the right at L5-S1, which correlates best with his symptoms.**

Impressions/Plans: I have discussed with Mr. Neal that I believe he suffered a disc injury at L5-S1. He understands that quite often these will respond with simple conservative care including injections and physical therapy, chiropractic care, etc. I have referred him to Multicare Specialists for further treatment, which includes chiropractic and physical therapy services. I have requested a single injection right L5-S1 by Dr. Boutwell. I will see him back in six weeks' time. At this point, I believe he is capable of light duty with a 10 pound limit, no repetitive bending or lifting, alternating between sitting and standing as needed. My hope is to gradually improve on these restrictions over time. Again, our working diagnosis is disc injury. I do believe his current symptoms are causally connected to his work related injury as described. I have dispensed today Meloxicam 7.5 mg p.o. b.i.d. X 60 days and Cyclobenzaprine 10 mg p.o. q.h.s. X 60 days. These were filled in the office to manage his symptoms.

MFG: jc

This report was dictated by Matthew F. Gornet, M.D. and approved without proofreading/editing to expedite distribution.

40

LDC0289



**The ORTHOPEDIC CENTER OF ST. LOUIS**

Matthew F. Gornet, M.D.

Patient Name _Jerry Neal_

Patient was seen on _2/28/17_

The above named patient is <u>unable</u> to work beginning

_____ through _____ .

The above named patient is <u>able</u> to return to work as of _2/28/17_ .

_____ FULL DUTY NO RESTRICTIONS

__✓__ LIGHT DUTY

__✓__ no lifting greater than __10__ pounds

__✓__ must be able to alternate between sitting and standing as needed

__✓__ no repetitive bending

__✓__ no repetitive lifting

_____ may not work over 40 hours per week

_____ may not work over 8 hours per day

_____ no overhead work

_____ no pushing or pulling

other _____

_____

_____

Dr. Matthew F. Gornet _Matthew F. Gornet_

14825 N. Outer Forty Rd. • Suite 200 • Chesterfield, MO 63017 • (314) 336-2555 • Fax (314) 336-2557

41

LDC0290

## Amy Khatib

| | |
|---|---|
| **From:** | Amber Randall |
| **Sent:** | Wednesday, May 24, 2017 10:25 AM |
| **To:** | Amy Khatib; Dave Stafford |
| **Subject:** | FW: Jerry Neal |
| **Attachments:** | Jerry Neal 5-23-2017.pdf |

As FYI...Jerry provided this note yesterday (dated 5/11/17) indicating no change in his condition...remains off work. This is the employee whose claim was initially Short Term Disability, then Worker's comp & is currently under investigation by Zurich.



Amber Randall
**Human Resources Generalist**
Phone: +1 816 412 2779 | Fax: +1 816 218 2389 | Email: Amber.Randall@ldc.com
Louis Dreyfus Company Services LLC
4800 Main Street Suite 600 Kansas City, MO 64112 / USA

**From:** Scott Becker
**Sent:** Wednesday, May 24, 2017 7:56 AM
**To:** Meaka Benton <meaka.benton@zurichna.com>
**Cc:** Mark Nemechek <MARK.NEMECHEK@ldc.com>; Marcus Dixon <Marcus.Dixon@ldc.com>; Amber Randall <AMBER.RANDALL@ldc.com>; Gene Loffler <GENE.LOFFLER@ldc.com>
**Subject:** Jerry Neal

Jerry dropped this off yesterday. Did not get a chance to talk with him.

Any questions please give me a call

42

LDC0333



## PRS
PAIN AND REHABILITATION
SPECIALISTS OF ST LOUIS

Kaylea M. Boutwell, M.D.

14325 North Outer Forty Rd., Suite 350

Chesterfield, MO 63017

Phone = (314)-335-2570

Fax # (314)-335-2571

NAME: NEAL JR., JERRY L
ACT#: ▓▓▓
DOB: ▓▓▓▓ 31
DR: BOUTWELL, KAYLEA M
DOS: 05/11/17

OASCC

Patient Name __Jerry Neal Jr.__    Date __5/11/17__

The above named patient is unable to work beginning _____ through _____

The above named patient is able to return to work. Date _____

____ Full Duty

____ Limited Duty

(✓) No change in previous duties per __Dr. Garnet__

Next Appointment Date _____

Was Seen _____

Comments _____

_____ M.D.

43
LDC0334

# Amy Khatib

**From:** Dave Stafford
**Sent:** Wednesday, May 24, 2017 11:46 AM
**To:** Amy Khatib; Amber Randall
**Subject:** RE: Jerry Neal

Thanks Amy ☺

**From:** Amy Khatib
**Sent:** Wednesday, May 24, 2017 10:45 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Amber Randall <AMBER.RANDALL@ldc.com>
**Subject:** RE: Jerry Neal

Hi- was just getting back to Amber. I will forward the note on to Sun Life. As you know, we have been paying this claim under STD. I will also check with them on the status of his LTD application. In addition, attached is a copy of his "26 week" letter. I agree it is a matter of waiting to see if he contacts us about an accommodation, it doesn't sound like he will if he is going ahead with the LTD claim. I'll get back to you both after I speak to Sun Life.

Thank you,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Wednesday, May 24, 2017 11:30 AM
**To:** Amber Randall <AMBER.RANDALL@ldc.com>; Amy Khatib <AMY.KHATIB@ldc.com>
**Subject:** RE: Jerry Neal

So we sent him the 26 week letter right? And his date is June 19? At this point it's a matter of waiting and seeing if he contacts us about either potential accommodations or other return to work options. We shall see but my money is on him counting on a W/C settlement and so wont' see him again.

Thanks

**From:** Amber Randall
**Sent:** Wednesday, May 24, 2017 9:25 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>; Dave Stafford <DAVID.STAFFORD@ldc.com>
**Subject:** FW: Jerry Neal

As FYI...Jerry provided this note yesterday (dated 5/11/17) indicating no change in his condition...remains off work. This is the employee whose claim was initially Short Term Disability, then Worker's comp & is currently under investigation by Zurich.

1

44

LDC0335

## Amy Khatib

| | |
|---|---|
| **From:** | Dave Stafford |
| **Sent:** | Monday, June 26, 2017 3:32 PM |
| **To:** | Amy Khatib |
| **Subject:** | FW: Jerry Neal |
| **Attachments:** | Jerrt Neal 6-26-2017.pdf |

Amy,

Here's the note from Cahokia on Jerry. I'd point out a couple of items:

A) Didn't go to the doctor until Monday AFTER his June 19 deadline to contact us as noted in his May letter.
B) Release effective immediately on the 22nd but was not presented to us until today at noon (1 week later)
C) Is not a full release, not that matters, and is only a trial basis after July 3.

The site and myself would prefer to hold to the June 19 date given the fact that this appears to only have come about as a result of Sun Life's decision not to pay STD benefits and he didn't even present the release in a timely manner delayed from the 22nd until today and our grain elevators do work weekends.

**From:** Scott Becker
**Sent:** Monday, June 26, 2017 2:23 PM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>
**Cc:** Gene Loffler <GENE.LOFFLER@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>; Marcus Dixon <Marcus.Dixon@ldc.com>
**Subject:** Jerry Neal

Jerry dropped this off today Monday 6-26-2017 at 2pm. I explained to Jerry that he needed to call you tomorrow morning after 8am. And if HE, Jerry had any questions to ask you. Mike Raney was also present as this was explained to Jerry.

This is a little hard to read but on the light Duty line it say until 7-2-2017. Also in the other line its says " Trial " beginning 7-3-2017

Let me know if anything else is needed.

Thanks

1

45
LDC0349



**The ORTHOPEDIC CENTER OF ST. LOUIS**

Matthew F. Gornet, M.D.

Patient Name_____

Patient was seen on _____

The above named patient is <u>unable</u> to work beginning

_____through_____.

The above named patient is <u>able</u> to return to work as of _____.

_____FULL DUTY NO RESTRICTIONS

_____LIGHT DUTY

_____no lifting greater than _____pounds

_____must be able to alternate between sitting and standing as needed

_____no repetitive bending

_____no repetitive lifting

_____may not work over 40 hours per week

_____may not work over 8 hours per day

_____no overhead work

_____no pushing or pulling

other_____
_____
_____

Dr. Matthew F. Gornet_____

14825 N. Outer Forty Rd. • Suite 200 • Chesterfield, MO 63017 • (314) 336-2555 • Fax (314) 336-2557

46

LDC0350

**ORTHOPEDIC AMBULATORY SURGERY CENTER OF CHESTERFIELD**
14825 North Outer 40 Road, Suite 100
Chesterfield, MO 63017
Tel: (636) 898-4704   Fax: (636) 898-4700

**OPERATIVE REPORT**

PATIENT NAME: NEAL JR., JERRY L.                    PATIENT NUMBER #: ███

SURGEON: KAYLEA M BOUTWELL, M.D.                     DATE OF SURGERY: 05/11/2017

DATE OF BIRTH:                          ███1981

REFERRAL SOURCE:                        Matthew F. Gornet, M.D.

PREOPERATIVE DIAGNOSIS:                  Right lumbar radiculopathy.

POSTOPERATIVE DIAGNOSIS:                 Right lumbar radiculopathy.

OPERATION PERFORMED:                     Right L5-S1 ESI.

SURGEON:                                 Kaylea M. Boutwell, M.D.

**DISCUSSION OF PROCEDURE/RISKS/CONSENT:**   The right L5-S1 ESI procedure was discussed in detail with the patient. The risks of the procedure were explained, including but not limited to bleeding, infection, damage to surrounding tissues, failure of the procedure to produce the desired therapeutic effect, worsening of the patient's current condition, new neurological deficit, and inadvertent intravascular or intrathecal injection. If applicable, a body mass index >40, with its unique added risks, are discussed in detail. The benefits and alternatives were discussed in detail. Questions were carefully addressed and answered.   At this point, the patient demonstrated an understanding of the procedure-including its associated risks, benefits, and alternative and verbally expressed a clear desire to proceed.

**DESCRIPTION OF THE OPERATIVE PROCEDURE:**   The patient was brought to the procedure room and placed in prone position. Pulse oximetry, blood pressure and heart rate monitors were applied and monitored at all times. Following a full sterile prep and wide draping, the procedure areas were anesthetized using 10 mL of 1% lidocaine with 0.5 mL sodium bicarbonate. An 18-gauge Tuohy needle was advanced into the right L5-S1 interlaminar epidural space utilizing loss of resistance technique with preservative free normal saline using fluoroscopic guidance in multiple views as indicated. After negative aspiration for heme and/or CSF 2 mL of Omnipaque aqueous solution was injected to confirm placement. The patient at this time denied symptoms of pain or paresthesias. A solution of 1 mL 80 mg of Depo-Medrol and 4 mL 1% lidocaine was then carefully administered at the desired location. The needle was then removed.

The procedure area was cleansed and a Band-Aid was applied over the injection site. The patient tolerated the procedure well and was transported uneventfully to the recovery area.

**DISPOSITION:**   The patient was observed in the recovery room for approximately 15 minutes. An instruction form featuring 24-hour contact information was provided. The patient was instructed to call in the event of severe pain, bleeding, new neurological deficit and/or fever to call 911 in the event of a

**OPERATIVE REPORT - PAGE 1 OF 2**

47

LDC0356

**ORTHOPEDIC AMBULATORY SURGERY CENTER OF CHESTERFIELD**
14825 North Outer 40 Road, Suite 100
Chesterfield, MO 63017
Tel: (636) 898-4704    Fax: (636) 898-4700

## OPERATIVE REPORT

**PATIENT NAME:** NEAL JR., JERRY L.          **PATIENT NUMBER #:** ███

**SURGEON:** KAYLEA M BOUTWELL, M.D.          **DATE OF SURGERY:** 05/11/2017

presumed emergency.  The patient was discharged home when discharge criteria met, ambulating well without assistance.

This is an electronically verified report by: Kaylea M. Boutwell, M.D.

Kaylea M. Boutwell, M.D.

JOB#: 115815104   KMB: med: psl/ap          DD: 05/12/2017          DT: 05/13/2017

**OPERATIVE REPORT - PAGE 2 OF 2**

48
LDC0357

## Amy Khatib

| | |
|---|---|
| **From:** | Amy Khatib |
| **Sent:** | Tuesday, March 21, 2017 9:19 AM |
| **To:** | std.ccu@sunlife.com |
| **Cc:** | Charise Twyne-Stokes |
| **Subject:** | RE: Claim Inquiry: 242104 – Jerry Neal |

| | |
|---|---|
| **Importance:** | High |

Good morning Karen:

Worker's Comp is denying Mr. Neal's claim. We would like you to go ahead and approve his STD and begin payments.

Please let me know if we need to provide you with any additional information.

Thank you again for your attention to this claim.

Best,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amy Khatib
**Sent:** Friday, March 17, 2017 3:04 PM
**To:** 'std.ccu@sunlife.com' <std.ccu@sunlife.com>
**Cc:** Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Claim Inquiry: 242104 - Jerry Neal

Hi Karen:

I'll follow up on this and get back to you shortly.

Thank you,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

1

49

LDC0415

## Amy Khatib

| | |
|---|---|
| **From:** | Karen.Cue@sunlife.com on behalf of std.ccu@sunlife.com |
| **Sent:** | Wednesday, March 22, 2017 7:19 AM |
| **To:** | Amy Khatib; Charise Twyne-Stokes |
| **Subject:** | Advice to Pay: 242104 – Jerry Neal |
| **Attachments:** | JN.pdf |

Hello,

Attached you will find a SunAdvisor disability claim recommendation for the above referenced employee based upon a review of all information in our files. Disability payments, if due, are mailed the business day following claim approval and will continue weekly through the Approved To date.

Should you not accept this claim recommendation for any reason, please respond to this email within 24 business hours. Should you have any questions regarding this claim or your STD plan, please feel free to contact me directly at any time.

Kind Regards,

Karen Cue
Case Manager I
Sun Life Financial

Toll Free: 855-629-8811
Fax: 781-304-5519
Customer Service: 855-629-8811, Option 3

Claim Document Submissions: MyClaimDocuments@sunlife.com

www.sunlife-usa.com

Count on us. Partner with us. Grow with us.

50

LDC0417



Sun Life Financial®

March 22, 2017

AMY.KHATIB@ldc.com
CHARISE.STOKES@ldc.com

**Sun Life Assurance Company of Canada**
SC 4312
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

1-855-629-8811
Extension Option 3

Fax: 1-781-304-5519

Re:    **SunAdvisor Short Term Disability**
   Plan Number:        242104
   Plan Sponsor:       Louis Dreyfus Company LLC
   Claim Number:      040117-02665-00

Dear  Leave Specialist,

We have completed our review regarding Jerry Neal's absence.

According to our review of the information received, we recommend that the Disability approval commence effective December 20, 2016 (date of Disability). Any payment would be subject to your Plan Elimination Period for an illness. At this time we recommend, based on the employee's condition; that the Disability payments continue through April 20, 2017 (next office visit, we will need updated medical records from the treating Provider(s) - the claim is open).

If the employee does not return to work by the aforementioned date, and would like to be considered for additional benefit review, a medical update should be submitted.  Specifically, the employee should have the treating physician submit a copy of the most recent examination report(s) and any accompanying test results and surgical notes.
Upon receipt, we will advise you accordingly.

The information may be forwarded to this office by fax at **(781) 304-5519** or mailed to the below address:

Sun Life Assurance Company of Canada
Short Term Disability Claims
One Sun Life Executive Park, SC4312
P.O. Box 81915
Wellesley Hills, MA 02481-5699

Page 1 of 2

51
LDC0418

Disability payments, if due, are mailed the business day following claim approval and will continue weekly through April 20, 2017.

*Sun Life Assurance Company of Canada has provided this review pursuant to an administrative services agreement with Louis Dreyfus Company LLC.*

**Should you not accept this claim recommendation for any reason, please notify us within 24 business hours.**

Should you have any questions, please call me at 1-855-629-8811, Extension Option 3. Thank you for choosing Sun Life.

Sincerely,

*Karen Cue*

Karen Cue
Case Specialist III
Short Term Disability

52

LDC0419

# Amy Khatib

**From:** Amy Khatib
**Sent:** Wednesday, March 22, 2017 11:24 AM
**To:** std.ccu@sunlife.com; Charise Twyne-Stokes
**Subject:** RE: Advice to Pay: 242104 - Jerry Neal

**Tracking:**

| Recipient | Delivery |
|---|---|
| std.ccu@sunlife.com | |
| Charise Twyne-Stokes | Delivered: 3/22/2017 11:24 AM |

Thank you Karen. We agree with your ATP.

# LDC.

Louis Dreyfus Company

Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Karen.Cue@sunlife.com [mailto:Karen.Cue@sunlife.com] **On Behalf Of** std.ccu@sunlife.com
**Sent:** Wednesday, March 22, 2017 7:19 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** Advice to Pay: 242104 - Jerry Neal

Hello,

Attached you will find a SunAdvisor disability claim recommendation for the above referenced employee based upon a review of all information in our files.  Disability payments, if due, are mailed the business day following claim approval and will continue weekly through the Approved To date.

Should you not accept this claim recommendation for any reason, please respond to this email within 24 business hours.  Should you have any questions regarding this claim or your STD plan, please feel free to contact me directly at any time.

Kind Regards,

Karen Cue
Case Manager I
Sun Life Financial

Toll Free: 855-629-8811
Fax: 781-304-5519
Customer Service: 855-629-8811, Option 3

Claim Document Submissions: MyClaimDocuments@sunlife.com

www.sunlife-usa.com

Count on us. Partner with us. Grow with us.

1

53

LDC0420

## Amy Khatib

| | |
|---|---|
| **From:** | Amy Khatib |
| **Sent:** | Tuesday, March 21, 2017 9:19 AM |
| **To:** | std.ccu@sunlife.com |
| **Cc:** | Charise Twyne-Stokes |
| **Subject:** | RE: Claim Inquiry: 242104 - Jerry Neal |

**Importance:**  High

Good morning Karen:

Worker's Comp is denying Mr. Neal's claim. We would like you to go ahead and approve his STD and begin payments.

Please let me know if we need to provide you with any additional information.

Thank you again for your attention to this claim.

Best,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amy Khatib
**Sent:** Friday, March 17, 2017 3:04 PM
**To:** 'std.ccu@sunlife.com' <std.ccu@sunlife.com>
**Cc:** Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Claim Inquiry: 242104 - Jerry Neal

Hi Karen:

I'll follow up on this and get back to you shortly.

Thank you,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

1

54
LDC0421

**From:** Marcus Dixon
**Sent:** Monday, December 19, 2016 10:25 AM
**To:** Scott Becker; Mark Nemechek
**Cc:** Amber Randall; Gene Loffler
**Subject:** Jerry Neal

This is the conversation we had with Jerry on the day we found out about his back.

On December 08, 2016 Jerry Neal came up to me and said his back was sore and bothering him. I first asked if he needed to go to the doctor and his reply was "No". So I told him we will need to talk to Scott before you do anything else. Scott pulled up and him and I ended up talking with Jerry. We asked his a few questions. First, did you hurt you back at work? Jerry's response was No that he woke up on Sunday with some stiffness and believed it was his bed. Second, do you need to see a doctor? He replied with "No, I'm fine". Scott made sure and let him know not to bend, lift, or put tension on the lower back and if it does start to bother him anymore to let him know so he can go see a doctor.



**Marcus Dixon**
Operations Supervisor
Phone: 618-857-7330 Mobile: 206-747-9528
Email : **Marcus.Dixon@ldcom.com**
**Louis Dreyfus River Elevators LLC**
46 Cargill Elevator Rd
Cahokia, IL 62206

1

55

LDC0426

## Amy Khatib

**From:** Charise Twyne-Stokes
**Sent:** Monday, June 19, 2017 10:25 AM
**To:** std.ccu@sunlife.com; Amy Khatib
**Subject:** RE: Claim Update: 242104 – Jerry Neal

Thank you Karen.

Regards,
Charise



**Charise Stokes**
Health & insured Benefits Assistant
Phone: +1 203 761 4708 | Fax: +1 203 761 4715 | Email: charise.stokes@ldc.com

  

**Louis Dreyfus Company LLC**
40 Danbury Road Wilton CT 06897 / USA

**From:** Karen.Cue@sunlife.com [mailto:Karen.Cue@sunlife.com] **On Behalf Of** std.ccu@sunlife.com
**Sent:** Monday, June 19, 2017 9:13 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** Claim Update: 242104 - Jerry Neal

[WARNING] This message originated from outside of your organization. Please use caution

Good morning,

I just received an updated medical referral back for Mr. Neal's claim. Unfortunately, we do not have sufficient clinical support of ongoing Total Disability or reasonable restrictions and/or limitations as of 04/21 (after his current last pay date) through the present. Mr. Neal was not seen by a provider since February and although he did receive an injection on 5/11, we are unable to support disability during the gap from 4/21 to 5/11.

Please let me know if you have any questions or concerns before I reach out to Mr. Neal to discuss.

Kind regards,

Karen
Case Manager I, Short Term Disability | Sun Life Financial Phone (855) 629-8811 opt 3| Fax (781) 304-5599 | std.ccu@sunlife.com |

1

56
LDC0446

## Amy Khatib

| | |
|---|---|
| **From:** | Karen.Cue@sunlife.com on behalf of std.ccu@sunlife.com |
| **Sent:** | Friday, June 23, 2017 3:20 PM |
| **To:** | Amy Khatib; Charise Twyne-Stokes |
| **Subject:** | Advice to Deny: 242104 - Jerry Neal |
| **Attachments:** | Jerry Neal Denial.pdf |

WARNING Message originated from outside of our organization.
Hello,

Attached you will find a SunAdvisor disability claim recommendation for the above referenced employee based upon a review of all information in our files. Disability payments, if due, are mailed the business day following claim approval and will continue weekly through the Approved To date.

Should you not accept this claim recommendation for any reason, please respond to this email within 24 business hours. Should you have any questions regarding this claim or your STD plan, please feel free to contact me directly at any time.

Kind Regards,

Karen Cue
Case Manager I
Sun Life Financial

Toll Free: 855-629-8811
Fax: 781-304-5519
Customer Service: 855-629-8811, Option 3

Claim Document Submissions: MyClaimDocuments@sunlife.com

www.sunlife-usa.com

Count on us. Partner with us. Grow with us.

57

LDC0447



Sun Life Assurance Company of Canada

SC 4312
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

1-855-629-8811
Extension Option 3

Fax: 1-781-304-5519

June 23, 2017

Jerry Neal
532 Saint James
Cahokia, IL 62206

Re:   **SunAdvisor Short Term Disability**
     Plan Number:            242104
     Plan Sponsor:          Louis Dreyfus Company LLC
     Claim Number:         040117-02665-00

Dear  Mr. Neal,

Your employer has retained Sun Life to assist them with administrating claims under their self-funded Short Term Disability benefit Plan.  On behalf of your employer, we completed our review of your claim.

We cannot approve your claim because the information you provided does not demonstrate that you are "Totally Disabled" beyond April 20, 2017.

This letter explains how we reached our claim decision and how you can appeal it if you wish to do so.

*Our Review of Your Claim*
To determine whether you qualify for benefits, we consider the following:
- applicable Plan provisions
- the duties of your occupation
- whether your condition affected your ability to perform the duties of your occupation.

As part of our evaluation, we also ask a medical consultant to review your medical records.

*The Plan Provisions*
Your Plan requires that you must be Totally Disabled to qualify for Short Term Disability benefits.  "Totally Disabled" means that *"because of your Injury or Sickness, you are unable to perform all of the material and substantial duties of your own occupation and you are not*

Page 1 of 5

58

LDC0448

engaged in any occupation for wage or profit."

The Plan also defines the following:

"**Total Disability or Totally Disabled** means because of your Injury or Sickness, you are unable to perform all of the material and substantial duties of your own occupation and you are not engaged in any occupation for wage or profit.

The loss of your professional or occupational license or your inability to obtain or qualify for a license for any reason does not, in itself, constitute Total Disability.

To qualify for benefits, you must satisfy your Elimination Period with the required number of days of Total Disability."

"**What conditions must be met for STD benefits to continue?**

The Company will pay you an STD benefit, up to the Maximum Benefit Period, if you provide ongoing proof that you continue to be Totally Disabled and you still require the regular and continuing care of a Physician. You need to provide proof when the Company asks for it, but the proof is at your expense."

"**When does my weekly STD benefit cease?**

Your weekly STD benefit will cease on the earliest of:
- the date you are no longer Totally Disabled;
-the date you do not provide proof that you continue to be Totally Disabled..."

"**What is considered Proof of Claim?**

Proof of Claim may include, but is not limited to, police accident reports, autopsy reports, laboratory results, toxicology results, hospital records, x-rays, narrative reports, or other diagnostic testing materials as required.

Proof of Claim for disability must include evidence demonstrating the disability including, but not limited to, hospital records, Physician records, Psychiatric records, x-rays, narrative reports, or other diagnostic testing materials as appropriate for the disabling condition."

**Your Occupational Duties**

Your employer told us that you last worked as an Operator on December 19, 2016.  As an Operator you are required to unload trucks and railcars to ensure product is sent to appropriate storage.  Your employer has indicated that your position requires good balance and agility, the ability to lift up to 75 pounds, outside work in all weather conditions, working at heights when and if needed, standing, walking, crawling, kneeling, squatting, and stooping.

**Your Medical Condition**

We reviewed the following documentation from your treating physician, Dr. Nidal Shawahin, MD:

- Attending Physician's Statement dated January 3, 2017
- Certification by Healthcare Provider dated January 3, 2017

59

LDC0449

- Office visit notes dated April 22, 2016, December 14, 2016, January 3, 2017, January 23, 2017, and February 13, 2017
- Lumbar Radiology Report dated January 23, 2017

We also received the following documentation:

- Physical Therapy Evaluation Report dated January 6, 2017
- Office visit note dated February 28, 2017 from Dr. Matthew Gornet, MD
- Return to Work note from Dr. Matthew Gornet, MD, not dated
- Lumbar MRI Report dated February 28, 2017 from Dr. Matthew Gornet, MD
- History & Physical and Operative Report dated May 11, 2017 from Dr. Kaylea Boutwell, MD
- Out of Work note dated May 11, 2017 from Dr. Kaylea Boutwell, MD

Dr. Shawahin's Attending Physician's Statement outlines a diagnosis of "Low back pain." Restrictions (what you should not do) were noted to be "Lifting over 10 pounds". Limitations (what you cannot do) were noted to be "No pushing or carrying over 10 pounds". Your Physical Impairment was noted to be "Class 3 - Medium limitation". A return to work date was not provided. Information within the file indicates that you were last seen by Dr. Gornet on February 28, 2017. No follow up is noted until May 11, 2017 when you received an injection with Dr. Boutwell.

As mentioned above, we referred your claim file, including your medical records, to a medical consultant for review. The medical consultant noted the following:

- Dr. Shawahin's records, including the record of your last office visit with Dr. Gornet and Dr. Boutwell, did not provide medical support for the recommended restrictions and limitations as stated in the Attending Physician's Statement. Our medical consultant also noted that there is nothing in your medical records to support the restrictions and limitations beyond April 20, 2017.
- "There is no ongoing follow up with exam findings, physical therapy notes, indication of injection post 2-28-17 to indicate ongoing restrictions and limitations noted for light duty or noted restriction of no lift, push, carry > 10 lbs."
- "There is no ongoing follow up with Dr. Shawahin, IM to support noted restrictions and limitations on Attending Physician's Statement dated 1-3-17 of no lifting, pushing or pulling over 10 lbs ongoing."

We note that none of the records show that a treatment plan or medications were prescribed for you, and there is no documentation reflecting completion of, or recommendations for, diagnostic testing.

### Our Claim Decision
The information we received for your claim is not sufficient to show that your condition prevented you from performing the Material and Substantial duties of your occupation as an Operator beyond April 20, 2017.

While Dr. Shawahin notes that you are restricted from lifting, pushing, or carrying over ten pounds and Dr. Gornet notes that you must also be able to alternate between sitting and standing

60
LDC0450

as needed with no repetitive bending or lifting, the restrictions are not clinically supported in the medical records received and reviewed. Our medical consultant also noted that your medical records do not support this restriction.

The discharge note from Dr. Boutwell dated May 11, 2017 indicates that after the injection you were ambulating well without assistance. You were to slowly resume activity level and apply ice to the area as some bruising was noted to be normal. There is no follow up with Dr. Boutwell, Dr. Gornet, or Dr. Shawahin indicating any physical examination or diagnostic findings that would support the ongoing restrictions and limitations as stated by your Providers.

Unfortunately the medical records do not contain sufficient clinical evidence to support that your physical impairment was of a type or severity to support Total Disability beyond April 20, 2017, as defined in the Plan, as there were minimal significant physical examination and diagnostic findings that would warrant ongoing disability beyond this date. While we understand that you may have experienced symptoms during your leave of absence, based on the clinical information we have received and reviewed to date, we do not find that your condition would have rendered you Totally Disabled, as defined in the Plan, beyond April 20, 2017. Therefore, we must recommend that no further benefits are payable under this Plan, and as a result, your claim is denied beyond this date.

*Your Right to Appeal our Claim Decision*
If you disagree with our claim decision, you may send us a written request to appeal the decision within 180 days after receiving this notice. Please make sure you sign and date your written appeal request, and explain why you disagree with our decision.

To support your appeal, you may send us anything you believe is helpful to your claim. This includes any written comments, office treatment notes, prescription records, test results from all providers who have treated you, and any other relevant documents records or information. Examples of documents that will help with our review include treatment plans, physical therapy records and an explanation from your attending physician to support the recommended restrictions outlined as of January 3, 2017.

Please be sure to include all supporting documents that you would like us to consider in our review.

You can send your appeal to:

Sun Life Assurance Company of Canada
One Sun Life Executive Park
STD Appeals Unit SC4312
P.O. Box 81601
Wellesley Hills, MA 02481-0006

A Sun Life appeal consultant will review the information you send us on behalf of your employer. We understand that you will want to hear back from us as soon as possible. We will let you know of our appeal decision in writing no later than 45 days after we receive your written appeal request in good order.

In some cases, we may require an extension of an additional 45 days if we do not receive the necessary information to make a decision. If this happens, we will write to you and outline any

61
LDC0451

special circumstances that require this extension and when we expect to reach a decision. The days between when we request additional information and when we receive it will not count toward the 45 days.

If your claim is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), then you have the right to bring a civil action under ERISA section 502(a) following an appeal decision that is not in your favor.

You and your plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State Insurance regulatory agency.

Should you have any questions, please call me at 1-855-629-8811, Extension Option 3. Thank you for choosing Sun Life.

Sincerely,

*Karen Cue*

Karen Cue
Case Manager I
Short Term Disability

62
LDC0452

# Amy Khatib

| | |
|---|---|
| **From:** | Dave Stafford |
| **Sent:** | Monday, June 26, 2017 10:37 AM |
| **To:** | Amy Khatib |
| **Subject:** | FW: Jerry Neal |

Amy,

That's the last contact I was aware of with Mr. Neal too so am going to go ahead and key termination today and not wait on Mark. If he were to come back tomorrow say he had visited with Jerry since June 8 when he dropped off the STD form then I can always reverse the termination but given it's already been a week and Mark is generally the first to tell us of what's going on in Cahokia, I think we are in good shape and have minimal risk in keying term today. That said, do I need to return him from leave prior to keying termination? Please advise.

Thanks

**From:** Scott Becker
**Sent:** Monday, June 26, 2017 8:56 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>
**Cc:** Gene Loffler <GENE.LOFFLER@ldc.com>
**Subject:** RE: Jerry Neal

I have not had any conversations at all with Jerry. He did however come in on 6-5-2017 and drop of a STD form which was forwarded to Amber and yourself. With no conversations .

Mark is out on vacation today, but will double check with him when he returns.

**From:** Dave Stafford
**Sent:** Monday, June 26, 2017 8:36 AM
**To:** Scott Becker <Scott.Becker@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>
**Subject:** FW: Jerry Neal

Please see below. As we are well past June 19 I want to confirm that neither of you or anyone else there has been approached or contacted by Jerry or someone on his behalf to discuss return to work and possible accommodations or just indicating a desire to return to work? Would like to know the last time you all heard from him and what that was discussed etc.

**From:** Amy Khatib
**Sent:** Monday, June 26, 2017 7:51 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Amber Randall <AMBER.RANDALL@ldc.com>
**Cc:** Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal

Hi All:
Just wanted to follow up with you regarding Mr. Neal. On June 23rd, Sun Life issued a denial of his STD claim beyond April 20, 2017. He can appeal the denial but we should go head and terminate him as of June 19, unless he has requested an accommodation.

1

63

LDC0458

## Amy Khatib

| | |
|---|---|
| **From:** | MaryJo Magrone |
| **Sent:** | Tuesday, February 7, 2017 11:52 AM |
| **To:** | Galimi, Adriana; Bill Salvatore |
| **Cc:** | Amy Khatib |
| **Subject:** | Neal, Jerry |

Adriana/Bill

This is another problematic claim. Do we know status.

Thank you

**St. Louis (Cahokia)**
Jerry Neal #1
Date of injury 11-23-2015
Injury was caused by our barge cable hitting a leaf blower which Jerry was holding in his left hand. Possible injuries were his left hand and left Shoulder
Taken to Memorial Hospital in Belleville Illinois by yourself. No injuries were found and was released back to full duty on restrictions.
Zurich was notified, and Meaka Benton was assigned the claim. Meaka's telephone number is 847-706-2211. Claim number 2240293180
4-7-2016 received a letter from Jerrys attorney Brown & Brown filing suit against Louis Dreyfus for injury's resulting from the above injury date. This was forwarded to Zurich.
Jerry had went back to the doctor and was getting medical treatment without us knowing. After a conversation with Meaka Benton, Jerry has continued to receive treatment for this injury and just recently was released by the attending Doctor. Meaka was going to contact Jerrys attorney and request a settlement agreement.

Jerry Neal #2
Date of injury depending on what day Jerry was asked is now 11-26-2016
Lower back strain
Reported to LDC 12-16-2016
No mention of this injury happening at work until 12-21-2016
Zurich was notified 12-22-2016
Carol Pongo was first to handle this claim, Claim # 2240308214, as of 1-12-2017 this claim has now been handed over to Meaka Benton , phone number again is 847-706-2211
Carol also added Jerry has again contacted the Brown & Brown law firm to handle this claim.



Mary Jo Magrone
Director of Insurance
Phone: 203-761-2216 | Mobile: 203-451-5611
Email: maryjo.magrone@ldcom.com
**Louis Dreyfus Company LLC** 40 Danbury Road  Wilton CT  06897

1

64
LDC0564

## Amy Khatib

| | |
|---|---|
| **From:** | MaryJo Magrone |
| **Sent:** | Wednesday, February 8, 2017 10:43 AM |
| **To:** | Amy Khatib |
| **Cc:** | Dawn Esposito |
| **Subject:** | FW: Neal, Jerry |

Amy,

Meanka is still investigating this case to determine if it is compensable under workers comp.  She is waiting for medical records.  Nothing has been paid to date.  She will keep me posted / updated.  She does not have the last day worked.  Only information received from when loss was reported.

This is a red flag on this case, so she is doing a thorough investigation.

We have no further information at this point.



Mary Jo Magrone
Director of Insurance
Phone: 203-761-2216 | Mobile: 203-451-5611
Email: maryjo.magrone@ldcom.com
Louis Dreyfus Company LLC 40 Danbury Road  Wilton CT  06897

**From:** Meaka Benton [mailto:meaka.benton@zurichna.com]
**Sent:** Wednesday, February 08, 2017 10:32 AM
**To:** MaryJo Magrone <MARYJO.MAGRONE@ldc.com>
**Subject:** RE: Neal, Jerry

See below.

Sincerely,

Meaka Benton
Zurich North America
Illinois Workers Compensation
PO Box 66941
Chicago, IL 60666-0941
****************************

847-706-2211 - Direct
847-240-8172 - Fax
****************************

Meaka.benton@zurichna.com

1

65
LDC0567

## Amy Khatib

| | |
|---|---|
| **From:** | Amy Khatib |
| **Sent:** | Tuesday, February 21, 2017 10:50 AM |
| **To:** | MaryJo Magrone |
| **Cc:** | Dawn Esposito |
| **Subject:** | RE: Neal, Jerry |

| **Tracking:** | **Recipient** | **Delivery** |
|---|---|---|
| | MaryJo Magrone | Delivered: 2/21/2017 10:50 AM |
| | Dawn Esposito | Delivered: 2/21/2017 10:50 AM |

Hi Jo Jo:

Our STD carrier is asking if there is any update on Mr. Neal's claim. They still haven't received the requested medical records so they are continuing to pend his claim.

I appreciate you letting me know if there is any updated information on the WC claim.

Thank you,

Amy

**LDC.**

Louis Dreyfus Company

**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** MaryJo Magrone
**Sent:** Wednesday, February 08, 2017 10:43 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>
**Cc:** Dawn Esposito <DAWN.ESPOSITO@ldc.com>
**Subject:** FW: Neal, Jerry

Amy,

Meanka is still investigating this case to determine if it is compensable under workers comp. She is waiting for medical records. Nothing has been paid to date. She will keep me posted / updated. She does not have the last day worked. Only information received from when loss was reported.

This is a red flag on this case, so she is doing a thorough investigation.

We have no further information at this point.

1

66
LDC0582

## ILLINOIS WORKERS' COMPENSATION COMMISSION15
### SETTLEMENT CONTRACT LUMP SUM PETITION AND ORDER

ATTENTION. Please type or print. Answer all questions. File four copies of this form. Attach a recent medical report.

Workers' Compensation Act ☒  Occupational Diseases Act ☐      Fatal case? No ☒  Yes ☐  Date of death _____

**Jerry Neal, Jr.**
Employee/Petitioner

Case # **16** WC **12004**

v.

**Louis Dreyfus Corporation**
Employer/Respondent

Setting **Collinsville**

To resolve this dispute regarding the benefits due the petitioner under the Illinois Workers' Compensation or Occupational Diseases Act, we offer the following statements. We understand these statements are not binding if this contract is not approved.

| | | |
|---|---|---|
| **Jerry Neal, Jr.** | **532 St. James** | **Cahokia, IL  62206** |
| Employee's name | Street address | City, State, Zip code |
| **Louis Dreyfus Corporation** | **#46 Cargill Elevator Road** | **Cahokia, IL  62206** |
| Employer's name | Street address | City, State, Zip code |

State Employee? Yes ☐  No ☒      Male ☒  Female ☐      Married ☒  Single ☐

# Dependents under age 18 **5**      Birthdate **10/26/1981**      Average weekly wage $ **558.00**

Date of accident **11/23/2015**

How did the accident occur? **Struck by cable** _____

What part of the body was affected? **Right hand/right upper extremity** _____

What is the nature of the injury? **Trigger fingers** _____

The employer was notified of the accident orally ☒  in writing ☐.          Return-to-work date **11/24/2015**

Location of accident **Cahokia, IL**      Did the employee return to his or her regular job? Yes ☒  No ☐
If not, explain below and describe the type of work the employee is doing, the wage earned, and the current employer's name and address.

_____

TEMPORARY TOTAL DISABILITY BENEFITS: Compensation was paid for **n/a** weeks at the rate of $ **334.80/**week.
The employee was temporarily totally disabled from **no lost ime**

MEDICAL EXPENSES: The employer has ☐  has not ☒  paid all medical bills. List unpaid bills in the space below.
**Orthopedic Center of St. Louis, $646.00; CEP America, $250.00; Belleville Memorial Hospital, $100.00**

PREVIOUS AGREEMENTS: Before the petitioner signed an *Attorney Representation Agreement*, the respondent or its agent offered in writing to pay the petitioner $ **n/a** as compensation for the permanent disability caused by this injury.

An arbitrator or commissioner of the Commission previously made an award on this case on **n/a** regarding

TTD $ _____      Permanent disability $ _____      Medical expenses $ _____      Other $ _____

IC5 05/12  100 W. Randolph Street #8-200 Chicago, IL 60601 312/814-6611    Toll-free 866/352-3033    Web site: www.iwcc.il.gov
Downstate offices: Collinsville 618/346-3450  Peoria 309/671-3019  Rockford 815/987-7292  Springfield 217/785-7084

67

LDC0591

TERMS OF SETTLEMENT:   Attach a recent medical report signed by the physician who examined or treated the employee. Respondent agrees to pay and Petitioner agrees to accept $3,431.70 in full and final settlement of all claims under the Workers' Compensation Act or otherwise for accidental injuries allegedly incurred on 11/23/2015 and including all developments and sequale, fatal or non-fatal, resulting from such accidental injuries. Issues exist between the parties as to whether the Petitioner has incurred injures or to the degree alleged and whether or not such injuries are compensable. This settlement is entered into to resolve these issues. The Petitioner releases Respondent from all liability for all compensation and medical and hospital expenses unless specifically set forth in this contract. Respondent specifically retains its rights of recovery and does not waive its rights under Sec. 5(b) of the Illinois Workers' Compensation Act. Petitioner releases Respondent from liability under the Workers' Compensation Act Sections 8(a) and 19(h). This settlement represents 5% of the right hand. Respondent will satisfy any outstanding medical bills pursuant to the provisions of Section 8 provided that the bills are for reasonable, necessary and related treatment incurred prior to the date of this settlement. Some payments were made by group health and the providers are balance billing the rest of their total bill. In no instance shall this agreement be construed as to create liability for medical bills beyond what the fee schedule indicates. The Respondent will NOT satisfy balance bills pursuant to this contract. Respondent will hold petitioner harmless against amounts paid by group health on account of this injury, but only to the extent that the fee schedule allows for the provider to bill for the services rendered.

| | |
|---|---|
| Total amount of settlement | $ 3,431.70 |
| Deduction: Attorney's fees | $ 686.34 |
| Deduction: Medical reports, X-rays | $ 174.53 |
| Deduction: Other (explain) | $ ——— |
| Amount employee will receive | $ 2,570.83 |

PETITIONER'S SIGNATURE. *Attention, petitioner. Do not sign this contract unless you understand all of the following statements.* I have read this document, understand its terms, and sign this contract voluntarily. I believe it is in my best interests for the Commission to approve this contract. I understand that I can present this settlement contract to the Commission in person. I understand that by signing this contract, I am giving up the following rights:

1. My right to a trial before an arbitrator;
2. My right to appeal the arbitrator's decision to the Commission;
3. My right to any further medical treatment, at the employer's expense, for the results of this injury;
4. My right to any additional benefits if my condition worsens as a result of this injury.

x *Jerry Neal*     Jerry Neal, Jr.          x 6/29/17
Signature of petitioner    Name of petitioner (please print)     Telephone number    Date

PETITIONER'S ATTORNEY. I attest that any fee petitions on file with the IWCC have been resolved. Based on the information reasonably available to me, I recommend this settlement contract be approved.

6/29/17
Signature of attorney    Date

David Jerome #5341
Attorney's name and IC code # (please print)

Tax ID# 43-1674182

Brown & Brown
Firm name

5440 North Illinois, Suite 101
Street address

Fairview Heights, IL  62208
City, State, Zip code

(618) 234-4878    djerome@brownlawoffice.com
Telephone number    E-mail address

RESPONDENT'S ATTORNEY. I attest that any fee petitions on file with the IWCC have been resolved. The respondent agrees to this settlement and will pay the benefits to the petitioner or the petitioner's attorney, according to the terms of this contract, promptly after receiving a copy of the approved contract.

6/8/2017
Signature of attorney or agent    Date

Andrew J. Kovacs, #725
Attorney's name and IC code # or agent (please print)

Law Office of Craig A. Hansen
Firm name

3660 South Geyer Road, Suite 340
Street address

St. Louis, Missouri 63127-1223
City, State, Zip code

314-436-2776    andrew.kovacs@zurichna.com
Telephone number    E-mail address

Zurich American Insurance Company
Name of respondent's insurance or service company (please print)

APPROVED BY ARBITRATOR OF THE ILLINOIS WORKERS' COMPENSATION COMMISSION pursuant to the provisions of the Workers' Compensation and Occupational Diseases Act

JUL 05 2017

ORDER OF ARBITRATOR OR COMMISSIONER:
Having carefully reviewed the terms of this contract, in accordance with Section 9 of the Act, by my stamp I hereby approve this contract, order the respondent to promptly pay in a lump sum the total amount of settlement stated above, and dismiss this case.

By: Melinda M. Rowe-Sullivan, Arbitrator

IC5  page 2

68

LDC0592

1/10/16

On 11/26/16 We finish Running the grain Train. Around 3:00. Started house keeping 'We Started on the cross conveir sweeping, Shoveling ~~water~~. Sprayed down trail seccion And down the incline into the basement. So while we were spaying, I notice the suck pump was ~~not~~ not working. Stop using the fire hose, to fix the drain pipe for the suck pump in basement, So I clime out of the Basement check drain pipe, I use the Air hose to fix, Unclog the drain pipe, Once we got the pipe clear. I return to the basement to finish cleaning. We were using our normal tools to clean which is Shovel, brrom, etc So we began to scoop grain. sweep into piles, from the belts in the basement thier Alot of grain that fall off the belt. ~~~~ We repeat this prosess is throush out the day. the grian was wet and heavy it took Around 1 1/2 hours to clean it. I came out of the basement finilized my paperwork. I was at the desk in Railpit my lower back ~~was~~ feeling A little tight So I ~~~~ finish my papperwork, didn't think nothing about it I thought maybe it will just go Away later, I call Scott Becker and told

69
LDC0621

him were done with train & house keeping
he told me thanks he appreciate. The Right
after that I clocked out got in my car and
went home. The very next day my lower back
was very sore couldn't bend over or move to fast


Jesus Naal  1/10/16


70

LDC0622



Daniel J. Brown+
C. Edward Brown+
David J. Jerome+
Ely Hadowsky+
Mark A. Cordes+
Kenneth B. Beljanski*
Richard E. Salmi+
Mark J. Cero+
Kelsey Johnson°
Elizabeth F. McQuage°
Greg Motil+
Jaye R. Lindsay*

**BROWN&BROWN** LLP

(618) 888-8888

Offices in Saint Louis
& Fairview Heights

5440 North Illinois, Suite 101
Fairview Heights, IL 62208
Fax (618) 234-4818

BrownLawOffice.com

* Licensed in IL
° Licensed in MO
+ Licensed in MO & IL

May 23, 2017

Mr. Andrew J. Kovacs
Law Office of Craig Hansen
3660 South Geyer Road, Suite 340
St. Louis, MO 63127-1223

MAY 2 5 2017

RE:    Jerry Neal, Jr. v. Louis Dreyfus Corporation
       Dates of Injury:  11/23/15; 11/25/16
       IWCC#:  16 WC 12004; 17 WC 02629

Dear Mr. Kovacs:

My client recently received correspondence regarding his off work status. As you know, my client has been off work since December 20, 2016 stemming from his back injury. He has been provided work restrictions by Dr. Gornet and Dr. Boutwell which your client has indicated they cannot accommodate. My client is currently completing his injections to determine whether he will be released from care or recommended for further medical treatment.

In the meantime, please note that my client does not plan on abandoning his position and wishes to return to work once the effects of this work injury have remitted. I would ask that you advise your client of this issue or let me know if I need to forward correspondence to them directly.

If you should have any questions about this or wish to discuss things further, please feel free to contact my office.

Yours very truly,

David J. Jerome
BROWN & BROWN
Attorneys at Law

DJJ/kao

71
LDC0624

**SHORT TERM DISABILITY**

Short Term Disability (STD) Insurance is intended to provide income to you for up to 26 weeks if you are unable to work due to a disability.

**QUALIFYING FOR BENEFITS**

If you are a regular full-time employee, you are eligible for STD benefits upon your date of hire. You are eligible to receive STD benefits if you are absent from work and under the care of a physician as the result of a non-occupational illness or injury. STD benefits are not payable until after you have been absent from work for seven consecutive calendar days, unless you are a full-time impatient in a hospital, in which event STD benefits are payable from the first day of your confinement.

**PROGRAM PAY**

The program will pay you an STD benefit equal to 60 percent of your basic weekly earnings, but not more than $150 per week. Your basic weekly earnings are determined by averaging your weekly earnings (excluding overtime, bonuses or commissions) for eight weeks immediately preceding the pay period in which your disability absence began.

**DURATION OF BENEFITS**

STD benefits are payable up to 26 weeks for any one period of disability. STD benefits will end sooner if you are able to return to work or you begin working elsewhere. If you are covered under the group insurance program, you will continue to be covered during your leave on the same basis as during your active employment. However, while you are on leave, you must make all employee contributions required for any coverage you have elected under the group insurance program. If you participate in a Flexible Spending Account (FSA) plan, your coverage under the FSA plan will be suspended until your contributions are paid.

**LIMITATION ON COVERAGE**

No STD benefits are payable for a day during which you do any work for pay or profit or for an illness or injury for which you are not under the care of a physician. You must have been seen in person or treated by a physician to be deemed under his or her care.

**PROCEDURES**

Contact your Human Resources representative to obtain the proper forms to apply for STD benefits or the Health and Insured Benefits Department in Wilton, Connecticut. If you do not return to work when your STD leave ends, your employment will be terminated, unless you are otherwise entitled to unpaid leave under the Federal Family and Medical Leave policy. Your STD leave runs concurrently with any leave you may be entitled to under the Federal Family and Medical Leave policy. If applicable, you must apply for Family and Medical Leave on separate forms provided by your Human Resources representative.

4.08

72

LDC0038

**WORKERS' COMPENSATION**

In the event that you suffer a work-related injury or illness, the Company's workers' compensation insurance will cover your medical expenses and may provide income replacement benefits during absences. The amount and duration of benefits depend on the nature of your injury or illness.

You must immediately report any on-the-job injury or possible work-related illness, however minor, to your supervisor. This ensures that the Company will be able to assist you in obtaining appropriate medical treatment and benefits and take any measures which may be necessary for the safety of your co-workers. Your failure to follow this procedure may delay payment of benefits under workers' compensation insurance and/or subject an employee to disciplinary action up to and including termination.

If you are unable to work because of such injury or illness and provided you meet the requisite eligibility criteria, you may also be entitled to continued salary under the Paid Time Off policy or partial salary continuation under the Short Term Disability policy. If so, for each week these benefits are paid, the amount of your workers' compensation income benefit will be deducted from the sick pay or disability benefit payable to you. If you are eligible for salary continuation, you are required to submit copies of all workers' compensation checks received to the Payroll Department in Connecticut.

If you are unable to work because of such injury or illness, you may be eligible for compensation from the Company's workers' compensation carrier. In other words, leaves under all applicable policies and programs run concurrently. Your group insurance coverage and other employee benefits will continue as long as you are medically unable to work, up to a maximum of 26 weeks. However, while you are on leave, you must make all employee contributions required for any coverage you have elected under the group insurance program. If your group health insurance coverage ends, you and your family will be offered continued health insurance coverage at your own expense.

Your ability to return to work following a period of injury or illness will be determined in accordance with workers' compensation and other applicable state and federal laws and Company policies.

Questions regarding workers' compensation should be directed to the Company's Insurance Department located in Connecticut.

7.03

73

LDC0050



**LDC.**

Louis Dreyfus Company

Louis Dreyfus Company
4800 Main St., Suite 600
Kansas City, MO. 64112
United States of America

www.ldc.com

816-756-3560

June 28, 2017

Jerry Neal
532 St. James
Cahokia, IL  66206

    Re:    *Employment with Louis Dreyfus Company Services, LLC*

Dear Mr. Neal:

This letter will confirm that your employment with Louis Dreyfus Company Services, LLC (the "Company") has been terminated effective June 19, 2017.

You were on a leave of absence with the Company that extended beyond six months.  On May 4, 2017, you were advised that you needed to contact the Company on or before June 19, 2017 to discuss your employment status including any potential accommodations that may allow you to return to work.  You were also instructed to submit current medical documentation.  Although you were provided several weeks to comply with this request, you did not contact the Company or see a doctor prior to this deadline.  The medical paperwork you recently provided indicates that you were released to return to work as of June 22, 2017, however, you did not report to work or contact the Company until late in the day on June 26, 2017.

The Company has terminated your employment effective June 19, 2017 based on your failure to timely respond to the May 4, 2017 letter as well as your violation of the Company's Attendance Policy.  As you know, a failure to report to work without notifying the Company for three consecutive work days is considered a job abandonment.

On behalf of the Company, thank you for the services you have provided during your employment.

Sincerely,

R. David Stafford
Sr. Regional Human Resource Mgr.    68·560 - 4163

*[handwritten notes:]*

11:40 Am 6/28 - left message for him to call back.

10:00 Am 6/29 - Jerry called - notifyd him the company had terminated his employmt. He asked why - explaind that we had sent letter (red 2 sentences in 2nd ¶).
— Said his attorney would contact the comp upon receipt of the letter —

**74**

LDC0096

11:55 - Jerry called to say his attorney sent letter & did we receive it? I told him no I wasn't aware of any such letter & asked who was sent to & Jerry said to our attorney & I asked who that was & he said a Jeffry or Andy Cofax - told Jerry no idea who that was but wasn't an attorney I knew - Jerry said he'd call his attorney.

75

LDC0097

## 5 Restrictions and Limitations

Restrictions and Limitations should be associated with the Objective and Subjective findings/symptoms noted in section 2.

Restrictions (what the patient should not do)

No lifting over 10 I lbs,

Limitations (what the patient cannot do)

No pushing or carrying over 10 I lbs,

Is the patient capable of working within these restrictions/limitations? .......................... ☒ Yes ☐ No
Can the patient work an eight-hour day with these restrictions/limitations? .................... ☒ Yes ☐ No
If no, how many hours could he/she work? ........................................................... _____ hours
Is patient capable of working in another occupation?        ☐ Yes – Full-time ☐ Yes – Part-time ☐ No

Indicate class of impairment – As defined in federal dictionary of occupation titles

**Physical Impairment**

| | |
|---|---|
| ☐ Class 1 – No limitation | ☐ Class 4 – Moderate limitation |
| ☐ Class 2 – Slight limitation | ☐ Class 5 – Severe limitation |
| ☒ Class 3 – Medium limitation | |

**Mental Impairment** (if applicable)        **Current DSM diagnosis**

| | |
|---|---|
| ☐ Class 1 – No limitation | |
| ☐ Class 2 – Slight limitation | |
| ☐ Class 3 – Moderate limitation | |
| ☐ Class 4 – Marked limitation | |
| ☐ Class 5 – Severe limitation | |

Do you believe this patient is competent to endorse checks/direct the use of proceeds?   ☐ Yes ☐ No

## 6 Return-to-Work

1. When will patient recover sufficiently to perform duties? (Specify date or check recovery period)
   - Patient's occupation part-time:    unknown.
     Date: _____ -or- ☐ < 3 wks ☐ 3-4 wks ☐ 5-6 wks ☐ 7-8 wks ☐ 2 months or more ☐ Never
   - Patient's occupation full-time:
     Date: _____ -or- ☐ < 3 wks ☐ 3-4 wks ☐ 5-6 wks ☐ 7-8 wks ☐ 2 months or more ☐ Never

2. After reviewing the material and substantial duties of the patient's occupation, would you recommend vocational counseling and/or rehabilitation or job modification? ...... ☐ Yes ☐ No

## 7 Certification and Signature

Remember to provide your full address and Tax ID number.

A stamp or signature of a person other than the examining physician is not acceptable.

I certify that the above statements are true and complete. I have read or had read to me the fraud warning for my state.

| Name of Attending Physician | Degree/Specialty | | |
|---|---|---|---|
| Nidal Snawahin | Internal medicine | | |
| Street address | City | State | Zip Code |
| 4800 memorial dr. Ste 3100 | Belleville | IL | 62226 |
| Tax ID number | Telephone number | Fax number | |
| 37-1595406 | 618·222-7280 | 618 222-7281 | |
| Attending Physician Signature | | Date | |
| X | | 1/3/17 | |

76
LDC0154



March 22, 2017

AMY.KHATIB@ldc.com
CHARISE.STOKES@ldc.com

Sun Life Assurance Company of Canada
SC 4312
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

1-855-629-8811
Extension Option 3
Fax: 1-781-304-5519

Re:    **SunAdvisor Short Term Disability**
       Plan Number:          242104
       Plan Sponsor:         Louis Dreyfus Company LLC
       Claim Number:         040117-02665-00

Dear  Leave Specialist,

We have completed our review regarding Jerry Neal's absence.

According to our review of the information received, we recommend that the Disability approval commence effective December 20, 2016 (date of Disability). Any payment would be subject to your Plan Elimination Period for an illness. At this time we recommend, based on the employee's condition; that the Disability payments continue through April 20, 2017 (next office visit, we will need updated medical records from the treating Provider(s) - the claim is open).

If the employee does not return to work by the aforementioned date, and would like to be considered for additional benefit review, a medical update should be submitted.  Specifically, the employee should have the treating physician submit a copy of the most recent examination report(s) and any accompanying test results and surgical notes.
Upon receipt, we will advise you accordingly.

The information may be forwarded to this office by fax at **(781) 304-5519** or mailed to the below address:

<div style="text-align:center">

Sun Life Assurance Company of Canada
Short Term Disability Claims
One Sun Life Executive Park, SC4312
P.O. Box 81915
Wellesley Hills, MA 02481-5699

</div>

<div style="text-align:center">Page 1 of 2</div>

77
LDC0220

Disability payments, if due, are mailed the business day following claim approval and will continue weekly through April 20, 2017.

*Sun Life Assurance Company of Canada has provided this review pursuant to an administrative services agreement with Louis Dreyfus Company LLC.*

**Should you not accept this claim recommendation for any reason, please notify us within 24 business hours.**

Should you have any questions, please call me at 1-855-629-8811, Extension Option 3. Thank you for choosing Sun Life.

Sincerely,

*Karen Cue*

Karen Cue

Case Specialist III
Short Term Disability

78
LDC0221

## Amy Khatib

| | |
|---|---|
| **From:** | Karen.Cue@sunlife.com on behalf of std.ccu@sunlife.com |
| **Sent:** | Wednesday, May 24, 2017 2:56 PM |
| **To:** | Amy Khatib |
| **Cc:** | Charise Twyne-Stokes |
| **Subject:** | RE: Advice to Pay: 242104 - Jerry Neal |

*as of 6/14/2017*
*LTD - pending approval*

[WARNING] This message originated from outside of your organization. Please use caution

Hi Amy,

LTD paperwork was mailed to Mr. Neal's home on 5/4/17, so he would have to complete that paperwork and submit it back.  Once Sun Life receives it, an LTD file will be set up and assigned to an LTD examiner.  I hope this helps!  I am still waiting on additional records from one of his providers to continue with my review.

Thank you,

Karen
Case Manager I, Short Term Disability | Sun Life Financial Phone (855) 629-8811 opt 3| Fax (781) 304-5599 | std.ccu@sunlife.com |
Life's brighter under the sun

From:     Amy Khatib <AMY.KHATIB@ldc.com>
To:       "std.ccu@sunlife.com" <std.ccu@sunlife.com>, Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
Date:     05/24/2017 11:50 AM
Subject:     RE: Advice to Pay: 242104 - Jerry Neal

Hi- attached is an updated doctor's note for Mr. Neal. It was our understanding the Sun Life was going to start transitioning this claim to LTD. Has that process begun?

Thank you in advance.

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amy Khatib
**Sent:** Wednesday, March 22, 2017 11:24 AM
**To:** 'std.ccu@sunlife.com' <std.ccu@sunlife.com>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Advice to Pay: 242104 - Jerry Neal

Thank you Karen. We agree with your ATP.

1

79
LDC0232



**LDC.**
Louis Dreyfus Company

Louis Dreyfus Company          Telephone 203 761-4702
40 Danbury Road                Fax 203 761-4715
Wilton, Connecticut
06897-0810

*Amy Khatib*
*Health and Insured Benefits*

## Fax Transmittal

To  Sun Life
LTD

From  Amy Khatib

Fax  781 304-5537

Date  June 6, 2017

RE  J. Neal
Policy Number: 242104

Pages 5  Including cover

Attached is a LTD claim for our insured Jerry Neal. Mr. Neal is currently receiving STD benefits under claim number 040117-02665-00.

Please let us know if we need to provide you with any additional information.

Thank you in advance for your attention to this claim.

Amy Khatib
Health and Insured Benefits Manager

This fax communication is intended of the use of the individual to whom it is addressed and may contain information that is proprietary, confidential, or privileged. If you are not the intended recipient (and/or employee or agent responsible for delivering this communication to the intended recipient), you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender by telephone immediately and return it to the sender by mail. Sender will reimburse you for any expense incurred. Thank you. If any problems occur during transmission please call 203 761-4708 or 203 761-4702.

80
LDC0240

# FAX CONFIRMATION

**Result: Success**

## Sent by:

Name:            Walkup
Voice Number:
Fax Number:
RightFax ID:     WALKUP

## Sent to:

Name:            Fax User
Company:
Number/Address:  917813045537
Voice Number:
Remote CSID:     USSLF RF106 PRD1

---

**LDC.**
Louis Dreyfus Company

Louis Dreyfus Company
40 Danbury Road
Wilton, Connecticut
06897-0610

Telephone 203 761-4702
Fax 203 761-4715

Amy Khatib
Health and Insured Benefits

**Fax Transmittal**

To   Sun Life
     LTD

From  Amy Khatib

Fax  781 304-5537

Date  June 6, 2017

RE   J. Neal
     Policy Number: 242104

Pages  5  Including cover

Attached is a LTD claim for our insured Jerry Neal. Mr. Neal is currently receiving STD benefits under claim number 040117-02665-00.

Please let us know if we need to provide you with any additional information.

Thank you in advance for your attention to this claim.

Amy Khatib
Health and Insured Benefits Manager

This fax communication is intended of the use of the individual to whom it is addressed and may contain information that is proprietary, confidential, or privileged. If you are not the intended recipient (and/or employee or agent responsible for delivering this communication to the intended recipient), you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender by telephone immediately and return it to the sender by mail. Sender will reimburse you for any expense incurred. Thank you. If any problems occur during transmission please call 203 761-4708 or 203 761-4702.

## Details:

Type:            FAX

Cover Sheet:     does not have a cover page
Body Pages:      6

Billing Code #1:
Billing Code #2:

Unique ID:       WAL5936DEB35FE7
Fax Channel:     1

Scanning Device:

Scanned at:      06/06/17 16:56:07
Submitted at:    06/06/17 16:56:18
Completed at:    06/06/17 16:56:21

81

LDC0241

## Job Notification
**Success**

## HP Digital Sending Software

Page 1

The following job has been successfully delivered to the specified destinations or intermediate server.

Original Job Details

Device Name: HP LaserJet M3035 MFP - 10.10.32.21
User:
Date: Jun/6/2017 4:56:05 PM (-0400 GMT)
Scanned Pages: 6

Destination

917813045537                                                    Success

Additional Details

No additional details available.

82

LDC0242

# Sun Life Assurance Company of Canada
## Long Term Disability Claim Packet - Employer



Sun
Life Financial®

---

**Instructions for the Plan Administrator**

Please call our Customer Service Center at 1-800-247-6875 from 8 a.m. to 8 p.m. Eastern Time to report any scheduled or actual return-to-work dates as soon as possible.

Please make sure that the employee initiates the Long Term Disability claim filing process as soon as it first appears that his or her disability will extend beyond the required elimination period. Please refer to your group insurance policy to determine the length of the elimination period.

**Please be sure to submit the Employer's Statement directly to Sun Life Financial.**

**The Employer must:**

☐ Attach a copy of the LTD enrollment form if the employee contributes to the premium.

☐ Attach copies of employee's medical information relating to the disability (if available).

☐ Attach a copy of the employee's formal job description or a detailed description of primary duties.

☐ Attach a copy of all payroll documentation and attendance records for the last six months.

☐ If Waiver of Premium claim, attach the Basic and/or Optional enrollment form, payroll record and other required documentation.

**NOTE:**

FOR TRANSITION CLAIMS: If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes on page 4. Then complete the rest of the Employer portion of this claim packet.

FOR NON-TRANSITION CLAIMS: Fill out the entire Employer portion of this packet.

Mail or fax the completed claim form to:

Sun Life Assurance Company of Canada
Group Long Term Disability Claims
P.O. Box 81830
Wellesley Hills, MA 02481
Fax: (781) 304-5537

**Failure to provide complete and accurate information could result in the need for additional claims investigation which could delay the initial benefit payment.**

---

83
LDC0243

# Sun Life Assurance Company of Canada
## Long Term Disability Claim Packet - Employer



Sun
Life Financial®

| **Fraud Warnings**

State law requires that we notify you of the following:

**Fraud warning**: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Fraud warning—AK**: A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**Fraud warning—AL**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Fraud warning—AR, LA, MA, MN, NM, RI, TX, and WV**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Fraud warning—AZ**: For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Fraud warning—CA**: For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Fraud warning—CO**: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Fraud warning—DC**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Fraud warning—DE, ID, and IN**: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**Fraud warning—FL**: Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

**Fraud warning—KS**: Any person who knowingly and with intent to defraud any insurance company or other person files an Application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto may be guilty of insurance fraud as determined by a court of law.

84
LDC0244

# Sun Life Assurance Company of Canada
## Long Term Disability Claim Packet - Employer


Sun
Life Financial®

## Employer's Statement

### 1  General Information

Please print clearly.

Return to:
Sun Life Assurance
Company of Canada
Group LTD Claims,
SC 4328
1 Sun Life Exec. Park
P.O. Box 81830
Wellesley Hills, MA 02481
Fax: (781) 304-5537

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

| Name of employer | | | Group policy number | Class |
|---|---|---|---|---|
| Louis Dreyfus Company | | | 242-104 | |
| Street address | City | State | Zip | |
| 40 Danbury Rd. | Wilton | CT | 06 897 | |
| Name and address of division where employee works (if different from above) | | | | |

Does your company have a formal Return to Work Program? .................................. ☐ Yes ☑ No

| Contact Person | Telephone number |
|---|---|
| | |

### 2  Employee Information

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

| Name of employee (first, middle initial, last) | | | | ☑ M |
|---|---|---|---|---|
| Jerry Neal | | | | ☐ F |
| Social Security number | Date of birth (m/d/y) | | Telephone number | |
| ██████ 0655 | ████ 1981 | | 618 560-4163 | |
| Employee's street address | | City | State | Zip Code |

### 3  Employment and Claim Information

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

| Date hired (m/d/y) | Effective date of coverage | Date last worked (m/d/y) | Hours worked last day |
|---|---|---|---|
| | 8/20/2015 | | |

What was the employee's permanent occupation on his/her last date of work?

| How long had employee been in occupation? | Regularly scheduled work week: |
|---|---|
| Years:          Months: | Days per week:          Hours per day: |

Has the employee's employment been terminated?  ☐ Yes  ☑ No      If yes, provide termination date

Why did employee cease working?

Is the condition due to an injury or sickness arising out of employee's job?
☐ Yes  ☐ No  ☐ Disputed

Has a Workers' Compensation claim been filed? ........................................... ☑ Yes  ☐ No
If "yes," please include the initial report of illness/injury and award/denial notice with this claim.

| Name and address of your Workers' Compensation carrier: | Telephone number |
|---|---|
| Zurich North America | 800-987-3373 |

| Was employee covered under prior LTD policy? ........ ☑ Yes  ☐ No | Effective date under prior policy (m/d/y) 8/2/15 | Termination date under prior policy (m/d/y) 12/31/2015 |
|---|---|---|

| Has employee returned to work? ☐ Yes  ☑ No  If yes: ☐ With restrictions  ☐ Full capacity | Date returned (m/d/y) N/A |
|---|---|

85

LDC0245

## 7 Physical Aspects of Occupation continued – Complete this section for all claimants.

In a typical work day, the employee must:

| | Occasionally (1/4 – 2½ hours) | Frequently (2½ – 5½ hours) | Continuously (5½ – 8 hours) | Never |
|---|---|---|---|---|
| Bend/Stoop | ☐ | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ | ☐ |
| Reach above shoulder level | ☐ | ☐ | ☐ | ☐ |
| Kneel | ☐ | ☐ | ☐ | ☐ |
| Balance | ☐ | ☐ | ☐ | ☐ |
| Push/Pull | ☐ | ☐ | ☐ | ☐ |
| Crawl/Crouch | ☐ | ☐ | ☐ | ☐ |
| Lift _____ lbs. | ☐ | ☐ | ☐ | ☐ |
| Carry _____ lbs. | ☐ | ☐ | ☐ | ☐ |

Does the employee use feet for repetitive movements, as in operating foot controls?
Right foot ☐ Yes ☐ No     Left foot ☐ Yes ☐ No     Both feet ☐ Yes ☐ No

What are the major tasks requiring use of one or both hands?

**Check all that apply.**

Which of the following describes the employee's working environment?
☐ Working at heights          ☐ Exposure to dust, fumes and gases
☐ Operating heavy machinery   ☐ Changes in temperature or humidity
☐ Precise manual dexterity    ☐ Other hazards (specify): _____

## 8 Non-Physical Aspects of Occupation – Complete this section for all claimants.

Does employee have to answer customer complaints? ........................................................ ☐ Yes ☐ No
Is employee primarily evaluated on production? ................................................................ ☐ Yes ☐ No
Is employee routinely subject to close supervision? ......................................................... ☐ Yes ☐ No
Does employee work closely with his/her co-workers? ...................................................... ☐ Yes ☐ No
Is employee responsible for the overall performance of his/her particular
department? ....................................................................................................................... ☐ Yes ☐ No
Number of people this employee supervises _____

## 9 Checklist of Required Attachments – Complete this section for all claimants.

**Failure to provide the following information could result in a delay of the initial benefit payment.**

☐ Attach a copy of the LTD enrollment form if the employee contributes to the premium.

☐ Attach copies of employee's medical information relating to the disability (if available).

☐ Attach a copy of the employee's formal job description or a detailed description of primary duties.

☐ Attach a copy of all payroll documentation and attendance records for the last six months.

☐ If Waiver of Premium claim, attach the Basic and/or Optional enrollment form, payroll record and other required documentation.

## 10 Certification and Signature – Complete this section for all claimants.

Tip: To certify eligibility, mail or fax the employee's enrollment form with the claim.

**I certify that the above statements are true and complete. I have read or had read to me the fraud warning for my state.**

| Name of person completing this form | Telephone number: 203 761-4702 |
|---|---|
| Amy A. Khatri | Fax Number: 203 761-4767 |
| Title     Benefits | E-mail address: amy.khatri6 ldc.com |
| Health d Insed my | Company's Website: |
| Signature     X | Date signed     6/6/17 |

For more information about Long Term Disability, the claim process and the status of your employees' claims, log onto your plan administrator web portal.

86
LDC0246



Sun Life Assurance      Page 1 of 1
Company of Canada
One Sun Life Executive Park
PO Box 81915
Wellesley Hills, MA 02481
1-800-247-6875
fax: (781) 304-5519

May 3, 2017

52

LOUIS DREYFUS COMMOD
AMY KHATIB
40 DANBURY RD
WILTON CT  06897

Issued By:
Sun Life Assurance COPY
Company of Canada

**Your Sun Life Financial Claim Number**
040117-02665-00

Plan Member:      Jerry Neal
Contract Number:      242104
Control Number:      040117-02665-00

Our records show that your employer also has Long Term Disability ( LTD )  coverage with Sun Life Financial. To be eligible for LTD benefits you must be Totally Disabled as defined by the Policy.

If you wish to file a claim for LTD benefits please complete the enclosed claim forms and return them to our address (see above). Please return this information as soon as possible. Once the completed claim forms are received the evaluation of your eligibility for LTD benefits will begin.
You must provide the Employee's Statement, Authorization, Reimbursement Agreement, a copy of a photo ID, (e.g. a driver's license) and the Training, Education and Experience form to initiate a LTD claim. Please note that although there are several parties involved in completing the paperwork the burden of Proof of claim is your sole responsibility.

A LTD Case Manager will contact you by telephone within five business days after we receive your completed claim forms. The Case Manager will explain the LTD claim process and any additional information required from you, your attending physician, or employer.

Under the terms of the Policy you are responsible for providing adequate Proof of claim which includes evidence of Disability. This may include medical information such as hospital records, physician records, or laboratory results. You may also be asked to provide non-medical Proof of claim which could include police accident reports or earnings documentation. Please note that approval of your claim for LTD benefits is not a guarantee. Sun Life may require authorizations to obtain medical and non-medical information.

Every effort will be made to reach a timely decision. In the event the decision is delayed you will be informed of the reason(s) for the delay and of any information needed to complete the evaluation of your eligibility for LTD benefits.

If you have any questions please call 855-629-8811. Thank you for choosing Sun Life Financial.

Sun Life Assurance Company of Canada
is a member of the Sun Life Financial
group of companies.  Check on the status of
your disability claim online at www.sunlife-usa.com

87
LDC0250



Sun Life Assurance Company of Canada
SC 4312
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

1-855-629-8811
Extension Option 3
Fax: 1-781-304-5519

June 23, 2017

Jerry Neal
532 Saint James
Cahokia, IL 62206

Re:   **SunAdvisor Short Term Disability**
|  |  |
|---|---|
| Plan Number: | 242104 |
| Plan Sponsor: | Louis Dreyfus Company LLC |
| Claim Number: | 040117-02665-00 |

Dear  Mr. Neal,

Your employer has retained Sun Life to assist them with administrating claims under their self-funded Short Term Disability benefit Plan.  On behalf of your employer, we completed our review of your claim.

We cannot approve your claim because the information you provided does not demonstrate that you are "Totally Disabled" beyond April 20, 2017.

This letter explains how we reached our claim decision and how you can appeal it if you wish to do so.

*Our Review of Your Claim*
To determine whether you qualify for benefits, we consider the following:
- applicable Plan provisions
- the duties of your occupation
- whether your condition affected your ability to perform the duties of your occupation.

As part of our evaluation, we also ask a medical consultant to review your medical records.

*The Plan Provisions*
Your Plan requires that you must be Totally Disabled to qualify for Short Term Disability benefits.  "Totally Disabled" means that *"because of your Injury or Sickness, you are unable to perform all of the material and substantial duties of your own occupation and you are not*

**88**

LDC0261



Sun Life Assurance Company of Canada

SC 4328
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

Tel: 1-800-786-5433 x3122450
Fax: 1-781-304-5537

October 27, 2017

Louis Dreyfus Commodities LLC
Attn: Amy Khatib
40 Danbury Road
Wilton, CT 06897

Re: Policy Number:       242104-Long Term Disability
    Claim Number:        050617-05803-00

Dear Ms. Khatib ,

We are writing to you concerning your employee, Jerry Neal.

Please be advised that Jerry Neal's Long Term Disability Claim has been denied for benefits beyond September 7, 2017, and a letter providing the details of the denial was sent under separate cover to the employee. We have advised your employee of their right to appeal our decision.

Should you have any questions, please call me at 1-800-786-5433, Extension 3122450.

Sincerely,

Scott Titcomb
Case Manager 2

89
LDC0325



Sun Life Assurance
Company of Canada
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

## Fax

| | | | |
|---|---|---|---|
| **Date:** | October 27, 2017 11:04:00 AM | **From:** | Scott Titcomb |
| **To:** | Louis Dreyfus Commodities LLC Attn: Amy Khatib | **Fax** | 203 761-4715 |
| **Company:** | | **Pages:** | 02 |

Good Morning: Here is the denial letter for Jerry Neal. Thank you.

If transmission is illegible or incomplete, contact the sender immediately. This material is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, proprietary, confidential and exempt from disclosure. If you are not the intended recipient or the person responsible for delivering the material to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, we would appreciate it if you would please notify the sender immediately by telephone (collect if required) and destroy this material accordingly.

**www.sunlife-usa.com**

90

LDC0326



Sun Life Financial

Sun Life Assurance Company of Canada

SC 4328
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

Tel: 1-800-786-5433 x3122450
Fax: 1-781-304-5537

July 27, 2017

Jerry Neal
532 Saint James
Cahokia, IL 62206

Re:  Policy Number:        242104-Long Term Disability
     Claim Number:         050617-05803-00

Dear  Mr. Neal,

We have completed our review of your claim for Long Term Disability (LTD) benefits and are pleased to inform you that we have approved payment of benefits at this time.

We have determined that your date of disability is December 20, 2016. The Group Policy has an Elimination Period of 180 days. You have satisfied the Elimination Period with the required number of days of Total or Partial Disability. Therefore, LTD benefits begin to accrue effective June 18, 2017.

We have verified your monthly earnings and calculated your benefit as follows:
Total Monthly Earnings: $2662.62
Benefit Percent: 60%
Gross Monthly Benefit: $1597.57

Your first payment for benefits from June 18, 2017 through June 30, 2017 in the amount of $692.28 has been issued under a separate cover. The amount of your first payment was calculated based on the gross benefits due, less any required withholding for FICA taxes and any offsets listed above. If applicable, we have pro-rated the gross benefits and any offsets for less than a complete month. Benefit checks are issued on a monthly basis subject to ongoing proof of Total or Partial Disability. Checks are issued at the end of each month.

In order to consider your claim for benefits beyond August 31, 2017, we will need your medical records from your next office visit with Dr. Matthew Gornet.

Please be aware that after June 17, 2019, the definition of Total Disability changes. This means that as of this date, you will only continue to meet the definition of Total Disability if you are unable to perform the duties of any Gainful Occupation. If you continue to be eligible for benefits under the Policy after this time, benefits will be payable for the maximum benefit period of up to age 65, subject to any limitations in the Group Policy.

Page 1 of 5

91
LDC0327

92

At this time, our plan is to follow-up with you to monitor your treatment and progress with your physician(s) so that we can determine whether you continue to meet the definition of Total or Partial Disability on an ongoing basis. If you are improved and receive a release to return to work, you must notify Sun Life immediately. Otherwise, to help you with providing ongoing Proof of Claim, we will periodically send you forms for you or your treatment providers to complete, and may also request other information from you. A prompt reply to our requests will prevent any interruption in your benefits.

Sun Life Financial believes that people are at their healthiest when they are working, whether at their own job or at a new occupation, so long as their medical condition permits a return to work. Therefore, our Vocational Rehabilitation Services Unit will be reviewing your claim to determine if you could benefit from return to work assistance. As part of that review, the Vocational Rehabilitation Services Unit may contact you directly. Any rehabilitation services we offer are provided free of charge to you. While participating in an approved rehabilitation plan, you may be eligible for additional benefit incentives, equal to 10% of your gross monthly benefit for up to 12 months. Participation in a rehabilitation program is voluntary.

Your claim will be reviewed to determine if you are a potential candidate for Social Security Disability benefits. If it is determined that you are a potential candidate, you will be contacted directly by The Advocator Group, a third party group of professionals who specialize in Social Security Disability benefits, and they will assist you beginning with initial application for Social Security Disability benefits through any necessary appeals.

Under the terms of the Group Policy, the amount of benefits you receive may be reduced by Other Income you receive. Sources of Other Income include Social Security Disability, Workers' Compensation, state disability, employer sick leave, salary continuation programs, certain pension benefits and/or income provided in settlement of an employment contract, etc. If you have applied for or do apply for any of these Other Income benefits in the future, the terms of the Group Policy require that you keep us informed about the status of your applications and provide us with a copy of any award showing the benefit amount and period paid within 30 days of any award.

Your disability coverage is offered through your employer. As such, it may be considered a third-party sick pay plan, and the benefits provided may be taxable to you. If you have any questions or concerns in this regard, you should discuss them with a tax professional or the Internal Revenue Service (http://www.irs.gov). We may be able to withhold federal taxes for you upon your written request. The minimum withholding amount is $88.00 per month, per IRS publication 15-A "Employers Supplemental Tax Guide". If you wish to take advantage of this optional withholding service, please send a written request to us indicating the amount to be withheld for federal income taxes. Please include a completed IRS Form W4S with your request.

Additionally, if you would prefer that your LTD benefit be provided to you by direct deposit rather than by check, you may complete and return the enclosed direct deposit authorization, being sure to also include a voided check.

If you are still employed by your employer, please be aware that LTD premium payments are waived during any period LTD benefits are payable under this Policy. Therefore, your LTD premiums can be waived as of the first day of the month following the benefit start date above.

LDC0328

If you have questions about this, please discuss this with your Human Resources department. LTD premium payments for a Totally or Partially Disabled Employee are waived during any period LTD benefits are payable under this Policy. Therefore, premiums for this employee may be waived as of July 1, 2017.

Please refer to the Group Policy and employee booklet for additional information concerning the disability and benefit standards explained in this letter.

Rider Approval or Declination

**RETRO DISABILITY BENEFIT**

Effective January 1, 2016, the following Retro Disability Benefit is added to Group Policy No. 242104-001 Long Term Disability Income Benefit Provision.

**Retro Disability Benefit**

If an Employee is receiving a Total Disability Benefit, an additional Retro Disability Benefit may be payable if Sun Life receives proof that the Employee had a Retro Disability that was due to the same Injury or Sickness that caused Total Disability.

The Retro Disability Benefit is the Employee's Gross Monthly Benefit multiplied by the number of months (each 30 days) in the Elimination Period. This amount is not subject to reduction due to Other Income.

The Retro Disability Benefit will be paid in a single lump sum amount. Sun Life must receive proof that the Employee had a Retro Disability within 90 days following the date the Employee completes the Elimination Period.

Any Long Term Disability Benefits payable after completion of the Elimination Period will be subject to the terms of this Policy, including reductions by any Other Income.

**Retro Disability** means an Injury or Sickness that results in:

1. Hospital Confinement that begins on the date the Employee becomes Totally Disabled or within 48 hours of the date the Employee's Total Disability begins; and
2. such Hospital Confinement continues for at least 14 consecutive days; and
3. the Employee's Total Disability remains continuous throughout the Elimination Period.

**Hospital Confinement** means admission to a Hospital as a registered inpatient due to an Injury or Sickness. The confinement must be on the advice of a Physician and medically necessary according to generally accepted medical standards. Confinement to an emergency room, outpatient treatment room, or observation unit is not considered a Hospital Confinement.

**Hospital** means a facility licensed in the applicable jurisdiction that provides medical care and treatment to sick and injured persons on an inpatient basis with 24 hour nursing service by or under the supervision of a Physician. Hospital does not include a rest home, a place of convalescence, rehabilitative care, custodial care or a place primarily for the treatment of drug addicts or alcoholics.

93

LDC0329

This provision would not apply at this time.

Effective January 1, 2016, the following provision is added to Group Policy No. 242104-001 Long Term Disability Income Benefit Provision.

**The following is added to the Successive Periods provision of the LTD Benefit Section:**

If an Employee received a monthly Total or Partial Disability benefit under the Employer's prior LTD plan; and
- the Employee returned to work as an active Full-Time Employee prior to July 1, 2016; and
- within 6 months of the Employee's return to active Full-Time employment, he has a recurrence of the same Total or Partial Disability payable under the prior LTD policy; and
- there are no benefits available for that recurrence under the prior LTD policy;
then the Elimination Period under this Policy will be waived if the recurrent Total or Partial Disability would have been paid without any further Elimination Period if the prior LTD policy had remained in force.

This would not apply to your claim.

<u>Right to Appeal</u>

If you disagree with any part of our decision, you may request in writing a review within 180 days after receiving this notice.

You may submit written comments, documents, records or other information relating to your claim for benefits, and may request free of charge copies of all documents, records, and other information relevant to your claim for benefits.

We will review your claim on receipt of the written request for review, and will notify you of our decision within a reasonable period of time but not later than 45 days after the request has been received. If an extension of time is required to process the claim, we will notify you in writing of the special circumstances requiring the extension and the date by which we expect to make a determination on review. The extension cannot exceed a period of 45 days from the end of the initial review period.

If a period of time is extended because we did not receive information necessary to decide your claim, the period for making the decision on review is tolled from the date we send notice of the extension to you until the date on which you respond to the request for additional information. You will have 45 days to provide the specified information.

If this claim is governed by the Employee Retirement Income Security Act of 1974 (ERISA), you have the right to bring a civil action under section §502(a) of ERISA following an adverse determination on review.

Your request for a review should be addressed to:

<div align="center">

Sun Life Financial
Appeals Unit
PO Box 81601
Wellesley Hills, MA  02481-0006

</div>

94

LDC0330

95

Rule 919 of the Rules and Regulations of the Illinois Department of Insurance, requires that our company advise you that if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at:

Illinois Department of Insurance
Consumer Division
122 S. Michigan Ave., 19th Floor
Chicago, Illinois 60603
or in Springfield at:
320 W. Washington Street
Springfield, IL 62767"

Should you have any questions, please call me at 1-800-786-5433, Extension 3122450.

Sincerely,

Scott Titcomb
Case Manager 2

Louis Dreyfus Commodities LLC
Attn: Amy Khatib
40 Danbury Road
Wilton, CT 06897

95

LDC0331

**Amy Khatib**

| | |
|---|---|
| **From:** | Karen.Cue@sunlife.com on behalf of std.ccu@sunlife.com |
| **Sent:** | Wednesday, May 24, 2017 2:56 PM |
| **To:** | Amy Khatib |
| **Cc:** | Charise Twyne-Stokes |
| **Subject:** | RE: Advice to Pay: 242104 - Jerry Neal |

[WARNING] This message originated from outside of your organization. Please use caution

Hi Amy,

LTD paperwork was mailed to Mr. Neal's home on 5/4/17, so he would have to complete that paperwork and submit it back. Once Sun Life receives it, an LTD file will be set up and assigned to an LTD examiner. I hope this helps! I am still waiting on additional records from one of his providers to continue with my review.

Thank you,

Karen
Case Manager I, Short Term Disability | Sun Life Financial Phone (855) 629-8811 opt 3| Fax (781) 304-5599 | std.ccu@sunlife.com |
Life's brighter under the sun.

From:     Amy Khatib <AMY.KHATIB@ldc.com>
To:       "std.ccu@sunlife.com" <std.ccu@sunlife.com>, Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
Date:     05/24/2017 11:50 AM
Subject:  RE: Advice to Pay: 242104 - Jerry Neal

Hi- attached is an updated doctor's note for Mr. Neal. It was our understanding the Sun Life was going to start transitioning this claim to LTD. Has that process begun?

Thank you in advance.

Amy



Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amy Khatib
**Sent:** Wednesday, March 22, 2017 11:24 AM
**To:** 'std.ccu@sunlife.com' <std.ccu@sunlife.com>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Advice to Pay: 242104 - Jerry Neal

Thank you Karen. We agree with your ATP.

1

96

LDC0340

# Internal Medicine Specialists of Southern Illinois
## Nidal Shawahin, M.D. • Kristen N. Massey, NP

Date __11/23/17__

__Jerry Mead__ _____ was seen in my office

on __11/23/17__ , for the following condition:

_____

This individual:

May return to work, school, gym, sports participation

on _____ , with the following restrictions:

_____ None

_____ Participation based on level of comfort

__Patient can't lift, push or pull__
__anything for 2 weeks.__

_____ May not return to work, school, gym or sports until

_____

Dr. Shawahin

97

LDC0400

# Internal Medicine Specialists of Southern Illinois
## Nidal Shawahin, M.D. • Kristen N. Massey, NP

Date 12/14/16

Jerry Neal _____ was seen in my office

on 12/14/16 _____, for the following condition:

_____

This individual:

May return to work, school, gym, sports participation

on _____, with the following restrictions:

_____ None

_____ Participation based on level of comfort

Patient can't lift, push or pull anything for 2 weeks.

_____ May not return to work, school, gym or sports until

_____

Dr. Shawahin

98

LDC0401

**Amy Khatib**

| | |
|---|---|
| **From:** | Amy Khatib |
| **Sent:** | Tuesday, March 21, 2017 9:19 AM |
| **To:** | std.ccu@sunlife.com |
| **Cc:** | Charise Twyne-Stokes |
| **Subject:** | RE: Claim Inquiry: 242104 – Jerry Neal |

**Importance:**  High

Good morning Karen:

Worker's Comp is denying Mr. Neal's claim. We would like you to go ahead and approve his STD and begin payments.

Please let me know if we need to provide you with any additional information.

Thank you again for your attention to this claim.

Best,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amy Khatib
**Sent:** Friday, March 17, 2017 3:04 PM
**To:** 'std.ccu@sunlife.com' <std.ccu@sunlife.com>
**Cc:** Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Claim Inquiry: 242104 - Jerry Neal

Hi Karen:

I'll follow up on this and get back to you shortly.

Thank you,

Amy

**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

1

99

**From:** Karen.Cue@sunlife.com [mailto:Karen.Cue@sunlife.com] **On Behalf Of** std.ccu@sunlife.com
**Sent:** Thursday, March 16, 2017 9:49 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>
**Cc:** Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** Claim Inquiry: 242104 - Jerry Neal

Good morning,

I was wondering if there was any update regarding the status of Mr. Neal's Workers' Comp claim?

I have received medical records from two of his providers.  The heavy lifting at work is the only activity that has been cited as potentially being the cause of his back condition, and his provider from a visit on 2/28 opined that his symptoms are "causally connected to work related injury as described. "

Thank you!

Karen Cue
Case Manager I, Short Term Disability | Sun Life Financial Phone (855) 629-8811 opt 3| Fax (781) 304-5599 | std.ccu@sunlife.com |

2

100
LDC0416

## Amy Khatib

| | |
|---|---|
| **From:** | Karen.Cue@sunlife.com on behalf of std.ccu@sunlife.com |
| **Sent:** | Wednesday, March 22, 2017 7:19 AM |
| **To:** | Amy Khatib; Charise Twyne-Stokes |
| **Subject:** | Advice to Pay: 242104 – Jerry Neal |
| **Attachments:** | JN.pdf |

Hello,

Attached you will find a SunAdvisor disability claim recommendation for the above referenced employee based upon a review of all information in our files. Disability payments, if due, are mailed the business day following claim approval and will continue weekly through the Approved To date.

Should you not accept this claim recommendation for any reason, please respond to this email within 24 business hours. Should you have any questions regarding this claim or your STD plan, please feel free to contact me directly at any time.

Kind Regards,

Karen Cue
Case Manager I
Sun Life Financial

Toll Free: 855-629-8811
Fax: 781-304-5519
Customer Service: 855-629-8811, Option 3

Claim Document Submissions: MyClaimDocuments@sunlife.com

www.sunlife-usa.com

Count on us. Partner with us. Grow with us.

101
LDC0417



**Sun Life Assurance Company of Canada**

SC 4312
One Sun Life Executive Park
Wellesley Hills, MA 02481-5699

1-855-629-8811
Extension Option 3

Fax: 1-781-304-5519

March 22, 2017

AMY.KHATIB@ldc.com
CHARISE.STOKES@ldc.com

Re:   **SunAdvisor Short Term Disability**
       Plan Number:            242104
       Plan Sponsor:           Louis Dreyfus Company LLC
       Claim Number:           040117-02665-00

Dear  Leave Specialist,

We have completed our review regarding Jerry Neal's absence.

According to our review of the information received, we recommend that the Disability approval commence effective December 20, 2016 (date of Disability). Any payment would be subject to your Plan Elimination Period for an illness. At this time we recommend, based on the employee's condition; that the Disability payments continue through April 20, 2017 (next office visit, we will need updated medical records from the treating Provider(s) - the claim is open).

If the employee does not return to work by the aforementioned date, and would like to be considered for additional benefit review, a medical update should be submitted.  Specifically, the employee should have the treating physician submit a copy of the most recent examination report(s) and any accompanying test results and surgical notes.
Upon receipt, we will advise you accordingly.

The information may be forwarded to this office by fax at **(781) 304-5519** or mailed to the below address:

<div align="center">

Sun Life Assurance Company of Canada
Short Term Disability Claims
One Sun Life Executive Park, SC4312
P.O. Box 81915
Wellesley Hills, MA 02481-5699

</div>

<div align="center">Page 1 of 2</div>

102
LDC0418

Disability payments, if due, are mailed the business day following claim approval and will continue weekly through April 20, 2017.

*Sun Life Assurance Company of Canada has provided this review pursuant to an administrative services agreement with Louis Dreyfus Company LLC.*

**Should you not accept this claim recommendation for any reason, please notify us within 24 business hours.**

Should you have any questions, please call me at 1-855-629-8811, Extension Option 3. Thank you for choosing Sun Life.

Sincerely,

*Karen Cue*

Karen Cue
Case Specialist III
Short Term Disability

103

LDC0419

## Amy Khatib

| From: | Amy Khatib |
|---|---|
| Sent: | Wednesday, March 22, 2017 11:24 AM |
| To: | std.ccu@sunlife.com; Charise Twyne-Stokes |
| Subject: | RE: Advice to Pay: 242104 - Jerry Neal |

| Tracking: | Recipient | Delivery |
|---|---|---|
| | std.ccu@sunlife.com | |
| | Charise Twyne-Stokes | Delivered: 3/22/2017 11:24 AM |

Thank you Karen. We agree with your ATP.

**LDC.**

Louis Dreyfus Company

**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Karen.Cue@sunlife.com [mailto:Karen.Cue@sunlife.com] **On Behalf Of** std.ccu@sunlife.com
**Sent:** Wednesday, March 22, 2017 7:19 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** Advice to Pay: 242104 - Jerry Neal

Hello,

Attached you will find a SunAdvisor disability claim recommendation for the above referenced employee based upon a review of all information in our files. Disability payments, if due, are mailed the business day following claim approval and will continue weekly through the Approved To date.

Should you not accept this claim recommendation for any reason, please respond to this email within 24 business hours. Should you have any questions regarding this claim or your STD plan, please feel free to contact me directly at any time.

Kind Regards,

Karen Cue
Case Manager I
Sun Life Financial

Toll Free: 855-629-8811
Fax: 781-304-5519
Customer Service: 855-629-8811, Option 3

Claim Document Submissions: MyClaimDocuments@sunlife.com

www.sunlife-usa.com

Count on us. Partner with us. Grow with us.

104
LDC0420

## Amy Khatib

| | |
|---|---|
| **From:** | Amy Khatib |
| **Sent:** | Tuesday, March 21, 2017 9:19 AM |
| **To:** | std.ccu@sunlife.com |
| **Cc:** | Charise Twyne-Stokes |
| **Subject:** | RE: Claim Inquiry: 242104 - Jerry Neal |

**Importance:** High

Good morning Karen:

Worker's Comp is denying Mr. Neal's claim. We would like you to go ahead and approve his STD and begin payments.

Please let me know if we need to provide you with any additional information.

Thank you again for your attention to this claim.

Best,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Amy Khatib
**Sent:** Friday, March 17, 2017 3:04 PM
**To:** 'std.ccu@sunlife.com' <std.ccu@sunlife.com>
**Cc:** Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Claim Inquiry: 242104 - Jerry Neal

Hi Karen:

I'll follow up on this and get back to you shortly.

Thank you,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

1

105
LDC0421

**From:** Karen.Cue@sunlife.com [mailto:Karen.Cue@sunlife.com] **On Behalf Of** std.ccu@sunlife.com
**Sent:** Thursday, March 16, 2017 9:49 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>
**Cc:** Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** Claim Inquiry: 242104 - Jerry Neal

Good morning,

I was wondering if there was any update regarding the status of Mr. Neal's Workers' Comp claim?

I have received medical records from two of his providers. The heavy lifting at work is the only activity that has been cited as potentially being the cause of his back condition, and his provider from a visit on 2/28 opined that his symptoms are "causally connected to work related injury as described. "

Thank you!

Karen Cue
Case Manager I, Short Term Disability | Sun Life Financial Phone (855) 629-8811 opt 3| Fax (781) 304-5599 | std.ccu@sunlife.com |

106
LDC0422

## Amy Khatib

| | |
|---|---|
| **From:** | Dave Stafford |
| **Sent:** | Monday, June 5, 2017 4:48 PM |
| **To:** | Amy Khatib |
| **Cc:** | Amber Randall |
| **Subject:** | FW: Jerry Neal |
| **Attachments:** | STD Neal.pdf |

Amy,

Jerry brought in the attached to the Cahokia office. I've told them we'd complete our portion and get it to Sun Life. Don't you all normally do this?

Dave

**From:** Scott Becker
**Sent:** Monday, June 05, 2017 3:26 PM
**To:** Amber Randall <AMBER.RANDALL@ldc.com>
**Cc:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Gene Loffler <GENE.LOFFLER@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>; Marcus Dixon <Marcus.Dixon@ldc.com>
**Subject:** Jerry Neal

Hello Amber, Jerry Neal came into the office today requesting that we fill out the attached paper work. This is again the Sun Life Assurance STD form. Jerry has already been told that he could not file both a STD claim as well as a Workers comp claim for the same injury. Just was wondering if something had changed with this case. This information was not filled out and given back to him. I am guessing that workers comp is still investigating the case which may have held up any compensation benefits...... which is Jerrys fault. Please tell me how to proceed or if you want me to contact Jerry again.

I have not forwarded this information to Zurick rep Meka Benton yet. And will wait until told to do so.

Thanks Amber

107
LDC0436

571

# Sun Life Assurance Company of Canada
## Long Term Disability Claim Packet - Employer



**Instructions for the Plan Administrator**

Please call our Customer Service Center at 1-800-247-6875 from 8 a.m. to 8 p.m. Eastern Time to report any scheduled or actual return-to-work dates as soon as possible.

Please make sure that the employee initiates the Long Term Disability claim filing process as soon as it first appears that his or her disability will extend beyond the required elimination period. Please refer to your group insurance policy to determine the length of the elimination period.

**Please be sure to submit the Employer's Statement directly to Sun Life Financial.**

**The Employer must:**

☐ Attach a copy of the LTD enrollment form if the employee contributes to the premium.

☐ Attach copies of employee's medical information relating to the disability (if available).

☐ Attach a copy of the employee's formal job description or a detailed description of primary duties.

☐ Attach a copy of all payroll documentation and attendance records for the last six months.

☐ If Waiver of Premium claim, attach the Basic and/or Optional enrollment form, payroll record and other required documentation.

**NOTE:**

FOR TRANSITION CLAIMS: If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes on page 4. Then complete the rest of the Employer portion of this claim packet.

FOR NON-TRANSITION CLAIMS: Fill out the entire Employer portion of this packet.

Mail or fax the completed claim form to:

Sun Life Assurance Company of Canada
Group Long Term Disability Claims
P.O. Box 81830
Wellesley Hills, MA 02481
Fax: (781) 304-5537

**Failure to provide complete and accurate information could result in the need for additional claims investigation which could delay the initial benefit payment.**

108
LDC0437

# Sun Life Assurance Company of Canada
## Long Term Disability Claim Packet - Employer



## Fraud Warnings

State law requires that we notify you of the following:

**Fraud warning**: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Fraud warning—AK**: A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**Fraud warning—AL**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

**Fraud warning—AR, LA, MA, MN, NM, RI, TX, and WV**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Fraud warning—AZ**: For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Fraud warning—CA**: For your protection California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Fraud warning—CO**: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Fraud warning—DC**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Fraud warning—DE, ID, and IN**: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**Fraud warning—FL**: Any person who knowingly and with intent to injure, defraud or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony of the third degree.

**Fraud warning—KS**: Any person who knowingly and with intent to defraud any insurance company or other person files an Application for insurance or statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto may be guilty of insurance fraud as determined by a court of law.

109
LDC0438

# Sun Life Assurance Company of Canada
# Long Term Disability Claim Packet - Employer



Sun
Life Financial®

## Employer's Statement

### 1  General Information

Please print clearly.

Return to:
Sun Life Assurance
Company of Canada
Group LTD Claims,
SC 4328
1 Sun Life Exec. Park
P.O. Box 81830
Wellesley Hills, MA 02481
Fax: (781) 304-5537

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term
Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

| Name of employer | | Group policy number | Class |
|---|---|---|---|
| Street address | City | State | Zip |
| Name and address of division where employee works (if different from above) | | | |

Does your company have a formal Return to Work Program? ...................................... ☐ Yes  ☐ No

| Contact Person | Telephone number |
|---|---|

### 2  Employee Information

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

| Name of employee (first, middle initial, last) | | | ☐ M  ☐ F |
|---|---|---|---|
| Social Security number | Date of birth (m/d/y) | Telephone number | |
| Employee's street address | City | State | Zip Code |

### 3  Employment and Claim Information

If claimant is transitioning from a Sun Life Assurance Company of Canada Short Term Disability claim to a Long Term Disability claim, only fill in the shaded boxes.

| Date hired (m/d/y) | Effective date of coverage | Date last worked (m/d/y) | Hours worked last day |
|---|---|---|---|

What was the employee's permanent occupation on his/her last date of work?

| How long had employee been in occupation? Years:  Months: | Regularly scheduled work week: Days per week:  Hours per day: |
|---|---|

| Has the employee's employment been terminated? ☐ Yes  ☐ No | If yes, provide termination date |
|---|---|

Why did employee cease working?

Is the condition due to an injury or sickness arising out of employee's job?
☐ Yes  ☐ No  ☐ Disputed

Has a Workers' Compensation claim been filed? .......................................... ☐ Yes  ☐ No
If "yes," please include the initial report of illness/injury and award/denial notice with this claim.

| Name and address of your Workers' Compensation carrier: | Telephone number |
|---|---|

| Was employee covered under prior LTD policy?............. ☐ Yes ☐ No | Effective date under prior policy (m/d/y) | Termination date under prior policy (m/d/y) |
|---|---|---|

| Has employee returned to work? ☐ Yes  ☐ No  If yes: ☐ With restrictions  ☐ Full capacity | Date returned (m/d/y) |
|---|---|

110

LDC0439

**7 Physical Aspects of Occupation continued** – Complete this section for all claimants.

In a typical work day, the employee must:

| | Occasionally (1/4 – 2 ½ hours) | Frequently (2 ½ - 5 ½ hours) | Continuously (5 ½ - 8 hours) | Never |
|---|---|---|---|---|
| Bend/Stoop | ☐ | ☐ | ☐ | ☐ |
| Climb | ☐ | ☐ | ☐ | ☐ |
| Reach above shoulder level | ☐ | ☐ | ☐ | ☐ |
| Kneel | ☐ | ☐ | ☐ | ☐ |
| Balance | ☐ | ☐ | ☐ | ☐ |
| Push/Pull | ☐ | ☐ | ☐ | ☐ |
| Crawl/Crouch | ☐ | ☐ | ☐ | ☐ |
| Lift ____ lbs. | ☐ | ☐ | ☐ | ☐ |
| Carry ____ lbs. | ☐ | ☐ | ☐ | ☐ |

Does the employee use feet for repetitive movements, as in operating foot controls?

Right foot ☐ Yes ☐ No    Left foot ☐ Yes ☐ No    Both feet ☐ Yes ☐ No

What are the major tasks requiring use of one or both hands?

**Check all that apply.**

Which of the following describes the employee's working environment?
☐ Working at heights        ☐ Exposure to dust, fumes and gases
☐ Operating heavy machinery ☐ Changes in temperature or humidity
☐ Precise manual dexterity  ☐ Other hazards (specify): _____

**8 Non-Physical Aspects of Occupation** – Complete this section for all claimants.

Does employee have to answer customer complaints? ......................................... ☐ Yes ☐ No
Is employee primarily evaluated on production? .............................................. ☐ Yes ☐ No
Is employee routinely subject to close supervision? ......................................... ☐ Yes ☐ No
Does employee work closely with his/her co-workers? ....................................... ☐ Yes ☐ No
Is employee responsible for the overall performance of his/her particular department? ..................................................................................... ☐ Yes ☐ No
Number of people this employee supervises _____

**9 Checklist of Required Attachments** – Complete this section for all claimants.

**Failure to provide the following information could result in a delay of the initial benefit payment.**

☐ Attach a copy of the LTD enrollment form if the employee contributes to the premium.

☐ Attach copies of employee's medical information relating to the disability (if available).

☐ Attach a copy of the employee's formal job description or a detailed description of primary duties.

☐ Attach a copy of all payroll documentation and attendance records for the last six months.

☐ If Waiver of Premium claim, attach the Basic and/or Optional enrollment form, payroll record and other required documentation.

**10 Certification and Signature** – Complete this section for all claimants.

Tip: To certify eligibility, mail or fax the employee's enrollment form with the claim.

**I certify that the above statements are true and complete. I have read or had read to me the fraud warning for my state.**

| Name of person completing this form | Telephone number: Fax Number: |
|---|---|
| Title | E-mail address: Company's Website: |
| Signature X | Date signed |

For more information about Long Term Disability, the claim process and the status of your employees' claims, log onto your plan administrator web portal.

XGR/1640  •  LTD Claim Packet - Employer          Page 6 of 7

111

LDC0440

What reason do we typically use in this situation for termination?

**From:** Amy Khatib
**Sent:** Monday, June 26, 2017 9:40 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>
**Subject:** RE: Jerry Neal

Hi Dave:

Thank you for following up on Mr. Neal. Yes, please return him from leave and then do the termination.

Amy



Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldc.com

  

Louis Dreyfus Company LLC
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Monday, June 26, 2017 10:37 AM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>
**Subject:** FW: Jerry Neal

Amy,

That's the last contact I was aware of with Mr. Neal too so am going to go ahead and key termination today and not wait on Mark. If he were to come back tomorrow say he had visited with Jerry since June 8 when he dropped off the STD form then I can always reverse the termination but given it's already been a week and Mark is generally the first to tell us of what's going on in Cahokia, I think we are in good shape and have minimal risk in keying term today. That said, do I need to return him from leave prior to keying termination? Please advise.

Thanks

**From:** Scott Becker
**Sent:** Monday, June 26, 2017 8:56 AM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>
**Cc:** Gene Loffler <GENE.LOFFLER@ldc.com>
**Subject:** RE: Jerry Neal

I have not had any conversations at all with Jerry. He did however come in on 6-5-2017 and drop of a STD form which was forwarded to Amber and yourself. With no conversations .

Mark is out on vacation today, but will double check with him when he returns.

**From:** Dave Stafford
**Sent:** Monday, June 26, 2017 8:36 AM

2

112

LDC0466

# Deposition of:
# **Jerry Neal, Jr.**

**Date:** December 2, 2022

**Case:** Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC

**Reporter:** Nancy Naas Harmon, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

EXHIBIT

2

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS


JERRY NEAL, JR.,            )
                           )
            Plaintiff,     )
                           )
    vs.                    )  No. 3:21:CV-00820-GCS
                           )
LOUIS DREYFUS COMPANY       )
SERVICES LLC,              )
                           )
            Defendant.     )


                Deposition of
                JERRY NEAL, JR.
                December 2, 2022


                    INDEX
         Questions by:         Page:
         Mr. Clark               5


         REPORTER:  Nancy Naas Harmon, CSR, RPR
              MO #986, IL #084-003219

              Keefe Reporting Company
              11 North 44th Street
              Belleville, Illinois  62226

INDEX OF EXHIBITS

Defendant's Exhibit Number 2                         Page 10
Plaintiff's Answers to Defendant's First Set of
Interrogatories (10 pages)
Defendant's Exhibit Number 3                         Page 14
Job Description for Operator (3 pages)

Defendant's Exhibit Number 4                         Page 29
Letter from Sun Life Financial 7/27/17
Defendant's Exhibit Number 5                         Page 42
Policy Manual Excerpts (3 pages)

Defendant's Exhibit Number 6                         Page 43
Policy Manual Acknowledgement (1 page)
Defendant's Exhibit Number 7                         Page 48
Handwritten Statement 1/10/16 (2 pages)

Defendant's Exhibit Number 8                         Page 54
SunAdvisor Claim Packet (7 pages)
Defendant's Exhibit Number 9                         Page 58
Doctors' Notes during December 2016-June 2017 (6 pages)

Defendant's Exhibit Number 10                        Page 77
6/6/17 Completed Long-Term Disability Application to
Sun Life from LDC (7 pages)

Defendant's Exhibit Number 11                        Page 60
Letter from LDC to Mr. Neal 5/4/17 (2 pages)
Defendant's Exhibit Number 12                        Page 65
5/24/17 Emails from Amber Randall and Scott Becker,
5/11/17 Letter from Dr. Gornet (2 pages)
Defendant's Exhibit Number 13                        Page 74
6/5/17 Email from Dave Stafford to Amy Khatib, etc.,
with attachments (5 pages)
Defendant's Exhibit Number 14                        Page 78
6/23/17 Sun Life Financial Letter to Mr. Neal (5 pages)

Defendant's Exhibit Number 15                        Page 85
6/28/17 Letter from Mr. Stafford to Mr. Neal (1 page)

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS


JERRY NEAL, JR.,            )
                           )
            Plaintiff,     )
                           )
    vs.                    )  No. 3:21:CV-00820-GCS
                           )
LOUIS DREYFUS COMPANY       )
SERVICES LLC,              )
                           )
            Defendant.     )



APPEARANCES:

For Plaintiff:
            Eric J. Carlson, Esq.
            BYRON CARLSON PETRI KALB, LLC
            411 St. Louis Street
            PO Box 527
            Edwardsville, IL  62025
            ejc@bcpklaw.com

For Defendant:
            Aaron A. Clark, Esq.
            McGRATH NORTH MULLIN & KRATZ, PC LLO
            First National Tower, Suite 3700
            1601 Dodge Street
            Omaha, NE  68102
            aclark@mcgrathnorth.com

Page 4

Defendant's Exhibit Number 16            Page 83
6/26/17 Email from Scott Becker to Dave Stafford, etc.
With Attachment (2 pages)


IT IS STIPULATED AND AGREED by and between counsel for Plaintiff and counsel for Defendant that the deposition of JERRY NEAL, JR., may be taken pursuant to the Federal Rules of Civil Procedure by and on behalf of the Defendant on December 2, 2022, from the law offices of Byron, Carlson, Petri & Kalb, LLC, 411 St. Louis Street, Edwardsville, Illinois, before Nancy Naas Harmon, Certified Court Reporter for the State of Missouri, Certified Shorthand Reporter for the State of Illinois, Registered Professional Reporter; that the issuance of notice is waived; and that this deposition may be taken with the same force and effect as if all Federal Rules had been complied with.

IT IS FURTHER STIPULATED AND AGREED that the signature of the deponent is reserved.


(On the record at 12:42 p.m.)


JERRY NEAL, JR., produced, sworn, and examined as a witness on behalf of the Defendant, testified and deposed as follows:

1 (Pages 1 to 4)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 5

DIRECT EXAMINATION
BY MR. CLARK:

Q.  Can you please state your name for the record.

A.  Jerry Neal, Jr.

Q.  And what's your current address?

A.  532 Saint James, Cahokia, Illinois.

Q.  How long have you lived at that address?

A.  Around 12 years.

Q.  Are you currently married?

A.  Yes.

Q.  Do you have any kids?

A.  Yes.

Q.  How many kids do you have?

A.  I have four kids.

Q.  Okay. Just to give you a little background, my name is Aaron Clark again. We just met. I represent Louis Dreyfus Company in a lawsuit that's pending that was filed on your behalf.

A.  Okay.

Q.  I'm going to ask you some questions today that relate to your case and your employment at Louis Dreyfus, okay?

Page 6

A.  Okay.

Q.  Have you ever had your deposition taken before?

A.  No.

Q.  Okay. And your lawyer may have explained it to you a little bit. I'm going to be asking questions, and then you can answer the questions. The court reporter here is taking down your testimony, so we have to kind of be careful not to talk over each other, okay?

A.  Okay.

Q.  And if for some reason you don't understand my question or you want me to rephrase it, I'm happy to to do that. Just let me know, okay?

A.  Okay.

Q.  And if you answer it, I'm just going to assume that you understood the question and your answer is true and correct to the best of your knowledge; is that fair?

A.  Yes.

Q.  And if you need a break at any time, just let me know. I'm happy to accommodate you. Let me know. I'll just ask that you finish the answer to the question before we take a break, okay?

Page 7

A.  Okay.

Q.  Are you taking any medications today?

A.  No.

Q.  And have you ever been involved in a lawsuit before this one?

A.  Not like -- No.

Q.  Okay.

A.  No lawsuit. Never no lawsuit, no.

Q.  You've never sued anybody before?

A.  No.

Q.  Have you ever been sued by somebody else before?

A.  No.

Q.  Have you ever testified in a trial or anything like that before?

A.  No.

Q.  Okay. And have you ever had any claims against employers other than the ones that we have in this case?

A.  No.

Q.  All right. And have you ever sought workers' compensation benefits from any other companies other than Louis Dreyfus?

A.  No.

Page 8

Q.  And I understand that you had two workers' compensation claims with Louis Dreyfus; is that correct?

A.  Correct.

Q.  So is that all the claims you've ever had relating to work injuries --

A.  Yes.

Q.  -- as long as you've been working?

A.  Yes.

Q.  Okay. Very good. Have you ever had to file bankruptcy before?

A.  No.

Q.  Have you ever been arrested or charged with a criminal offense?

A.  No.

Q.  Did you review any documents before you came here today?

A.  Yes. Not before I got here. We went over a couple things -- my medical records, some tax forms, things like that.

Q.  Okay. Very good. Can you give me kind of a brief summary of your educational background?

A.  Okay. I went to -- I attended East St. Louis Senior High School, graduated from there. I didn't go to any college. After that I pursued job

2 (Pages 5 to 8)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 9

careers after high school.

Q. Okay. So have you ever gone to get any kind of training or special education after high school for anything?

A. No.

Q. Do you have any certifications or anything like that?

A. No, not -- No.

Q. Okay. And where are you currently working?

A. St. Louis Water.

Q. And what's your position at St. Louis Water?

A. Water technician.

Q. And what do you do as a water technician?

A. We fix main breaks in the street. Right now I'm not in that department. That's what department I started in. Right now I'm in meter and tap, which we just do meter work, blown meters, leaking meters, things of that nature, blown service lines, so that's what I do at St. Louis Water.

Q. Okay. And does that involve going to people's houses and residences?

A. Yes, we do go into residences. Some residences does have basement meters, and we do have to

Page 10

have access to basement meters, so, yes, we do enter homes.

Q. And I'll probably ask you some more questions about your job there, but how long have you been working there?

A. Four years.

Q. Four years?

A. Yes.

Q. Do you remember when you started, what month or date?

A. September 3, 2019.

Q. 2019, okay. I'm going to show you an exhibit. Today I'll have some documents. I'll have you look at them, and I'll ask you some questions about them, so feel free to read through them and make sure you understand them and things like that before you feel comfortable answering, okay?

A. Okay.

Q. The first one I'm going to show you is what I've marked as Exhibit 2 for the deposition.

(Defendant's Exhibit Number 2 was marked for identification.)

Q. And for the record, these are Plaintiff's Answers to Defendant's First Set of Interrogatories, and

Page 11

if you want to flip through it, I'm just going to ask if you recall ever seeing this document before.

A. Okay.

Q. Do you remember ever seeing this document before?

A. Not before today.

Q. Okay. Would this have been a document you reviewed before your deposition or just when I presented it to you?

A. Before I reviewed a little bit of it.

Q. Okay. And I'm going to be asking some questions in your deposition about this, but if you could for now turn to page 5 of that document. And just for your background, when we have a lawsuit, we get to exchange written discovery where I get to ask questions, and then your lawyer will work to respond to those questions. Do you remember ever having to work with your lawyer to respond to questions that were presented in connection with this case?

A. No.

Q. Okay. So on page 5, there's some calculations here that relate to what I would say are the damages you're claiming in this case.

A. Yes.

Page 12

Q. Did you have any involvement in doing these calculations or preparing this?

A. No.

Q. All right.

A. I mean --

Q. I'm sorry. Do you recall having any involvement in calculating the damages?

A. Yes, as far as my work, yes.

Q. For your work, okay. And would you have provided information to your attorneys so you could calculate your damages?

A. Yes.

Q. Okay. Did you actually do the numbers, though, as far as adding and figuring out what you think you're owed?

A. No.

Q. Very good. And you might just want to set that aside. I'll probably ask you some more questions about that when we get to them. But do you remember when you were hired by Louis Dreyfus Company?

A. I don't remember the exact date.

Q. If I told you it was around August of 2015, does that sound about right?

A. Yes.

3 (Pages 9 to 12)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 13

Q. And do you know where you worked before you went to Louis Dreyfus Company?

A. Yes. I was at Sam's Club and Auto Zone before Louis Dreyfus.

Q. And do you remember who at Louis Dreyfus Company would have hired you?

A. Well, Mark Nemechek was the main guy that I dealt with. I don't know the hiring process of who hired me exactly, but that's who I dealt with every day through the my startup and training.

Q. And was Mark your supervisor or your manager?

A. Yes.

Q. Do you know what his job title was?

A. He was assistant manager for Scott Becker.

Q. Okay. And Scott Becker, do you know what his job was?

A. Superintendent. He was the superintendent of the facility.

Q. And that's the Cahokia facility?

A. Yes.

Q. And when you were hired, were you hired for the position of operator?

A. Can you repeat that.

Page 14

Q. Yeah. When you were hired, what was the job you were hired for?

A. Oh, laborer. It was a laborer, because we trained for barge work, so I started on that, so I was laborer.

Q. Do you know if they call that position operator or do you know what the title is?

A. Yes, it might be operator.

Q. I'm going to show you what I've marked as Exhibit Number 3.

(Defendant's Exhibit Number 3 was marked for identification.)

Q. For the record, this is a Job Description for operator at Cahokia, Illinois. Do you see that at the top where it says Operator and then it says Location Cahokia?

A. Yes.

Q. Have you ever seen the Job Description before for an operator?

A. No.

Q. I want to go through a little bit with you, but maybe you can just tell me generally what were the things you did as an operator at Cahokia?

A. As an operator, we loaded -- Well, we

Page 15

guided the railcars into the rail pit, made sure it was even loaded in the pit. Once the train stops, depending what type of product that we were dealing with, if we were dealing with the DDG, we'd put the vibrators on the side of the train and we'd take the hopper bottom door openers and we'd open the hopper bottom, let the grain fall out, close it, and go on with the next car.

Q. So those were railcars that came into the facility to unload grain?

A. Yes.

Q. Did you work at all with the barges that came in?

A. Yes.

Q. Was that also part of what you did as an operator?

A. Yes.

Q. And could you describe what you did for that?

A. Barge work, the new barges that came in, we put them on the slide line, empty barges, get them set up to be loaded, moving slide lines, tied down barges, made sure that the barges are secure with the roping, things like that.

Q. So with respect to barges, you were

Page 16

actually loading barges. Were you ever taking grain off barges?

A. No.

Q. And the railcars would bring in the grain; is that fair?

A. Yes.

Q. Okay. Anything else you did in connection with your job other than the actual loading and unloading of railcars and barges?

A. Well, cleaning, we had to do the necessary cleaning. Basically that's all we did. Like we loaded barges all day, just basically loading, moving barges down the slide lines, securing barges.

Q. And did that require working indoors and outdoors?

A. Outdoors.

Q. Mostly outdoors?

A. Mostly outdoors.

Q. Did you ever do any indoor work?

A. No.

Q. Did you ever unload grain from trucks?

A. Yes.

Q. So it would also come in on trucks and vehicles in addition to trains?

4 (Pages 13 to 16)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 17

A. Yes, trucks and trains.

Q. Okay. And when you were hired to do that job, did you have to fill out any -- do you remember if you had to fill out any information talking about your medical condition or your health or anything like that?

A. Yes.

Q. Did you have to go through a physical or anything like that?

A. Yes.

Q. And do you recall what they made you do or what that process entailed?

A. Basically a body exam, he checked my kidneys area, checked my bladder area, things like that, and my testicles and things like that, made me cough, I guess check you for hernia or something to that nature.

Q. So it was like a physical exam?

A. Yes.

Q. In connection with the job as well, I want you to turn to the second page of this exhibit if you don't mind. Do you see there's a section there called Working Conditions? Do you see that kind of in the middle?

A. Yes.

Q. Now, according to this job description, it

Page 18

says that the work is physically demanding. Do you agree with that?

A. Yes.

Q. How is it physically demanding?

A. Physically demanding because everything you do, you have to use your muscles, your strength.

Q. Okay.

A. Demanding, it's just a demanding job, you know. You have to use your muscles, your strength, and your mind, you know, and you have to be safe also working out there. So, yes, it's a very demanding job.

Q. And if you go down a little bit under the Working Conditions, it says you have to sometimes lift equipment and materials. Do you see that?

A. Yes.

Q. And was lifting something you had to do in that job?

A. Yes.

Q. And it says you may have to lift up to 75 pounds. Do you see that?

A. Yes.

Q. And did you have to do some heavy lifting in connection with that job?

A. Yes.

Page 19

Q. And would it be up to 75 pounds?

A. Yes.

Q. Okay. And it also says you have to be able to stand, walk, crawl, kneel, squat, and stoop as required. Do you see that?

A. Yes.

Q. And is that something you also have to do as far as the physical requirements of the job?

A. Yes.

Q. How many operators worked at the facility when you were there, do you know?

A. Of all the employees?

Q. Yeah, at the Cahokia facility, if you know.

A. At that time, roughly 40, maybe 50 people.

Q. 40 to 50 maybe?

A. Yes.

Q. And were most of those people operators that did the same stuff you did?

A. Yes. Well, we all had different positions as far as that, but everybody always in the pit was known as a operator, correct.

Q. And when you were working in the job, what kind of -- do you use tools and equipment as part of your job at all?

Page 20

A. Yes. We use chains, come-alongs. There was times that doors get stuck, we had to get up under the train and jack the door open. We lift vibrators to vibrate the grain from the train. Those were some of them too. The door openers, we had to use them also to open the train rails or the --

Q. So did you ever use like shovels and brooms?

A. Yes.

Q. Anything else that you would use regularly?

A. We used shovels or brooms on a regular during the cleanup process. Air hose, sometimes we had to blow the pit down, basically tools like that. It wasn't nothing like hand tools.

Q. Got you. Okay. And when you talked about lifting the vibrators, do you know how much those weighed?

A. Roughly in between 50 to 75 pounds. They pretty heavy.

Q. Okay. And would that be something two people would do? Would that be something one person would do?

A. It's one person, one person can handle it. You can handle it with your strength.

5 (Pages 17 to 20)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 21

Q.   All right.  Since you've stopped working at Louis Dreyfus Company, you indicated that you currently work for St. Louis Water; is that right?

A.   Yes.

Q.   Any other employers that you've worked for since Louis Dreyfus Company?

A.   Sunbasket.

Q.   And maybe if you go back to that Exhibit Number 2, there was a question we asked about it, and if you go to page 6, you'll see in the middle that Interrogatory Number 7 asked you to identify all employment that you've held since June of 2017, and you listed St. Louis Water District and Sunbasket Inc.  Do you see that?

A.   Yes.

Q.   And are those the two employers that you've worked for since Louis Dreyfus Company?

A.   Yes.

Q.   Anybody else that's not listed?

A.   No.

Q.   Now, Sunbasket Inc., what was that position that you had there?  Do you remember?

A.   Sunbasket, I was basically assembly line worker.

Page 22

Q.   What kind of stuff did they make?

A.   They dealt with fresh food, packaging fresh food home meals.

Q.   It says you started working there in 2018.  Do you know what month you would have started working there, if you know?

A.   Maybe August.

Q.   So maybe in the middle of the year in 2018?

A.   Yes.

Q.   And it says here that you were making $10.50 an hour.  Was that the wage you were making at that time?

A.   Yes.

Q.   Did they have any benefits for their employment, do you know?

A.   Not good benefits.  They had benefits but not good benefits.  Yes, they had benefits.

Q.   Did you have health benefits with them, do you know?

A.   Yes.

Q.   Does your wife work?

A.   Yes.

Q.   And does she have any benefits through her company?

Page 23

A.   Yes.  We worked for the -- Well, she just transitioned over to a job.  She was at St. Louis City Justice Center.  She's going to Ameren now, so she's going over to a new employer.

Q.   And you said she worked for St. Louis City Justice Center.  What was her job there?

A.   Payroll specialist.

Q.   Do you know how long she worked there?

A.   About a year.

Q.   And with respect to your health benefits and coverage, you said she worked there a year.  Do you know what time frame she worked there?

A.   I know she began October 26 of I think last year.

Q.   Oh, okay.  So she wasn't -- Did she have a job --

A.   Oh, year before last, uh-huh.

Q.   And did she have a job when you were working at Louis Dreyfus Company?

A.   Yes.

Q.   And what was the job she was working then?

A.   She was working at Illinois -- I don't remember what exactly.  I don't know the name of the company.

Page 24

Q.   That's okay.  But did she have a job -- Like so you worked at Louis Dreyfus from 2015 through June 2017, correct?

A.   Correct.

Q.   And during that time, did she work throughout that time, do you know?

A.   Off and on, yes.

Q.   Okay.  Did you ever have your, like, benefits through her job or her employer?

A.   What do you mean by that?

Q.   Well, your health insurance and things like that, did she work for somebody who provided those for your family?

A.   Once upon a time, she did have me on her insurance, and I think when I went to St. Louis Water, that's when I didn't go on her insurance; I went on St. Louis Water, on my own insurance --

Q.   Okay.

A.   -- for my job.

Q.   And when you worked at Louis Dreyfus Company, do you remember if you had your health benefits through Louis Dreyfus or through her?

A.   Louis Dreyfus.

Q.   Okay.  So you worked at Sunbasket through

6 (Pages 21 to 24)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 25

August of 2019, is that correct, according to this?

A. Yes.

Q. And what was your reason for separating from that job?

A. The job closed down. They went out of business.

Q. Oh, they did? Okay.

A. Yes.

Q. So were you placed off work at that time?

A. Yes.

Q. And it looks like it was wasn't long after that that you started work at St. Louis Water District; is that right?

A. That's correct.

Q. And your position there, it says water maintenance, and it said your starting pay was $15.89 an hour, right?

A. Yes. Yes.

Q. Okay. And are you currently making $20.75 an hour?

A. Yes.

Q. Is that a union facility or union job?

A. No.

Q. And do you get benefits through St. Louis

Page 26

Water District?

A. Yes.

Q. And what benefits do you have?

A. My medical, dental benefits, life insurance.

Q. And do you have a pension through them?

A. Yes. Through St. Louis City water?

Q. Yes.

A. Yes, I do have a pension through them.

Q. So do you have any other retirement benefits other than the pension?

A. No.

Q. Okay.

A. But I won't reach my pension until this year, my fifth year.

Q. You're going to be eligible for your pension?

A. Yes.

Q. And how old are you, sir?

A. I'm 41.

Q. Okay. That's a pretty good deal. With respect to your job at St. Louis Water District, is it physically demanding?

A. Yes.

Page 27

Q. And do you have to do a lot of lifting?

A. Yes.

Q. Are you currently subject to any restrictions?

A. No.

Q. So right now you've got a full release to physically work in that job?

A. Yes.

Q. Okay. So up until the time you started working at Sunbasket in the middle of 2018, so the time period between June of '17 when you stopped working at Louis Dreyfus through mid 2018, did you have any employment?

A. No. I was drawing unemployment. I didn't have no employment in between there.

Q. And were you looking for work at that time --

A. Yes.

Q. -- while you were getting unemployment?

A. Yes.

Q. When did you start looking for work after Louis Dreyfus?

A. I was always looking for work after everything was over, as far as like when I knew I wasn't

Page 28

coming back to work, I knew I had to find me a job. And I was always looking throughout the unemployment process also.

Q. And do you know when you started looking for a job after Louis Dreyfus?

A. When I first started? No, I don't remember.

Q. Okay. And when you were filing for unemployment, did you have to keep track of the jobs that you applied for or anything like that?

A. Yes.

Q. And was that stuff you had to submit to unemployment?

A. Yes.

Q. And do you still have those records?

A. Most of them, yes.

Q. Did you ever talk to any recruiters or staffing companies about jobs since you left -- since you stopped working at Louis Dreyfus?

A. No.

Q. And have you done any special training or tried to get any certifications or anything like that since then?

A. No.

7 (Pages 25 to 28)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 29

Q.   Okay.

A.   I went straight from there and ended up in this job at St. Louis Water, so . . .

Q.   Okay.

(Defendant's Exhibit Number 4 was marked for identification.)

Q.   I'm going to show you what we've marked as Exhibit 4. And for the record, this is a letter from Sun Life Financial dated July 27, 2017. Do you see that at the top?

A.   Yes.

Q.   And this is a letter that was addressed and sent to you. Do you see that?

A.   Yes.

Q.   And it relates to a claim for long-term disability benefits. Did you apply for long-term disability benefits when you were at Louis Dreyfus?

A.   Yes.

Q.   And did you receive this letter from Sun Life Financial do you remember?

A.   I think so, yes.

Q.   And in this letter, it indicates that it looks like in the second paragraph if you see that, it says that they've determined that you have a date of

Page 30

disability of December 20 of 2016. Do you see that?

A.   Yes.

Q.   Now, was that around the time that you went off work at Louis Dreyfus Company?

A.   Yes.

Q.   And why did you go off work? Do you remember?

A.   Yes.  When I left -- Why did I leave work?

Q.   Yeah.  Why did you go off work around December 20 of 2016?

A.   Oh, due to my back pain.  I was having pain in my back.

Q.   And did you go to a doctor before that time?

A.   Yes, I went to the doctor, yes.

Q.   And we're going to talk about that more in a bit, but do you remember the doctor imposed some restrictions on you?

A.   Yes.

Q.   And this letter indicates that you're going to get your disability benefits; would you agree?

A.   Yes.

Q.   And it says in the letter in the second paragraph that they would begin to accrue effective

Page 31

June 18, 2017.  Do you see that?

A.   Yes.

Q.   Now, was that around the time that you were separated from employment at Louis Dreyfus, do you know?

A.   Yes.  I wasn't working there then, at this time.

Q.   All right.  Now, if you jump down a little bit to the second to last paragraph on that first page, it says:  In order to consider your claim for benefits beyond August 31, 2017, you will need your medical records from your next office visit with Dr. Matthew Gornet.  Was Dr. Matthew Gornet your doctor?

A.   Yes.

Q.   Was that the person who was helping you with your back issues?

A.   Yes.

Q.   And so did you get long-term disability benefits from June 18, 2017, through the end of August, 2017?

A.   Yes.

Q.   And were those checks that were mailed to you or how did you get paid?  Do you know?  Do you remember?

A.   I think they were mailed, yeah.  They were

Page 32

paper checks.

Q.   Now, when you applied for long-term disability benefits, were you still working at Louis Dreyfus when you applied?

A.   When I applied, well, I think so.

Q.   Okay.  I guess that's a bad question.  You weren't actually at the facility?

A.   No.

Q.   But to your understanding, were you still employed?

A.   Yes.

Q.   That's a good question, and feel free to challenge me on that.  So when you applied for these benefits, did you understand when you applied for long-term disability benefits you're seeking to get payments for being off work?

A.   Yes.

Q.   And if you look at this last paragraph on the first page of Exhibit 4, it says:  Please be aware that after June 17, 2019, the definition of "total disability" changes.  And it says:  This means that as of this date, you will only continue to meet the definition of "total disability" if you are unable to perform the duties of any gainful occupation.  Do you

8 (Pages 29 to 32)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 33

see that?

A.   Yes.

Q.   Now, did you understand that in order to get these benefits, you have to be considered totally disabled?

A.   No, I didn't know that.

Q.   You didn't know that?  When you applied for the benefits, did you understand you were applying to get paid for not having to work?

A.   Well, for short-term, that's what I thought the short-term disability was for.

Q.   Okay.

A.   And I thought it would just hold me over until I get back to work.

Q.   Okay.  And with respect to this disability application that was submitted, do you recall filling out disability paperwork when you were there?

A.   At Louis Dreyfus?

Q.   Yes.

A.   Did I -- I filled it out, and I think I had to take some information to my doctor also for him to fill out also.

Q.   So some of it might have been filled out by your doctor?

Page 34

A.   Yes, most of it.

Q.   Okay.  All right.  So since being employed at Louis Dreyfus, from June 2017 all the way through today we talked about you've had two jobs that have paid you income, correct?

A.   Yes.

Q.   And you also indicated you received some unemployment benefits, right?

A.   Yes.

Q.   Do you know how long you got unemployment benefits?

A.   Not very long.  I didn't get it long.  Maybe six months I guess.  I didn't get it long.

Q.   And do you know when they started?

A.   No, not exactly, no.

Q.   But you did also get these long-term disability benefits as well, right?

A.   Well, I got my work -- I mean, I got my unemployment after this.  I was getting Sun Life first, and once all that stopped and I knew I wasn't no longer working, I applied for unemployment.

Q.   Got you.  Did you ever apply for any social security disability benefits?

A.   No.

Page 35

Q.   So just to kind of wrap up all the income you've had since Louis Dreyfus, you've had two jobs you've gotten income from, right?

A.   Right.

Q.   And long-term disability benefits that you've received?

A.   Yes.

Q.   And is there anything else that I'm missing?  Oh, I'm sorry.  Did you get some workers' compensation payments, benefits after --

A.   Yes.

Q.   You had two workers' compensation claims; is that right?

A.   Yes.

Q.   And I'm going to talk about those, but did both of those cases settle?

A.   Yes.

Q.   And did you get payments off those?

A.   Yes.

Q.   Anything else that we haven't talked about as far as money you would have received since June of 2017 that you're aware of?

A.   That's about it.

Q.   Okay.  And do you remember what you were

Page 36

making at Louis Dreyfus as of June 19, 2017, when the separation happened?

A.   I think 17.75, 17.72, 17.72 or 75.

Q.   And if I told you it was 17.72, any reason to disagree with that, $17.72?

A.   It sounds about right.

Q.   Okay.  Now, with respect to workers' compensation claims that you've had relating to Louis Dreyfus, do you remember what the injuries were that you sustained?

A.   For the first one?

Q.   Yes.

A.   To my hand.

Q.   Okay.  And what happened?

A.   I was cleaning off a barge, heavy debris on a barge.  The barge was -- We had to do the dock and the barge, and the barge was going in and out, and we was blowing the leaf blower and grain into the river.  As I was getting -- The barge was coming back in, and as operator I was sliding a slide line tight trying to pull the next barge down.  The cable got stuck underneath the dock, and as I was getting -- Actually I was about to stick my leg over, but the barge was out a little bit too far, so I just started blowing with the leaf blower.

9 (Pages 33 to 36)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 37

And once I stuck my hand out there, the cable snapped and came up, but it hit the bottom of the leaf blower. That's what saved my hand.

Q. Yeah. Yeah. That's pretty dangerous out there on the docks, isn't it?

A. Yes.

Q. Were you there at the time of any other employees being injured out there?

A. A couple, but I know one that got injured, but he passed. I wasn't there then.

Q. And was that your job at all dealing with those cables or anything like that?

A. Yes. Anytime we out on the river, yes, all deckhands deal with the slide lines and cables.

Q. And those are used to bring the barges in?

A. Yeah, keep the barges, keep them from floating off the dock into the middle of the river. So they all were tied together, so we slide them down. We have cavels, so we have to move it from one side of the cavel to the other side till they continue to slide down.

Q. Now, with respect to that claim, you understand you did file a workers' compensation claim, right?

Page 38

A. Yes.

Q. And did you have any time off work for that?

A. No.

Q. Did you get your medical bills paid by the company for that, do you remember?

A. Yes.

Q. And did you end up getting a settlement for that?

A. Yes.

Q. And do you remember how much the settlement was that you received?

A. It wasn't much, probably like -- what I brought home, maybe 2,500.

Q. That's a good memory. Yes. Do you remember the settlement also required you to pay some -- there were some attorney's fees that came out of it?

A. Yes.

Q. And then you remember receiving about $2,500?

A. Yes.

Q. And that again was for your right hand based on the injury you had?

A. Yes.

Page 39

Q. Okay. Now, at any time did the company ever try to deny that claim, do you remember, and say it didn't happen?

A. No.

Q. Did you report it right when it happened?

A. Yes. Well, because they heard it, so everybody came over.

Q. And that claim was processed through workers' comp, and you got the money, right?

A. Yes.

Q. And you had a lawyer helping you with that?

A. Yes.

Q. Was there anything during that process that made you unhappy with the way the company handled the workers' compensation claim?

A. No.

Q. Okay. Now we'll talk about the other one you had, which is the one relating to your back I believe. Do you remember when that issue arose for you?

A. Yes.

Q. When was that?

A. 11/26/16.

Q. What do you remember about that date? What

Page 40

happened?

A. It was Saturday. We had like a hundred-some railcars that come in, but we had to run that train until the train was over. Throughout the day, we'd go down and clean after each barge been loaded due to the buildup of grain, so we would just do that periodically throughout the day. That whole Saturday, that's basically what we was doing. We was running the trains, cleaning the basement, come back up, you know, run another barge, and that was just repetitive back and forth. That's what we were doing that Saturday.

Q. And so with respect to that, did you get a workers' compensation settlement payment in that case?

A. For my back?

Q. Yes.

A. Yes.

Q. And do you remember when you got that?

A. I don't remember when I received it. No, I don't remember when I received it.

Q. If I told you it was around May of 2019, would you disagree with that or do you know?

A. Sounds about right.

Q. Do you know how much money you received in connection with that settlement?

10 (Pages 37 to 40)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 41

A.   12,000 and some change.

Q.   Yeah.  You know, it was around, you know -- And I could show you this if you like.  Let me mark this.

A.   You mean the total amount?

Q.   Yeah.

A.   Total amount I think was like 25,000, was it?

Q.   Yes.  And then from that, there were some deductions, right?

A.   Yes.

Q.   And then you ended up getting what was left over, right?

A.   Yeah, 12 and some change.

Q.   Lawyers take a piece of it, don't they?

A.   Yeah.

Q.   So it ended up to be about 13; does that sound about right?

A.   Yes.

Q.   And that, according to this -- And I'm just going to represent that was around May of 2019; does that sound about right?

A.   Yes.

Q.   Okay.  Thank you.  That saves some time

Page 42

showing you all this stuff.  All right.  So when you were hired by Louis Dreyfus Company, did you receive some -- Did you receive what they call a policy manual, do you remember?

A.   Yeah, I remember.

Q.   I'm going to show you this if you don't mind. I'll show you what's been marked as Exhibit 5.
(Defendant's Exhibit Number 5 was marked for identification.)

Q.   And this is not a full copy of it because it's pretty thick, but it's a copy of the policy manual index, and it has the attendance policy and short-term disability policy as part of it.  Do you see that?

A.   What are you looking at?

Q.   Yeah, if you look at the -- It's a three-page document I gave you, which is Exhibit 5, right?

A.   5.

Q.   And it has an attendance policy and a short-term disability policy.  You indicated you got a policy manual, and I'm just representing that these documents are part of it, but before I ask you any more questions, let me give you this.  I'm showing you what's been marked as Exhibit 6.

Page 43

(Defendant's Exhibit Number 6 was marked for identification.)

Q.   And for the record, this is a Policy Manual Acknowledgement, and I'm just going to ask does that look like your signature on the bottom of Exhibit 6?

A.   Yes.

Q.   And when you were hired, did you receive some policies and then you signed this form, do you remember?

A.   Yes.

Q.   And this one indicates at the top:  I have received a copy of Louis Dreyfus Commodities and its subsidiaries policy manual.  Do you see that at the beginning?

A.   Yes.

Q.   Okay.  And you agree you would have gotten that when you were hired?

A.   Yes.

Q.   And this signature confirms that you would have gotten it, correct?

A.   Yes.

Q.   So now when you talked about your injury with respect to your back -- And I believe you indicated was that November 26 of '16?

Page 44

A.   Yes.

Q.   Did you report an injury to your back on that day; do you remember?

A.   Wasn't no one there at the end of the day. It was Saturday.  We normally don't work on Saturday. Wasn't no one there at the end of the day.

Q.   Did you report it on the Monday after?

A.   Yes.

Q.   And who did you talk to?

A.   Scott Becker and Marcus Dixon.

Q.   Now, when you talked to Scott and Mark, did you tell them that your back was hurting you or it was stiff or something like that?

A.   Yes.

Q.   Do you remember exactly how you described it?

A.   Yeah.  I told them that morning, I told them that my back, I was having problems with my back that Sunday when I woke up.  I told them I got out the bed, I was going to try to use the restroom and my back just was hurting.

Q.   Was any other part of your body hurting other than your back at that time?

A.   My buttocks and my legs.

11 (Pages 41 to 44)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 45

Q.   Okay.  So kind of the lower part?

A.   Yes.

Q.   And when you talked to Scott -- And who was the other person you said you spoke to?

A.   Marcus Dixon.

Q.   And who is Marcus Dixon?

A.   He was a -- I didn't really know his job title.  He had just got there.  He was more of like an assistant of Nemechek.  I don't know his job title, but he always was assisting Nemechek and Scott.

Q.   Did he -- Was he a manager or --

A.   I would say he was upper manager, upper manager area.

Q.   Okay.  Now, when you spoke to Scott and Marcus, did you talk to them at the same time or did you talk to them separately?

A.   They were there together.

Q.   And do you remember if they asked you whether your injury was work-related?

A.   Yes.

Q.   And what was your answer?

A.   I said I don't know at the moment.  I told them we worked Saturday, I got up Sunday, my back was feeling tight, waited, thought it was going to go away,

Page 46

took some Aleve, things like that.  And so at that time he said something about, well, he wanted to put me on light duty, so he stated that I could go on light duty for a little while, and that was that.

Q.   Do you remember them telling you that -- Do you remember them asking you specifically -- And where were you at when you talked to them I guess?  Maybe that's the first question.

A.   I was outside the rail pit.

Q.   Okay.  And do you remember what day that would have been?

A.   That following Monday.  That had to be the 28th.

Q.   Now, did they ever ask you during that conversation did you hurt your back at work?

A.   Yes.

Q.   And did you tell them no?

A.   No, I did not tell them no.

Q.   Okay.

A.   I told them that when we left Saturday and I got up Sunday that my back was very irritable, and I told them I took the medicine and whatnot, took a couple Aleve, hoping it would just go away.

Q.   So did you tell them you woke up on Sunday

Page 47

with some stiffness and believed it was your bed?

A.   No.  I told them it was stiff because when I got out of the bed.  When I woke up to sit up and stand up, that's when I was getting up out of the bed, not due to my bed.

Q.   Did you ever tell them during that conversation that you felt the injury happened at work?

A.   Yes.

MR. CARLSON:  Objection, asked and answered.  He's answered that twice already.

Q.   I believe the question I asked you before is whether they asked you directly is this something that happened at work.

A.   Yes.

Q.   And you said I never said no, but did you say no?

A.   No, I never told them I didn't get my back hurt at work.

Q.   Okay.  So is it your position that if both Scott and Marcus said they asked you about whether it was work-related --

A.   Yes.

Q.   -- and whether it happened at work --

A.   Yes.

Page 48

Q.   -- and they both said you said no, it didn't, that they're not telling the truth?

A.   No, they're not.

Q.   Okay.  And if they said that they spoke to you on December 8, not November 28, do you have any reason to disagree with the date that you talked to them?

A.   No, because I talked to them on the 28th, and as the days, as the weeks went by, I come in, he would ask me how I'm doing, how your back feeling, I'd tell them still about the same, and he just said continue my light duty.

(Defendant's Exhibit Number 7 was marked for identification.)

Q.   Okay.  I'll show you what I've just marked as Exhibit Number 7.  For the record, this is a handwritten statement dated January 10, 2016.  Do you see that?

A.   Yes.

Q.   Is this your handwriting?

A.   Yes.

Q.   And did you sign this at the end on the second page?

A.   Yes.

12 (Pages 45 to 48)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 49

Q.   And did you complete this on January 10, 2016?

A.   Yes.

Q.   And were you asked to submit a written statement in connection with your injury?

A.   Yes.

Q.   Who told you to do that?

A.   I know I had to -- Oh, I can't remember right offhand.

Q.   Do you know why you filled out this statement?

A.   It was part of a injury report I was thinking.

Q.   Okay.  Was it your understanding that they were going to submit it to workers' compensation?

A.   No.

Q.   Was it your understanding that they were asking you to fill this out because they were going to submit it to workers' compensation?

A.   No.

Q.   And sitting here today, do you have any idea why you filled this out?

A.   Well, I filled it out because it was a report.  I guess it was my accident report or what

Page 50

happened to my back, so that's what I was assuming.

Q.   Did somebody tell you to do this do you mean?

A.   I don't remember.

Q.   Would it have been something you just would have done on your own?

A.   No.  I mean, I don't remember.

Q.   Well, I want to kind of talk about some pieces of it if you don't mind.  It does say on November 26, 2016, is the date that this happened, right?

A.   Yes.

Q.   Okay.  And if you go down toward the first page toward the bottom, do you see where it says the grain was wet and heavy?

A.   Yes.

Q.   And were you shoveling grain at that time?

A.   Throughout the whole day, yes.

Q.   Okay.  And when you say it was wet and heavy, was that referring to how it felt when you were shoveling it?

A.   No.  The grain was actually wet.

Q.   Okay.

A.   Because we was getting it off the floor.

Page 51

Q.   Oh, okay.  And then if you go down a couple lines, it says:  I was at the desk in the rail pit, my lower back was feeling a little tight.

A.   Yes.

Q.   So I finished my paperwork, didn't think nothing about it.  I thought maybe it will just go away later.  Do you see that statement?

A.   Yes.

Q.   Is that a true statement, how you felt at the time?

A.   Yes.

Q.   And then it says you called Scott Becker at that time, right?

A.   Yes.

Q.   And you told him you were done with the train and housekeeping, and he told you thanks, appreciate it; is that right?

A.   Yes.

Q.   So you agree when you called Scott, you didn't tell him about your back being tight at that time?

A.   No.

Q.   Why didn't you tell him that if you felt like you got hurt at that point?

Page 52

A.   I didn't feel like it was from that because it wasn't like something that fell on me or something.  I didn't think it even came from that.  It was like a brief conversation, Boss, we done with our job for the day, and that's what type of day it was, like we done with our job, and he said thanks, appreciate it, and I told him all right, and that's how we wrapped it up.  It wasn't like something like I slipped and fell or something like that.  It wasn't nothing like that.

Q.   Okay.  So at that time were you having pain on that day?

A.   Not on that day.  I just a little -- just a little tightness, like you feel like you've been working out a little bit, your muscles are stretched a little bit.  That's how I felt.  I didn't feel any pain that day.  I just felt the tightness in my lower back.

Q.   Okay.  And when you talked to Scott and Marcus later, in that discussion you had when you talked to them, did you ever tell them during that conversation that you thought you got injured on November 26, 2016, when you were doing this?

A.   Can you repeat that.

Q.   When you talked to Scott and Marcus later -- And I think you said you talked to them a

13 (Pages 49 to 52)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 53

couple days later, right?

A. Yes.

Q. Did you ever tell them that you thought you hurt your back during this incident on November 26?

A. No, not at that time.

Q. Okay. And at that time you told them you woke up from your bed and you felt that, right?

A. Yeah, when I got out the bed, when I woke up and got out the bed, not when I woke up from the bed.

Q. So during that meeting with Scott and Marcus, at any point did you tell them that this was something that happened at work?

A. I wasn't sure that it was from that.

Q. Okay. So you wouldn't have told them that at that time?

A. Not at that time.

Q. Okay. Thank you. Now, you understand eventually a workers' compensation claim was pursued for that injury, right?

A. Yes.

Q. And we talked about the settlement that you received on that, correct?

A. Yes.

Page 54

(Defendant's Exhibit Number 8 was marked for identification.)

Q. I'll show you what we've marked as Exhibit Number 8. For the record, this is a document entitled Sun Life Assurance Company, and it's a SunAdvisor Claim Packet. Do you see that at the top?

A. Yes.

Q. Now, we kind of talked earlier about at some point there was an application for short-term disability benefits made for you, correct?

A. Yes.

Q. And you said some paperwork was filled out for that, right?

A. Yes.

Q. And do you remember if this is the paperwork that related to that? And if you want to flip toward the back, the second or third last page, there's some signatures there. Do you see that?

A. Yes.

Q. Is that your signature --

A. At the bottom, yes.

Q. And it's dated December 20, 2016?

A. Yes.

Q. And would you have signed this document on

Page 55

that day?

A. Yes.

Q. Now, I want to go through some information on this document, first of all. If you look at the very first page under the second section, which is Diagnosis and History, do you see there's a bunch of filled-in information. Do you know if your doctor filled this in?

A. Yes.

Q. And you can see on the bottom of the second page it looks like your doctor did sign off on this, right?

A. Yes.

Q. And what's your doctor's name?

A. Shawahin.

(Spelling requested by the court reporter.)

A. S-H-A-W-A-H-I-N.

Q. And would you agree your doctor signed it on January 3, 2017?

A. Yes.

Q. And it refers to low back pain and back tenderness, correct?

A. Yes.

Q. And you'll see the doctor -- If you look in that section, it says: Is condition due to an injury or

Page 56

sickness arising out of patient's employment? Do you see that question?

A. Yes.

Q. And your doctor says: Unknown. Right?

A. Yes.

Q. Now, did you ever talk to your doctor at this time about how you got injured?

A. He asked how did my back get injured, and I told him -- Basically I was explaining the same thing about how I went out and shoveled the grain, stuff like that, and told him the next day how my back was feeling.

Q. But you agree your doctor is not saying that he knows it's arising out of your employment, right?

A. Say it again.

Q. Would you agree your doctor didn't check the box when it says: Is condition due to injury or sickness arising out of patient's employment? It doesn't say yes, right? It says unknown?

A. Right.

Q. Now, it also says you're getting medication and going through physical therapy; is that correct?

A. Yes.

Q. And were you doing that at the time that

14 (Pages 53 to 56)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 57

this was filled out?

A.   Yes.

Q.   And on the top of the next page, this references some restrictions; would you agree with that?

A.   Yes.

Q.   And it says:  No lifting over 10 pounds. Were you subject to a restriction at that time?

A.   Yes.

Q.   It also says:  No pushing or carrying over 10 pounds.  And was that another restriction imposed at that time?

A.   Yes.

Q.   And would you agree that as an operator, you cannot perform the work we talked about unless you can do these things?

A.   Yes.

Q.   Now, do you remember calling Scott Becker regarding your short-term disability claim?

A.   I think I had reached out to him once before because I think it was somehow stopped, and I think they said my employer had something to do with it, something like that, and I probably called to ask them about it.

Q.   Did you ever tell Scott Becker in early

Page 58

January that you wanted to move forward with your short-term disability claim?

A.   What you mean by that?  What you mean?

Q.   Well, did you ever talk to Scott Becker and tell him you wanted to move forward and pursue this claim for short-term disability benefits?

A.   Yes, for my short-term, yes.

Q.   And do you remember if at the time that you submitted this that they also asked you to fill out this statement that we talked about, Exhibit 7?  Do you remember if that was asked at that point?

A.   I don't remember.

Q.   Okay.  That's fair.  How are you doing?  Do you want to take a break?

A.   I'm all right.

Q.   Okay.  We'll keep going.  Just let me know if you need a break.  I'll probably need one shortly anyway.

(Defendant's Exhibit Number 9 was marked for identification.)

Q.   Let me show you what's been marked as Exhibit 9, and I want you to flip through Exhibit 9 if you don't mind, and these are various doctors' notes during the time frame of December 2016.  And the last

Page 59

one is kind of hard to read, but it's dated June 22, 2017.

MR. CARLSON:  We do have a darker copy of that if you want it.  It was in the medical records.

MR. CLARK:  Let's go off the record.

(A discussion was held off the record.)

Q.   (By Mr. Clark)  Back on.  So just going back on the record, do you agree that Exhibit 9 are various doctors' notes relating to your restrictions?

A.   Are you asking me --

Q.   Yeah.  Do you agree after looking at Exhibit 9 that these are notes from your doctors about work restrictions?

A.   Yes.

Q.   And again these are dated from December of '16 through June of '17, agree?  If you look at the first one and the last one.  Is that right?

A.   Yes.

Q.   So during December when you went off work all the way through June 19 when that separation date happened at the company, do you agree you were subject to these restrictions relating to 10 pounds?

A.   Yes.

Q.   And do you agree that that didn't change,

Page 60

you had those restrictions throughout that time frame?

A.   Yes.

MR. CLARK:  This might be a good time to take a break if you don't mind.  Five minutes.

(A recess was taken from 1:45 p.m. to 1:53 p.m.)

(Defendant's Exhibit Number 11 was marked for identification.)

Q.   (By Mr. Clark)  Moving right along, back on the record, I've got another exhibit I'm just going to show you.  It's Exhibit 11, and this is a letter from the company to you dated May 4, 2017.  Do you recognize this letter?

A.   Yes.

Q.   And did you receive this letter?

A.   Yes.

Q.   And if you look at the second page, there's a certified mail receipt that says Date of Delivery, May 10, 2017.  Do you think would that be the day you would have received it you think?

A.   Yes.

Q.   And that's your signature on that card?

A.   Yes.

Q.   Okay.  Now, when you got this letter, what

15 (Pages 57 to 60)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 61

was your understanding of what it meant to you when you received it? I assume you read it, right?

A. Yeah, but I ain't read it since then.

Q. At the time did you read it too do you think, when you got it?

A. Yeah. I was aware of it, yes.

Q. And did you understand from the letter -- And if we look at it, Amy Khatib is the person who sent it to you, right? Do you see her name at the bottom?

A. Yes.

Q. And had you ever heard of Amy Khatib or even know who she was before you got this?

A. No.

Q. And in the letter, it says in the third sentence, it says: We are writing to inform you that pursuant to company policy, your employment and all company-provided benefits will end on June 19, 2017, unless you're able to return to work. Do you see that statement?

A. Yes.

Q. And do you remember reading that at the time you got this letter?

A. Yes.

Q. So what was your understanding when you

Page 62

read that, what that meant?

A. Basically that my long-term -- my long-term disability was ending basically.

Q. Did you understand when it said your employment was going to be terminated on June 19?

A. Yes.

Q. So you knew you were going to lose your job on that day?

A. I was aware of it through this letter, yes.

Q. Okay. And then it also says if you're unable to return to work, you can apply for LTD or long-term disability benefits. Do you see that?

A. Yes.

Q. And do you remember reading that when you received it?

A. Yes.

Q. And did you apply for long-term disability benefits?

A. I think I -- No, I did not. I think I tried and got denied, I think. I'm not sure. I'm not sure.

Q. And if you look at the second paragraph, it says: If you believe you are disabled under the Americans with Disabilities Act or other applicable laws

Page 63

and would like to discuss potential accommodations that may allow you to return to work and perform the essential functions of your job or otherwise continue your employment, it tells you to contact Amber Randall. Do you see that?

A. Yes.

Q. And did you read that at the time and understand -- Did you understand what that meant I guess?

A. Yes.

Q. And what did you understand that to mean?

A. Basically that I need to get in contact with Amber about my unemployment.

Q. Okay. And it also says after that that you'll need to provide current medical documentation from your physician concerning your return-to-work status, right?

A. Yes.

Q. So did this letter concern you when you got it?

A. Yes.

Q. And why did it concern you?

A. Because I don't know -- First of all, I didn't know what I did wrong, like why am I losing my

Page 64

job. That was the first thing, like it was a big shock. I'm thinking I'm in the process to go back to work. When I received this, it was a big shock. It was actually a heartbreaker for me.

Q. Did you understand what she was saying here is the company had a policy that it's kind of like you get terminated if you can't come back to work within a certain time?

MR. CARLSON: Object to form.

Q. I don't know if you understood that when you read the letter. Did you understand that?

A. No.

Q. And did you call Amy Khatib when you got the letter?

A. I turned it over to my attorney at the time. I didn't know what to do with it, so I let them handle it.

Q. And was that your workers' compensation attorney?

A. Yes, David Jerome.

Q. Did you do anything else other than go to your attorney, do you remember?

A. As far as this, I went to -- Well, I turned it over to him, and he responded. That was it as far as

16 (Pages 61 to 64)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 65

this particular one.

(Defendant's Exhibit Number 12 was marked for identification.)

Q. Okay. I'm going to show you what's been marked as Exhibit 12, and I'm going to talk about the letter from your attorney in a little bit, but this is Exhibit 12. I want to -- If you could look at the second page of this Exhibit 12. Do you recognize that medical note?

A. Yes.

Q. And is that from your doctor?

A. Yes.

Q. Is that Dr. Gornet?

A. Yes.

Q. And did you go see the doctor on May 11, 2017?

A. Yes.

Q. And do you agree that's the date your doctor filled this out?

A. Yes.

Q. And at the time this was filled out, your doctor indicated there was no change to your status?

A. Right.

Q. And would you agree that means you're still

Page 66

subject to those restrictions we talked about earlier?

A. Yes.

Q. And did you take this note anywhere when you got it?

A. This one?

Q. Do you remember?

A. All my notes go up to my job.

Q. And who would you take those two?

A. Mainly Mark Nemechek.

Q. Now, if you look at this first page -- And I know you're not on these emails, but I just want to see if you -- You know, this is an email from Scott Becker on May 24, and he says: Jerry dropped this off today.

MR. CARLSON: It says yesterday.

Q. I'm sorry. It says: Jerry dropped this off yesterday. Do you see that at the bottom email?

A. Oh, right here?

Q. Yeah. Jerry dropped this off yesterday is what it says. Do you see that?

A. Yes.

Q. Do you agree that this note could have been dropped off on May 23, 2017, or do you know?

A. I'm not sure about the date.

Page 67

Q. But you believe you took it to the company?

A. Yes, I know I took it to them, yes.

Q. And you also agree that this note doesn't indicate any change in your condition. We talked about that.

A. Right.

Q. Now, do you agree that the doctor's note, which is the second page of that, does not indicate that you're going to be able to come back to work on or before June 19?

A. Say that again.

Q. Do you agree that this doctor's note does not indicate that you're going to be able to come back to work on June 19, 2017?

MR. CARLSON: I'll object. The document speaks for itself. It says what it says. You can answer.

A. Oh, say that again. I'm sorry.

Q. Yeah, you bet. When you look at that note, does it say anything about you coming back to work on or before June 19?

A. No.

Q. Okay. Now, before that note, did you receive forms for the company to apply for long-term

Page 68

disability benefits, do you know?

A. No, I don't remember.

Q. And so you don't know if Sun Life sent forms to you on May 4, 2017, regarding long-term disability benefits?

A. Maybe, because I know I remember the short-term. I was so frustrated when they stopped my short-term, I don't know if I proceeded -- No, I did proceed with long-term.

Q. Okay. Do you know if you got a packet in the mail with some paperwork you could fill out to get long-term disability benefits?

A. I think so.

Q. And do you know when you got it?

A. No.

Q. Could it have been early May of 2017?

A. I don't know.

Q. Okay. Now, when you received the May 4, 2017, letter that we talked about, which is Exhibit 11 I believe, you said you went to talk to your workers' compensation lawyer, David Jerome, right?

A. Yes.

Q. And do you know if you gave him a copy of this Exhibit 11 letter?

17 (Pages 65 to 68)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 69

A. Yes.

Q. Okay. You would have handed this to him?

A. Yes.

Q. And do you know if he put together any information to send out for you after you met with him?

A. No. I'm not sure.

Q. I don't want to get into what you guys talked about. I can't ask you questions about that. But do you know if your attorney, David Jerome, sent out anything on your behalf after you met with him?

A. In response to this letter?

Q. Yes.

A. Yes.

Q. Okay. And I don't have that document, but it's in a document we already have. I'll have to show it to you on this computer I think. I should have printed that one out. For the record, this document I'm referring to is part of Plaintiff's Exhibit 1, page 42, and it's Neal 366 at the bottom, and I'm going to show it to you. Have you ever seen this letter before?

A. Yes. That was a response, yes, because he sent me one also, yes.

Q. So he sent a copy of this May 23, 2017, letter to you as well?

Page 70

A. Yes, I think so. This was the response from this Exhibit 11.

Q. Okay. And did you read this letter when you received it?

A. Yes.

Q. And have you reviewed it recently?

A. No.

Q. Now, when you gave the letter to your lawyer, it looks here that he sent a letter to Andrew Kovacs, and do you know who Andrew Kovacs is?

A. Attorney.

Q. Was that an attorney that was working on the workers' compensation case, do you know?

A. Yes, with David.

Q. Do you know if Mr. Kovacs is employed by Louis Dreyfus?

A. I don't know.

Q. So would you agree as of the date that your lawyer sent this letter, which is dated May 23, 2017, that you were still subject to your restrictions at that time?

A. Yes.

Q. And would you agree that you were still not in a position to come back to work and perform the

Page 71

duties of an operator based on those restrictions?

A. Yes.

Q. Now, in this letter, the lawyer says that you're currently completing injections to determine whether you'll get released from care or recommended for further treatment. Do you see that?

A. Yes.

Q. Was that going on at that time when this letter was sent?

A. Yes.

Q. And then it says: In the meantime, please note that my client does not plan on abandoning his position. Do you see that?

A. Yes.

Q. And he wishes to return to work once the effects of his injury have remitted, right?

A. Yes.

Q. So when you read that, what does that mean to you? I mean, what's your understanding of what he's saying? What do you understand when you read that what that means?

A. You mean the last part that you just read?

Q. That first sentence, yeah, of that second paragraph. If you need to read it again, feel free.

Page 72

A. Oh, well, I wasn't planning on abandoning my job. I liked my job, liked the atmosphere, liked the people. So, no, I wasn't planning on abandoning my job.

Q. And would you agree your lawyer is telling the company that after your work injury is done or taken care of, that would be a time that you could come back to work?

A. Yes.

Q. Now, you agree that this letter doesn't say you're going to be back at work by June 19, correct?

A. It doesn't say that.

Q. And it doesn't talk about any accommodations that you guys are asking for that would allow you to come back to work by June 19, correct?

MR. CARLSON: I object. The letter speaks for itself on that issue.

Q. Let me ask the question again I guess. Do you know if in this letter, was your lawyer asking the company to bring you back to work on June 19?

MR. CARLSON: I object to the form. I think the letter speaks for itself, and you're asking him to interpret the mind of his lawyer.

Q. I'm just asking what your understanding was in this letter. Is there anything saying you're going

18 (Pages 69 to 72)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 73

to come back to work by June 19?

A. It doesn't state it in there.

Q. Okay. You agree this isn't a medical note, right?

A. No.

Q. Now, at the time this letter was sent in May, you were seeking workers' compensation benefits, correct?

A. Yes.

Q. In fact, you have your lawyer, and he's sending a letter on your behalf at that time, right?

A. Yes.

Q. Okay. And that was for your back, right?

A. Yes.

Q. And at the time you were getting the workers' compensation claim, did you indicate you also received short-term disability benefits?

A. What you mean?

Q. Well, did you get some short-term disability benefit payments when you were still employed by the company?

A. Short-term?

Q. Yes.

A. Sun Life, yes.

Page 74

Q. And those were being paid to you in early 2017?

A. Yes.

Q. And do you know when they stopped?

A. Not exactly, but it wasn't long. I think I only maybe received three, four checks maybe.

Q. Okay. Did those come every month or every couple weeks, do you know?

A. Every month.

(Defendant's Exhibit Number 13 was marked for identification.)

Q. I'll show you what's been marked as Exhibit 13, and again these are some emails that you didn't get or you were not copied on, but I'm going to show you these just as a point of reference because they refer to things that you would have maybe done. But for the record, Exhibit 13 is an email from Dave Stafford dated June 5, 2017, and he's forwarding an email from Scott Becker of that same date. Do you see the June 5, 2017, date?

A. Yes.

Q. Now, there's a reference in the email at the bottom that says: Jerry Neal came into the office today, June 5, requesting that the company fill out the

Page 75

attached paperwork. Okay? Do you remember going to the company around June 5 and asking to have some paperwork filled out?

A. I think so, yes.

Q. And attached to this email is some paperwork, and it says Long-Term Disability Claim Packet. Do you see that?

A. Yes.

Q. Now, so on June 5 would you have come in with this paperwork and asked for the company to help fill it out?

A. I don't remember if I asked them to help me with this.

Q. So with respect to the long-term disability application, do you know if the company did help fill this information out and send it on?

A. I don't know.

Q. Okay. Did you fill out anything or give anything to your doctor at that time to fill out?

A. No, as far as long-term, no.

Q. Now, as of June 5, 2017, when this was happening, did you understand at that time again your workers' compensation claim was pending, right?

A. Yes.

Page 76

Q. And was it granted or was it under review or do you know what the status was of it?

A. On my workers' comp?

Q. Your workers' comp, yeah.

A. Repeat that question.

Q. Sure. You know, as of June 5, 2017, what was the status of your workers' compensation claim? Were you getting any workers' compensation benefits, do you know?

A. I can't remember the exact date of that when I was receiving it, June 5.

Q. Do you know if there were any issues with your claim and whether they were granting it or were they investigating it? Do you know what was going on? If you remember.

A. No.

Q. You don't remember?

A. No.

Q. Okay. So as of June 5, 2017, you remember coming to the plant, you remember asking for some paperwork to be filled out; is that a fair statement?

MR. CARLSON: I'd object to the form, misstating his prior testimony.

Q. I'm sorry. We talked about June 5. You

19 (Pages 73 to 76)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 77

remember coming into the office around that time to have some paperwork filled out?

A. Yes.

Q. Okay. As of June 5 again in 2017, you were still subject to those restrictions that the doctor imposed, right?

A. Yes.

Q. And as of June 5, 2017, did you believe you were going to be able to come back to work by June 19?

A. Physically, my body, no, the way I felt.

Q. You were having some pain at that time?

A. Yes.

Q. And you were still getting treatment?

A. Yes.

(Defendant's Exhibit Number 10 was marked for identification.)

Q. I'm going to show you what's been marked add Defendant's Exhibit 10. For the record, this is a document dated June 6, 2017, and it's a completed long-term disability application submitted to Sun Life by the company. My question is have you ever seen this document before to your knowledge?

A. (Shaking head).

Q. You don't remember seeing this?

Page 78

A. No.

Q. And do you know if this is the information that you asked the company to complete for the application information when you came in on June 5? Do you know if this is it? If you know.

A. I don't remember right offhand.

Q. Okay. You agree on the third or fourth page of the document at the top this refers to this document as a Long-Term Disability Claim Packet. Do you see that?

A. Yes.

Q. Thanks. You can set that aside.

(Defendant's Exhibit Number 14 was marked for identification.)

Q. Showing you what's been marked as Exhibit 14, this is a letter that actually was sent to you, and it's from Sun Life Financial dated June 23, 2017. Do you see that that's addressed to you?

A. Yes.

Q. And do you remember receiving this document?

A. Yes.

Q. Now, it says in the document in the second paragraph that -- Well, in the first paragraph it refers

Page 79

to Sun Life and a short-term disability benefit plan, correct? Do you see that?

A. Yes.

Q. And then it says in the second paragraph that they cannot approve your claim because the information you provided does not demonstrate you were totally disabled after April 20, 2017. Do you see that?

A. Yes.

Q. So when you were talking earlier about your short-term disability benefits stopping or being denied, was this the letter you got?

A. Yes.

Q. And did you understand that you have the right to appeal this?

A. No, I didn't then, no.

Q. And there is some information in the letter about appealing it. Do you remember if you ever appealed this decision?

A. No, I didn't.

Q. Did you take this to anybody to help you with it when you got it, do you know?

A. No. As far as my short-term, I just thought it was over.

Q. Okay. You know, after this -- Before

Page 80

June 23, 2017, the date June 19, 2017, came and went. Now, you understood from the letter you got earlier from the company that that was the date your employment would be terminated if you were unable to return; is that a fair statement?

MR. CARLSON: Object to form, foundation.

Q. Is that what you understood from the letter you got earlier?

A. Yes, for the 19th, yes.

Q. For June 19?

A. Yes.

Q. And would you agree as of June 19, 2017, that other than the medical note on May 11 that you showed which said no change of status that there was no other medical note from a doctor that was provided to the company, do you know?

MR. CARLSON: I would object to form, foundation, also ignores the work comp and what medical records they had as well, so I object to form.

Q. Okay. Are you aware of any medical paperwork from your doctors that were sent to the company between May 4, 2017, through June 19, 2017, other than that May 11 doctor's note that we talked about?

20 (Pages 77 to 80)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 81

A. No.

Q. And did you provide any information between May 4 through June 19, 2017, from your doctor to the company showing that your status had changed in any way?

A. Say that again.

Q. Yeah. That's a bad question. Let me try to ask it differently. You know, between May 4, 2017, through June 19, 2017, did you ever advise the company or did you ever provide the company information from a doctor saying you were going to be able to come back to work by June 19?

A. No.

Q. Okay. And would you agree as of June 19, 2017, that you didn't feel like you could come back to work on that day?

A. No.

Q. You don't believe you could have come back to work on that day?

A. Physically the way I was feeling, probably not at that time.

Q. Now, eventually did you find out that the company had processed your employment termination?

A. At that time, yes. You mean when I found out?

Page 82

Q. How did you find out?

A. I had to call Dave Schaefer over the phone.

Q. Is that Dave Stafford?

A. Stafford, I think so.

Q. And prior to calling him, did you come to the plant?

A. Yes.

Q. And do you know what day you came in?

A. I know it was on a Monday. It was on a Monday, the following Monday I think.

Q. And do you remember who you talked to when you came in?

A. On that Monday? Yeah, I talked to Mark Nemechek and -- No, I talked to Scott that morning, that Monday morning, and he gave me Dave Schaefer's number. What's his name? I'm sorry.

Q. Dave Stafford?

A. Stafford, I'm sorry.

Q. That's okay.

A. He gave me a number to contact and call Dave Stafford.

Q. And did you bring in a medical note that day? Had you seen a doctor around that time?

A. Yes.

Page 83

(Defendant's Exhibit Number 16 was marked for identification.)

Q. Okay. I'm going to show you what has been marked as Exhibit 16. I apologize because this has got that same medical note that you can't read on the second page, but you can kind of read it. I mean, do you agree that the second page of Exhibit 16 has a medical note on it? Go ahead and look at this one on Exhibit 16. At the top of it, can you make out the date that's on there?

A. I can see 6/22/17.

Q. Yeah. Does it look like it says June 22, 2017?

A. Yes.

Q. And you agree this is your doctor?

A. Yes.

Q. Dr. Gornet?

A. Yes.

Q. Okay. Now, if you look at the first page of the email, the email is dated June 26, 2017, at 2:23 p.m., and it says: Jerry dropped this off today, Monday, 6/26/2017 at 2:00 p.m. Do you see that?

A. Yes.

Q. Do you have any reason to dispute that that

Page 84

was the day you came to the facility to drop off this note?

A. Can you say that last part again? I was reading.

Q. No, that's okay. According to the email -- and I know you weren't on this email -- Scott Becker is saying that you dropped off this doctor's note on Monday, June 26, correct?

A. Yes.

Q. And did you come in that day? Is that the day you think you came in?

A. Yes.

Q. And he says you came in around 2:00 p.m. in the afternoon. Does that sound right to you?

A. I'm not for sure what time.

Q. Okay. And according to Scott Becker, he said he explained to you that you needed to call Dave Stafford tomorrow at 8:00 a.m. Do you remember him telling you that?

A. Yes.

Q. So he told you to call Dave?

A. Yes.

Q. Did he tell you anything about your employment status at that time?

21 (Pages 81 to 84)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 85

A.  No.

Q.  And did Mark Nemechek tell you anything about your employment status at that time?

A.  No.

Q.  Okay.  So now we jump forward, and did you talk to Dave Stafford and call Dave Stafford?

A.  Yes.

Q.  And did you leave a message for him or do you remember if you connected with him right away?

A.  I think I talked to him.  I did talk to him.

Q.  Okay.  Do you remember how the conversation went?  What do you remember?

A.  Oh, I don't remember quite how it went.  I know I asked him about the letter that was sent as far as me being terminated, and he just stated that -- He just made it plain and simple, like basically we don't need your service anymore, you're been terminated.

(Defendant's Exhibit Number 15 was marked for identification.)

Q.  Let me show you that letter I think you're referring to.  I'll show you what's been marked as Exhibit 15.  Do you recognize this?

MR. CARLSON:  You're throwing me off.

Page 86

You're out of order again.

Q.  I did 16 already, so this is 15.

A.  Yeah, I remember seeing this letter.

Q.  Is this the termination letter that you received from the company, do you remember?

A.  Yes.

Q.  And did this come in the mail?

A.  Yes.

Q.  And you said you talked to Dave Stafford.  Do you know if it was before or after you received this letter?

A.  It was after I received this letter.

Q.  During your conversation with Dave, did you ever talk to him about your workers' compensation lawyer and him submitting documents or anything like that?

A.  Not to my knowledge.

Q.  So what is all that you remember about your conversation with Dave Stafford again?  I just want to make sure we've covered it.

A.  It was basically a short conversation.  I was asking him about the letter.  He just basically told me as of today or as of that day, I was being terminated from Louis Dreyfus.

Q.  Okay.  And when you came in to talk to

Page 87

Scott Becker that day and he told you to call Dave Stafford, what was your physical status?  Did you feel like you could come to work at that time?

A.  Yeah.

Q.  What changed?

A.  Nothing changed, just my mindset, just like I was ready to get back engaged in work.

Q.  Okay.  Now, do you agree that you went to the doctor on June 22, 2017?  That was the date that that medical note reflected?

A.  Yes.

Q.  And do you know what day of the week that was?  Could that have been a Thursday?

A.  Yes.

Q.  And would you normally be scheduled on a Thursday?  Was that one of the days you would work?

A.  Yes.

Q.  And you didn't come in on Thursday after your doctor's appointment, did you?

A.  Yeah, it was about seven-something, later on in the evening.

Q.  You came into work that day?

A.  I did not come in to work, just to drop off some papers, copies of my papers off.

Page 88

Q.  Well, according to the email from Scott we talked about earlier, he said you came in on June 26, right?

A.  June 26?  Was that a Monday?

Q.  Which was a Monday.

A.  Yeah, that Monday.

Q.  So if June 22 is a Thursday, you agree that's the date your appointment would have been before that Monday, right?

A.  Yes.

Q.  And so you didn't come in on Thursday, right?

A.  Well, I got released on Thursday.  I couldn't come in Thursday.

Q.  And then on Friday you didn't come in, right?

A.  On Friday I came up there.  Mark -- I mean Scott wasn't there, so I couldn't drop off my papers to Scott.  They told me I need to leave and come back Monday when Scott here.

Q.  Who told you that?

A.  Mark, because I don't even think he took -- I don't even think he took a copy of that paper.

Q.  So you're saying you came in on Friday?

22 (Pages 85 to 88)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 89

A.    Yeah, I came in that Friday.  They told me Scott wasn't there so I had to come back Monday.  That Monday I came back.  That's when Scott gave me that number to Dave.

Q.    So you're saying you came in on Friday to drop off paperwork?

A.    Yes.  Dave wasn't --

Q.    And you're saying you talked to Mark Nemechek on that day?

A.    I talked to Mark Nemechek, but I couldn't drop no paperwork off because he said I needed to see Scott before I returned to work.  So I when I brought the paperwork, I would let them know that my duties are done as far as with my back and everything, so I was planning on returning to work.  So when I got there Friday, Scott wasn't there, so I had to come back Monday to talk to Scott before I could return to work.

Q.    And that's what Mark told you is what you're saying?

A.    What you mean what he told me?

Q.    I'm sorry.  On Friday you talked to Mark Nemechek is what you're saying?

A.    Yes.

Q.    And you didn't feel like you could give

Page 90

your paperwork to Mark Nemechek?

A.    I gave it to him.  He didn't run a copy of it.  He told me to come back Monday, give it to Scott.

Q.    Okay.  And then on Monday, you said you did come in on that day?

A.    Yes.

Q.    And Scott indicated that was in the afternoon?

A.    Yes.  And he gave me the number to Dave, and that's when he told me I needed to get in contact with Dave, and he said just call him tomorrow.

Q.    And you agree, though, that on Thursday when you had your doctor's appointment --

A.    Yes.

Q.    -- you didn't come in on that day, right?

A.    Well, the day was over with.  The workday was over with.

Q.    Okay.  And then on Friday, you said you came in to drop off the paperwork, you didn't come in to report to work or anything?

A.    Yes, I was going to drop my paperwork off and hopefully they give me work.  That's what I'm thinking.  They'd see that my thing is over with, so hopefully I would get right back to work.  That's what I

Page 91

was hoping.

Q.    And you were told Scott wasn't there that day?

A.    Yeah, Scott wasn't there that day.

Q.    And on Monday you came in in the afternoon, and you did talk to Scott that day?

A.    Yes, I talked to Scott that Monday.

MR. CLARK:  Let's take a couple-minute break.

(A recess was taken from 2:33 p.m. to 2:39 p.m.)

Q.    (By Mr. Clark) Mr. Neal, you understand that you filed a lawsuit against Louis Dreyfus Company, right?  You understand you have a lawsuit pending?

A.    Yes.

Q.    And what is your understanding of the claim you have against the company?  What is your claim?

A.    Wrongful termination.

Q.    Wrongful termination?

A.    Uh-huh.

Q.    And on the wrongful termination claim, what do you feel that the company did that was wrongful?

A.    Not allowing me back to work, just not allowing me back to work.

Page 92

Q.    And do you agree that the letter on May 4, 2017, indicated that you were going to be terminated on June 19 if you didn't come back to work, right?

MR. CARLSON:  I object to form.  I think it misstates the letter and the letter speaks for itself.

Q.    And we went through the letter before, but you understood that, based on here today, that the company was saying that it had a policy that after 26 weeks, we terminate employees who can't come back?

MR. CARLSON:  I object to form, foundation. There's no written policy that he has been provided anywhere that says they fire employees after 26 weeks. So if there is a written policy in some policy manual and you have it, I'd like to see it.  Object to form.

Q.    Well, let's go to Exhibit 11 if you don't mind, if you can find that, and if you could grab Exhibit 5 also.  There you go.  So if you want to go to Exhibit 11 first, and I don't know if I asked you specifically this before, but if you look at that third sentence where it talks about your employment with the company and all benefits will end on June 19 unless you're able to come back to work, do you see that, that sentence?

A.    Which one in particular?

23 (Pages 89 to 92)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 93

Q.   It's the third sentence where it says "We are" at the beginning, if you want to read that again. Do you see that sentence?

A.   Up here at the top?

Q.   Yeah, first paragraph.  And you agree that the company is telling you there that unless you're able to return to work, your employment and company-provided benefits will end on June 19, 2017.  Do you see that?

A.   Yes.

Q.   And do you see that before that, it says "pursuant to company policy," right, right in the middle of that sentence?

A.   Yes.

Q.   So you understood when you got this letter the company was telling you that they had a policy that they were enforcing that would end your employment on June 19 unless you were able to come back to work?

MR. CARLSON:  I object to form, foundation.

Q.   Is that what you understand or understood when you got that letter?

MR. CARLSON:  It also leaves out the second paragraph, so I just object to form and foundation.

A.   So are you asking me did I understand it? No, I didn't understand that I was going to be

Page 94

terminated.

Q.   And we talked about the second paragraph before.  The other thing you could do is contact Amber Randall to talk about accommodations to get back to work.  Would you agree that's also in the letter?

A.   Yes.

Q.   I'm going to have you look at Exhibit 5. If you go to the very last page of that, and you can see this is a short-term disability policy.  It says that at the very top, correct?

A.   Yes.

Q.   And did you understand that short-term disability is something that goes for 26 weeks if you're unable to work due to a disability?

A.   I know I wasn't aware of the timing of it, of short-term disability.

Q.   And if you go to the bottom of that policy in that last paragraph, in the second sentence it says -- Do you see where it says "If you do not"?

A.   Yes.

Q.   It says:  If you do not return to work when your STD leave ends, your employment will be terminated unless you are otherwise entitled to unpaid leave under the Federal Family and Medical Leave policy.  Do you see

Page 95

that?

A.   Yes.

Q.   Okay.  Do you remember ever looking at this policy or reading this policy when you got the policy manual?

A.   No.

Q.   Okay.  Do you know of any employee at the Cahokia facility who was off work for 26 weeks and did not get terminated?

A.   No.

Q.   During your employment and prior to June 19, did you ever make any complaints to anybody within the company that you felt you were being treated adversely because you had a workers' compensation claim?

A.   That's how I felt.  I probably never stated it to no one in the company, but personal feelings, yes.

Q.   Okay.  But you never reported it to anybody in the company?

A.   No.  The way that I feel?

Q.   Yes.

A.   About the workers' comp, no, because I barely had contact with anybody at the company during the time I was off.

Q.   You had contact with Mark Nemechek and

Page 96

Scott Becker, though, right?

A.   Well, Scott -- Well, yes, if I go up there to turn my paperwork in.

Q.   Now, in this case, I understand you're claiming some damages, and I have a statement of your damages which are in your responses to interrogatories, Exhibit 2.  Other than the money part of it, are you claiming that you have emotional or mental distress from this?

A.   Yes.

Q.   What kind of emotional or mental distress are you claiming?

A.   I have a lot of emotional distress, not being able to pay my bills, not able to sleep, not knowing where -- like how we gonna go grocery shopping for food, you know, repossession of car, I lost my insurance, I couldn't maintain my automobile insurance, just a lot, just a lot.

Q.   Did you ever go to a doctor for any emotional or mental distress issues?

A.   No, I didn't ever go to no doctor.  It was just more me and my wife talking.

Q.   Okay.  Have you ever been diagnosed as having depression or anything like that?

24 (Pages 93 to 96)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 97

A.  No.

Q.  And you never went to any kind of therapist or anything like that?

A.  No.  I just would get headaches from worry. I just worry, like worry, worry, worry where this is coming from, you know, and then like I wasn't getting any short-term or long-term or basically no other income, so, yes, my life was in shambles.  I couldn't take care of my family, couldn't provide for my wife, you know.  It was very hard.

Q.  Was there a time where you weren't getting any benefits at all?  I mean, you got long-term for a while after your termination.

A.  Yes.

Q.  When was that time frame?

A.  I can't remember exactly.  I know my short-term disability ran out, you know, ended up stopping, and my unemployment ended, and I was always trying to find employment, you know, trying to find something to do to make money, but I had no success until I moved on and went to my other jobs.

Q.  And you agree your current job is paying an hourly rate that's more than what you were making at Louis Dreyfus Company?

Page 98

A.  At the time.  At this time, yes.

Q.  And do you know how operators are paid at Louis Dreyfus as far as additional compensation?  I mean, do you know anybody that's making over $20 an hour there?

A.  Yes.

Q.  Who do you know that's making over $20 an hour?

A.  A couple guys that I know that still work there, Abdul Garrett and --

(Spelling requested by court reporter.)

A.  It's Abdul Garrett, A-B-D-U-L Garrett, Sean Ferrell, S-E-A-N, Ferrell, and I think he spells it like F-E-R-R-E-L-L.

Q.  Do you still talk to those guys?

A.  Periodically, yes.

Q.  Anybody else you talk to in the company that you still know?

A.  Well, I still have relatives work there.

Q.  That work at Cahokia?

A.  Yes.

Q.  And do you know how long those guys have worked for the company that are making more than $20 an hour?

Page 99

A.  Well, me and my cousin, Sanchez Rose, he probably started two months before me, so he was part of helping me get that job, so --

Q.  Did he get the same job as you?

A.  Yes, and he just moved over to deckhand.

Q.  So he's now a deckhand and not an operator anymore?

A.  Well, he's a deckhand/operator.  It's either/or.  He carries both titles.  He started off as a operator, moved over to deckhand.

Q.  And do you know if that pays more if you do that job as well?

A.  Yes, it will.  The highest pay will maybe be a loader.  Abdul Garrett, he was a loader.  Sanchez Rose was a deckhand/operator.

Q.  Do you know how much -- I think you said was it your cousin, I'm sorry, that you said was still there that started around the same time?

A.  Yes.

Q.  Do you know how much he's making now?

A.  Not exactly.

MR. CLARK:  I think that's all the questions I have.  I don't know if your attorney has any.

Page 100

MR. CARLSON:  I don't have any.

MR. CLARK:  Thank you very much for your time.  I appreciate it.

THE WITNESS:  Thank you.

MR. CARLSON:  He'll read it.

(Off the record at 2:51 p.m.)

(Defendant's Exhibits Numbers 2 through 16 were attached to the transcript.)

***************

25 (Pages 97 to 100)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Jerry Neal, Jr. 12/2/2022

Page 101

_____
JERRY NEAL, JR.

STATE OF _____ )
                           )
COUNTY OF _____   )

Subscribed and sworn to before me this _____ day of _____, 20___.

_____
NOTARY PUBLIC

My Commission Expires:
***************

(NNH)

Page 102

CERTIFICATION

I, Nancy Naas Harmon, a Certified Shorthand Reporter in the State of Illinois and Certified Court Reporter in the State of Missouri, DO HEREBY CERTIFY that pursuant to agreement between counsel there appeared before me on December 2, 2022, at the law offices of Byron, Carlson, Petri & Kalb, LLC, 411 St. Louis Street, Edwardsville, Illinois, JERRY NEAL, JR., who was first duly sworn by me to tell the whole truth of all knowledge touching upon the matter in controversy aforesaid so far as the witness should be interrogated concerning the same; that the witness was examined and said examination was taken down in shorthand by me and afterwards transcribed, then being signed by the deponent, signature not having been waived by agreement of counsel, and said deposition is herewith returned.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of December, 2022.

_____
Nancy Naas Harmon, CSR, CCR, RPR
IL #084-003219, MO #986

Page 103

KEEFE REPORTING COMPANY
11 North 44th Street
Belleville, IL  62226
December 13, 2022

Mr. Eric J. Carlson
BYRON CARLSON PETRI KALB, LLC
411 St. Louis Street
PO Box 527
Edwardsville, IL  62025

IN RE:  JERRY NEAL, JR. vs. LOUIS DREYFUS COMPANY SERVICES LLC
No. 3:21:CV-00820-GCS

Dear Mr. Carlson:

Enclosed herewith, please find a copy of the deposition transcript of JERRY NEAL, JR., taken in the above-captioned matter on December 2, 2022, along with the original signature page of same.
Please have Mr. Neal read his deposition, note any corrections to be made on the provided sheets, sign the original signature page, and have his signature notarized where indicated.  Following this, please return the original executed signature page and correction sheets to me within 30 days and forward same to all counsel of record.  Thank you.
Yours very truly,
KEEFE REPORTING COMPANY

Nancy Naas Harmon, CSR, RPR
Illinois License #084-003219

Cc w/Enc:  Aaron A. Clark, Esq.

26 (Pages 101 to 103)

**Corey Rubin**

| | |
|---|---|
| **From:** | Dave Stafford |
| **Sent:** | Friday, March 17, 2017 3:04 PM |
| **To:** | Scott Becker |
| **Cc:** | Gene Loffler; Amber Randall; Mark Nemechek |
| **Subject:** | FW: CMC Neal 2240308214 |

Wanted you to know ball is in Wilton's court at this point.  As I get an update from there will update all.

Dave

**From:** Amy Khatib
**Sent:** Friday, March 17, 2017 2:02 PM
**To:** Dave Stafford <DAVID.STAFFORD@ldc.com>; JoJo Magrone <MARYJO.MAGRONE@ldc.com>
**Cc:** Mary-Beth Price <MARYBETH.PRICE@ldc.com>
**Subject:** RE: CMC Neal 2240308214

Hi Dave:

Thank you for the information. I'll speak with JoJo and we'll keep you and Mary-Beth in the loop.

Currently the STD carrier is reviewing the medical records from 2 of his physicians and have asked us for an update on the status of the WC claim. What they have shared with us as of yesterday was: The heavy lifting at work is the only activity that has been cited as potentially being the cause of his back condition, and his provider from a visit on 2/28 opined that his symptoms are "causally connected to work related injury as described. "

Amy



Amy Khatib
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Friday, March 17, 2017 2:45 PM
**To:** Amy Khatib <AMY.KHATIB@ldc.com>; JoJo Magrone <MARYJO.MAGRONE@ldc.com>
**Cc:** Mary-Beth Price <MARYBETH.PRICE@ldc.com>
**Subject:** FW: CMC Neal 2240308214

Assume you two will put your heads together for a recommendation going forward?  Please see last paragraph of the overview below.

Thanks

**From:** Scott Becker
**Sent:** Friday, March 17, 2017 1:23 PM
**To:** Gene Loffler <GENE.LOFFLER@ldc.com>

1

EXHIBIT

3

NEAL 0216

1

## Corey Rubin

| | |
|---|---|
| **From:** | Daniel Murray |
| **Sent:** | Sunday, March 19, 2017 12:36 PM |
| **To:** | Gene Loffler; Scott Becker |
| **Cc:** | Mark Nemechek; Amber Randall; Dave Stafford; JoJo Magrone |
| **Subject:** | RE: CMC Neal 2240308214 |

Hi All,

My thoughts are that the back claim would likely be ruled as WC, however, without any specific injury other than general low back claim, perhaps a 2nd opinion could limit our liability on the injured disc. A disc injury usually is attributed to an event injury, which doesn't seem to exist here. While the claim would remain WC, the liability on the back injury could be limited to only the most recent injury; back strain from overuse during cleaning the basement.

**Jo Jo,** On a related note, we recently met with Zurich to discuss suspect and challenging claims. I understood you and I would be a part of these case management calls. It is in our best interest to participate on calls for these types of claims. Please ensure so going fwd.

The e-mail below states the next case mgmt. call is scheduled for June 14th, however, it seems there are case handling decisions to be made now, correct?

Dan



**Daniel Murray**
**Regional Head- Safety, Health & Environmental**
Phone: +1 816 412 2710 | Mobile: +1 816 728 4955
Email: daniel.murray@ldcom.com
**Louis Dreyfus Company LLC**
4800 Main St., Suite 600
Kansas City, MO 64112 / USA



**From:** Gene Loffler
**Sent:** Saturday, March 18, 2017 10:40 PM
**To:** Scott Becker <Scott.Becker@ldc.com>
**Cc:** Mark Nemechek <MARK.NEMECHEK@ldc.com>; Amber Randall <AMBER.RANDALL@ldc.com>; Dave Stafford <DAVID.STAFFORD@ldc.com>; Daniel Murray <DANIEL.MURRAY@ldc.com>
**Subject:** RE: CMC Neal 2240308214

Including Dan for his info. We should discuss this next week and decide the best route to take.
Thanks



**Gene Loffler**
Industrial Manager-North American Grains+Oilseeds Logistics
Phone: 503-243-1133 | Mobile: 503-880-9357 | Email: Gene.Loffler@ldcom.com
**Louis Dreyfus Company LLC**
1500 SW First Ave  Suite 680  Portland, OR  97201

NEAL 0218

2

**Corey Rubin**

| | |
|---|---|
| **From:** | Gene Loffler |
| **Sent:** | Monday, March 20, 2017 11:02 PM |
| **To:** | Daniel Murray |
| **Cc:** | Scott Becker |
| **Subject:** | FW: Neal 2240293180 |

Dan  FYI  This is the same guy just a different issue. To my knowledge he did not miss any work as a result of this injury.   We were surprised when he hooked up with an attorney on this one.
Guess I shouldn't be surprised.



**Gene Loffler**
Industrial Manager-North American Grains+Oilseeds Logistics
Phone: 503-243-1133 | Mobile: 503-880-9357 | Email: Gene.Loffler@ldcom.com
**Louis Dreyfus Company LLC**
1500 SW First Ave  Suite 680  Portland, OR  97201

**From:** Scott Becker
**Sent:** Monday, March 20, 2017 10:08 AM
**To:** Gene Loffler <GENE.LOFFLER@ldc.com>
**Subject:** FW: Neal 2240293180

FYI

NEAL 0223

3

**Corey Rubin**

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Tuesday, June 27, 2017 9:51 AM |
| **To:** | Dave Stafford |
| **Subject:** | RE: J. Neal - 26 weeks of Disability Termination |

The only work we had for the 24$^{th}$ and 25$^{th}$ was people on-site to watch over Hot work being done over the weekend.  And it was on a volunteer basic .

We have never had a Holiday party at our facility.  Also having a party during this time frame would be very hard to do, right in the middle of  the busy season.   We do have a total of 33 people at the facility, that's counting everyone........ hope that helps some.

Please let me know on the final outcome on Jerry please

And thanks

**From:** Dave Stafford
**Sent:** Tuesday, June 27, 2017 8:07 AM
**To:** Scott Becker <Scott.Becker@ldc.com>
**Subject:** FW: J. Neal - 26 weeks of Disability Termination
**Importance:** High

Clearly missed 3 days – 22$^{nd}$, 23$^{rd}$ and 26$^{th}$ only question I have is what were you scheduled over this weekend the 24$^{th}$ and 25$^{th}$?

On a completely different topic.. I need to know if you had a holiday party for the staff there last year, are you planning to hold one this year and if so is it booked, budgeted?  And if booked when?  Finally if you know the cost of any holiday party you had last year let me know.. rough estimate is fine – doesn't need to be exact.

thanks

NEAL 0243

4

**Corey Rubin**

| | |
|---|---|
| **From:** | Mark Nemechek |
| **Sent:** | Tuesday, May 15, 2018 4:13 PM |
| **To:** | Corey Rubin |
| **Cc:** | Scott Becker |
| **Subject:** | FW: J. Neal - 26 weeks of Disability Termination |
| **Attachments:** | Jerry Neal Letter_Termination-06.28.2017.docx |

**From:** Dave Stafford
**Sent:** Wednesday, June 28, 2017 11:35 AM
**To:** Scott Becker <Scott.Becker@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>
**Subject:** FW: J. Neal - 26 weeks of Disability Termination

Heads up.. Will be sending the attached letter out to Mr. Neal today.  Will also return his phone call and let him know of decision to terminate.

NEAL 0244

## Corey Rubin

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Wednesday, April 20, 2016 8:51 AM |
| **To:** | Dave Stafford |
| **Cc:** | Jacky Murphy; Gene Loffler; Mark Nemechek |
| **Subject:** | FW: Jerry Neal Jr #2240293180 |
| **Attachments:** | Blank Wage Form for Employers 2-2013.xlsx |

| | |
|---|---|
| **Importance:** | High |

This is our Contact with Zurich regarding the Jerry Neal claim. I cannot remember who to pass on the Wage request form to complete. Can you please let me know so I can forward this onto them. Also Meaka will be calling Jerry's lawyer direct to get more information needed. Meaka explained she deals with this a lot in the state of Illinois. Sad to say but in most cases the claimant is just looking for an easy buck.
Will keep you all posted.

-----Original Message-----
From: Meaka Benton [mailto:meaka.benton@zurichna.com]
Sent: Tuesday, April 19, 2016 2:36 PM
To: Scott Becker
Subject: Jerry Neal Jr #2240293180
Importance: High

Per our conversation today on employee, Jerry Neal Jr #2240293180, please forward the date of hire, social security number and 52 weeks of wages prior to the accident date showing gross earnings. You can use the wage for attached and have payroll complete it or you can use the form from payroll.
Thanks.

(See attached file: Blank Wage Form for Employers 2-2013.xlsx)

Sincerely,

Meaka Benton
Zurich North America
Illinois Workers Compensation
PO Box 66941
Chicago, IL 60666-0941
**************************
847-706-2211 - Direct
847-240-8172 - Fax
**************************
Meaka.benton@zurichna.com

1

NEAL 0255    6

**Corey Rubin**

| | |
|---|---|
| **From:** | Marcus Dixon |
| **Sent:** | Monday, December 19, 2016 12:19 PM |
| **To:** | Gene Loffler |
| **Subject:** | Jerry Neal |

This is the conversation we had with Jerry on the day we found out about his back.

On December 08, 2016 Jerry Neal came up to me and said his back was sore and bothering him. I first asked if he needed to go to the doctor and his reply was "No". So I told him we will need to talk to Scott before you do anything else. Scott pulled up and him and I ended up talking with Jerry. We asked his a few questions. First, did you hurt you back at work? Jerry's response was No that he woke up on Sunday with some stiffness and believed it was his bed. Second, do you need to see a doctor? He replied with "No, I'm fine". Scott made sure and let him know not to bend, lift, or put tension on the lower back and if it does start to bother him anymore to let him know so he can go see a doctor.



**Marcus Dixon**
Operations Supervisor
Phone: 618-857-7330 Mobile: 206-747-9528
Email : Marcus.Dixon@ldcom.com
**Louis Dreyfus River Elevators LLC**
46 Cargill Elevator Rd
Cahokia, IL 62206

NEAL 0258

7

## Corey Rubin

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Wednesday, December 21, 2016 2:46 PM |
| **To:** | usz_carecenter@zurichna.com |
| **Cc:** | Gene Loffler; Mark Nemechek; Marcus Dixon; Amber Randall |
| **Subject:** | Jerry Neal |
| **Attachments:** | Jerry Neal 12-19-2016.pdf |

Attached is Jerry Neal's Reporting form.  Please give me a call when you receive this so I may better explain.

Scott Becker
618-578-0541

Thank you

NEAL 0259    8

## Claim Reporting Guide
**Workers Compensation**

| | |
|---|---|
| Phone Report# | 800-987-3373 |
| Fax Report# | 877-962-2567 |
| E-mail Report | usz_carecenter@zurichna.com |
| Internet | www.zurichna.com |

**ZURICH**

**Name of person reporting**

SCOTT BECKER

LET REST / REPORT ONLY
☐ Yes ☐ No

### Address Information:

**Name and address of the company**

LOUIS DREYFUS COMPANY
46 CARGILL Elevator Road
CAHOKIA IL. 62206

**Policy Number**

**Site Code (if applicable)**

**FEIN Number**
27-3305101

**WC Benefit State**
ILLINOIS

**Contact Name**

SCOTT BECKER

**Telephone Number of Loss Location**
618-578-0541

### Accident Information:

**Date of Accident**
UNKNOWN

**Time of Accident**
AM   PM

**Address Where Incident Occurred**
UNKNOWN

**County**
St. Clair

**Please Give a Description of the Incident**

Went to a doctor on 12-14-2016 with a Sore Lower Back. Jenny never Reported that he Had Injured At Work or that he Could not do any Job Tasks

**Were any Authorities Contacted? (Police, Fire, Ambulance)**
☐ Yes  ☑ No

**If Yes, who**

**Was a Report Number Given**
☐ Yes  ☑ No

**If Yes, List Report Number**

**Officer's Name & Badge Number**

**Were any Citation Issued**
☐ Yes  ☐ No

**If Yes, whom and for what violation**

**Were any Safeguards Provided?**
☐ Yes  ☐ No

**Were they in use at the time?**
☐ Yes  ☐ No

**In event of a fatality, what is OSHA Number**

**Occurred on employer's premises?**
☐ Yes  ☐ No   Unknown

### Claimant Information:

**What is the Name and Address of the Injured Party**

Jenny Neal
532 St. James
CAHOKIA IL, 62206

**Home Phone**
618-560-4163

**Work Phone**

**Contact at Home or Work**
☑ Home  ☐ Work

**Is the Injured Party**
☑ Male  ☐ Female

**Social Security Number**
████ 0655

**Date of Birth**
████/1991

**Marital Status**
☐ Divorced  ☑ Married

**How Many Dependents**
5

## Employment Information:

**Employment Status**
☑ Full-time ☐ Temporary ☐ Contract ☐ On-call
☐ Part-time ☐ Seasonal ☐ Retired ☐ Volunteer

**Date of Hire** 8-20-2015

**Hours & Day worked per Week** 40 Hours 5 Days

**Was there any Lost Time?** ☑ Yes ☐ No

**Paid thru Date** 12-19-2016

**Salary Continued?** ☐ Yes ☑ No

**Last Date Worked** 12-19-2016

**RTW Date**

**RTW Qualifier**
☐ Released W/ Restrictions ☐ Released W/O Restrictions
☐ Return W/ Restrictions ☐ Return W/O Restrictions

**Released to Work Date** EST 1-2-2017

**Estimated RTW Date** 1-2-2017

**Employer Notified Date** 12-16-2016

**Hourly or Weekly Wage** 17.50 (Hourly) Weekly

**Weeks worked in past 52 Weeks** 50

**Regular Occupation** LABORER

**Occupation performed at time of Incident** UNKNOWN

**If Fatality, give date it Occurred** N/A

**Supervisor's Name** SCOTT BECKER

**Supervisor's Phone Number** 618-578-0541

**Eligible for?**
☐ Tips ☑ Overtime
☐ Bonuses ☐ Commissions

**Last Exposure Date**

**Drug Screen Program Enforced?** ☐ Yes ☑ No

**If Yes, give Outcome** ☐ Positive ☐ Negative

## Injury Information:

**Were there any Injuries?** ☐ Yes ☑ No

**What Part of the Body** LOWER BACK

**What Treatment was given, if any?**
☐ No Medical Treatment
☐ Minor On-Site Treatment
☑ Minor Clinic or Hospital
☐ Emergency Evaluation
☐ Hospitalization-More than 24hrs

**Give a Description/ Cause of the Injury**
UNKNOWN

**Name and Address of Treating Physician**
NIDAL SHAWAHIN
4600 MEMORIAL DRIVE
Suite 360
Belleville IL 62226
Phone Number: 618-222-7280

**Name and Address of Treating Hospital or Clinic**
INTERNAL MEDICINE
4600 MEMORIAL DRIVE
Suite 360
Belleville IL
Phone Number: 618-222-7280

**ICD9 Number**

**Surgery Needed** ☐ Yes ☐ No

**Pre-existing Condition** ☐ Yes ☐ No

**Accident caused Death** ☐ Yes ☑ No

**If Yes, Date**

## Witness Information:

**Name and Address of a witness to the Incident**
MARCUS DIXON
46 CARGILL Elev Road
Cargill Elev Road

**Phone Number of Witness** 206-747-9528

**Anything Additional to the Incident you would like to add?**
Jenny NEVER SAID this Injury Happened AT WORK or Never could Provide Any date or Activity that was being done that could have Caused this Injury.

NEAL 0261

10

**Corey Rubin**

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Thursday, December 22, 2016 9:36 AM |
| **To:** | Gene Loffler |
| **Cc:** | Mark Nemechek; Marcus Dixon |
| **Attachments:** | Jerry Neal LDC investigation report.pdf |

Incident Investigation Report for Jerry Neal.

NEAL 0262     11

**☰ LouisDreyfus**
Commodities

| Incident Investigation Report | Incident OSHA Recordable → <br> ☑ Yes <br> ☐ No | Case Class→ <br> ☐ Death <br> ☐ LTA <br> ☑ Restricted <br> ☐ Doctor | Recordable Category <br> ☑ Injury ☐ Hearing <br> ☐ Skin Disorder ☐ All Other <br> ☐ Respiratory Condition <br> ☐ Poisoning |
|---|---|---|---|

| | |
|---|---|
| Location: Cahokia | Date of Accident: Unknown   Date of Investigation: 12/21/2016 |
| Employee Name: Jerry Neal | Time of Accident: Unknown   Time of Investigation: 12/21/2016 |

**Type of Incident** (More than one may apply)
- ☐ Accident
- ☑ Injury
- ☐ Near Miss
- ☐ Process/Substance Incident
  - ☐ Reportable (Exceeds RQ)
  - ☐ Non-Reportable (See Release Info)

**Other Incidents**
- ☐ Fire
- ☐ Explosion
- ☐ Property Damage     Estimated Value: _____
- ☐ Natural Disaster
- ☐ Illness        Explain: _____

(Use additional sheets if needed)

**Employee Statement** (To be completed by injured employee(s) if applicable. Use additional sheets if needed)

On Wednesday 12-14-2016 Jerry Neal went to his doctor because of a lower back pain. Jerry never at anytime has reported an injury on the job site. After Jerrys doctors appointment they decided that his condition had to be caused at work and needed to be handled by workers compensation. Jerry then informed us that he had injured his back on 11/25/2016 shovling grain. He had been asked several times by myself and Marcus Dixon about this injury and at no time did he ever report any type of injury happening. I then told Jerry this claim would be fowarded to our workers compensation carrier Zurich and they would decide on how to proceed.

**Specific Location of Incident** (Building, Floor, Area, etc.)

Unknown

**Type of Injury** (Include specific body part)

Reported lower back.

**Witnesses** (Names & statements and to include contractor employee(s) if applicable)

None

**Investigation Team if PSM Related** (Investigation to occur within 48-Hours)

Person(s) Knowledgeable of Process:  Scott Becker

Person(s) Involved with Incident:  Marcus Dixon

Contractor Employee:    ☑ NA

**Environmental Conditions**

| Indoors / Outdoors | Weather | Surface | Lighting | Temp. (F) 36 |
|---|---|---|---|---|
| ☐ Indoors <br> ☐ Outdoors | ☐ Cloudy <br> ☐ Clear <br> ☐ Rain <br> ☐ Snow <br> ☐ NA | ☐ Slipping <br> ☐ Tripping <br> ☐ Uneven <br> ☐ NA | ☐ Good <br> ☐ Fair <br> ☐ Poor <br> ☐ NA | Unknown |

**Evidence Collected**
- ☐ Photographs
- ☐ Video
- ☐ Drug Screen
- ☑ Other      Explain:  Do not know where the employee got injured or if it even happened at work.

NEAL 0263

12


**LouisDreyfus**
Commodities

| Detailed Description of Incident *(Include attachments if needed)* |
|---|
| Unknown |

| Contributing Causes *(Include attachments if needed)* |
|---|
| Unknown |

| Type of Corrective Action Taken | |
|---|---|
| ☐ Work Practice Change<br>☐ Policy/Procedure Change<br>☐ Process/Equipment Change<br>☐ Employee Training<br>☑ Disciplinary Action<br>☐ Other | Need to use Disciplinary action regarding not reporting injurys. |

Investigator's Signature:

Title: Superintendent

Date: 12/22/16

| Management & Employee Review & Concurrence  *Give additional recommendations.* | | | |
|---|---|---|---|
| | | | |
| ☐Yes  ☐No | Employee: | | |
| ☐Yes  ☐No | Supervisor: | | |
| ☐Yes  ☐No | Superintentant: | | |
| ☐Yes  ☐No | SHE Manager: | | |
| ☐Yes  ☐No | Asst. Superintendent: | | |

rev 9-10-08                                   Page 2 of 2

NEAL 0264

13

**Corey Rubin**

| | |
|---|---|
| **From:** | Jacky Murphy |
| **Sent:** | Thursday, December 29, 2016 12:38 PM |
| **To:** | Scott Becker |
| **Cc:** | Dave Stafford; Gene Loffler |
| **Subject:** | RE: Jerry Neal 2240308214 |
| **Attachments:** | Jerry Neal2.xlsx |

Hi Scott,

Wage statement attached.  OT is paid at time and a half.  It is mandatory.

I assume you will respond to Carol with this information and address her other questions in her email?

Thank you,

Jacky



Jaclyn Murphy
Human Resources Supervisor
Phone:+1 816 218 2377 | Fax:+1 816 218 2389 | Email: Jaclyn.Murphy@ldcom.com Louis Dreyfus Company LLC
4800 Main Street Suite 600 Kansas City, MO 64112 / USA


-----Original Message-----
From: Scott Becker
Sent: Wednesday, December 28, 2016 11:26 AM
To: Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>
Cc: Dave Stafford <DAVID.STAFFORD@LDCOM.COM>; Gene Loffler <GENE.LOFFLER@LDCOM.COM>
Subject: FW: Jerry Neal 2240308214

Carol Ponzo from are workers compensation carrier has requested a wage statement form to be filled out for Jerry Neal.. Could you please forward to the correct person in payroll so it may be filled out.

-----Original Message-----
From: Carol Ponzo [mailto:carol.ponzo@zurichna.com]
Sent: Tuesday, December 27, 2016 4:15 PM
To: Scott Becker <Scott.Becker@ldcom.com>
Subject: Jerry Neal 2240308214

 Scott,

Please complete the attached wage statement and if there is any overtime, clarify if overtime is mandatory or optional and if it is paid at time and a half.

Since 11/25/16, what work days did Jerry miss and for what reason.

1

NEAL 0265 14

**Corey Rubin**

| | |
|---|---|
| **From:** | Mark Nemechek |
| **Sent:** | Tuesday, January 10, 2017 2:40 PM |
| **To:** | Amber Randall; Jacky Murphy; Dave Stafford |
| **Cc:** | Scott Becker; Gene Loffler; Marcus Dixon |
| **Subject:** | Jerry Neal Statement |
| **Attachments:** | Jerry Neal Statment .pdf |

All,

Jerry Neal came into the office today and filled out a statement on his back. Please see attached. Mentioned to Jerry, that HR would have to review his statement before we decide on how to proceed.

Thanks,
Mark Nemechek





**Mark Nemechek**
Assistant Superintendent
Phone: +1 618-857-7337
Mobile: +1 515-230-7678 Email:mark.nemechek@ldcom.com
Louis Dreyfus Company River Elevators LLC
46 Cargill Elevator Road
Cahokia, Illinois 62206

1

NEAL 0272    15

1/10/16

On 11/26/16 we finish Running the grain
Train. Around 3:00. Started house keeping
We started on the cross conveir sweeping,
shoveling ~~ett~~. Sprayed down tail section
And down the incline into the basement.
So while we were spaying, I notice the
suck pump was ~~a~~ not working. Stop using
the fire hose, to fix the drain pipe for the
suck pump in basement, so I clime out of the
Basement check drain pipe, I use the Air hose
to fix, Unclog the drain pipe, Once we got
the pipe clear. I return to the basement
to finish cleaning. We were using our normal
tools to clean which is Shovel, broom, etc
So we began to scoop grain. sweep into
piles, from the belts in the basement thier Alot
of grain that fall off the belt. ~~to the conveer~~
We repeat this prosess is through out the
day. the grian was wet and heavy it took around
1½ hours to clean it. I came out of the basement
finilized my papperwork. I was at the desk in
Railpit my lower back was feeling a little tight
so. I ~~sta~~ finish my papperwork, didn't think
nothing about it I thought maybe it will just
go away later, I call Scott Becker and told

NEAL 0273

16

him were done with train & house keeping
he told me thanks he appreciate the right
after that I clocked out got in my car and
went home. The very next day my lower back
was very sore couldn't bend over or move to fast

Jesus Neal  1/10/16

## Corey Rubin

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Wednesday, January 11, 2017 1:26 PM |
| **To:** | Gene Loffler |
| **Subject:** | FW: Jerry Neal Statement |

FYI

**From:** Amber Randall
**Sent:** Wednesday, January 11, 2017 10:01 AM
**To:** Scott Becker <Scott.Becker@ldcom.com>; Mark Nemechek <MARK.NEMECHEK@LDCOM.COM>; Marcus Dixon <Marcus.Dixon@ldcom.com>
**Cc:** Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Subject:** FW: Jerry Neal Statement

Hi Scott/Mark/Marcus,

Our Short Term Disability provider, Sun Life, received a Short Term Disability application directly from Jerry's physician. His doctor indicated that it is unknown whether Jerry's condition was due to injury/sickness arising out of his employment.

Please make sure that Jerry understands we will be closing the STD claim and filing only the Work Comp claim. Please let us know once you've relayed this message to him.

Thank you,



Amber Randall
**Human Resources Generalist**
Phone: +1 816 412 2779 | Fax: +1 816 218 2389 | Email: Amber.Randall@ldcom.com
**Louis Dreyfus Company Services LLC**
4800 Main Street Suite 600 Kansas City, MO 64112 / USA

**From:** Amy Khatib
**Sent:** Wednesday, January 11, 2017 9:12 AM
**To:** Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Amber Randall <AMBER.RANDALL@ldc.com>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal Statement

Hi Dave:

Sun Life sent us the APS that was filed for Mr. Neal. To the question is the condition due to injury/sickness arising out to patients employment, the doctor checked unknown. Before we close this claim with Sun Life, I just want to confirm that Jerry understands that we will be closing the STD claim and filing only the WC claim.

Thank you,

1

NEAL 0275 18

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Tuesday, January 10, 2017 4:08 PM
**To:** Amy Khatib <AMY.KHATIB@LDCOM.COM>
**Cc:** Amber Randall <AMBER.RANDALL@LDCOM.COM>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>
**Subject:** FW: Jerry Neal Statement

**From:** Mark Nemechek
**Sent:** Tuesday, January 10, 2017 1:40 PM
**To:** Amber Randall <AMBER.RANDALL@LDCOM.COM>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Scott Becker <Scott.Becker@ldcom.com>; Gene Loffler <GENE.LOFFLER@LDCOM.COM>; Marcus Dixon <Marcus.Dixon@ldcom.com>
**Subject:** Jerry Neal Statement

All,
    Jerry Neal came into the office today and filled out a statement on his back. Please see attached.
Mentioned to Jerry, that HR would have to review his statement before we decide on how to proceed.

Thanks,
Mark Nemechek



 

**Mark Nemechek**
Assistant Superintendent
Phone: +1 618-857-7337
Mobile: +1 515-230-7678 Email:mark.nemechek@ldcom.com
Louis Dreyfus Company River Elevators LLC
46 Cargill Elevator Road
Cahokia, Illinois 62206

2

NEAL 0276 19

## Corey Rubin

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Wednesday, January 11, 2017 1:51 PM |
| **To:** | Amber Randall; Mark Nemechek; Marcus Dixon |
| **Cc:** | Jacky Murphy; Dave Stafford; Gene Loffler |
| **Subject:** | RE: Jerry Neal Statement |

I have talked to Jerry about this @ 1015 am this morning.

Jerrys comments were he was just going to use the STD until the workers compensation kicked in.
And he was needing some type of compensation because he has been without a pay check for a while.

I commented that he presented the doctor's note with restrictions to Mark Nemechek on 12/14/2016. HR was informed on 12/19/2016 and it was decided to place Jerry on STD . Jerry was given the STD paper work on 12/20/2016 to be completed by him and his doctor. Then changed his story on 12/21/2016 saying he had been hurt at work. Due to him changing his story is the cause for the delay of any type of reimbursement. You cannot have both STD and workers compensation, its either one or the other.

On a side note, if Jerry would have stayed with the STD claim he would have already been receiving its benefits.

Any questions please give me a call

**From:** Amber Randall
**Sent:** Wednesday, January 11, 2017 10:01 AM
**To:** Scott Becker <Scott.Becker@ldcom.com>; Mark Nemechek <MARK.NEMECHEK@LDCOM.COM>; Marcus Dixon <Marcus.Dixon@ldcom.com>
**Cc:** Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Subject:** FW: Jerry Neal Statement

Hi Scott/Mark/Marcus,

Our Short Term Disability provider, Sun Life, received a Short Term Disability application directly from Jerry's physician. His doctor indicated that it is unknown whether Jerry's condition was due to injury/sickness arising out of his employment.

Please make sure that Jerry understands we will be closing the STD claim and filing only the Work Comp claim. Please let us know once you've relayed this message to him.

Thank you,



**Amber Randall**
**Human Resources Generalist**
Phone: +1 816 412 2779 | Fax: +1 816 218 2389 | Email: Amber.Randall@ldcom.com
Louis Dreyfus Company Services LLC
4800 Main Street Suite 600 Kansas City, MO 64112 / USA

NEAL 0277 20

**From:** Amy Khatib
**Sent:** Wednesday, January 11, 2017 9:12 AM
**To:** Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Amber Randall <AMBER.RANDALL@ldc.com>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Charise Twyne-Stokes <CHARISE.STOKES@ldc.com>
**Subject:** RE: Jerry Neal Statement

Hi Dave:

Sun Life sent us the APS that was filed for Mr. Neal. To the question is the condition due to injury/sickness arising out to patients employment, the doctor checked unknown. Before we close this claim with Sun Life, I just want to confirm that Jerry understands that we will be closing the STD claim and filing only the WC claim.

Thank you,

Amy



**Amy Khatib**
Health and Insured Benefits Manager
Phone: 203 761-4702 | Mobile: 203 451-0887 | Email: amy.khatib@ldcom.com
**Louis Dreyfus Company LLC**
40 Danbury Road Wilton, CT 06897 / USA

**From:** Dave Stafford
**Sent:** Tuesday, January 10, 2017 4:08 PM
**To:** Amy Khatib <AMY.KHATIB@LDCOM.COM>
**Cc:** Amber Randall <AMBER.RANDALL@LDCOM.COM>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>
**Subject:** FW: Jerry Neal Statement

**From:** Mark Nemechek
**Sent:** Tuesday, January 10, 2017 1:40 PM
**To:** Amber Randall <AMBER.RANDALL@LDCOM.COM>; Jacky Murphy <JACLYN.MURPHY@LDCOM.COM>; Dave Stafford <DAVID.STAFFORD@LDCOM.COM>
**Cc:** Scott Becker <Scott.Becker@ldcom.com>; Gene Loffler <GENE.LOFFLER@LDCOM.COM>; Marcus Dixon <Marcus.Dixon@ldcom.com>
**Subject:** Jerry Neal Statement

All,
   Jerry Neal came into the office today and filled out a statement on his back. Please see attached.
Mentioned to Jerry, that HR would have to review his statement before we decide on how to proceed.

Thanks,
Mark Nemechek

2

NEAL 0278  21

**Corey Rubin**

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Thursday, January 12, 2017 2:59 PM |
| **To:** | Amber Randall |
| **Cc:** | Gene Loffler; Mark Nemechek; Marcus Dixon |
| **Subject:** | Jerry Neal |

Zurich workers compensation called today explaining that Jerry has a lawyer handling his back injury case. Also Jerry has 2 workers comp cases going at the same time, so both cases will be handled by the same representative Meaka Benton. Her phone number is 847-706-2211.

Any questions please give me a call



**Scott Becker**
Superintendent
Phone: +1 618-857-7335| Mobile: +1 618-578-0541 |
Louis Dreyfus River Elevators LLC
46 Cargill Elevator Road
Cahokia, Illinois 62206

NEAL 0280  22

23

**Corey Rubin**

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Thursday, January 12, 2017 8:22 PM |
| **To:** | Mark Nemechek |
| **Cc:** | Daniel Murray; Gene Loffler; Scott Cogbill |
| **Subject:** | Workers compensation information |

Here is some information that may be helpful in your SHE meeting concerning our workers compensation provider

Jerry Neal #1
Date of injury 11-23-2015
Injury was caused by our barge cable hitting a leaf blower which Jerry was holding in his left hand. Possible injuries were his left hand and left Shoulder
Taken to Memorial Hospital in Belleville Illinois by yourself. No injuries were found and was released back to full duty on restrictions.
Zurich was notified, and Meaka Benton was assigned the claim. Meaka's telephone number is 847-706-2211. Claim number 2240293180
4-7-2016 received a letter from Jerrys attorney Brown & Brown filing suit against Louis Dreyfus for injury's resulting from the above injury date. This was forwarded to Zurich

Jerry had went back to the doctor and was getting medical treatment without us knowing. After a conversation with Meaka Benton, Jerry has continued to receive treatment for this injury and just recently was released by the attending Doctor. Meaka was going to contact Jerrys attorney and request a settlement agreement.

Jerry Neal #2
Date of injury depending on what day Jerry was asked is now 11-26-2016
Lower back strain
Reported to LDC 12-16-2016
No mention of this injury happening at work until 12-21-2016
Zurich was notified 12-22-2016
Carol Pongo was first to handle this claim, Claim # 2240308214, as of 1-12-2017 this claim has now been handed over to Meaka Benton , phone number again is 847-706-2211
Carol also added Jerry has again contacted the Brown & Brown law firm to handle this claim.

Hope this is what you and Dan are looking for. If you need anything else please give me a shout.



**Scott Becker**
Superintendent
Phone: +1 618-857-7335| Mobile: +1 618-578-0541 |
Louis Dreyfus River Elevators LLC
46 Cargill Elevator Road
Cahokia, Illinois 62206

1

NEAL 0281

**Corey Rubin**

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Monday, January 23, 2017 8:54 AM |
| **To:** | Gene Loffler |
| **Cc:** | Mark Nemechek; Marcus Dixon; Amber Randall; Scott Cogbill; Dave Stafford |
| **Subject:** | FW: Jerry Neal |

Will get these statements from Jason and Thomas today.    Also talked with Meaka Benton on Friday as well.  They, Zurich have discovered several inconsistency's in several of Jerrys statements.    Will keep you all posted.

**From:** Meaka Benton [mailto:meaka.benton@zurichna.com]
**Sent:** Thursday, January 19, 2017 2:24 PM
**To:** Scott Becker <Scott.Becker@ldcom.com>
**Subject:** RE: Jerry Neal

The employee reported via a recorded statement that Jason Reeves and Thomas Barrette were working with him on the alleged date of injury 11/26/16. Please confirm if Jason Reeves, Operator and Thomas Barrette, Operator were working with him on 11/26/16 when he claims he cleaned the basement (under the rail pit) and was shoveling  throughout the day, twisting to put grain in a bucket and sweeping grain on the floor. As he walked up the incline from the basement to the ground level, his lower back became tight. Please confirm and/or obtain statements from Jason Reeves and Thomas Barrette regarding what activities they were doing on the date of injury 11/26/16, with the employee as claim? Thanks.

Sincerely,

Meaka Benton
Zurich North America
Illinois Workers Compensation
PO Box 66941
Chicago, IL 60666-0941
****************************

847-706-2211 - Direct
847-240-8172 - Fax
****************************

Meaka.benton@zurichna.com

**From:** Scott Becker [mailto:Scott.Becker@ldcom.com]
**Sent:** Thursday, January 19, 2017 11:54 AM
**To:** Meaka Benton
**Subject:** Jerry Neal

Here is the STD form filled out by Jerry.. Also I think a copy of this somehow was sent to Carol Pongo . I have no idea who sent this to her…………….. it was not us.

CONFIDENTIAL
This message and any attachments (the "Message") are confidential and intended solely for the addressee(s). If you are not the intended recipient, any use, copying or dissemination is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return and delete this original

NEAL 0282    24

## Corey Rubin

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Friday, May 19, 2017 11:49 AM |
| **To:** | Amber Randall |
| **Cc:** | Mark Nemechek; Marcus Dixon; Gene Loffler; Dave Stafford |
| **Subject:** | FW: Jerry Neal |

FYI

**From:** Meaka Benton [mailto:meaka.benton@zurichna.com]
**Sent:** Friday, May 19, 2017 10:00 AM
**To:** Scott Becker <Scott.Becker@ldc.com>
**Subject:** RE: Jerry Neal

He continues to treat and we continue to deny treatment. Once treatment has been completed we will subpoena a full copy of medical records to confirm the extent of the injury and treatment sought to evaluate for exposure to settle on a disputed compromised basis. We continue to watch for a 19B/hearing notice based on the denial letter y issued. I will work closely with defense to bring the claim to resolution once litigation begins. Please see below the last office note on file confirming the current medical status. Thanks.

Medical:
Date: 04/13/2017    BodyPart: LOW BACK AREA
Summary: Protrusion of lumbar intervertebral disc. CC: Low back pain. Patient returns to the office today. He states that overall today he is having a better day. Impression: Patient is improving. Plan: Chiropractic manipulation of lumbar spine three times a week for six weeks. Continue physical therapy and HEP. Return on Monday.
Treated By: Ashley Eavenson DC

Sincerely,

Meaka Benton
Zurich North America
Illinois Workers Compensation
PO Box 66941
Chicago, IL 60666-0941
****************************

847-706-2211 - Direct
847-240-8172 – Fax

**Please use the following email address to send claim related documents , medical bills, reports, and expense bills for Zurich. Email: usz.zurich.claims.documents@zurichna.com**

***************************
Meaka.benton@zurichna.com

NEAL 0302    25

**Corey Rubin**

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Thursday, July 20, 2017 12:19 PM |
| **To:** | Amber Randall |
| **Cc:** | Dave Stafford; Mark Nemechek; Gene Loffler |
| **Subject:** | Brown and Brown, Jerry Neal |
| **Attachments:** | Brown and Brown 2017.pdf |

Received this in the mail today

1

NEAL 0316   26

Daniel J. Brown+
C. Edward Brown+
David J. Jerome+
Ely Hadowsky+
Mark A. Cordes+
Kenneth B. Beljanski*
Richard E. Salmi+
Kelsey Johnson°
Greg Motil+
Jaye R. Lindsay*
John P. Zimmerman+

\* Licensed in IL
° Licensed in MO
+ Licensed in MO & IL



**BROWN&BROWN** LLP

(618) 888-8888

Offices in Saint Louis
& Fairview Heights

5440 North Illinois, Suite 101
Fairview Heights, IL 62208
Fax (618) 234-4818

BrownLawOffice.com

July 14, 2017

**VIA CERTIFIED U.S. MAIL**

9171 9690 0935 0161 7694 23

Louis Dreyfus Corporation
#46 Cargill Elevator Road
Cahokia, IL 62206

RE:     Jerry Neal, Jr. v. Louis Dreyfus Corporation
        Date of Injury: 11/23/15

Dear Sir or Madam:

        Enclosed please find the following:

1.      Correspondence to attorney Andy Kovacs dated 5/23/17 with corresponding off
        work slip.

        It is my understanding that you have terminated my client based upon an allegation that
you were not provided information regarding his off work status. However, I have enclosed for
your review correspondence sent to your attorney confirming this status. Furthermore, opposing
counsel has confirmed that he received this letter and forwarded it to you on May 26, 2017. As a
result, you were made fully aware of my client's off work status and you were even provided the
corresponding off work slip confirming this status.

        As a result, I would ask that you review this termination process and reinstate my client's
employment. Alternatively, if his employment is not reinstated, we will consider this retaliation
for his filing this workers compensation case and will seek the appropriate civil redress. Please
review this and get back to me within the next 14 days to let me know how you wish to proceed.
I look forward to hearing from you on this issue.

                                Yours very truly,

                                David J. Jerome
                                BROWN & BROWN
                                Attorneys at Law

DJJ/kao
Enclosure
cc: Jerry Neal

NEAL 0317   27

## Corey Rubin

| | |
|---|---|
| **From:** | Dave Stafford |
| **Sent:** | Thursday, July 20, 2017 1:49 PM |
| **To:** | Gene Loffler; Scott Becker; Amber Randall |
| **Cc:** | Mark Nemechek |
| **Subject:** | RE: Brown and Brown, Jerry Neal |

No need for call.. will send to legal and Jo Jo.. this is a result of his w/c claim and his attorney communicating with Zurich attorney and not us.  We sit tight.  Will advise after visiting with our attorneys.

Thanks

**From:** Gene Loffler
**Sent:** Thursday, July 20, 2017 11:50 AM
**To:** Scott Becker <Scott.Becker@ldc.com>; Amber Randall <AMBER.RANDALL@ldc.com>
**Cc:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>
**Subject:** RE: Brown and Brown, Jerry Neal

We need to discuss this. Does Fri 8:30 am you time work for everyone?

Need a timeline of what happened when and what info we have on this.
Thanks

**From:** Scott Becker
**Sent:** Thursday, July 20, 2017 9:19 AM
**To:** Amber Randall <AMBER.RANDALL@ldc.com>
**Cc:** Dave Stafford <DAVID.STAFFORD@ldc.com>; Mark Nemechek <MARK.NEMECHEK@ldc.com>; Gene Loffler <GENE.LOFFLER@ldc.com>
**Subject:** Brown and Brown, Jerry Neal

Received this in the mail today

1

NEAL 0318    28

Page 1 of 3



**NEAL, JERRY L**
35 Y old Male, DOB: ___ 1981
Account Number: ___
532 ST JAMES DR, CAHOKIA, IL-62206-1729
Home: 618-337-6246
Guarantor: NEAL, JERRY L   Insurance: Aetna Health Plans
Payer ID: ___
PCP: KRISTEN NICOLE MASSEY
Appointment Facility: MMG Internal Medicine Belleville 360

12/14/2016     **Progress Notes: NIDAL SHAWAHIN, MD**

## Current Medications
**Taking**
- Aleve PM(Naproxen Sod-Diphenhydramine) 220-25 MG Tablet
- Medication List reviewed and reconciled with the patient

## Past Medical History
No Medical History

## Surgical History
Denies Past Surgical History

## Family History
Mother: alive
Father: alive

## Social History
Tobacco Use:
Tobacco Use/Smoking
Are you a *current smoker*
How many cigarettes a day do you smoke?
*11-20*

## Allergies
N.K.D.A.

## Hospitalization/Major Diagnostic Procedure
Denies Past Hospitalization

## Review of Systems

General/Constitutional:
Denies Change in appetite. Denies Fever.

Ophthalmologic:
Denies Discharge. Denies Red eye.
Denies Eye problems.
ENT:
Denies Difficulty swallowing. Denies Ear problems. Denies Nose/Throat problems.
Endocrine:
Denies Cold intolerance.
Denies Dizziness. Denies Heat intolerance.
Denies Weight loss.
Respiratory:

## Reason for Appointment
1. C/o lower back pain that radiates down rt legx 2 weeks

## History of Present Illness
Depression Screening:
PHQ-2 In last 2 weeks have you been bothered by
Little interest or pleasure in doing things *No*
Feeling down, depressed, or hopeless *No*
HPI:
The patient complains of lower back pain of 2 weeks' duration with radiation down the right buttock area, it is sharp and about 7 in a scale of 1-10 and persistent. He takes Aleve with slight relief. He denied numbness in the lower extremities and no incontinence. The patient does not recall certain injury or trauma but he said that he does heavy lifting sometimes at work and he cannot rule that out as a possible cause.

## Vital Signs
Temp 97.4 F, HR 72 /min, BP 122/80 mm Hg, Wt 221 lbs, BMI 28.37 Index, Ht 74 in, RR 18 /min, Ht-cm 187.96 cm.

## Examination
General Examination:
GENERAL APPEARANCE: Pleasant, well-nourished, well-developed, in no acute distress.
EYES: Pupils equal, round, reactive to light and accommodation PERRLA, extraocular movement intact (EMOI).
EARS: Tympanic membrane intact, translucent, auditory canal clear.
NOSE: Nares patent.
ORAL CAVITY: Good dentition, gums normal, no lesions, mucosa moist, oropharynx clear.
THROAT: No erythema, no exudate.
NECK/THYROID: Neck supple, full range of motion, no lymphadenopathy, thyroid nontender.
SKIN: No rashes, no suspicious lesions, palpation without induration.
HEART: Regular rate and rhythm, no murmurs, rubs, gallops, clicks.
LUNGS: Clear to auscultation bilaterally, unlabored breathing

NEAL 0346

29

Denies Cough. Denies Wheezing. Denies Shortness of breath.
Cardiovascular:
Denies Dizziness. Denies Chest pain. Denies Swelling in hands/feet. Denies High blood pressure.
Gastrointestinal:
Denies Constipation. Denies Diarrhea. Denies Nausea. Denies Vomiting.
Hematology:
Denies Easy bruising. Denies Bleeding problems.
Genitourinary:
Denies Blood in urine. Denies Frequent urination. Denies Painful urination. Denies Incontinence.
Musculoskeletal:
Denies Painful joints. Denies Joint stiffness.
Peripheral Vascular:
Denies Decreased sensation in extremities. Denies Painful extremities.
Skin:
Denies Rash. Denies Discoloration.
Neurologic:
Denies Memory loss. Denies Seizures. Denies Tingling/Numbness. Denies Fainting.
Psychiatric:
Denies Anxiety. Denies Depressed mood. Denies Difficulty sleeping. Denies Stressors.

without retraction.

ABDOMEN: Soft, nontender, nondistended, bowel sounds present, no hepatosplenomegaly, no masses palpable.

BACK: Localized tenderness in the lower lumbar area and the right buttock area, no muscle spasm, lumbar flexion limited to 100?, negative leg raising test bilaterally.

MUSCULOSKELETAL: Normal gait and station, no swelling or deformity, full range of motion.

EXTREMITIES: No clubbing, cyanosis, or edema.

NEUROLOGIC: Cranial nerves II through XII grossly intact, deep tendon reflexes 2+ symmetrical, sensory exam intact.

## Assessments

1. Low back pain - M54.5 (Primary)

## Treatment

### 1. Low back pain

Start Baclofen Tablet, 10 MG, 1 tablet with food or milk, Orally, Three times a day, 10 days, 30 Tablet

Start Mobic Tablet, 15 MG, 1 tablet, Orally, Once a day, 30 day(s), 30

Notes: The patient complains of lower back pain of 2 weeks' duration which sounds like muscular. He was started on baclofen and Mobic and side effects including dizziness and tiredness explained to the patient and he was given a note for no lifting or carrying for 2 weeks and we advised him to apply ice to the area and we well see him again for follow-up in 2 weeks ,Back Pain: Care Instructions material was printed.

**Follow Up**
2 Weeks

*N. Shawahin*

**Electronically signed by NIDAL SHAWAHIN , MD on 12/16/2016 at 09:32 AM CST**

**Sign off status: Completed**

MMG Internal Medicine Belleville 360

Patient: NEAL, JERRY L   DOB: ███ 1981   Progress Note: NIDAL SHAWAHIN, MD   12/14/2016
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*


Louis Dreyfus Company

Louis Dreyfus Company
4800 Main St., Suite 600
Kansas City, MO. 64112
United States of America

www.ldc.com

816-756-3560

June 28, 2017

Jerry Neal
532 St. James
Cahokia, IL  66206

Re:    Employment with Louis Dreyfus Company Services, LLC

Dear Mr. Neal:

This letter will confirm that your employment with Louis Dreyfus Company Services, LLC (the "Company") has been terminated effective June 19, 2017.

You were on a leave of absence with the Company that extended beyond six months.  On May 4, 2017, you were advised that you needed to contact the Company on or before June 19, 2017 to discuss your employment status including any potential accommodations that may allow you to return to work.  You were also instructed to submit current medical documentation.  Although you were provided several weeks to comply with this request, you did not contact the Company or see a doctor prior to this deadline.  The medical paperwork you recently provided indicates that you were released to return to work as of June 22, 2017, however, you did not report to work or contact the Company until late in the day on June 26, 2017.

The Company has terminated your employment effective June 19, 2017 based on your failure to timely respond to the May 4, 2017 letter as well as your violation of the Company's Attendance Policy.  As you know, a failure to report to work without notifying the Company for three consecutive work days is considered a job abandonment.

On behalf of the Company, thank you for the services you have provided during your employment.

Sincerely,

R. David Stafford
Sr. Regional Human Resource Mgr.    68·560- 4163

11:40 Am 6/28 - left message for him to call back.
10:00 Am 6/29 - Jerry called - notified him the company had terminated his employment. He asked why - explained that we had sent letter (read 2 sentences in 2nd ¶).
— Said his attorney would contact the company upon receipt of the letter —

NEAL 0400  31

11:55 - Jerry called to say his attorney sent letter ~~them~~ + did we recive it? I told him no I wasn't aware of any such letter + asked who was sent to + Jerry said to OUR attorney + I asked Who that was + he said a Jeffry or Andy Cofax - told Jerry no idea who that was but wasn't an attorney I knew - Jerry said he'd call his attorney.

NEAL 0401   32

5240-0115

Illinois Department of Employment Security

P.O. Box 19509
Springfield, IL 62794
Phone: (800) 244-5631 · TTY: (800) 244-5631
Fax: (217) 557-4913
www.ides.illinois.gov



1059617771

LD COMMODITIES SERVICES LLC
40 DANBURY RD
WILTON, CT  06897-4441

| | |
|---|---|
| Date Mailed: | 07/14/2017 |
| Employer Account Number: | 4615866 |
| FEIN: | 273305101 |
| Claimant SSN: | 0655 |
| Reply Due Date: | 07/24/2017 |

## Notice of Claim to Benefit Chargeable Employer

The claimant listed below has filed a claim for Unemployment Insurance. Please review the information carefully. If you wish to protest the claimant's right to benefits for any reason other than the claimant's involvement in a Labor Dispute, you must do so in writing by attaching a signed letter to this notice which includes the claimant's name and Social Security Number.  Provide a detailed and complete statement of facts supporting your allegation and mail or fax  the statement  by 07/24/2017 to  the Agency at the address listed above.

IF YOU ARE RESPONDING TO THIS NOTICE, PLEASE PLACE ADDITIONAL DOCUMENTS BEHIND ANY BAR-CODED PAGE.

If you are registered as a SIDES Employer, and you also received an E-mail notification regarding this notice, please respond using the SIDES E-Response process by logging into https://uisides.org/sew-s/views/login.

If you would like to begin receiving or responding to Notices of Claims electronically, you may register with SIDES at https://taxnet.ides.state.il.us. Once you have registered with SIDES E-Response you will start to receive E-mail notifications that you have requests pending.  Only at this time will your SIDES account be activated and you can begin responding to Notice of Claims electronically. If at the time you receive this notice you are not registered for SIDES, you cannot respond electronically to this notice.

IMPORTANT INFORMATION: If you DO NOT wish to protest this claim, no response is necessary.
HOWEVER: If you do respond to this notice please submit your response only once. If you respond electronically via SIDES then please DO NOT fax or mail your protest or response as well.

| Last Name: NEAL | Suffix: | Other Last Name: | |
|---|---|---|---|
| First Name: JERRY | Middle Initial: L | Benefit Year Begin Date: 07/09/2017 | |
| Date of Claim: 07/09/2017 | Claim ID:15017608 | Claim Type: New | Program: Regular |
| First Day Worked: 09/01/2015 | Last Day Worked: 12/19/2016 | Reason for Separation: Laid-Off (Lack of Work) | |
| Return to Work Date: Unknown | Claimant Resides In: IL | State Worked In: IL | Dependent:Dependent Under 18 |

The wages shown represent earnings the claimant received from you during the base period. A worker's base period consists of the first four of the last five completed calendar quarters immediately preceding the month in which the benefit year begins. The alternate base period is the last four completed calendar quarters immediately preceding the benefit year.

Benefit Year Begin Date: 07/09/2017
Total Base Period Wages: $39,367.46

| | | |
|---|---|---|
| Base Period Qtr: 2 | Base Period Year: 2016 | Wages: $12,514.96 |
| Base Period Qtr: 3 | Base Period Year: 2016 | Wages: $12,707.48 |
| Base Period Qtr: 4 | Base Period Year: 2016 | Wages: $13,941.24 |
| Base Period Qtr: 1 | Base Period Year: 2017 | Wages: $203.78 |

NEAL 0404    **33**



LD COMMODITIES SERVICES LLC    07/14/2017
Claimant Name: JERRY L. NEAL    SSN: █████0655

This notice is being sent to you because you are the Chargeable Employer for whom the claimant worked for 30 days (not necessarily consecutively) from the beginning of the claimant's Base Period to the "Date of Claim." You will be charged for any benefits paid to him/her. There is no connection between the amount that you paid the claimant and the amount you will be charged. The claimant's benefits are based on his/her wages during the first four of the last five completed calendar quarters (Base Period) prior to the claimant's "Benefit Year Begin." You will be charged for the benefits paid even if the wages you paid the claimant are not used in calculating his/her benefits.  If the claimant worked for you for less than 30 days, you can be charged because you were the single employer that paid the claimant enough wages to requalify the claimant after a disqualifying separation from a previous employer. Rules on charging can be found at 56 Ill. Adm. Code 2765.325 et seq.  [See www.ides.Illinois.gov under rules.]

FOR INFORMATION REGARDING YOUR RIGHTS UNDER ILLINOIS' UNEMPLOYMENT INSURANCE ACT, INCLUDING INFORMATION ON HOW TO OBTAIN FREE LEGAL SERVICES, AND THE EXACT LANGUAGE OF THE ACT AND IDES RULES, PLEASE VISIT THE AGENCY'S WEBSITE AT www.ides.illinois.gov/UIRights.

If you wish to protest the claimant's right to benefits because he/she received vacation pay in connection with his/her separation. In your response, you must indicate the period covered by the vacation pay and the amount of the pay. Your protest must be filed by the "Reply Due Date" or within 10 days of the date that the vacation pay is paid or becomes payable. If the payment was made for an announced period of vacation or inventory shutdown, it is not necessary to make this designation.

Appeal Rights
If your protest is not postmarked, faxed, or successfully submitted via SIDES by the "Reply Due Date", you will not have the right to appeal a determination that is not in your favor. However, you can protest at any time that the claimant was not able, available or actively seeking work, giving details. You can also protest anytime that the claimant was not unemployed or that the claimant is receiving a retirement pension. In those cases, you would have the right to appeal a determination for periods after the date that you filed your protest. Even if your protest is late, we will still consider any information that you provide. However, you will not be able to appeal our determination.

If you wish to request a change of address for forms such as Notice of Claims (ADJ030F), Employer Contribution and Wage Report (UI-3/40), Statement of Benefit Charges (BEN 118), send a written request to Illinois Department of Employment Security (IDES) Revenue-Employer Account Analysis at 33 S. State St 10th Floor, Chicago, IL  60603 or fax to (312) 793-5009. NOTE: All agents must have power of attorney on file to request a change of address.

Please complete, sign and return this form by 07/24/2017, to the Agency at the address listed above.
NOTE: If you choose to fax your protest, it is not necessary to mail as well.

IF YOU ARE RESPONDING TO THIS NOTICE, PLEASE PLACE ADDITIONAL DOCUMENTS BEHIND ANY BAR-CODED PAGE.

| Please select one of the following and complete all other related information: |
| --- |
| ☐ I did not employ the claimant for 30 days<br><br>Start Date: __ __ / __ __ / __ __ __ __      End Date: __ __ / __ __ / __ __ __ __<br><br>Total Number of Days Worked: _____ |
| ☐ Leased employee  (Please identify leasing Agency Name and Address) |
| Agency Name |

| Address 1 | Address 2 (Apt., Floor, Suite, etc.) | |
| --- | --- | --- |
| City | State | Zip Code |

| ☐ Claimant never worked for me        ☐ Claimant is not unemployed    *NOTE: Claimant may still be eligible if working part-time | | |
| --- | --- | --- |
| I certify that the information contained herein is true and correct. | | |
| Name (printed): | Signature: | |
| Title: | Contact Name (if different): | |
| Date: | Telephone Number: | |

J30F

NEAL 0405    34

LD COMMODITIES SERVICES LLC 07/14/2017
Claimant Name: JERRY L. NEAL SSN: ███████0655

Employer's Response to UI Claim:

Mr. Neal began employment on August 20, 2015 as a Grain Elevator operator at our Cahokia, Illinois facility. On December 20, Mr. Neal was taken off work by his Health Care provider due to a back injury. He remained in a leave status collecting Short Term disability benefits until April 20th when it could not be substantiated that he was in fact 'totally disabled' as required by the terms of the plan.

On May 4th, Mr. Neal was sent a letter notifying him that his employment would be terminated on June 19 unless prior to that date he contacted the Company to discuss his employment status including possible accommodations that may allow him to return to work. The Company also requested Mr. Neal to provide updated medical documentation prior to June 19th. Mr. Neal did not bother to provide an update until June 26 at 2:00 PM CDT when he appeared at the facility with a note from his physician stating he was examined and released on June 22nd with restrictions. The note went on to state that he could resume full duties on July 3.

Although Mr. Neal had been released to return to work as of June 22, he did not notify the Company of his absence for his scheduled shifts on the 22nd, 23rd. or the 26th and did not show up for work on any of those dates. Such conduct violates the Company's attendance policy. Furthermore, Mr. Neal failed to properly respond prior to June 19th regarding his return to work status or his medical condition. The Company had already taken actions to fill his position based on the assumption that Mr. Neal was not interested in returning to work. Mr. Neal was terminated effective June 19, 2017 for failing to notify the Company of his absence from work, failing to keep us informed as to his ability to return to work as requested.

Mr. Neal is unemployed only due to his lack of attention and failure to meet minimally reasonable standards of attendance and communications.

NEAL 0406    35

**LouisDreyfus⊟**

Louis Dreyfus Corporation          Telephone 816 756-3560
Kansas City Board of Trade
Suite 274
Kansas City, Missouri
64112-2505

Fax Transmittal

To   Ill. Dept Empl. Sec.          From   LDC

                                   Date   7/24/17

                                   Pages     including this page   4

                                   cc

Fax   217·557·4913

This fax communication is intended for the use of the individual to whom it is addressed and may contain information that is proprietary, confidential or privileged. If you are not the intended recipient (and/or employee or agent responsible for delivering this communication to the intended recipient), you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify sender by telephone immediately and return it to the sender by mail. Sender will reimburse you for any expense incurred. Thank you. If any problems occur during transmission, please call 816 756-3560.

NEAL 0407    36

# FAX CONFIRMATION

**Result: Success**

## Sent by:

Name: Walkup

Voice Number:

Fax Number:

RightFax ID: WALKUP

## Sent to:

Name: Fax User

Company:

Number/Address: 912175574913

Voice Number:

Remote CSID: State of IL 841

## Details:

Type: FAX

Cover Sheet: does not have a cover page

Body Pages: 4

Billing Code #1:

Billing Code #2:

Unique ID: WAL5977015D5FAC

Fax Channel: 0

Scanning Device:

Scanned at: 07/25/17 08:29:05

Submitted at: 07/25/17 08:29:16

Completed at: 07/25/17 08:46:55

**Corey Rubin**

| | |
|---|---|
| **From:** | Scott Becker |
| **Sent:** | Friday, March 03, 2017 8:55 AM |
| **To:** | Meaka Benton |
| **Cc:** | Mark Nemechek; Marcus Dixon; Gene Loffler |
| **Subject:** | Jerry Neal |
| **Attachments:** | Jerry Neal 2-28-2017.pdf |

Jerry dropped this doctors note off yesterday 3-2-2017.  I had a short conversation with Jerry asking him if he had the same restriction as before, and he replied yes.  And he also added that he had taken a MRI and it had shown 2 slipped disc in his lower back.  He did not give a date of the MRI or where it was done at.  I replied by only saying , well if anything changes to let us know.

Any questions please give me a call @ 618-578-0541

NEAL 0286    38

# Deposition of:
# **Amy Khatib**

**Date:** December 2, 2022

**Case:** Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC

**Reporter:** Nancy Naas Harmon, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

EXHIBIT

4

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 3

INDEX OF EXHIBITS

Plaintiff's Group Exhibit Number 1
Documents (138 pages)

IT IS STIPULATED AND AGREED by and between counsel for Plaintiff and counsel for Defendant that the deposition of AMY KHATIB may be taken by videoconference pursuant to the Federal Rules of Civil Procedure by and on behalf of the Plaintiff on December 2, 2022, from the law offices of Byron, Carlson, Petri & Kalb, LLC, 411 St. Louis Street, Edwardsville, Illinois, before Nancy Naas Harmon, Certified Court Reporter for the State of Missouri, Certified Shorthand Reporter for the State of Illinois, Registered Professional Reporter; that the issuance of notice is waived; and that this deposition may be taken with the same force and effect as if all Federal Rules had been complied with.

IT IS FURTHER STIPULATED AND AGREED that the signature of the deponent is reserved.

(On the record at 9:06 a.m.)

AMY KHATIB, produced, sworn, and examined as a witness on behalf of the Plaintiff, testified and deposed as follows:

---

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JERRY NEAL, JR.,                )
                                )
            Plaintiff,          )
                                )
     vs.                        )  No. 3:21:CV-00820-GCS
                                )
LOUIS DREYFUS COMPANY           )
SERVICES LLC,                   )
                                )
            Defendant.          )

Videoconference Deposition of
AMY KHATIB
December 2, 2022

INDEX
Questions by:          Page:
Mr. Ezra               4, 97
Mr. Clark              90

REPORTER:  Nancy Naas Harmon, CSR, RPR
MO #986, IL #084-003219
Keefe Reporting Company
11 North 44th Street
Belleville, Illinois  62226

---

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JERRY NEAL, JR.,                )
                                )
            Plaintiff,          )
                                )
     vs.                        )  No. 3:21:CV-00820-GCS
                                )
LOUIS DREYFUS COMPANY           )
SERVICES LLC,                   )
                                )
            Defendant.          )

APPEARANCES:

For Plaintiff:
        D. Jeffrey Ezra, Esq.
        BYRON CARLSON PETRI KALB, LLC
        411 St. Louis Street
        PO Box 527
        Edwardsville, IL  62025
        jezra@bcpklaw.com

For Defendant:
        Aaron A. Clark, Esq.
        McGRATH NORTH MULLIN & KRATZ, PC LLO
        First National Tower, Suite 3700
        1601 Dodge Street
        Omaha, NE  68102
        aclark@mcgrathnorth.com

Videoconference Coordinator:
        Ms. Linda Donner, Mudge Legal Video

---

Page 4

DIRECT EXAMINATION
BY MR. EZRA:

Q.  Ms. Khatib, am I stating your last name correctly?

A.  Yes.

Q.  Great.  Ms. Khatib, my name is Jeff Ezra. I am one of the attorneys that represents Gary Neal in a claim that has been brought against Louis Dreyfus.  Have you had your deposition taken previously?

A.  No, I have not.

Q.  All right.  So let me give you some ground rules, and I think we all agree that yesterday's deposition was a little painful, and we're going to try to make that as less painful for you as we possibly can. I'm going to ask you a series of questions.  Please answer those questions verbally because the court reporter cannot take down a nod of the head or uh-huh you or an uh-huh, okay?

A.  Yes.

Q.  All right.  If there is a question that you do not understand, please let me know and I'll be happy to rephrase it.  Fair enough?

1 (Pages 1 to 4)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 5

A.   Yes.

Q.   And if you want to take a break -- We may take a break, but you want to take a break, please by all means just let us know and we'll do so.  All that we ask is if there is a question pending at the time you want to take a break that you answer the question before we take a break.  Is that reasonable?

A.   Yes.

Q.   All right.  Ms. Khatib, where do you currently reside?

A.   Wilton, Connecticut.

Q.   And I learned yesterday that Wilton is where one of the main offices of Louis Dreyfus is located; is that correct?

A.   Yes.

Q.   Is that its international headquarters?

A.   No, we are not the international headquarters.

Q.   Are you the national headquarters?

A.   Yes.

Q.   Okay.  And how long have you lived at your current address?

A.   35 years.

Q.   Would you give us a little understanding of

Page 6

your educational background, please.

A.   I graduated from the University of Delaware with a BA in sociology.

Q.   What year?

A.   1981.

Q.   Any other -- I'm sorry.  Any post-graduate work?

A.   No.

Q.   Do you have any certifications that you obtained through your work with Louis Dreyfus?

A.   No, I do not.

Q.   What is your current job at Louis Dreyfus?

A.   My job is I'm the Health and Insured Benefits Manager for North America.  In addition to that, I handle all the leave policies for North America.

Q.   For the entire country?

A.   Yes, U.S. and Canada.

Q.   So explain to me, if you will, in a synopsis as best you can what exactly your job entails.

A.   For the health and welfare plans, I manage those, everything from enrollment in all of our health and group insurance plans as well as dealing with any issues that come up, working on plan renewals, open enrollments, all aspects of health and welfare.  For my

Page 7

leave role, I manage the policies and procedures for North America.  I am at the corporate level, so I oversee what's happening regionally.

Q.   So in Mr. Neal's case, there were issues, and he received short-term disability.  Would that have been something that you would have been involved in?

A.   Yes.

Q.   Is that something that you would be, for lack of a better term, the overseer with regard to how it would apply to Mr. Neal?

A.   No.

Q.   All right.  Why not?

A.   I don't make the claim determinations for STD.

Q.   Okay.  Who makes those determinations?

A.   They are made by our third-party administrator, which is currently Prudential.  At that time --

Q.   Did you --

A.   I'm sorry.

Q.   No, I cut you off.  Please, by all means.

A.   At the time of this case, our STD was being administered by Sun Life.

Q.   Do you coordinate with the administrator

Page 8

with regard to whether short-term disability claims should be processed or not, based upon the injury or whatever the employee is claiming?

A.   No.

Q.   So how is your -- Do you have any involvement with the administrator at all after a determination is made that short-term disability benefits are going to be provided?

A.   No.

Q.   Do you have any interaction with them in terms of whether short-term disability benefits are going to be provided at all?

A.   Yes.

Q.   What is your involvement in that process?

A.   Generally the process is that the claim will come to my office here.  We will complete an employer statement and send it on to the carrier.

Q.   What kind of statement does the employer make?

A.   The employer fills out just the basic information -- name, address, social.  The main reason we need to see it, of course, is for plan eligibility, that they're eligible for the coverage and then also to get their pay rate so that they can be paid correctly.

2 (Pages 5 to 8)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 9

Q. And when the claim comes to you, do you make a determination whether the person is eligible for short-term disability and/or whether there is a possibility that it might be a workers' compensation claim?

A. No, I do not.

Q. So if you see a claim that comes to you that you may think is ripe or better for a workers' compensation claim, what do you do with it --

MR. NEAL: Objection, form.

Q. -- if one comes across your desk?

A. If an STD claim comes across my desk, it is filed with the STD administrator.

Q. Do you have the right or the opportunity to suggest that an STD claim be closed out because it may be a workers' compensation claim?

A. No.

Q. Have you been involved in any situations where there is a question of a claim that comes across your desk as to whether it may be a short-term disability claim or it may, in fact, be a workers' compensation claim?

A. Yes.

Q. When that situation occurs, what do you do?

Page 10

A. If the claim is being filed by the employee for STD, we send it to the STD administrator.

Q. And what if the employee subsequently files a workers' compensation claim, are you made aware of that?

A. Not all the time.

Q. Okay. In those instances that you are made aware, is there anything that you do in that situation once you were made aware that the employee has filed a workers' compensation claim but filed for short-term disability benefits?

A. I'm sorry. Could you repeat the question.

Q. Sure. If a claim comes across your desk where -- I'm sorry. Strike that. If you are made aware that an individual has filed a short-term disability claim but has also filed a workers' compensation claim, what, if anything, do you do when that hits your desk?

A. If the claim has already been filed, I would notify the STD administrator.

Q. And you then would leave it up to them to determine whether it should be closed out because he or she filed a workers' compensation claim?

A. That's correct.

Q. In that situation when you find out that an

Page 11

individual has indeed filed a workers' compensation claim, do you have the opportunity or the right to state to the administrator, "Hey, we here think you should close it out because they filed a workers' compensation claim"?

MR. CLARK: Objection to form.

A. No, we do not.

Q. Are you involved at all in the termination of employees at Louis Dreyfus?

A. Yes.

Q. What is your role in that?

A. I'm only involved when it is a leave case.

Q. When you say "a leave case," we're talking about a short-term disability leave case or even a long-term disability leave case?

A. It would only be for medical leaves, whether short-term disability, medical disability pay under the salary plan or workers' compensation.

Q. So you are involved in the determination of situations where an individual has filed a workers' compensation claim?

A. Yes.

Q. What is your involvement with that then?

A. My involvement would be based on the leave

Page 12

policy for employees on approved medical leaves of absence.

Q. Explain to me what you mean by "leave policy," please.

A. Our leave policy states that after 26 weeks of disability, your employment is terminated.

Q. When you use the term "disability," you mean the inability of that individual to be able to return to work within 26 weeks?

A. Yes.

Q. And that inability to return to work within 26 weeks applies whether the individual has filed -- I apologize. Let me rephrase it. And that inability to return to work and termination within 26 weeks applies whether the individual suffered a work-related injury or an injury that is non-occupational; is that correct?

A. That is correct.

Q. So I want to make sure I have an understanding. An individual gets injured at Louis Dreyfus. And bear with me. This is a hypothetical. It's a severe injury. It's clear that that individual, because of the injury, is not going to return in 26 weeks. In addition to that person, you know, going through medical and trying to get better, if it's clear

3 (Pages 9 to 12)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 13

that that person is not going to come back in 26 weeks, he is going to get a letter in 26 weeks saying you're fired; is that correct?

MR. CLARK: Objection, form.

Q. Is that correct?

MR. CLARK: Same objection.

A. Yes, they will get the 26-week letter.

Q. All right. So an individual, who through potentially no fault of his own gets injured on the job severely enough where he's not going to come back to work or can't come back to work in 26 weeks, he is going to get fired, correct?

MR. CLARK: Objection, form.

A. His employment will be ended.

Q. Okay. And how long have you worked at Louis Dreyfus?

A. 33 years.

Q. And did you work anyplace else before Louis Dreyfus?

A. Yes, I did.

Q. Where did you work?

A. I worked at Winchester Hospital in Massachusetts.

Q. And what did you do at Winchester?

Page 14

A. I was a human resources assistant. That's way back. I'm sorry. It's been a long time.

Q. That's okay. It's a strange question. Why are you asking me something that happened 34 years ago, right? I get it.

A. That's okay.

Q. In the 33 years that you have been at Louis Dreyfus, has this policy regarding 26 weeks been in existence?

A. Yes.

Q. And does this apply throughout the entire system so that if you, for example, were to get injured on the job and you could not come back within 26 weeks, you would be fired?

A. Yes.

(Plaintiff's Group Exhibit Number 1 was marked for identification at the conclusion of the deposition.)

Q. Ms. Khatib, I'm going to apologize to you because we have some documents, and I'm going to be jumping around, so if you can bear with me. We are going to be bouncing around with documents and stuff, so I'll ask, Ms. Khatib, for you to bear with me.

Did you review any documents in

Page 15

anticipation of your deposition today?

A. Yes.

Q. Tell me what you reviewed, please.

A. I reviewed certain emails, certain medical letters, just certain information related to this case.

Q. Well, and I appreciate that. Could you be more specific? Do you recall specifically or at least some of the materials specifically that you reviewed?

A. I reviewed the letter that I had sent to Mr. Neal. I reviewed --

Q. Was that -- I'm sorry. Excuse me. Was that the May 4 letter?

A. Yes, that's correct.

Q. Okay. Please continue.

A. I reviewed some of the long-term disability correspondence. I reviewed emails from Dave Stafford and other people going back and forth to refresh my recollection of this case.

Q. Do you have them with you?

A. Yes, I do.

Q. Okay. Did you review emails that you had actually sent out to others?

A. Yes. Not all of them.

Q. That's an interesting question. How do you

Page 16

know that they're not all of them?

A. Because there was a lot of correspondence back and forth.

Q. So the pile that you got or whatever you're looking at you're pretty sure is not the extent of the amount of information that was exchanged back and forth, correct?

A. No. I have not -- Would you please repeat the question.

Q. Sure. Sure. You believe that there is more correspondence that you may have been involved in, whether you sent it out or received it, than what you reviewed in anticipation of your deposition today; is that correct?

A. No. No.

Q. That's not correct?

A. No.

Q. You believe you've seen everything?

A. I have not reviewed everything I received.

Q. Oh, okay. The materials that you have in front of you or that you have available to you, do those include the materials that you have not reviewed?

A. I believe so.

Q. Okay. Can you tell me what you have not

4 (Pages 13 to 16)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 17

reviewed, please?

MR. CLARK: Objection, form, foundation.

A. I can't recall if I reviewed every page of correspondence that was available.

Q. Can I ask you why you did not review all the materials that were provided to you?

A. From a timing standpoint, I'm in open enrollment here, and I have been quite, quite busy.

Q. Got you. That's an extra burden that has been placed upon you through the years, hasn't it?

A. It's an annual burden.

Q. I got it. Just so that I'm sure, when it comes to short-term disability and long-term disability issues in North America or Canada for employees that may be eligible, with you essentially is where the buck stops, does that make sense, for Louis Dreyfus? Is that reasonable?

MR. CLARK: Objection to form.

Q. Is that reasonable?

MR. CLARK: Same objection.

A. No.

Q. Okay. Why not?

A. I don't make the determinations on any of those claims. I facilitate the filing and tracking of

Page 18

those claims. That's my role.

Q. Okay. And I understand that. I didn't mean to say that you were making the determination, but you're the person that it goes through when it is then disseminated out to the administrator; is that correct?

A. Generally, that is correct.

Q. Can you see the documents?

A. Yes.

Q. Okay. That means I did it right. That's pretty cool. All right. Ms. Khatib, I'm showing you what has been marked LCD (sic) 567 and also page 138. Do you see that?

A. Yes.

Q. I'm going to scroll up. And this is an email from you -- I'm sorry -- from MaryJo Magrone to you. Do you see that?

A. Yes.

Q. And it's dated February 8, 2017?

A. Yes.

Q. Is this one of the pieces of materials that you reviewed in anticipation of your deposition today?

A. I saw it, yes.

Q. All right. And it also CCs Dawn Esposito. Who is Dawn Esposito?

Page 19

A. Dawn Esposito was in our tax department, so I'm not quite sure why she is there. I don't know why.

Q. Fair enough. It says: Amy, directed to you, Meanka -- which I think is probably spelled wrong if I'm not mistaken -- but Meanka is still investigating this case to determine if it is compensable under workers' comp.

Now, do you know who Meanka is?

A. I do not.

Q. All right. She is waiting for medical records. Nothing has been paid to date. She will keep me posted/updated. She does not have the last day worked, only information received from when loss was reported.

And then it says: This is a red flag on this case, so she is doing a thorough investigation.

Do you have any idea what the term "red flag on this case" means?

A. No, I do not.

Q. Did you follow up with Ms. Magrone to ask her what do you mean by "red flag" when you sent that to me?

A. I don't recall.

Q. As we're sitting here today, do you have an

Page 20

understanding as to what the term "red flag on this case" means?

A. No.

Q. Okay. Do you have any understanding as to why a thorough investigation would have to be undertaken?

A. I'm not sure how to answer that question. I understand what an investigation is.

Q. All right. So when you received it, what were your thoughts with regard to Jerry Neal and what was being relayed to you?

A. It doesn't impact his STD claim.

Q. I appreciate that. That wasn't my question.

A. I'm sorry.

Q. My question was as you received this and when you received this, what did you -- what was your interpretation of what was being sent to you by Ms. Magrone with regard to Jerry Neal?

A. That it was informational.

Q. Informational to what degree?

A. To make me aware that there was a possible other case going on.

Q. That there is a possible workers'

5 (Pages 17 to 20)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 21

compensation case going on?

A. Yes.

Q. Fair enough. And to you for informational purposes, would that have potentially impacted you concerning short-term disability benefits that might have been paid to or eligible for Mr. Neal?

A. Can you repeat that for me again, please.

Q. Sure. Understanding that there might have been another case going on, would that have impacted you in your role in dealing with the short-term disability benefits?

A. Yes.

Q. How?

A. I would probably or most likely bring that to the attention of the STD carrier.

Q. But do you know whether -- Since you don't know Meanka, do you know whether she might have worked for or been somebody affiliated with that carrier?

A. Not that I -- I don't know.

Q. Okay. Fair enough. Do you have any understanding as to -- and I apologize because I think I may have asked this -- as to why a thorough investigation would have to be undertaken?

A. I don't know what their procedures are.

Page 22

Q. And I didn't see any emails from you in follow-up saying, "Hey, what do you mean by thorough investigation? What's going on here?" Did you see anything in the materials that you reviewed which indicated that you had inquired or written back to Ms. Magrone in response to this email on February 8, 2017?

A. Not that I recall.

Q. So if an employee -- And you may not know this. Please tell me if you don't know something, please tell me.

A. Okay.

Q. If an employee is injured on the job, do you know whether they are immediately offered short-term disability?

A. I don't know the answer to that.

Q. So you do know in this case that Mr. Neal did have a workers' compensation case or two, correct?

A. Yes.

Q. All right. And you do know that he filed for short-term disability, correct?

A. Yes.

Q. And you do know that he received short-term disability, true?

Page 23

A. Yes.

Q. So how is it that an individual that suffered a workers' compensation injury wound up getting short-term disability payment?

A. I don't know. I didn't make that determination.

Q. All right. Do you know at the lower level how a workers' compensation -- Strike that. Even in my head, that was a bad question. At the lower level when an on-the-job injury occurs, do you have an understanding as to how that individual is approached with regard to short-term disability payment versus filing for a work comp claim?

A. I do not.

Q. Okay. Now, my understanding -- Please correct me if I'm wrong -- is that short-term disability payments are to be provided or offered to eligible employees who have suffered from non-occupational illnesses or injuries; is that correct?

A. That is correct.

Q. It is not for individuals who have suffered on-the-job injuries; isn't that correct?

A. That is correct.

Q. On-the-job injuries, if they are eligible

Page 24

for benefits, those individuals get those benefits through a different source like the workers' compensation insurance company; is that your understanding?

A. That's my understanding.

Q. Do you have any understanding as to the difference in benefits for the employee if they get short-term disability payments versus temporary total disability payments through a work comp carrier?

A. I do not.

Q. Do you know whether the benefits are higher or lower for either one of those two?

A. I do not.

Q. Yesterday Mr. Stafford indicated that he thought there might be regional or state, but generally he stated that he believed that the benefits to workers' compensation individuals were higher than those for short-term disability employees. Do you have any reason to doubt that?

A. Yes.

Q. Why do you doubt that?

A. I have no understanding of what is paid under workers' comp.

Q. So you don't doubt it, you just don't know?

6 (Pages 21 to 24)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 25

A. I just don't know.

Q. Okay. You're not doubting him, you're just saying, hey, I don't know whether that's right?

A. I just don't know. I don't have experience with that.

Q. Sounds good. Okay. Ms. Khatib, I want to show you what has been marked Neal 278, page 15. Can you see that?

A. Yes.

Q. Is that one of the documents that you reviewed in the packet that was sent to you to look over?

A. Yes, I believe so.

Q. Okay. At the bottom is an email from Mark Nemechek. Do you know who he is?

A. Yes.

Q. Who is Mark Nemechek?

A. I believe he is the head person at the location, at Mr. Neal's location.

Q. Okay. And I believe that Mr. Neal worked in Cahokia, Illinois. Are you familiar with that location?

A. Yes, I am.

Q. Okay. And there's another gentleman by the

Page 26

name of Scott Becker. Are you familiar with Mr. Becker?

A. Yes, I am.

Q. All right. At the time of this claim by Mr. Neal, I believe -- and I could be wrong -- but I believe that Mr. Becker was actually the director, and I think Mr. Nemechek might have been the assistant director. You don't have any reason to doubt that, do you?

A. No. They both are there, so that could be correct.

Q. Okay. Great. So this is an email from Mr. Nemechek, and it states that Mr. Neal came into the office, please see attached. Mentioned to Jerry that HR would have to review his statement before we decide on how to proceed.

When an individual gets injured on the job, are they obligated to fill out some kind of form? Are you aware of that at all?

A. I don't know what the workers' compensation procedure is.

Q. All right. If an individual is injured in a non-occupational capacity, with whom do they get in contact to see whether they're eligible for short-term disability benefits?

Page 27

A. They would contact their HR partner or HR manager.

Q. At the particular facility that they're at?

A. Yes, or their regional HR partner.

Q. And I presume that in the middle of the page, this is Dave Stafford forwarding this to you. Is that reasonable?

A. Yes, that appears to be true.

Q. All right. So he's forwarding to you Mr. Nemechek's email to him and to Ms. Randall and to Ms. Murphy?

A. Uh-huh.

Q. You have to give a verbal response.

A. Yes. Sorry. Yes.

Q. No, that's okay. People forget that all the time, believe me. Then toward the top of the page -- I'm sorry. That was on January 10, 2017, at 1:40 in the afternoon, correct?

A. Yes.

Q. And then Mr. Stafford sent it to you on January 10 at 4:08 that same day, correct?

A. Yes.

Q. And then we go to the next day, which is January 11, and at 9:12 a.m. you are writing back to

Page 28

Mr. Stafford, correct?

A. Correct.

Q. And you say: Sun Life sent us the APS. What does APS mean?

A. Attending physician statement.

Q. Son Life sent us the APS that was filed for Mr. Neal. To the question is the condition due to injury/sickness arising out of patient's employment, the doctor checked unknown. Before we close this claim with Sun Life, I just want to confirm that Jerry understands that we will be closing the STD claim and filing only the workers' compensation claim. Did I read that correctly?

A. Yes.

Q. So why is the STD claim being closed?

A. Because of the workers' compensation.

Q. And it seems to me -- you correct me if I'm wrong, Ms. Khatib -- that you are the one that is indicating that the claim is going to be closed, correct?

A. Correct.

Q. So it was your determination, based upon information you received, to close the STD file because you believed it to be a workers' compensation claim,

7 (Pages 25 to 28)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 29

correct?

A. I would be providing that information to Sun Life.

Q. Right. The information would be that the short-term disability claim should be closed because you believe this to be a workers' compensation claim, correct?

A. That is the information that I'm being provided.

Q. That's not what I asked. And you are indicating that it will be closed and filing only the workers' compensation claim. I'm asking you who made the determination that the STD claim will be closing?

A. I would be providing that information to Sun Life.

Q. Right. So you made the determination that the STD claim should be closed and filing only the workers' compensation claim, correct?

MR. CLARK: Objection, form.

A. Could you repeat the question, please.

Q. Sure. You are the one that made the determination that Louis Dreyfus will be closing the short-term disability claim, correct?

A. I will be sending that information to Sun

Page 30

Life, yes.

Q. To close the STD claim, correct?

A. I guess I would do that in conjunction with them, but, yes, we would be advising that, correct.

Q. Right. Because it says "we will be closing." You're going to be closing the STD claim, correct?

A. Correct.

Q. And when you say that "we will be closing the STD claim," am I correct when I said that you're indicating you're closing it internally where you're at, correct?

A. No. We would be closing it with Sun Life.

Q. But it will be closed. It will be closed, correct?

A. Correct.

Q. And, of course, you want to confirm that Jerry understands that the short-term disability claim will be closed, correct?

A. Correct.

Q. Whose responsibility would it have been to make sure that Jerry understands that we, meaning you, in conjunction together, will be closing the STD claim?

A. His HR partner, HR manager.

Page 31

Q. And who would that have been?

A. I believe it would have been Dave Stafford or Amber or Jacky. They are all on the HR team.

Q. Let me ask you this. Does Amber or Jacky or Mr. Stafford, do they directly report to you?

A. They do not.

Q. Do you know to whom they directly report?

A. Amber and Jacky reported to Dave Stafford, and Dave Stafford reported to Mary-Beth Price, who I also report to.

(Clarification requested by the court reporter.)

Q. Mary-Beth Price. That's may understanding, Mary-Beth Price, P-R-I-C-E. Is that correct, Ms. Khatib?

A. Yes, that's correct.

Q. I'm going to show you what's been marked Neal 275, and page 14. And please let me know if you've had the opportunity to review it.

A. Yes.

Q. And this was part of the materials that you had the opportunity to review in anticipation of your deposition today?

A. I believe so.

Page 32

Q. All right. And this is on January 11, 2017, at 1:26. So this is later on the same day that you indicated that the short-term disability claim was going to be closed out, correct?

A. I believe so. I'm sorry. I'm looking at the timeline again. Yes.

Q. I can make it smaller.

A. That's okay.

Q. Smaller is not good for me either.

A. That's okay. I think larger was better. Sorry.

Q. That's all right. So essentially what is happening here -- Well, you tell me. What's happening here?

MR. CLARK: Objection, form.

Q. As best you know.

A. Amber is communicating here. Let's see. It's Amber telling Scott at the location that the claim is being closed.

Q. Right. So this is essentially a follow-up, if you will, from your direction, hey, we're going to close it, let's make sure that Jerry has an understanding that the short-term disability application is being closed, correct?

8 (Pages 29 to 32)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 33

A.   Correct.

Q.   And Mr. Stafford is on here, who would have been the regional -- I think which would have been the right person for that facility to provide that information, correct?

A.   Or Amber, who works for Mr. Stafford.

Q.   Fair enough. And, of course, she's also sending it directly to Mr. Becker and Mr. Nemechek, who were at that facility, correct?

A.   Correct.

Q.   Now, Ms. Khatib, I'm going to apologize to you because I have three documents that are not in here. I found them yesterday, and I apologize. I don't know whether they're part of the materials that you had to review or not. So I'm going to wind up, for all intents and purposes, reading them to you, so bear with me, please, okay.

A.   Uh-huh, yes.

Q.   The first one is LDC 0511, and it is dated -- And the reason I'm asking you this is because January 11 seems to be a date where there's a lot of activity going on, so these are also on January 11. And it's from you dated January 11, 2017, at 2:12 p.m., okay? And if we look at Mr. Rubin's email -- I'm sorry.

Page 34

If we look at -- Strike that. If we look at Ms. Randall's email and also the one from Scott Becker right above it, that's at 1:26 p.m. Do you see that?

A.   Uh-huh.

Q.   So this would be at 2:12, and this is from you to Ms. Randall and to Mr. Stafford, and you cc Jacky Murphy and Charise Twyne-Stokes. And it says: Thank you, Amber. We will contact Sun Life and have them close the claim.

And that is perfectly in line with what you just told me earlier, that you would be contacting them and directing them to close the short-term disability claim; is that correct?

A.   That is correct.

Q.   On that same page, 0511, Ms. Khatib, there is an email from you -- Strike that. I apologize. This is now LCD 0175, another document unfortunately that's not part of it, and it is an email from you on January 11, 2017, at 2:55 p.m., which is 15 minutes after the last one we just talked about. And it is to Claims Updates at sunlife.com, and you also cc Charise Twyne-Stokes, and the subject matter is Disability Claim. And it says: Hi, Tina. Thank you again for faxing us the APS on Mr. Neal. Please close the STD

Page 35

claim for Mr. Neal. He has filed a workers' compensation claim for his injury.

Again, this is in line with your determination that the STD claim should be filed because there is a workers' compensation claim on Mr. Neal's behalf, correct?

A.   Mr. Neal has notified us that he is filing a workers' comp claim.

Q.   Right. I understand that. And based upon that, this is your direction and in line with what you told me earlier that you're going to send to Sun Life to close out the short-term disability claim, correct?

A.   Yes. Correct.

Q.   And so as of January 11 with regard to your last communication that I just talked to you about, Mr. Neal's short-term disability claim was closed, correct?

A.   Correct.

Q.   This is LDC 191. Ms. Khatib, on January 19 -- Now we're eight days later -- at 2:31 p.m. an email was forwarded to you by a individual I think whose name is Karen Cue on behalf of Sun Life regarding a claim inquiry for Jerry Neal, and it states this: Hi there. I just want to confirm that the STD claim for

Page 36

Mr. Neal should still be closed? Mr. Neal called us today looking for a status update, so I wasn't sure if he was made aware that the claim was being closed or if I should continue my review. Thank you. Karen.

Do you recall that as one of the documents that you reviewed in preparation for your deposition today?

A.   I believe it was.

Q.   All right. It appears -- You correct me if I'm wrong -- from this email that somehow Mr. Neal was not informed that the short-term disability claim was being closed out. Does that seem reasonable to you?

A.   I don't know what was communicated to him.

Q.   Well, he called to inquire about it eight days after you had indicated to Sun Life that it was going to be closed out, correct?

MR. CLARK:  Objection, form, foundation.

A.   Correct.

Q.   So that was at 2:31.

A.   And at 2:40 -- and I'm referencing now back to LCD 511 -- there is an email to you from Amber Randall and Dave Stafford, and you cc Jacky Murphy and Charise Twyne-Stokes, and it says: Hi, all. Son Life contacted us today saying -- it says the Mr. Neal -- but

9 (Pages 33 to 36)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 37

Mr. Neal called them regarding the status of his STD claim. There seems to be some confusion on his part that his claim is workers' comp and not STD. Can you please contact him again and make sure he understands this situation. Thank you. Amy.

That's at 2:40 p.m. Is that part of the materials that you had to review?

A. I believe so.

Q. So does it seem logical, Ms. Khatib, that the email that you sent out at 2:40 was in response to the one that you received at 2:31 from Ms. Cue stating that there seems to be some confusion because she had received a call from Mr. Neal inquiring about his STD claim?

A. That is correct.

Q. And you're essentially asking them to contact Mr. Neal, hey, let him know that his STD claim has been closed out, correct?

A. Can you repeat the question, please.

Q. Sure. In your email that I just read to Ms. Randall and Mr. Stafford, you're essentially asking them to please get in contact with Jerry to confirm that he is aware that his short-term disability claim has been closed down, correct?

Page 38

A. Correct.

Q. All right. Now we can finally go to a page that's in here. Ms. Khatib, can you see this document that has been marked LCD 192 and page 20? Can you see that page?

A. Yes.

Q. All right. And at the bottom of that page is the email that I just talked to you about that occurred on January 19, 2017, at 2:40 p.m. where you were contacting Ms. Randall and Mr. Stafford. Do you see that?

A. Yes.

Q. That's the one we were talking about when you were asking them to get in contact with Mr. Neal to let him know that his STD claim had been closed down, correct?

A. I'm asking them to contact him again, yes.

Q. To inform him that his STD claim has been closed down, true?

A. Yes.

Q. So that's at 2:40. And then at 3:38 on the same day, you send out an email to Ms. Randall and Mr. Stafford and to Ms. Murphy and to Ms. Twyne-Stokes stating that as a follow-up to that call with Amber, you

Page 39

don't need -- they do not need to contact Mr. Neal because you spoke with JoJo -- I guess that's Ms. Magrone?

A. Yes.

Q. -- and the work comp examiner, who said they received notice yesterday that he is being represented. The recommendation was to file the short-term disability claim and let both investigations take their course. We have contacted Sun Life to continue the processing of his claim. Do you see that?

A. Yes.

Q. Who recommended that?

A. That was the information that I was given by JoJo.

Q. I understand, but you're the one who sent it out. It says the recommendation was to file the STD claim. Who recommended that? Do you know?

A. I do not.

Q. So if Amber says to you, hey, my recommendation, our recommendation, somebody recommended, how do you know that that was legitimate or supposed to be done if you don't know who the recommendation was from?

A. I was given the information by JoJo. I

Page 40

don't make the determination. Whatever the workers' compensation examiner or whatever the case was, I was told by JoJo to continue the case, to continue the STD claim.

Q. Did you indicate that you were made aware that he had filed a workers' compensation matter when you received that information?

A. I'm sorry. Can you repeat the timeline.

Q. Sure. At the time that -- We've already discussed that you were aware that he had filed a workers' compensation claim and that's why the STD claim was being closed?

A. Correct.

Q. When you found out that this recommendation was being made, did you inquire why since you knew that there was a workers' compensation claim pending?

A. I followed what JoJo instructed me to --

Q. I appreciate that. That wasn't my question. Could you read the last question back, please.

A. Thank you.

(Question was read back by the court reporter.)

A. No, I did not.

10 (Pages 37 to 40)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 41

Q.   With knowledge, Ms. Khatib, that short-term disability is for employees that have suffered non-occupational injuries or illnesses, what would be the purpose of pursuing that when there is a known workers' compensation claim?

MR. CLARK:  Object to form, foundation.

Q.   If you don't know, you know, by all means if you don't know, please let me know.

A.   Can you repeat that for me, please.

Q.   Sure.  Having been aware and knowing that there was a pending workers' compensation claim, why would there be a necessity to reopen a claim for a non-occupational injury or illness on Mr. Neal's behalf?

MR. CLARK:  Object to foundation.

A.   If the employee has filed under both STD and workers' comp, there may be a reason to keep them both open until a determination is made.

Q.   Okay.  What kind of determination?

A.   Until a determination is made by the workers' compensation carrier.

Q.   Have you been involved in situations where an individual like Mr. Neal or over and beyond Mr. Neal have filed short-term disability claims and had pending workers' compensation claims at the same time?

Page 42

A.   I believe we have had cases of that, yes.

Q.   But you understand -- Let me ask you this first.  From your position, is it inconsistent to pay somebody for a non-occupational illness or injury when he has filed a claim for an occupational injury or illness?

A.   Can you repeat the question again, please.

Q.   Nancy, would you repeat that one, please.

(Question was read back by the court reporter.)

A.   Not if the employee has filed both claims.

Q.   Why?

MR. CLARK:  Objection, form, foundation.

Q.   I'll ask it this way.  Why is it not inconsistent?

MR. CLARK:  Same objection.

A.   If an employee is filing under both STD and workers' comp, until a determination is made, they can -- we have paid the STD in the past.  It benefits the employee to have some income coming in when a claim is in process.

Q.   But the gentleman has filed a workers' compensation claim; therefore, he's claiming he suffered a work-related injury, correct?

Page 43

A.   Correct.

Q.   And yet you're paying him for a non-work-related injury; is that correct?

MR. CLARK:  Objection to form.

Q.   Under the STD eligibility benefits?

A.   He filed a claim that said it was not workers' comp.

Q.   I appreciate that.  That's not what I'm asking you, Ms. Khatib.  An individual in this case, Mr. Neal, has filed a workers' compensation claim claiming that he has suffered a work-related injury, correct?

A.   Correct.

Q.   And you, for the third-party administrator, are paying him for a non-occupational injury; is that correct?

MR. CLARK:  Objection, form, foundation.

A.   Yes.

Q.   When you have a situation where an individual has brought suit for an occupational injury under the workers' compensation statute and he is being paid short-term disability payments for a non-occupational injury, do you try as quickly as possible to get that resolved as to whether it's one or

Page 44

the other?

A.   I don't know the answer to that.

Q.   All right.  For your tracking system and to track these kind of claims, why would you want to continue paying somebody for short-term disability benefits for a non-occupational injury when the person has claimed that it is an occupational injury?

A.   He has also claimed that it was a non-occupational injury.

Q.   Well, how do you know -- And I don't know this; I'm just asking.  How do you know that he just wasn't presented documents to fill out as a short-term disability claim when he didn't know one way or the other?

MR. CLARK:  Objection, form.

A.   I don't know the answer to that.

Q.   Okay.  Are there economic advantages to Louis Dreyfus to pay an individual short-term disability payments as opposed to temporary total disability payments?

MR. CLARK:  Objection, form.

A.   I don't know the answer to that.

Q.   So earlier on that same day, his claim was to be closed out as a workers' compensation claim and

11 (Pages 41 to 44)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 45

not a short-term disability claim, but by the end of the day, both claims were open, correct?

A. I believe that's the timeline here.

Q. Right. So you and Sun Life reversed course during the course of the day in regard to Mr. Neal's short-term disability claim, correct?

MR. CLARK: Objection, form.

A. Correct.

Q. Do you know whether it was reopened because there was a question as to whether, in fact, Mr. Neal did suffer an on-the-job injury?

A. I'm sorry. I'm not clear on the question.

Q. Sure. Do you know whether the short-term disability claim was opened or reopened because there was a question as to whether Mr. Neal actually did suffer an on-the-job injury?

A. A determination hadn't been made.

Q. So there was still a question or a determination had to be made whether he suffered an on-the-job injury or not; is that correct?

MR. CLARK: Objection, foundation.

Q. As far as you are aware; is that correct?

A. That was my understanding.

Q. Ms. Khatib, let me show you what's been

Page 46

marked LCD 0038 and page number 113 and ask you if you can see that and review it for me, please.

A. Yes, I can see it.

Q. And are you familiar with that document?

A. Yes, I am.

Q. Am I correct when I state that that document is from the policy manual for Louis Dreyfus?

A. Yes, an hourly policy manual.

Q. Right. I'm sorry, a what policy manual?

A. An hourly policy manual, policy manual for hourly employees.

Q. Got you. Are there other policies for other type of employees?

A. Yes.

Q. What are those other policies?

A. The short-term disability policy for salaried employees is called the medical disability pay policy.

Q. And when an employee is hired, do they get a copy of that or do they only get a copy of that when they apply for short-term disability?

A. I don't know what human resources provides at the time of hire.

Q. Fair enough. So let's take a look at this.

Page 47

By the way, was Mr. Neal an hourly employee?

A. Yes, he was.

Q. So this policy here, which is listed as I think 4.08 -- Do you see that at the bottom?

A. Yes.

Q. This would have applied to Mr. Neal?

A. Correct.

Q. All right. And where it says Qualifying for Benefits, do you see that paragraph?

A. Yes.

Q. And the second line of that states: You are eligible to receive STD benefits if you are absent from work and under the care of a physician as the result of a non-occupational illness or injury. Do you see that?

A. Yes.

Q. All right. Does it state anywhere in there -- and I didn't see this, so that's why I'm asking -- that an individual who has filed a workers' compensation case is eligible for short-term disability benefits?

A. It does not.

Q. Does it say anything in there about an individual who has filed a workers' compensation case

Page 48

should receive short-term disability benefits?

A. It does not.

Q. Am I correct when I state, Ms. Khatib, that it does not apply, Section 4.08 of the manual does not apply to employees who are injured on the job?

A. This is not a workers' compensation policy.

Q. Then am I correct when I state that it does not apply to individuals that are injured on the job for Louis Dreyfus?

A. That is correct.

Q. Let me show you, Ms. Khatib, what has been marked Neal 0282 and document page 21. Can you look at this?

A. Yes.

Q. Can you read it and would you please do so if you can.

A. Okay.

Q. All right. Have you seen this document?

A. I do not believe I have.

Q. Okay. So the questions here may be pretty short then. Where it says right at the top, the first line: Will get these statements from Jason and Thomas today. I talked to Meaka Benton on Friday as well. They, Zurich, have discovered several inconsistencies in

12 (Pages 45 to 48)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 49

several of Jerry's statements. Will keep you posted. Do you see that?

A. Yes.

Q. Did you ever have or would you ever have any contact with the workers' compensation carrier?

A. Generally, no, not that I can recall.

Q. All right. And I understand you said generally, though. Can you recall instances that you may have?

A. Over 30 years, maybe at some point, but not on any kind of consistent basis.

Q. Nothing stands out to you as we're talking?

A. No. No.

Q. It says that Zurich has discovered several inconsistencies. Are you aware of any of those inconsistencies?

A. No.

Q. Let me show you what's been marked Neal 216, page number 28. And I can close in if we need to, but would you please take a look at that.

A. Okay.

Q. And at the middle of the page, Ms. Khatib, is an email from you dated March 17, 2017, at 2:02 p.m. Do you see that?

Page 50

A. Yes.

Q. And that is to Mr. Stafford and Ms. Magrone?

A. Yes.

Q. And you cc Mary-Beth Price?

A. Yes.

Q. Who is your direct report -- You directly report to her, correct?

A. Yes, I report to her.

Q. What is her position?

A. She is the regional head of North America human resources.

Q. Okay. And this is basically information that was supplied to you from Mr. Stafford in an email below yours; is that correct? Does that seem reasonable?

A. It seems reasonable. I'm reading it really quickly here.

Q. That's okay. Take your time.

A. Yes, that seems reasonable, yes.

Q. And you indicate in your email in the second paragraph that what you heard from the short-term disability carrier that they shared with you is that the heavy lifting at work is the only activity that has been

Page 51

cited as potentially being the cause of his back condition, and his provider from a visit on 2/28 opined that his symptoms are "causally connected to work-related injury as described." Do you see that?

A. Yes.

Q. So you are and have been provided information that at least a provider has indicated there is a causal connection between Mr. Neal's injury and his work, correct?

MR. CLARK: Objection, form.

Q. Well, I'll ask it this way. You wrote it, so tell me what you're writing. What are you telling Mr. Stafford and Ms. Magrone?

A. Can I take awhile to read it?

Q. Yes. Please do.

A. It looks like I'm sharing information that the STD carrier shared with me.

Q. Okay. And that information is that it appears that at least a physician is indicating that his injuries are work-related or potentially work-related, correct?

A. Correct.

Q. Did you inquire of the short-term disability carrier at that time that maybe it's

Page 52

something to consider to close out the short-term disability claim since you now have something in hand indicating there might be a causal connection to his work and his injury?

A. I don't recall.

Q. In the materials that you reviewed in anticipation of your deposition, do you see anywhere where you made of that inquiry?

A. I don't recall.

Q. Would it have been reasonable for you to at least inquire of the short-term disability carrier about the continuation of short-term disability benefits when there is a doctor's note that indicates the potential relationship between Mr. Neal's injury and his work environment?

MR. CLARK: Objection to form.

A. I think we had addressed that previously that we were continuing the claim based on the timeline.

Q. So this is in March, so this is a month or two later from the January stuff. And now you're getting this information I presume for the first time from the short-term disability carrier, and a provider on the visit of 2/28 opined that his symptoms are causally connected to his work-related injury as

13 (Pages 49 to 52)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 53

described. My question is do you then inquire of the short-term disability carrier as to whether the short-term disability benefits should be continued?

A. I did not. I don't recall, but I do not believe that I did. I do not believe that I did.

Q. All right. Do you know whether you may have suggested that it be reviewed for that purpose so that the short-term disability benefits -- Strike that. Do you know whether you suggested whether the determination that short-term disability benefits should be continued or not?

MR. CLARK: Objection to form.

A. I do not recall.

Q. Let me show you what's been marked Neal 218 and Document Number 30, and if you would take a moment to read that.

(A discussion was held off the record.)

A. Okay.

Q. Have you had the opportunity to review the email from Mr. Murray?

A. Yes.

Q. Had you ever seen this before?

A. I do not believe so.

Q. On March 19, Mr. Murray indicates his

Page 54

thoughts that the back-claim would likely be ruled as WC, which I presume is workers' comp. Do you see that?

A. Yes.

Q. If you had been informed of that on March 19, would you have inquired of the short-term disability carrier about whether Mr. Neal should continue to receive short-term disability benefits?

MR. CLARK: Objection, form, foundation.

A. I would not, based on the previous instruction I was given.

Q. I'm sorry. What previous instruction?

A. Back several months ago, the instruction was to continue the claim.

Q. Oh. You're indicating that a couple of months before, the instruction was to continue both claims, correct?

A. Correct.

Q. And you still would have -- Notwithstanding the fact that you came into the information here that Mr. Murray indicates his thoughts that the back-claim would likely be ruled as work comp, it would not have altered you in terms of inquiring about short-term disability benefits still being given to Mr. Neal, correct?

Page 55

MR. CLARK: Objection, form.

A. Could you just repeat the question one more time, please. I'm sorry.

Q. Sure. Because you were instructed a couple of months before to have the claims brought as short-term disability and work comp, even this information from Mr. Murray that he believes it would likely have been ruled as work comp would not have altered your position in any way, correct?

A. That is correct.

MR. EZRA: All right. We can take a break if you want, Nancy.

MR. CLARK: How long do you want to break?

MR. EZRA: How about ten minutes?

MR. CLARK: Ten minutes.

(A recess was taken from 10:27 a.m. to 10:42 a.m.)

Q. (By Mr. Ezra) Ms. Khatib, we're back.

A. Yes.

Q. I know you're thrilled about that.

A. I had a nice cup of coffee there. Thank you.

Q. I'm going to show you page 40, and the questions here may go quickly as well. Mrs. Neal, 302,

Page 56

Document 40, and would you take a moment to look at that, please, and I'll try to -- How is that?

A. Thank you. That's better. Thank you. Okay.

Q. In the email from Ms. Benton to Mr. Becker, it states: He continues to treat and we continue to deny treatment. Do you see that?

A. Yes.

Q. Do you know why -- And you may not, so just please let me know. Do you know why treatment is being continued -- Strike that. Do you know why Ms. Benton is continuing to deny treatment?

A. I do not.

Q. All right. Were you ever made aware that there was a dispute regarding Mr. Neal's claim?

A. I don't recall.

Q. Does the fact that you were aware that there were two avenues that were being pursued for benefits, the short-term disability and workers' compensation, indicate to you that there was a dispute regarding his claim?

A. My understanding was a determination hadn't been made.

Q. For your purposes when it comes to

14 (Pages 53 to 56)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 57

short-term disability, would it be of benefit to have a determination made one way or the other?

MR. CLARK: Objection, form.

A. I -- No. We need to understand whether it's an STD claim or a workers' compensation claim.

Q. Right. You're indicating you'd like to know or need to know one way or the other, correct?

A. Yes, so the claim could be paid appropriately.

Q. Right. So for your benefit as overseeing the disability, the short-term disability claims on behalf of Louis Dreyfus and working with the short-term disability carrier, it would be of benefit to know one way or the other whether the claim is a short-term disability claim or a workers' compensation, correct?

A. Correct.

Q. And now we're talking sometime in May when this email is being written, and that had been some months now from when you were directed to pursue both claims, correct?

A. I was directed to continue the STD claim.

Q. And while you understood that there was also a workers' compensation claim, correct?

A. Correct.

Page 58

Q. So you knew I think we've established back in at least January that both of those claims are being pursued, correct?

A. Correct.

Q. And that's still being done as far as you were aware in May when this email on Document 40 is being written, correct?

A. Correct.

Q. In your experience -- And you told me earlier that you had seen cases where both STD payments and the claim was also being made under work comp. In your experience, is it unusual to see no determination having been made after four months?

A. I can't recall the timeline.

Q. So after an individual is off work for 26 weeks on short-term disability for a non-occupational injury, are they eligible for long-term disability?

A. All salaried employees are eligible for long-term disability at no cost. The company provides that benefit. For our hourly employees, they must elect voluntary LTD and pay for that coverage to be eligible.

Q. Okay. So they have the opportunity to pay for the insurance coverage, and if they're willing to do that, then they may be eligible for long-term

Page 59

disability?

A. They can elect a voluntary long-term disability, yes, at their time of hire.

Q. Explain to me what you mean by that.

A. They have to make an election for that plan because it's a hundred percent employee-paid.

Q. So when in the process are they informed about that election proceeding?

A. At the time of hire and only at the time of hire, and unless we change carriers, there might be a change in the offering so they could elect again, but generally at the time of hire.

Q. And so they have to elect at the time of hire; they can't elect subsequently?

A. That is correct.

Q. And if they elect at the time of hire, then I guess the payments for that program are then taken out as part of their regular pay?

A. Correct. It's a deduction.

Q. And apparently in this case, Mr. Neal must have done that, correct?

A. That is correct.

Q. So he elected to assert a claim of long-term disability; is that correct?

Page 60

A. Yes, he elected to do that.

Q. Right. And my understanding is that he actually filled out the documentation; are you aware of that?

A. Yes, I am aware of that, and that is correct.

Q. And would that be something that would be coordinated through your office?

A. I would fill out the employer section at least. When a short-term disability claim is transitioned into a long-term disability claim, I might not be the initial contact for that claim. The short-term disability carrier may just go ahead and send the LTD forms to the claimant.

Q. Is it safe to say that ultimately you're going to find out about it one way or the other because it's part and parcel of what you do?

A. Correct, yes.

Q. And how does one become eligible -- And you may not know. How does one become eligible for long-term disability?

A. There is a 180-day waiting period to be eligible for LTD, and you must be totally disabled as defined by the plan.

15 (Pages 57 to 60)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 61

Q.   So, of course, you don't make that determination; I presume that the long-term disability carrier makes that determination, correct?

A.   That is correct, the carrier makes that determination.

Q.   And you said there's a portion of the application that you fill out.  Generally, what portions do you fill out?

A.   It would be the standard information meaning social, date of birth, date of hire, pay, just, you know, verifying their eligibility and providing that information.

Q.   And what do you mean by "verifying their eligibility"?

A.   In the case of an hourly employee that they have elected the benefit and have been paying -- having that deducted out of their pay.

Q.   Do they have to go through short-term disability to be eligible for long-term disability?

A.   No, you do not.

Q.   So you could have an injury that would take you 180 days --

(Interruption by the court reporter.)

Q.   You could have a non-work-related injury

Page 62

that would require you to be off work for more than 180 days and not be eligible for short-term disability but still be eligible for long-term disability; is that correct?

A.   I think you changed the phrasing of the question there about adding the non-occupational part.

Q.   Okay.  If it's either occupational or non-occupational, you can still be --

A.   Correct.

Q.   -- eligible for long-term disability?

A.   Correct.

Q.   So as long as you're off 180 days, whether it's an occupational injury or not an occupational injury, you may be eligible for long-term disability benefits?

A.   If you are disabled, that is correct.

Q.   And obviously if you've paid for the policy?

A.   Correct, for an hourly employee, correct.

Q.   And in this particular case, Mr. Neal did make an application for long-term disability benefits, true?

A.   Yes, correct.

Q.   And he was denied; is that true?

Page 63

A.   That is not correct.

Q.   He was -- What happened?

A.   His claim was approved, and I believe it was approved through September of 2017.  I think there's documentation to that effect.

Q.   What makes you -- Was he off 180 days as of the time -- Strike that.  I just want to make sure.  Was Mr. Neal receiving short-term disability benefits during his 26 weeks?

A.   Yes, he was.

Q.   He was not receiving long-term disability benefits during that period of time, correct?

A.   No.  You can't receive long-term disability benefits until your short-term disability benefits are exhausted.

Q.   Okay.  So you're off 26 weeks, and then you become potentially eligible for long-term disability benefits as long as you've paid for the policy and you meet the criteria?

A.   Correct.

Q.   And it's your understanding that he was granted the long-term disability benefits after June of 2017 up to September of 2017?

A.   I believe that is correct.

Page 64

Q.   How long are long-term disability benefits supposed to continue?

A.   They are to continue as long as the LTD carrier determines that you are totally disabled generally up to the age of -- up and to the age of 65, excuse me, but you have to remain totally disabled.

Q.   And, Ms. Khatib, do you have documentation in front of you that indicates that his long-term disability was granted?

A.   Yes.

Q.   Would you designate the page number on that if you have a page number.

A.   I don't have the page number.

Q.   Could you please tell me --

A.   Hold on.  I would have to go to the document that I have in an email.

Q.   Sure.

MR. CLARK:  Jeff, you know, if you don't mind, I can tell you there is a record we produced that's LDC 327.

A.   Thank you.

Q.   Appreciate it.  All right.  Let me show you what's been marked Neal 241, Document 51.  Would you take a look at that.

16 (Pages 61 to 64)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 65

A. Okay.

Q. So this is an email that was sent to you from Mr. Stafford?

A. Yes.

Q. And you were also on an email from Ms. Randall?

A. Yes.

Q. And it says with regard to Ms. Randall, it says: For your information, Jerry provided this note yesterday dated 5/11/17 indicating no change in his condition, remains off work. Do you see that?

A. Yes.

Q. And then it also says: This is the employee whose claim was initially short-term disability, then workers' comp, and is currently under investigation by Zurich.

That's in line with what we've been talking about throughout that both of them were being pursued or investigated, correct?

A. Correct.

Q. I'm going to go up to 50, which is also Neal 0297. Take a look at that. Is that the note that's being referenced in the email dated 5/11/17 that we just talked about previously?

Page 66

A. Yes, I believe so, correct.

Q. All right. And do you see there -- This is kind of hard to read, which I understand. Do you see there's a check mark in the middle of the page, and it says: No change in previous duties per Dr. Gornet?

A. Uh-huh, yes.

Q. So it makes sense that there is a reference to a prior document that's supplied by Dr. Gornet with regard to Mr. Neal's restrictions? Does that seem reasonable?

A. That seems reasonable.

Q. And I will tell you that there were no off-work slips between May 11 and May 28 -- I'm sorry -- February 28, 2017. This is Neal 192, Document 27. Have you ever seen this?

A. I believe I have.

Q. All right. And this is a document that does indicate certain restrictions that are being placed on Mr. Neal in the workplace?

A. Yes.

Q. And whether he would be able to work within the restrictions that are provided, correct?

MR. CLARK: Objection, form.

Q. I'll say it this way. This note by

Page 67

Dr. Gornet states certain restrictions that are to be applied to Mr. Neal in his ability to perform physical stuff, correct?

A. To me, it's saying that he's -- I'm trying to answer this. I can't make that determination of what his job is.

Q. I'm not asking you to do that. I'm saying it appears to have certain restrictions that are being placed on Mr. Neal, correct?

A. Correct.

Q. Do you know whether this note was sent to you by Ms. Randall in addition to the 5/11 note?

A. I don't recall.

Q. Okay. Let me show you what's Neal 366, page 42, and ask you to take a look at that.

A. Okay. Yes.

Q. Have you seen this document before?

A. Yes, I have.

Q. Was this part of the documents that you received in preparation for your deposition today?

A. Yes, it was.

Q. And in this document, do you know who Mr. Jerome is?

A. I do not.

Page 68

Q. Do you have any understanding that Mr. Jerome may be Mr. Neal's attorney in the work comp case?

A. I did not until I saw this letter.

Q. All right. Having reviewed this letter, that makes sense to you that he is the attorney that represents Mr. Neal in the work comp case, correct?

A. Correct.

Q. And it's addressed to Mr. Kovacs. Do you know who that is?

A. I do not.

Q. I want you to assume that Mr. Kovacs was the attorney that represented Louis Dreyfus in defense of the workers' compensation case, okay?

A. Okay.

Q. All right. So in this document, it says that -- By the way, this is dated May 23. Do you see a file stamp of May 25, 2017, on it as well?

A. Yes.

Q. In the first paragraph, Mr. Kovacs -- I'm sorry -- Mr. Jerome indicates that there were work restrictions by Dr. Gornet and Dr. Boutwell. Those are the two documents that we just talked about and you just saw, correct?

17 (Pages 65 to 68)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 69

A.  I believe so, correct.

Q.  Including the one from Dr. Boutwell that was forwarded to you by Ms. Randall, correct?

A.  Correct.

Q.  And by the way, this is going to sound like a strange question, but if the individual is receiving short-term disability, they should not be working?

MR. CLARK:  Objection, form, foundation.

Q.  Correct?  It's obvious that an individual who is working for Louis Dreyfus should not be receiving short-term disability if they are also working?

A.  If they are actively at work, that is correct.

Q.  Okay.  And in the second paragraph it says: Please note that my client does not plan on abandoning his position.  He wishes to return to work once the effects of his work injury have remitted.  Do you see that?

A.  Yes.

Q.  And it also says:  I would ask that you advise your client of this issue or let me know if I need to forward correspondence to them directly.  Do you see that?

A.  Yes.

Page 70

Q.  Let's go to the next page, which is 43, Neal 555.  And I'm concerned only with the halfway point, Ms. Khatib, if you take a look at that.

A.  Okay.

Q.  So you see that there is an email for Mr. Kovacs to Ms. Magrone.  Do you see that?

A.  Yes.

Q.  And that's dated May 26, 2017, at 4:11 p.m.?

A.  Yes.

Q.  And it says:  Ms. Magrone, see attached letter from Attorney Jerome.

A.  Yes.

Q.  And that would be, it seems reasonable to assume, does it not, Ms. Khatib, that that is the letter that we just talked about and went through?

MR. CLARK:  Objection, form, foundation.

A.  I believe so, yes.

Q.  Okay.  Did you know that Mr. Jerome's letter had been forwarded to Ms. Magrone?

A.  I did not.

MR. CLARK:  Objection, form.

Q.  Is this the first time this document that you're looking at, Neal 555, Document 43, the first time

Page 71

that you were made aware that Mr. Jerome's letter had been forwarded to Ms. Magrone?

A.  I believe so.

Q.  This letter was sent out May 23, 2017, and has a stamp date of May 25, 2017.  Do you see that?

A.  Yes.

Q.  May 23, 2017, and May 25, 2017, is between May 4, 2017, and June 19, 2017; isn't that correct?

A.  Yes.

Q.  And earlier we talked about the off-work slip that you saw from Dr. Boutwell that was dated May 11, 2017.  Do you recall that discussion?

A.  Yes.

Q.  And May 11, 2017, is between May 4, 2017, and June 19, 2017; isn't that correct?

A.  Yes.

Q.  I'll show you what's been marked Neal 400 and Document Number 65.  Would you please take a look at that.

A.  Okay.

Q.  Have you seen this letter dated June 28, 2017, to Jerry Neal from Mr. Stafford?

A.  Yes, I have.

Q.  Was this part of the documents that you

Page 72

received to review in anticipation of your deposition today?

A.  Yes.

Q.  And this is the letter that is informing Jerry Neal that he has been terminated from his position with Louis Dreyfus; is that correct?

A.  Yes.

Q.  And the determination is effective June 19, 2017, correct?

A.  Correct.

Q.  And in it, it states that on May 4 he was -- Mr. Neal was advised that he needed to contact the company on or before June 19, 2017; is that correct?

A.  That is correct.

Q.  And in the middle of the page, it says: Although you were provided several weeks to comply with this requirement, you did not contact the company or see a doctor prior to this deadline.  Do you see that?

A.  Yes.

Q.  Ms. Khatib, Mr. Neal did see an attorney -- Strike that.  Ms. Khatib, Mr. Neal did see a doctor between May 4, 2017, and June 19, 2017, didn't he?

A.  Yes.

Q.  And he forwarded the off-work note to the

18 (Pages 69 to 72)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 73

company; isn't that correct?

A. Yes.

Q. I'll say it this way. The off-work slip was provided to the company during that period of time; isn't that correct?

A. He did provide a note but did not provide us with any updated information.

Q. Well, the information as of 5/11 was that his condition was the same; isn't that correct?

A. That is correct.

Q. And it was the same since the prior note on February 28 from Dr. Gornet which I showed you; isn't that correct?

A. Correct.

Q. So the update is that he was in the same condition; isn't that correct?

A. That is correct, but it didn't say that he could return to work by June 19, which was the end of the 26-week period.

Q. I understand. Does this letter say that he had to get in contact with them to tell them if he could go back to work or not? It says: You did not contact the company or see a doctor prior to this deadline. He did see a doctor prior to the deadline, did he not?

Page 74

A. I believe he did, yes.

Q. And that off-work slip provided what restrictions were to be placed on Mr. Neal, correct?

A. The last note did not provide the restrictions.

Q. No, because it referenced Dr. Gornet, which did provide an indication as to what the restrictions were, correct?

A. I believe that was stated in February.

Q. Yeah, but it did provide the restrictions.

A. At that time. The restrictions that were in place at that time.

Q. And Dr. Boutwell incorporated those restrictions in her note of May 11, 2017; isn't that correct?

A. I believe that's correct, yes.

Q. And in the letter that you saw from Mr. Jerome on May 23, it states that Mr. Neal had no intention of abandoning his job, didn't it?

A. Yes, that's correct.

Q. And that he wanted to come back to work; isn't that correct?

A. That is correct, at the --

Q. It says he wanted to come back to work once

Page 75

his symptoms remitted; isn't that correct?

A. That's correct.

Q. It also says in the third paragraph, Ms. Khatib, that it says: As well as your violation of the company's attendance policy. Do you see that?

A. Yes.

Q. Do you have an understanding as to what violations of the attendance policy are being referred to there?

A. I do not administer the attendance policy, so I do not know.

Q. Is an individual supposed to come to work after they've been fired?

MR. CLARK: Objection, form, foundation.

A. I'm sorry. I don't understand the question.

Q. Sure. So Mr. Neal was terminated, according to this letter, on June 19, 2017; is that correct?

A. That's correct.

Q. If he was terminated, then he should not have been scheduled and should not go to work because he had been terminated after June 19, 2017; isn't that correct?

Page 76

MR. CLARK: Objection, form, foundation.

A. I believe that's correct.

Q. Okay. So based upon what you know of the attendance policy, an individual cannot be held in violation of the -- Strike that. Let me show you what's been marked Neal 330, page 56, and ask you to take a look at that.

A. Yes.

Q. Are you familiar with that document?

A. I believe so. Can I just read it quickly?

Q. Absolutely. Absolutely.

A. Thank you. Yes. Go ahead, please.

Q. Okay. Do you see the note in the middle of the page from Mr. Stafford to Mr. Becker and Mr. Nemechek?

A. Yes.

Q. All right. It says: Please see below, which I presume is referencing your email. Does that make sense?

A. Yes, uh-huh.

Q. So he's forwarding or at least attaching your email to the one that he's sending to Mr. Becker and Mr. Nemechek; does that make sense?

A. Yes.

19 (Pages 73 to 76)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 77

Q.   All right.  And he asked him: As we are well past June 19, I want to confirm that neither of you or anyone else there has been approached or contacted by Jerry or someone on his behalf to discuss return to work.  Do you see that?

A.   Yes.

Q.   Did Mr. Stafford contact you to see whether you had been approached or contacted by Jerry or someone else on his behalf?

A.   I do not believe so.

Q.   Do you know if Mr. Stafford contacted anybody else other than Mr. Becker and Mr. Nemechek to see whether they had been approached or contacted by Jerry or someone on his behalf to discuss return to work?

A.   I don't know the answer to that.

Q.   This is Neal 336, and it is an email from you, Ms. Khatib, dated June 26, 2017, at 10:40 in the morning to Dave Stafford.  And in the middle of that page, there is one from Stafford on the same date, May 26, 2017, at 10:37.  So he sends an email to you at 10:37, and then you respond back.

A.   I'm sorry.  The document that's up here is from July 20.

Page 78

Q.   Yeah, yeah.  I'm not talking about that.

A.   Oh, we're going back?

Q.   No.  The problem is I don't have it.  I don't have it in the file.

A.   I'm sorry.

Q.   So it's designated Neal 336, and it's dated June 26, 2017, at 10:37 a.m., an email from Stafford to you regarding Jerry Neal.  It says:  Amy, the last contact I was aware of with Mr. Neal to -- so I'm going to go ahead --

(Interruption by the court reporter.)

Q.   In the middle of that paragraph, it says: I can always reverse the termination, but given it's already been a week and Mark is generally the first to tell us of what's going on in Cahokia, I think we are in good shape.  Do you recall seeing an email with that language in it, Ms. Khatib?

A.   Yes, I believe so.

Q.   All right.  Is it your understanding that Mr. Stafford had the right to reverse a termination?

A.   He could take it out of the Workday system, so yes.

Q.   Did you have that ability or do you have that ability?

Page 79

A.   I do not, no.

Q.   Okay.  And then in your note to him, it says:  Thank you for following up on Mr. Neal.  Yes, please return him from leave and then do the termination.  Explain that procedure to me.

A.   It's a process in our HRIS system, which uses Workday, so you cannot process a termination until you return a worker from leave, and then you can process their termination.

Q.   So I just want to make sure.  You have to bring the person back in order to fire them?

A.   To process a termination in the Workday system, you have to return them from leave, and then you can process a termination in the system.

Q.   The May 4, 2017, letter to Mr. Neal, page 39, Neal 402, which I'm showing you right now, came from you?

A.   That's correct.

Q.   Why did that come from you?

A.   Part of my job here is to draft the 26-week letters, what we determine here for employees who have been out on leave and are approaching their 26 weeks of disability, the end.

Q.   Do you do that for individuals who are out

Page 80

for 26 weeks for work-related injuries?

A.   That is correct.

Q.   And are you indicating that that may be the only contact that you really have with a work-related injury is when you're writing a letter because the 26 weeks are coming up or have passed?

A.   Yes.  I don't administer the workers' comp claims.

Q.   And you have nothing -- Let me ask you this.  I want to make sure I have this understanding. You send this out, and then whether it's complied with or not has nothing to do with you, correct?

A.   I track the leaves for the company, so of course an employee can reach out to me directly if they choose to, as is stated at the bottom of the letter.

Q.   Well, what I mean is if they actually comply with the requirements of the letter, that's not something that would be of concern to you, that would go to a different department to see whether he did comply and whether accommodations could be made, things of that nature?

A.   I would be informed.

Q.   What would be the purpose of you being informed?

20 (Pages 77 to 80)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 81

A.   Because I handle the leave processes here, so any responses to extending a leave and making an accommodation or a combination thereof I would have to be involved in or I would be involved in.

Q.   Before you saw the letter today or were given the letter to look at from Mr. Jerome, had anybody sent you that letter in follow-up to your letter of May 4?

A.   To be -- I'm sorry.  Could you repeat that.

Q.   Yeah, sure.  Before this lawsuit, had anybody at the company ever sent you Mr. Jerome's letter?

A.   No.

Q.   Before this lawsuit, had anybody ever sent you the note from May 11, 2017, from Dr. Boutwell regarding Mr. Neal's restrictions for his medical update?

A.   I believe I did see that.

Q.   So that had been sent?

A.   I believe I saw that.  I would have to go back and double-check, but I believe I did.  I believe I did.

Q.   Did you see that before June 19, 2017?

A.   I don't recall.

Page 82

Q.   All right.  Is there a way that you could find out or verify whether you had seen that particular document before June 19, 2017?

A.   I would have to go -- I guess I could look back through email.  I apologize.  I can't confirm that right now.

Q.   Okay.  If you were asked to do so by the attorney, would you do so?

A.   Yes, I would.

Q.   The letter, this letter that you sent out to Mr. Neal, if he responded correctly but did not send it to Ms. Randall, would he be subject to termination do you know?

MR. CLARK:  Objection, form, foundation.

A.   I don't believe the letter stated he could return to work by the June 19 date, and I don't believe that letter indicated the accommodations that he was requesting we make for him.

Q.   I apologize.  I'm saying that with regard to your May 4 letter that you sent to Mr. Neal --

A.   Uh-huh.

Q.   -- if he, in fact, had responded correctly between May 4 and June 19, 2017, but he didn't respond directly to Ms. Randall, he responded to somebody else

Page 83

in the corporation, would he or could he have been dismissed for not sending it to Ms. Randall?

MR. CLARK:  Objection, form, foundation.

Q.   If you know.

A.   No.

Q.   He would not have been dismissed, correct?

A.   He would not have been dismissed just because he didn't send it to Ms. Randall.

Q.   And he would not have been dismissed just because Ms. Randall was not necessarily informed as long as the company was informed, correct?

A.   And he complied with the requests that were in the letter.

Q.   Understood.  I get that.

A.   Yes.  In other words, he could have sent it to me.

Q.   All right.  Or he could have sent it to Mr. Stafford, he could have sent it to Ms. Murphy, he could have sent it to anybody in the organization as long as it was sent to somebody in the organization, correct?

MR. CLARK:  Objection, form and foundation.

A.   Yes.

Q.   I'm sorry.  You said yes?

Page 84

A.   It would have to be somebody who was aware of his leave of absence.

Q.   And he would not have been terminated for not sending it directly to Ms. Randall, correct?

MR. CLARK:  Objection, form, foundation.

A.   Ms. Randall is not the only contact person, so he would not be terminated just because he did not -- He would not be terminated because he didn't send it to Ms. Randall.

MR. EZRA:  Okay.  Let me take a minute.  We might be finished.  Let's take five.

(A recess was taken from 11:30 a.m. to 11:38 a.m.)

MR. EZRA:  Okay.  We're back.  Ms. Khatib, I only have a few more questions.

THE WITNESS:  Thank you.

MR. EZRA:  I know that's a relief.

THE WITNESS:  I can get on with my Friday afternoon.

Q.   (By Mr. Ezra)  Let me show you this.  This is Document 72, Neal 406.  If you would take a quick look at that, please.

A.   Yes.  Okay.

Q.   Did you create this on behalf of Louis

21 (Pages 81 to 84)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 85

Dreyfus?

A.  No, I did not.

Q.  Do you know what department or who creates these kind of documents to submit for unemployment benefits?

A.  I believe human resources does.

Q.  And when you say "human resources," do you know of anybody particularly at human resources who would be responsible for that?

A.  I do not know if it's the HR partners, the regional HR partners or an HR partner in Wilton.

Q.  If it was the regional partner, that would be Mr. Stafford or his staff?

A.  Yes, that's correct.

Q.  And in Wilton who would it be or potentially be?

A.  Mary-Beth Price.

Q.  Okay.  Do you have anything to do with the submission of any of this kind of document for unemployment insurance benefits at all?

A.  I do not.

Q.  All right.  I don't have it in this packet, but designated as LDC 245 and 246 is the Sun Life Insurance Company of Canada Long-Term Disability Claim

Page 86

Packet Employer's Statement.  Do you recall seeing that in Mr. Neal's case?

A.  Yes.

Q.  And that's the document that you indicated to me earlier that you would fill out for an individual who is seeking disability, long-term disability, correct?

A.  Correct.  They were our carrier at that time.

Q.  All right.  And as part of that statement, do you recall whether you have to fill out something that would indicate the employer's understanding of the Physical Aspects of Occupation for the individual that was asserting long-term disability benefits?

A.  I would have to review the form, but if it's requested, I would send a job description because I don't know what duties each employee has.

Q.  Understood.  This one has a section that's called Physical Aspects of Occupation Continued, and then it has boxes to check off and various things that they could do -- bend, stoop, climb.

A.  Yes.

Q.  And then it has whether he could do it occasionally, frequently, continuously, or never.  That

Page 87

would be -- And you would be obligated -- You would be the person to fill that out on behalf of the corporation, correct?

A.  I would need that submitted job description because I don't have direct knowledge of whether an employee stands, sits, stoops.  I don't have that information.

Q.  Okay.  The disability application that we're talking about, do you have that with you?  Is that part of this stuff that was sent to you to review?

A.  Yes, it was.

Q.  Do you have it readily available to you?

A.  I don't.  I would have to find it.  Sorry.

Q.  The only reason I say that is because under this section it says "Never" under physical aspects of occupation, and it looks like some of the things are checked off, and I just wanted to ask you about that.

A.  On the copy that I have that I signed on 6/17, I didn't check off anything.

Q.  I have one that's signed 6/6.

A.  I'm sorry, 6/6, yeah.

Q.  In the upper right-hand corner --

A.  I'm sorry.

Q.  Page 2 under Section 7.

Page 88

A.  Page 2?

Q.  Well, the second page of the application.

A.  Which is page 4.

Q.  Oh, okay.

A.  I'm sorry.  I don't see that page in this what I have in my hands here.  Can you pull that up for me?

Q.  Well, I wish I could.  Do you see a Section 7?

A.  Yes.  I'm looking at part of a Section 7.

Q.  Okay.

A.  The page that I have -- Oh, I see that.

Q.  Now do you see it?

A.  Yeah.  Those aren't check marks to me, though.  I don't know if it's from copying.  I didn't -- I'm not checking boxes I don't believe at all.

Q.  Okay.  So you're indicating that with regard to Section 7, which is Physical Aspects of Occupation Continued, and lists various activities and the frequency, you're not -- you're indicating that you did not check anything in that box or those boxes?

A.  Yeah.  Those don't look like check marks to me.  They're like lines through it on the copy that I have, so I don't believe so.

22 (Pages 85 to 88)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 89

Q. Okay. But you're the individual that signed on behalf of the corporation?

A. Yes, I signed. Yes, I did sign this form, correct.

Q. Okay. All right. I'll ask you about one more thing and I think we're through.

A. Okay.

Q. I want to show you this. This is marked Neal 108, Number 433. Take a quick look at that if you don't mind.

A. It's a fax cover sheet, yes?

Q. It is. Do you know whose writing that is in the box?

A. I do not. It's not mine.

Q. That's fine. I'm interested -- One of the other things I'm interested in is a number which is a 912 number. 912 is a Georgia number. Do you know why there is a Georgia number there?

A. I do not.

Q. Do you guys have a facility in Georgia?

A. Yes. Our Imperial Sugar operations is in Georgia.

Q. Where in Georgia is that located? Do you know?

Page 90

A. Savannah. It's Port Wentworth/Savannah.

Q. That would be a nice place to go.

A. It'll be warm.

MR. EZRA: I don't think I have anything further. Thank you, Ms. Khatib.

THE WITNESS: Thank you.

CROSS-EXAMINATION
BY MR. CLARK:

Q. Amy, can you her me okay?

A. Yes.

Q. I just have some follow-up questions for you. Do you recall earlier in your testimony where you discussed that an STD claim was being pursued for Mr. Neal at the same time that a workers' compensation claim was pending? Do you recall that testimony?

A. Yes.

Q. Okay. And with respect to processing both those claims, do you believe that's beneficial to the employee?

MR. EZRA: I'll object to form. You can answer.

A. Yes.

Page 91

Q. And why do you believe that's beneficial?

A. It continues payment while a workers' comp case is being reviewed.

Q. So would you agree if a workers' compensation claim is pending and they're still trying to determine whether they're going to pay benefits, the employee can get the STD benefits paid while that's going on?

MR. EZRA: Objection to the form of the question, leading. You can answer, Ms. Khatib.

A. Yes.

Q. And you also testified I believe that Mr. Neal pursued a long-term disability claim, correct?

A. Yes.

Q. Was that a yes? I'm sorry. I didn't catch that.

A. Yes. Correct.

Q. And were benefits paid on that claim starting in June of 2017?

A. Yes. I believe that is the correct date, yes.

Q. And when did you understand those benefits would have continued through?

A. They would have continued through his

Page 92

period of total disability but no longer or only up to the age of 65.

Q. And if he did receive those benefits, would that tell you that a determination was made that he is totally disabled at that time?

A. Yes.

Q. Okay. And what's your understanding of what that means when the determination is made for LTD that someone is totally disabled?

A. That you are unable -- That for the first 24 months, you are unable to perform your occupation, and then after that, the definition changes to any occupation.

Q. So in Mr. Neal's case, would that indicate that Sun Life -- or a determination was made that he was disabled and couldn't work from June through September of 2017?

MR. EZRA: Object to the form and -- Yeah, object to the form and foundation. You can answer, Ms. Khatib.

A. Yes. Yes.

Q. Okay. I want to talk about a couple of exhibits that were covered with you, and one of them is your letter dated May 5, 2017, which I believe is

23 (Pages 89 to 92)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 93

page 39. I don't know if we can pull that up on the screen. It's page 39. All right. And again this is your letter dated May 4, 2017, that you sent to Mr. Neal, correct?

A. Yes, correct.

Q. Okay. And in your letter, are you advising him that his employment would be subject to termination as of June 19, 2017, unless he is able to return to work?

A. Yes.

Q. And is that in the first paragraph of the letter that you sent?

MR. EZRA: Objection. The document speaks for itself. You can answer, Ms. Khatib.

A. Yes.

Q. And you also informed him in this letter, would you agree, that if he is not able to return to work, he can pursue the LTD benefits, correct?

A. Correct.

Q. Now, he also, under the second paragraph, can reach out if he wants to ask for accommodations; is that a fair statement?

A. Yes, that's correct.

Q. And who would he have to contact to do

Page 94

that?

A. In the letter it states Amber, but he could have also contacted me as instructed below.

Q. Okay. And that's a good point. On this letter at the bottom -- And you might not be able to see it on the screen, but there's some people copied on the letter, and do you know who you would have copied on the letter?

A. Yes. We copied the HR manager or HR partners, so in this case it would have been Dave Stafford, Amber, and I believe Jacky Ott was still there at the time.4.

Q. Okay.

A. Murphy, her new name is Murphy.

Q. So all those people were being provided information, and they were all in the loop about your 26-week letter that you had sent to Mr. Neal; is that correct?

A. That is correct.

Q. Okay. Now, after you sent this letter, there were some questions asked about information that was received by you or the company relating to Mr. Neal. Do you recall those questions?

A. Yes, I do.

Page 95

Q. Okay. And some of the questions were related to work slips that established restrictions for Mr. Neal. Do you recall those questions?

A. Yes, I do.

Q. Okay. In your mind, did any of those restriction notices change anything with regard to the May 4, 2017, letter you sent?

MR. EZRA: Objection, form and foundation. There is not her job. You can answer, Ms. Khatib.

A. No, they did not.

Q. Would you agree those restrictions merely established that he was physically unable to perform certain things based on his medical condition, correct?

MR. EZRA: Same objection. You can answer, Ms. Khatib.

A. Yes. Correct.

Q. Now, we also talked about the lawyer letter that was sent by Mr. Jerome, and if we could bring that up. That's page 42 of Plaintiff's Exhibit. Do you recall being asked some questions about this letter?

A. Yes, I do.

Q. And you agree this letter was not sent to you before June of 2017, correct?

A. That is correct.

Page 96

Q. Do you know if this letter was sent to anybody who was copied on your letter to Mr. Neal, including Mr. Stafford or Ms. Randall or the other HR manager you mentioned?

A. I don't believe so.

Q. Okay. And in this letter, you have read it and you reviewed it with counsel. Is there anything in this letter indicating that Mr. Neal is going to be able to return to work by June 19, 2017?

MR. EZRA: Same objection, form, foundation. You can answer, Ms. Khatib.

A. No, there is not.

Q. And you agree that this is an attorney letter, it's not a doctor's note, correct?

A. That's correct.

MR. EZRA: Same objection.

A. That's correct.

Q. And you agree there's nothing in this letter asking for accommodations that would allow Mr. Neal to return to work by June 19 of 2017?

MR. EZRA: Form, foundation, and leading. You can answer, Ms. Khatib.

A. That is correct.

Q. So with respect to this letter, did this

24 (Pages 93 to 96)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
Amy Khatib 12/2/2022

Page 97

change anything with respect to your May 4, 2017, letter indicating that his employment would be terminated as of June 19?

MR. EZRA: Same objection, form and foundation. You can answer, Ms. Khatib.

A. No, it did not.

Q. And again as of June 19, Mr. Neal was getting disability benefits at that time after being determined that he was totally disabled; is that a fair statement?

A. Yes.

Q. And again that's a determination that he can't work; would you agree?

A. I agree, correct.

MR. CLARK: Okay. I have no further questions.

REDIRECT EXAMINATION
BY MR. EZRA:

Q. I just want to make sure of one question, Ms. Khatib. Are you indicating that as of June 19, 2017, that Mr. Neal was getting long-term disability payments?

Page 98

A. I don't have the date of the approval letter in front of me, but the benefits were payable back to that date.

Q. Back to that date, but when were they approved?

A. I believe the approval -- and I will go back and check -- was in August.

Q. The approval was in August?

A. And the benefits were retro back to --

Q. Right. So the determination with regard to his ability or inability to work as to the long-term disability application wasn't made until August; is that correct?

A. Yes, but stating he could not work at that time.

Q. I understand, but it was not made until August, correct?

A. That's when the approval letter was done, yes.

MR. EZRA: That's all I have.

MR. CLARK: I have no further questions, and we'll read and sign the deposition. Thank you, Amy. I think that's all we have.

THE WITNESS: Thank you very much.

Page 99

(Off the record at 11:57 a.m.)
(Plaintiff's Group Exhibit Number 1 was attached to the transcript.)

***************

Page 100

_____
AMY KHATIB

STATE OF _____ )
                           )
COUNTY OF _____ )

Subscribed and sworn to before me this _____ day of _____, 2022.

_____
NOTARY PUBLIC

My Commission Expires:
***************

(NNH)

25 (Pages 97 to 100)

Page 101

CERTIFICATION

I, Nancy Naas Harmon, a Certified Shorthand Reporter in the State of Illinois and Certified Court Reporter in the State of Missouri, DO HEREBY CERTIFY that pursuant to agreement between counsel there appeared before me on December 2, 2022, at the law offices of Byron, Carlson, Petri & Kalb, LLC, 411 St. Louis Street, Edwardsville, Illinois, AMY KHATIB, who was first duly sworn by me to tell the whole truth of all knowledge touching upon the matter in controversy aforesaid so far as the witness should be interrogated concerning the same; that the witness was examined and said examination was taken down in shorthand by me and afterwards transcribed, then being signed by the deponent, signature not having been waived by agreement of counsel, and said deposition is herewith returned.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of December, 2022.

_____
Nancy Naas Harmon, CSR, CCR, RPR
IL #084-003219, MO #986

Page 102

KEEFE REPORTING COMPANY
11 North 44th Street
Belleville, IL 62226
December 13, 2022

Mr. Aaron A. Clark
McGRATH NORTH MULLIN & KRATZ, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, NE 68102

IN RE: JERRY NEAL, JR. vs. LOUIS DREYFUS COMPANY SERVICES LLC
No. 3:21:CV-00820-GCS

Dear Mr. Clark:

Enclosed herewith, please find a copy of the deposition transcript of AMY KHATIB taken in the above-captioned matter on December 2, 2022, along with the original signature page of same.
Please have Ms. Khatib read her deposition, note any corrections to be made on the provided sheets, sign the original signature page, and have her signature notarized where indicated. Following this, please return the original executed signature page and correction sheets to me within 30 days and forward same to all counsel of record. Thank you.
Yours very truly,
KEEFE REPORTING COMPANY

Nancy Naas Harmon, CSR, RPR
Illinois License #084-003219

cc w/Enc: D. Jeffrey Ezra, Esq.

# Deposition of:
# **David Stafford**

**Date:** December 1, 2022

**Case:** Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC

**Reporter:** Doris A. Eby, CSR

**Keefe Reporting Company**
618-277-0190
reporter@keefereporting.com

**EXHIBIT**

**5**

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JERRY NEAL, JR.,          )
                          )
          Plaintiff,      )
                          )
     -vs-                 ) Case No: 3:21-cv-00820-GCS
                          )
LOUIS DREYFUS COMPANY )
SERVICES LLC,             )
                          )
          Defendant.      )

DEPOSITION OF DAVID STAFFORD, taken to be used in an action pending in the United States District Court, Southern District of Illinois, State of Illinois, pursuant to agreement between counsel, under the provisions of Rule 26(a) of the Rules of Civil Procedure, taken on the 1st day of December, 2022, between the hours of eight o'clock in the forenoon and six o'clock in the afternoon of that day, all parties appearing remotely by video conference; before Doris A. Eby, CCR, CSR, MO & IL., in a certain cause now pending in the United States District Court, Southern District of Illinois, on behalf of the Plaintiff.

                    -o0o-

---

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JERRY NEAL, JR.,          )
                          )
          Plaintiff,      )
                          )
     -vs-                 ) Case No: 3:21-cv-00820-GCS
                          )
LOUIS DREYFUS COMPANY )
SERVICES LLC,             )
                          )
          Defendant.      )

VIDEO CONFERENCE DEPOSITION OF DAVID STAFFORD
TAKEN ON BEHALF OF THE PLAINTIFF
ON DECEMBER 1ST, 2022

Reported by
Doris A. Eby
Missouri CCR Number 518
Illinois CSR Number 084-004140
_____

KEEFE REPORTING COMPANY
11 North 44th St.
Belleville, IL 62226
(618)277-0190

Page 2

I N D E X   O F   E X A M I N A T I O N

WITNESS:  DAVID STAFFORD

Direct Examination by Mr. Ezra            5
Cross-Examination by Ms. Horvatich      166
Redirect Examination by Mr. Ezra        171

Page 4

A P P E A R A N C E S

FOR THE PLAINTIFF
BYRON, CARLSON, PETRI & KALB
411 St. Louis Street
P.O. Box 527
Edwardsville, IL 62025
By: D. Jeffrey Ezra, Esq.
Email: jezra@bcpklaw.com

FOR THE DEFENDANT
MCGRATH NORTH MULLIN & KRATZ, PC LLO
1601 Dodge Street
Omaha, NE 68102
By: Ruth A. Horvatich, Esq.
   Aaron A. Clark, Esq.
Email: Rhorvatich@mcgrathnorth.com

1 (Pages 1 to 4)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 5

DAVID STAFFORD, of lawful age, being first duly sworn to tell the truth, the whole truth, and nothing but the truth, deposes and says on behalf of the Plaintiff.

DIRECT EXAMINATION

QUESTIONS BY MR. EZRA:

(Going on the record at 10:01 a.m.)

Q   Would you please state your full name for the record?

A   Roger David Stafford.  I go by Dave.

Q   Mr. Stafford, my understanding is that you are retired; is that correct?

A   That is correct.

Q   Where did you retire from?

A   I retired from Louis Dreyfus Corporation -- Company, the Kansas City office.

Q   All right.  And I've seen some documents where it's designated LDC.

Would that be appropriate if we called it LDC?

A   Yeah.  The company has gone through several name changes.  It could be the LDC at that time, I don't recall.

Q   Okay.  Where do you currently reside?

Page 6

A   I currently reside in Leavenworth, Kansas.

Q   All right.  And have you had your deposition taken previously?

A   Yes, sir.  I have.

Q   How many times have you had your deposition taken previously?

A   I honestly couldn't tell you how many times.  I --

Q   All right.

A   -- haven't kept track.

Q   A number times, is that --

A   Yes.

Q   -- reasonable to assume?

A   Yes.

Q   Okay.  And have you had your deposition taken in any occasion wherein the claim was made that an individual had been wrongfully terminated?

A   Yes, I have.

Q   How many times have you done that?

A   Half a dozen, dozen times.

Q   Do you remember any of those cases in any particularity?

A   Some of them.

Q   All right.  Would you give me, as best you

Page 7

can, the ones you can recall?

A   Basically it was early '90s.  I was the HR manager for Cargill/Excel Corporation meat packing facility in Friona, Texas.

Q   That's the -- I don't mean to cut you off, but that's the place you worked for before you came to Louis Dreyfus; correct?

A   That is correct.

Q   Okay.  Please continue.

A   Was a human resource manager for them there.  We terminated a number of employees who had been on leave for, in some cases years.  And as a result of that, received lawsuits claiming retaliatory discharge.

Q   Was it a class action suit or were there individual suits?

A   They were individual claims.

Q   Do you remember the names of any of those individual clients?

A   No.  Not off the top of my head, no.

Q   The cases that were filed, do you remember, were they all kind of filed in the same court?

A   Yeah.  It was Northern District, Amarillo.

Page 8

Q   And you may not remember, I understand we're talking, you know, close to 30 years ago, so I get it.  Do you remember the names of any of the plaintiff's attorneys in those cases?

A   Yeah.  Sam Fadduol and Kevin Glasheen.

Q   I'm sorry, Sam Fadduol and?

A   Kevin Glasheen.

Q   All right.  Any other cases that you have been involved in where you provided a deposition in a wrongful termination claim?

A   Any wrongful termination?  Yeah, there may be a few -- I don't recall specifically -- over 30 years.

Q   Sure.  Do you recall any in which it was claimed that there was a -- that the individual was being retaliated against for having filed a workers' compensation?

A   Other than the ones we've previously discussed, no.

Q   No?  Okay.

All right.  When did you get over to Louis Dreyfus?

A   I started with Louis Dreyfus January 3rd of 2011.

2 (Pages 5 to 8)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 9

Q   And what was your role there when you first came on board?

A   I was a regional human -- a regional human resource manager.  And, basically, had responsibility for -- they had two ethanol plants, a biodiesel oil -- oilseed facility, one in Indiana, and became involved in one in Saskatchewan, an oilseed processing facility.  And had a grain elevator -- I'm trying to recall -- I want to say Houston and Seattle at that time.  So had some involvement with those locations.

Q   Gotcha.
And what were your responsibilities as a regional human resource?

A   It was basically the facility human resource manager for those locations.

Q   Okay.  And, again, what would your responsibilities encompass?

A   So, you know, typical human resource stuff:  Payroll, benefits administration, you know, work rules, discipline, safety, training development.  You know, just a generalist nature of duties.

Q   Were your duties similar to what you did

Page 10

at Cargill --

A   Yeah.

Q   -- or what you did last at Cargill?

A   To some extent.  I was -- my last position at Cargill I was a -- oh, I'm trying to recall what they called it -- a business unit HR manager.  So I oversaw, evaluated needs business unit from an HR perspective and had several direct reports.

Q   Gotcha.
Did your job responsibilities change at -- well, let me ask it this way.
What was your next job at Louis Dreyfus, if you, in fact, did have another?

A   Well, the job -- essentially the title stayed the same.  It evolved over time.  We added some grain elevators.  We acquired a sugar facility.  I became more involved in labor relations issues in Canada and in Seattle.
So, I mean, the job essentially stayed the same, it just evolved and got bigger with the --

Q   Expanded -- expanded in terms of the facilities that you had responsibility for?

A   Yeah, scope and geography and -- and got more involved in M&A type, you know, so mergers,

Page 11

acquisitions, divestitures, things of that nature.

Q   Sure.  Could you give me a little bit of an understanding -- I know some of it -- of your educational background.  Obviously you went to the University of Kansas, I know that.

A   Rock Chalk.
(Reporter clarification.)
MR. EZRA:  Rock Chalk.
THE WITNESS:  Rock Chalk.  It's the KU --
MR. EZRA:  See, these are people that are --
THE WITNESS:  Yeah.  It's a team slogan.  It's --
MR. EZRA:  Let's go off the record for a second.
(Off-the-record discussion.)

Q   (By Mr. Ezra) Mr. Stafford, we had sent out a notice, and the notice indicated that we needed you as: (Reading)
-- a deponent individually, and pursuant to Rule 30(b)(6) as corporate designee most knowledgeable of the reasons for Mr. Neal's termination from the

Page 12

defendant.
Are you aware that you have been designated that?

A   No.  But okay.

Q   All right.  Well, it's kind of important, so I want to make sure we go over that.  And since you've had your deposition taken previously, I'm not going to go over the ground rules too much.
You know you have to give a verbal response; right?

A   Correct.

Q   And if I ask a question that you do not understand -- and believe me, that is going to happen -- please let me know --

A   Okay.

Q   -- and I will rephrase it.  Okay?

A   Okay.

Q   If you want to take a break, that's fine.  But if there's a question that's pending at that moment, I would ask that you answer that question before we take the break, if that's okay.

A   Understand.

Q   All righty.
So the 30(b)(6) designation essentially

3 (Pages 9 to 12)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 13

means that you've been named by the company as their corporate representative on the issue of Jerry Neal's termination.
Okay?
A  Okay.
Q  And does that make sense to you?
A  Yep.
Q  All right. And you understand that you are speaking -- when you provide an answer, that you are speaking or answering questions on behalf of Louis Dreyfus in addition to any personal experience you may have had, and that your answers are binding upon the corporation.
Do you understand that?
A  Yes.
Q  Okay. So you may have personal knowledge, but in addition to personal knowledge, any other questions you answer are going to bind the corporation.
Got it?
A  Okay. Yes.
Q  Okay. And let me ask you this, it's going to sound like a strange question, but do you think, based upon what you know, that you are the

Page 14

individual most knowledgeable about the termination of Jerry Neal's work?
A  I try to stay away from adverbs like "most", but yes, I have a lot of knowledge about Mr. Neal's termination.
Q  Okay. Well, the deposition notice says "the designee most knowledgeable," and you've been designated that.
A  That's fine.
Q  All right. Can you think of anybody else that you think, within the organization when you were there, that would have more knowledge regarding his termination than you?
A  No.
Q  Okay. Did you familiarize yourself in any way with the circumstances surrounding the termination of Jerry Neal when it became apparent that you were going to have your deposition taken?
A  Yes. I have reviewed some documents.
Q  Can you tell me, as best you can, what documents you reviewed?
A  Basically they were some emails that I had sent/received. I believe there was a letter from Mr. Neal's attorney. I assume that's you.

Page 15

Q  It was not, but it's okay.
A  There were I want to say a set of restriction forms in there that I looked at. Some of my handwritten notes, things of that nature, that were in the file.
Q  All right. So I have a letter, we're probably going to talk about it, where you do have some handwritten notes. And then there's handwritten notes on the next page.
Other than that limited notes that I just talked to you about, did you have more notes? When you were looking, were there extensive notes that you had written personally?
A  Yeah. No, that -- that would probably all the handwritten notes. I haven't gone and looked at the personnel file, per se, but I assume that's been produced and --
Q  Okay.
A  -- that's where those documents I looked at came from.
Q  Gotcha.
Do you have those documents that you looked at in anticipation of today's deposition with you?

Page 16

A  Yes, but not readily available.
Q  Okay.
A  I mean, I've just got my --
Q  No, we'll probably get to a good portion of them --
A  Yeah.
Q  -- anyway.
Other than the documents that were provided to you, did you look at anything else or did you seek or ask for any other documents when you -- in other words, did anything hit you when you said, Hey, I need to see further stuff?
A  No, I -- I didn't.
Q  All right. In anticipation of your deposition and having been designated as a 30(b)(6) designee, did you receive any information from Louis Dreyfus attorneys regarding the facts, not their impressions, their facts that you were unaware of regarding the case?
MS. HORVATICH: I'm going to object as to form.
Q  (By Mr. Ezra) I don't want to know about any discussions you had with them where they gave you their impressions about the case. I'm only -- I'm

4 (Pages 13 to 16)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 17

only asking you about the facts of the case.

Q Were there facts that you were unaware of that you have learned from the attorneys in anticipation of today's deposition?

A No facts, no.

Q Okay. Other than the attorneys, did you speak to anyone in anticipation of your deposition today?

A I did not.

Q So what role -- and you told me that you were the HR -- regional HR director; is that correct?

A Correct.

Q All right. What role did you have when it became apparent that an individual was injured -- either work comp or, let's say, outside the job -- and it impacted their ability to work?

A My involvement was minimal. I may, from time to time, assist employees -- or, actually, it would be helping the managers understand where to file the appropriate forms, you know, whether if it was work-related, you'd file it with one insurance company versus a group. Or individual personal claim, you'd file it with another. I'd help them

Page 18

with that, that kind of thing.

Q Do you -- in reviewing the materials in anticipation of this deposition and being designated a 30(b)(6), would you have characterized your involvement in this case as minimal?

A Yes.

Q Okay. Is there a difference -- or was there a difference, as best you know, how an individual was dealt with if they were injured on a work-related event or outside of work? Were they dealt with differently?

A Not to my recollection, no.

Q Okay. So in this case -- and we're going to get into it -- in this case, for example, Mr. Neal's injured and they place him on short-term disability as opposed to workers' compensation.

Do you recall reading that in the documents that you looked at?

A Yes. I -- yes.

Q All right. How would that designation be made as to whether that injured employee would be given the opportunity to file a short-term disability claim or it came under the umbrella of workers' comp?

Page 19

A We let the employee decide. They'd tell us how they got hurt and how they wanted to file.

Q So everything would be driven by the employee?

A Yeah.

Q How would the employee know which one was to his benefit?

A Well, you're either hurt at work or you're not. I mean, so you're hurt at work, it's a work comp. If you're hurt at home, it's personal, or an illness, I mean...

Q All right. Gotcha.

So --

A Basically we ask the employee, how did this happen.

And based on what he told us, we'd move forward appropriately.

Q Gotcha. All right.

And if the individual -- I just want to make sure that I have this down. So if the individual said, Hey, I slipped and fell down some stairs at my house, that would be designated as a short-term disability claim if he couldn't work; correct?

Page 20

A Right. Right. We would help him file a short-term disability claim, correct.

Q Gotcha.

And if he slipped and fell at the facility where he worked, that would be considered a workers' compensation case, and you guys would designate it as such?

A Right. And we'd -- I'd instruct the facility manager to file a claim with Zurich, with the insurance company.

Q Okay. All right. Did you -- were there ever any instances in which the company would ultimately make a determination that, Hey, this person is workers' comp, but I don't think he got hurt on the job, we're going to make him file his short term disability claim, or vice versa, where we think he might have gotten hurt on the job, and we're not going to have him file a short term disability claim, but put it in work comp?

MS. HORVATICH: Object to form.

MR. EZRA: Yeah, that was pretty convoluted. That was -- that was definitely a compound question, there's no doubt about that.

Q (By Mr. Ezra) Let me ask it this way. Were

5 (Pages 17 to 20)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 21

there any instances in which somebody had been designated for short term disability. You decided that instead it was a work comp case?

A   There may have been cases where the employee filed -- I can think of one case, in particular out of the serve facility, where the employee insisted on filing it as a personal versus a work comp. And we had reason to think it was work-related, but they were absolutely insistent, and so we let them file that way.

Q   Gotcha.

Do you know whether there's a difference in terms of the amount of money that they would receive while they were off work if it was a work comp claim versus a short term disability claim?

A   Well, every state's different in terms of benefits paid, but I -- but I generally think that work comp indemnity benefits work better than short term disability. But I'm not an expert and wouldn't swear to that.

Q   Sure. Sure. Sure. But that -- based upon your experience at Dreyfus, you came to that kind of conclusion; correct?

A   Yeah, I came to that conclusion working at

Page 22

Cargill.

Q   Okay. Oh, Cargill. Gotcha.

All right. And then I presume that since -- that there was a cadre of individuals that would be involved at Louis Dreyfus with a particular claim, whether it be short term disability or workers' compensation.

Since your involvement was minimal, there must have been other people involved; correct?

A   Well, we -- not at Louis Dreyfus, no. I mean, involvement at Louis Dreyfus was minimal. We contracted with insurance carriers and they managed the claim.

Q   All right. Did you have individuals at Louis Dreyfus who would keep abreast of what was going on and make decisions if the carrier came to them and said, Hey, we need you to make a decision on something?

A   Yeah. We had a work comp manager in our Wilton office, yes.

Q   And do you remember who that was during the Jerry Neal matter?

A   I believe it was Mary Jo or JoJo Magrone.

Q   Okay. Yeah, so I don't want to call her

Page 23

wrong, but it says Mary Jo. But it looks like some of the correspondence has her down as JoJo, so I presume --

A   Yeah. Everybody calls her JoJo.

Q   Okay. All right. Fair enough.

In looking at the materials -- there are a number of individuals that were listed throughout the materials we're going to talk about, so I'd like to get a feel for who they are first. And then -- before we start talking about the actual documents.

So can you tell me, for example, who Amber Randall was during the period of time that you were working there?

A   Amber Randall, at that period of time, would have been at the Kansas City office. The HR department was composed of myself, another young lady named Jacqueline Murphy. And then Amber would have been the newest member. And I want to say she was relatively new to the organization at that time, but I -- but I'm not certain.

Q   Okay. So she would have been your subordinate?

A   Yes.

Q   Okay. And Ms. Murphy also?

Page 24

A   Yes.

Q   And -- and it's going to sound kind of strange, but bear with me.

They were -- you were their direct report?

A   They reported directly to me, yes.

Q   Okay. And they were in the same building with you, in the same office with you?

A   Yes.

Q   In the same location, like on the same floor or --

A   Yes. We --

Q   -- you know, with offices --

A   Yeah. At the time, I think -- yeah, we were on the fifth floor, basically over in a corner is where we kept all the HR files and things of that nature.

Q   Gotcha.

Do you know a Carol Ponzo, P-O-N-Z-O?

A   No.

Q   Do you know a Scott -- and I got to read it -- a Scott Cogbill.

A   Yes, I know Scott Cogbill.

Q   Who is Scott Cogbill?

A   Scott -- I forget his exact title, but he

6 (Pages 21 to 24)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 25

was one of our safety, health and environment managers there in the Kansas City office.

Q   All right.  So you were -- you guys were in the same building.  Maybe not the same floor, but the same building?

A   Right.

Q   By the way, do you still keep in contact with Ms. Murphy or Ms. Randall?

A   It's -- not routinely, no.

Q   Okay.  Who's Scott Becker?  Do you know that name?

A   Yeah, I do.  He was the facility operation manager at the Cahokia facility.

Q   And as part of your regular duties, would you come in contact with him on issues that were unrelated to, for example --

A   Yes.

Q   -- Jerry Neal's accident?

A   Yes.

Q   Okay.  Do you know a Gene Loffler?

A   I do.

Q   And what was Gene Loffler's position?

A   Again, at the time I'm not exactly certain.  I know he had responsibility over some of

Page 26

the elevators.  I'm not sure if he had responsibility on all -- over all of them, but at least some of them in North America.

Q   And where did he work out of?

A   He worked out of Portland, Oregon.

Q   And Marcus Dixon, do you know Ms. -- Marcus Dixon?

A   Yeah, I do.

Q   And what was his role?

A   Last I know, he was either assistant or the manager of the Seattle grain export facility.

Q   And do you remember what his role was during the Jerry Neal --

A   I believe he was an operations supervisor at that time.

Q   Amy Khatib?

A   Yes, I know Amy.

Q   Yeah.  And did I spell -- did I say that last name correctly?

A   No, you said it right.  I fumbled it.

Q   Hey, that's good.  That's pretty good.
    All right.  So what was -- what was Ms. Khatib's role when the Jerry Neal matter was going on?

Page 27

A   She was the benefits manager in our Wilton corporate headquarters -- country corporate headquarters.

Q   Where was that?  Where was that located?

A   In Wilton, Connecticut.

Q   In Wilton, okay.  I appreciate that, because I think there was an email that I saw that said something -- I think you wrote it -- that said we're waiting on Wilton or it's going to be up in Wilton.  I didn't know who that was.
    So it's just a location?

A   Yeah.  Yeah.

Q   Okay, I got it now.
    Do you have -- and we're going to be talking to her, I suspect -- but do you have an understanding as to what her role or responsibility would have been in the Jerry Neal matter?

A   Well, as you noted, he initially filed for short term disability.  And Ms. Khatib would -- I mean, she managed our group benefits, so medical dental, life, disability.

Q   All right.  Would that have included work comp as well?

A   No.

Page 28

Q   Okay.

A   I mean, there were more than one occasion -- Mr. Neal's not atypical -- where, you know, it takes some time for an employee to receive work comp benefits, determination has not been made, for whatever reason.  And so there have been situations where we have filed -- the employee's filed for short term disability, and she'd been involved, and then, you know, subrogating that claim at some point once that determination's made.

Q   Okay.  Mark Nemechek?

A   Mark, I believe at the time, was the assistant facility manager at the Cahokia facility.

Q   So Mr. Becker would have been his supervisor?

A   That's correct.

Q   Okay.  Charisse Twine-Stokes?

A   She's clerical and administrative support for Amy Khatib in benefits in Wilton.

Q   Meaka Benton, do you know that name?

A   No, I do not.

Q   Did you see that name in any of the materials that you reviewed in anticipation of the deposition?

7 (Pages 25 to 28)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 29

A   Not that I recall.  No, sir.

Q   Okay.  And JoJo Magrone was director of insurance; is that correct?

Does that make sense?

A   Mary Jo Magrone --

Q   Yes.

A   -- yes, sir.

Q   And what would have been her job in relation to what Ms. -- you just told me, who we just talked about -- Ms. Khatib's job would have been?  How were they -- how would those two jobs have been different?

A   Well, JoJo worked in our insurance department that oversaw P&L claims, you know, so a broader aspect.  And Amy was focused solely on the employee group health.

Q   Gotcha.

Mary-Beth Price, are you familiar with Mary-Beth Price?

A   Yes, I am.

Q   What was her role?

A   At the time -- I'm not sure of her title -- I think she was human resource manager for the Wilton office.  She may have been the assistant

Page 30

director at the time for Louis Dreyfus, but I'm not certain.

Q   All right.  Daniel Murray?

A   Who?

Q   Daniel Murray.  Are you familiar with that name?

A   It's not ringing a bell, no.

Q   Okay.  David Velasquez, you familiar with that name?

A   No, I couldn't -- no.

Q   That's fine.

Corey Rubin?

A   Yeah.  Corey is corporate counsel in our Wilton office.

Q   Okay.  I think we're coming to the end.  There's a lot of players here.

All right.  Okay.  I'm going to start showing you some documents, if you don't mind.

A   Sure.

Q   And let me try and bring this up.

All right.  And this is designated as Neal 406 and Page 72.  Okay?

Can you see it?

A   Yes.

Page 31

Q   All right.  So this document is -- it says LD Commodity Services, LLC, and it says Employer's Response to UI Claim.

Do you see that?

A   I do.

Q   Did you -- is this one of the documents that you reviewed in anticipation of your deposition today?

A   I have reviewed this, yes.

Q   All right.  So I want to talk a little bit about this for a moment.

And am I correct when I state, Mr. Stafford, that this is Louis Dreyfus's response to Mr. Neal's claim for unemployment benefits?

A   I would say yes, it is.

Q   All right.  And this is Louis Dreyfus's objection, if you will, or protest, to the granting of unemployment benefits to Mr. Neal; is that correct?

MS. HORVATICH:  I'll object to foundation and form.

Q   (By Mr. Ezra) As far as you are aware, how's that, as far as you are aware?

A   Yeah.  I mean, this -- to characterize it

Page 32

as a protest, I mean, whether he got unemployment or not, didn't -- I mean, that's not my decision, it didn't matter to me.

Q   Well, that's what we're going to talk about.

A   The state --

Q   Whose decision would it have been?

A   The state.

Q   No.  I'm talking about whose decision would it have been to submit this kind of document to the state?

A   It's -- typically when we receive a notice from the unemployment office saying a claim's been filed, please submit information, we'll send this type of information in.

Q   Who's "we"?

A   It could be myself.  It could be Amber.  It could have been Jackie.  It could have -- you know, it just depends on who got it that day and handled it.

Q   Okay.  Would there have been -- assuming for a moment that it came to you, would you have had a conversation with the other individuals that you just spoke -- that you just named to make a

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 33

determination whether you were going to submit something like this?

A   No.

Q   So you would have -- it's possible that you would have done it unilaterally?

A   Yeah.  I mean, it was -- yeah, I could have filed this, yes.

Q   Okay.  And Amy could have filed it unilaterally without having to have -- to talk to you or consult with you about it, correct?

A   I'm sorry, did you say Amy?

Q   Yeah.

A   Yeah.  No, Amy wouldn't have.  Amber or Jackie would have.

Q   Gotcha.  All right.
And they would have had the authority to do it individually without having to consult you or anybody else in the department, correct?

MS. HORVATICH:  Object to form.

Q   (By Mr. Ezra) You can answer.

MS. HORVATICH:  You can answer.

A   Yeah.  So long as they had sufficient facts to submit a truthful response to the state, yes.

Page 34

Q   (By Mr. Ezra) Were they under any obligation to let you know that they were doing something like this, when a --

A   No.

Q   Okay.  All right.  Do you have any independent recollection that you were the one that actually submitted this to the Illinois Employment Security Division?

A   I probably had the most knowledge.  If I had to speculate, I would say I was the one that filed it, but I have no specific knowledge.

Q   Okay.  Fair enough.
So in the second paragraph it states: (Reading)
On May 4th Mr. Neal was sent a letter notifying him that his employment would be terminated.
Is that correct, you believe that to be -- I mean --

A   Yes.

Q   -- I just want to verify --

A   I guess.

Q   -- that we're on the same page with the information that's in here.

Page 35

So do you remember --

A   Yeah.  I believe --

Q   -- doing this?

A   -- a letter was sent May that would notify him that he would be terminated on June 19 unless.

Q   Okay.

A   Just like it says.

Q   Right.  (Reading)
Unless prior to that date he contacted the company to discuss his employment status, including possible accommodations that may allow him to return to work.

A   That is correct.

Q   Okay.  And you also requested, the company, also requested:  (Reading)
Mr. Neal provide updated medical documentation prior to June 19th.
Is that accurate?

A   That is correct.

Q   All right.  And your next line is that: (Reading)
Mr. Neal did not bother to provide an update until June 26th.

Page 36

Is that your understanding?

A   That's what I wrote, yes, sir.

Q   All right.  The next paragraph states that: (Reading)
Although Mr. Neal had been released to return to work as of June 22nd, he did not notify the company of his absence for his scheduled shifts.
Correct?

A   That's my recollection, yes.

Q   All right.  All right.  Is it your understanding -- and I'm going to ask you more -- but is it your understanding that he was released to full duty on June 22nd?

A   No.  Not full duty, no, sir.

Q   All right.  Is it your understanding that he was released with restriction?

A   Yes, sir.

Q   And I presume one of the documents you reviewed in anticipation was a document that said that he was going to be on those restrictions until July 2nd, and then a trial full duty was going to start on July 3rd.

9 (Pages 33 to 36)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 37

**Do you recall seeing that?**

A   I didn't --

MS. HORVATICH:  Object to form.

Go ahead and answer.

**Q   (By Mr. Ezra) You can answer.**

A   Yeah.  The document I saw was very -- it was illegible, honestly, although it was represented that that's what it said.

**Q   Okay.  Not withstanding that, on June 22nd you understand that he had been released with restrictions?**

A   That is my understanding, yes.

**Q   Okay.  In the middle of that paragraph it says:  (Reading)**

> **Mr. Neal failed to properly respond prior to June 19th regarding his return to work status or his medical condition.**
> **Correct?**

A   That's my understanding, yes.

**Q   And that's your understanding of the events?**

A   That's correct.

**Q   All right.  And he was terminated**

Page 38

effective -- the last line of that paragraph: (Reading)

> **He was terminated effective June 19th, 2017 for failing to notify the company of his absence from work, failing to keep us informed as to his ability to return to work as requested.**
> **Correct?**

A   That is correct.

**Q   And this was a letter, I note, that was sent to an Illinois governmental agency on behalf of the company; is that correct?**

A   That is correct.

**Q   And that agency was the Illinois Department of Employment Security.  True?**

A   I -- that would seem logical, yes.

**Q   Okay.  Whatever -- so whatever agency deals with unemployment insurance --**

A   That's correct.

**Q   -- in Illinois?**

A   Right.

**Q   Okay.  Gotcha.**

**All right.  Let me show you --**

Page 39

(Off-the-record discussion.)

**Q   (By Mr. Ezra) Okay, let me show you what is marked 65, Neal 0400.  And very good -- can you see that?  Can you see that?**

A   Yes, I can.

**Q   All right.  And at the bottom of that, that's your signature, is it not?  Well, your signature -- your signature line.**

A   Yes, that's -- yeah, it's a letter from me.

**Q   Okay.  And we're not going to -- we're not going to haggle over that it's not your letter.  It is your letter; correct?**

A   That's correct.

**Q   All right.  And this is the letter that was dated June 28th, 2017.  So this was a letter that was sent to Mr. Neal after he had been terminated; is that correct?**

A   Correct.

**Q   All right.  And in the second paragraph it states:  (Reading)**

> **On May 4th, 2017 you were advised that you needed to contact the company on or before June 19th to**

Page 40

> **discuss your employment status, including any potential accommodations that may allow you to return to work.**
> **Correct?**

A   Correct.

**Q   And that's your understanding as to what was to occur?**

A   Right.

**Q   All right.  And he was to submit current medical documentation as well --**

A   Correct.

**Q   -- during that period of time, between May 4th and June 19th, 2017; correct?**

A   Correct.

**Q   Okay.  And it says:  (Reading)**

> **Although you were provided several weeks to comply with this request, you did not contact the company or see a doctor prior to this deadline.**
> **And your -- and -- well, first of all, that's what it says and that's your understanding of the events; correct?**

10 (Pages 37 to 40)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 41

A   Yeah.  To my knowledge at that time, that's my understanding.

Q   Okay.  And it says "you were provided several weeks."
The several weeks -- you correct me if I'm wrong -- is the May 4th, 2017 to June 19th, 2017 period; correct?

A   Correct.

Q   Okay.  And then the next paragraph: (Reading)
The company has terminated your employment effective June 19th, 2017 based on your failure to timely respond to the May 4th, 2017 letter, as well as your violation of the company's attendance policy.
And it states:  (Reading)
As you know, a failure to report to work without notifying the company for three consecutive workdays is considered job abandonment.
Correct?

A   That's what's in the letter, yes.

Page 42

Q   And is that your understanding with regard to the policy that Louis Dreyfus had concerning abandonment of a job?

A   That is how we define job abandonment, yes.

Q   All right.  So -- all right.  In this letter, is there an indication of any specific individual that Mr. Neal was to get in contact with during that period of time?

A   Not in this letter, no.

Q   All right.  At the bottom of the page, is that your writing?

A   Yes, it is.

Q   Okay.  And so subsequent, I guess -- and it's kind of interesting because the letter's dated June 28, 2017.
Do you know whether Mr. Neal or his representative got it on that day?

A   Probably not.  He probably -- it wasn't uncommon, he could have called and asked for a letter of termination, and I would have drafted it, and this would have been a copy I retained in the file.

Q   Okay.  At 11:40 on 6/28 it says:

Page 43

(Reading)
Left message for him to call back.
Is that an indication that you called him or that he called you?

A   It -- basically, what it appears is he called me, left a message on my voice mail.
I replied to him at 11:40 a.m. on the 28th.  Didn't get ahold of him, so left him a -- we played phone tag.

Q   Okay.  Do you know whether he had already been notified that he had been terminated?

A   I don't know.

Q   Okay.  Because it sounds kind of interesting that your letter's dated the 28th and you get a call on the 28th, or approximately the 28th, maybe even earlier.

A   Yeah.  Again, it could have been that his voice mail was, Hey, I need a letter of termination.
He -- he may have known.  But, as I said, I occasionally got those calls.

Q   Why would he need to have a letter of term -- why would he need to have a letter of termination?
MS. HORVATICH:  I object to foundation.

Page 44

Q   (By Mr. Ezra) Well, let me ask it this way.
Do you have any idea as to why an employee would need a letter of termination from you?

A   Reasons that I have been given in the past is they need to file through some other insurance carrier, you know, for benefits because of loss of income or, you know, home mortgage, stuff like that.  I mean, any number of reasons employees may want a letter saying they were terminated.

Q   Okay.  Could you -- and, then, you were able to have a conversation with him on June 29th at 10:00; is that correct?

A   Yeah.

Q   Can you read that for me, please, because I can't really read it?

A   Yeah.  I -- can -- let me see if I can move some --

Q   Yeah.

A   There we go.  (Reading)
Jerry called, notified him the company had terminated his employment.  He asked why.  I explained that we had sent letter.
And then:  (Reading)

11 (Pages 41 to 44)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 45

Read two sentences in paragraph 2 up above. Jerry told me, said his attorney would contact the company upon receipt of the letter.

Q   All right. And I apologize, the parentheses, it says "sent letter," parentheses. What's that again?

A   (Reading): Read two sentences in second paragraph.

Q   Gotcha.
Do you know who was involved in the determination to terminate Jerry Neal's employment with Louis Dreyfus?

A   Well, myself, obviously. I'm sure I talked to Scott Becker in regards to the term, and probably outside counsel.

Q   Okay. And who would that counsel have been? Do you know?

A   Mr. Clark.

Q   Mr.?

A   Clark.

Q   Clark.
Can you think of anybody else that you may have talked to? Would you have talked to

Page 46

Ms. Khatib, for example?

A   Yeah. We -- yeah, we certainly had discussions about the termination. But in terms of reviewing the termination, no.

Q   Okay.

A   If that makes sense.

Q   All right. And the termination that ultimately occurred, I don't know how the system works, so -- and we may wind up talking to Ms. Khatib about it, I don't know, but my understanding is that the short term disability ended. It was a 26-week term. It was coming up. And you guys needed information as to whether he was going to return back to work; correct?

A   Correct.

Q   If he had been put into the system as a workers' compensation claimant, would this kind of issue have arisen?

MS. HORVATICH: I'm going to object to foundation and form.

Q   (By Mr. Ezra) As best you know?

A   I -- I'm not sure I understand your question.

Q   Sure. If Mr. Neal, or anybody else, was a

Page 47

workers' compensation claimant and were off for a period of time, would they have received a letter stating, Hey, your short term disability is going to end and you need to get back in contact with us between X and Y to tell us whether you're coming back to work?

MS. HORVATICH: Object to form and foundation.

A   No, this was not a normal letter that we would send to work comp claimants, if that's your question.

Q   (By Mr. Ezra) Okay. And the reason you would not send it to a work comp claimant is because this is not a work comp claim. True?

MS. HORVATICH: Object to form.

A   I -- basically, at that time Mr. Neal had filed the claim through the group insurance, and this -- this is a standard letter that we tell people, Hey, you know, here's what happens at 26 weeks, here's what needs to occur from your end so that there's no surprises at the end of the 26 weeks.

Q   (By Mr. Ezra) Right. Understood.
So because he was in the short term

Page 48

disability program, this was a natural sequela of what you would send out as the 26 weeks was coming up; correct?

A   Correct.

Q   All right. Let's go to --
(Off-the-record discussion.)

Q   (By Mr. Ezra) This is Page 39 -- Exhibit 39, Neal 402.
All right. Are you familiar with this letter?

A   Yes.

Q   Okay. Is this part of the materials -- or part of the materials that you reviewed in anticipation of your deposition today?

A   Yes.

Q   So this is the letter that -- on May 4th -- that is directed to Mr. Neal indicating that he needs to provide some kind of indication by June 19th regarding his work status and his physical status; correct?

A   Correct.

Q   All right. And based upon the three documents that we just looked at, Jerry was under an obligation to get in contact with somebody to be

12 (Pages 45 to 48)

Keefe Reporting Company

Page 49

able to tell the company whether he wanted to come back to work and what his physical status was between May 4th and June 19th, 2017; correct?

MS. HORVATICH: Object to form.

A   Yeah. Basically, this letter says, you know, that his benefits will end, his employment will end, on June 19th unless he's able to return to work or he's eligible -- you know, we also ask so we can determine whether he needs to file a long term disability claim, you know. Want to talk to him about restrictions, if any, you know. Just, basically, it's a tell us what's going on.

Q   (By Mr. Ezra) Right, which is essentially what you indicated in the document to the Unemployment Security by indicating that he didn't get in contact with us regarding his work status or his physical ability between May 4th and June 19th, 2000.

A   Yeah. He certainly didn't contact Amber as instructed in the letter.

Q   Well, you know, when you -- when you send a letter out -- when you were working there, when you sent a letter out to anybody, Mr. Stafford, were you sending it out on behalf of Louis Dreyfus?

A   Yes.

Page 50

Q   And when you received a letter that was directed to you, business-related, did you receive that document as your -- in your position as HR resources at Louis Dreyfus?

MS. HORVATICH: Object to form.

THE WITNESS: I received -- I received both. I received some correspondence directly to me as an individual, not as a representative.

Q   (By Mr. Ezra) When Ms. -- well, we'll get to that shortly.

Do you have any idea as to when Mr. Neal got this letter on May 4th -- that was issued May 4th, 2017?

A   No, I don't.

Q   All right. So did you send it certified?

A   I didn't mail this letter.

Q   Do you normally send these kind of letters out certified mail?

MS. HORVATICH: Foundation.

A   I don't know.

Q   (By Mr. Ezra) All right. Let me take -- why don't you take a look, if you don't mind, at LGC0231, also Page 135.

Page 51

Do you see that document, Mr. Stafford?

A   Yeah, I do.

Q   Okay. And does it make sense to you, since this is dated May 10th, 2017, that this would be the letter -- at least it's coming to him -- that this is the letter that you issued, or that was issued from Louis Dreyfus on May 4th, 2017?

MS. HORVATICH: Object to form and foundation.

MR. EZRA: If he knows. Everything is if he knows. If he knows, he knows. If he doesn't know, he doesn't know.

A   Yeah. I mean, you know, the receipt there is contemporaneous with the letter, but yeah.

Q   (By Mr. Ezra) All right.

A   I mean, that's certified mail received --

Q   All right.

A   -- that he received the letter on the 10th.

Q   Thanks.

The problem is that the documents are not in the greatest order, so now I got to go all the way back up.

Okay. Let's take a look at Neal 277,

Page 52

Page 16.

MS. HORVATICH: And for clarity on the record, Jeff, when you're saying like Page 16, that's nothing that we have.

MR. EZRA: Yeah. You're going to get it, though.

MS. HORVATICH: Court reporter?

MR. EZRA: You'll be getting it.

MS. HORVATICH: And is this being marked as -- I have Exhibit 5?

MR. EZRA: No. We weren't going to -- we weren't going to mark them. We're just going to send one major set of documents to you.

MS. HORVATICH: You're not marking any of your deposition exhibits?

MR. EZRA: We can mark them all later. I mean, we can come to that determination later. We don't need to do that now. I don't think we're going to do that now.

MS. HORVATICH: Okay. That's --

MR. EZRA: I designated them. And I'm going to send them to you so you'll have them. And they'll be sufficiently designated within the deposition.

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 53

MS. HORVATICH: For future depositions, I think it's helpful if we mark them.

MR. EZRA: Well, that's up to you. The pile you're going to get is going to be the same pile that we have here. And they're designated Pages 1 through -- I think it's 150 -- no, hold on -- 153, something like that. And all I'm going to do is be referencing them that way.

You're going to have them as well. You can use them in that order as well. They'll still be the same uniform number of exhibits for both of us.

MS. HORVATICH: Sure. For the courts, I think it's helpful when you have exhibit numbers.

MR. EZRA: Well, if you want to attach them, that's fine, that's fine by me.

Q   (By Mr. Ezra) Okay. So Mr. Stafford, I'm going to reiterate that I'm now showing you what is designated Neal 277, and Page 16 of the large exhibit.

And have you had the opportunity to look at that?

MS. HORVATICH: He can't see the whole

Page 54

thing.

Q   (By Mr. Ezra) All right. Okay. Have you had the opportunity to review the top part? And I can put down the rest of it.

A   I mean, not -- I assume it's in the batch that was sent to me, but whether I've looked at this specifically, I can't say. But --

Q   All right. There you go. That's a little bit better.

A   Actually, no.

Q   No? Okay.

All right. How about that?

A   Yeah, I'm fine with that.

Q   Okay. I understand where you're coming from on that, by the way.

So I -- one of the things that is interesting to me on this page is down on the last paragraph it says: (Reading)

Please make sure that Jerry
understands we will be closing the
STD claim and filing only the
workers' comp -- or the work comp
claim. Please let us know once
you've relayed this message to him.

Page 55

So explain that to me, please, if you can.

MS. HORVATICH: I'm going to object to form and foundation.

A   Well, give me a minute to read through all this.

Okay. And I'm sorry, your question again?

Q   (By Mr. Ezra) Sure. And you may not know. So if you don't know, please tell me.

Can you tell me what the last line means? (Reading)

Please make sure that Jerry
understands we will be closing the
STD claim and filing only the
workers' comp claim. Please let us
know once you have relayed this
message to him.

A   Well, from the context of the prior email, it appears Jerry had initially filed a short term disability claim, as we discussed. And then came in subsequently and said it was a work comp, he was hurt at work. And so we were just simply filing the claim under work comp instead of the group disability claim.

Q   Gotcha.

Page 56

MS. HORVATICH: Form and foundation. This is a longer email string than what's shown on the screen.

Q   (By Mr. Ezra) Was that done, do you know?

A   I assume so. I do not know for certain.

Q   All right. So it's your understanding that, in fact, the STD claim was closed out, moved along under the -- as a work comp claim; is that correct?

A   I assume so.

MS. HORVATICH: Foundation.

(Technical difficulties)

(There was a brief recess.)

Q   (By Mr. Ezra) Okay. So Mr. Stafford, this is an instance -- this last paragraph, this is an instance which looks to me as if there's a determination being made by somebody at Louis Dreyfus with regard to how the claim is going to be designated, as either short term disability or work comp; is that correct?

MS. HORVATICH: Object to form and foundation.

A   No, not at all.

Q   (By Mr. Ezra) Well, it says: (Reading)

14 (Pages 53 to 56)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 57

Make sure that -- we will be closing the STD claim and filing only the work comp claim.

Does that indicate any action on Louis Dreyfus' behalf?

MS. HORVATICH:  Object to form and foundation.

A  Yes.  We took actions based on Jerry's instruction.

Q  (By Mr. Ezra) Is it your understanding that Mr. Neal contacted somebody and said, Hey, I want this now changed from short term disability to a work comp claim?

A  It's my understanding that when we asked how he was hurt, he initially said he hurt -- he hurt it at home, and then subsequently said he hurt it at work.

Q  I understand.

Earlier you told me that it was the employee that made a determination as to how it should be designated.

So my question is:  Are you indicating that Mr. Neal stated to somebody that he wanted his claim moved from short term disability to a workers'

Page 58

compensation claim?

MS. HORVATICH:  Object to form and foundation.

A  I will answer your question by stating that when Mr. Neal said his injury occurred at work, our assumption was he wished to pursue it as a workers' compensation claim.

Q  (By Mr. Ezra) Did anybody contact him to verify that?

MS. HORVATICH:  Object to foundation.

MR. EZRA:  It's already -- look, it's all foundation.  Either he knows or he doesn't, I get it.  If he doesn't know, I have no difficulty with him telling me he doesn't know, so --

A  Yeah, whether --

MS. HORVATICH:  I can make form and foundation objection.

MR. EZRA:  Yeah, I know.  I get it.  I'm not saying you can't.

A  To answer your question, I -- whether he was specifically asked, Do you want to file a workers' compensation claim, I cannot -- I -- I don't know.

Page 59

Q  (By Mr. Ezra) So how is it -- and please bear with me -- how is it that the employee makes the determination one way or the other?  Just by the very fact whether the facts indicate that he got hurt on the job or not hurt on the job?

A  Yeah, based on what the employee told us, how he got hurt.

Q  So it's not like you contact him and ask whether there's a -- whether he wants it to go under short term disability or work comp.  It's the facts that are related to you as to how the injury occurred that ultimately makes the determination; is that correct?

A  Yeah.  They --

MS. HORVATICH:  Form and foundation.

THE WITNESS:  Form and foundation.

A  Basically, I understand that based on what the employee -- how the employee characterizes the nature of their injury, how they sustained it, that that is what determines how we assist them in filing an appropriate claim, whether it's --

Q  (By Mr. Ezra) Gotcha.

A  -- more work-related --

Q  Gotcha.

Page 60

A  -- or group benefits.

Q  Understood.

So on this particular one, Exhibit 16, where it says up above, saying that he had been hurt at work, that would have been the trigger -- correct me if I'm wrong -- that would have taken it out of the short term disability and put it into a work comp claim; is that correct?

A  I -- that's correct.

Q  All right.  And throughout the rest of the time that you dealt with Mr. Neal's case, up until the time that he was terminated, let's say, is it your understanding that his claim was viewed as a workers' compensation claim?

A  Yeah.  Yes.

Q  Okay.  If a claim is to be viewed as a workers' compensation claim, is that individual entitled to temporary total disability if they're off due to a work-related claim?

MS. HORVATICH:  Object to foundation.

A  I don't know.  I -- that --

Q  (By Mr. Ezra) That would be outside --

A  We have a third party --

Q  That would be outside --

15 (Pages 57 to 60)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 61

A   -- that manages all that. They'd know better than I.

Q   Okay. And I apologize, I didn't mean to talk over you.

That would not be part of what your responsibility would have been?

A   Absolutely not.

Q   Okay. And it was not part and parcel of any of the documents that you read in anticipation of your deposition today; correct?

A   Yeah. It -- no.

Q   All right. I'm correct, right, it was not part or parcel of any of the documents that you read today -- or read -- I'm sorry, in anticipation of your deposition today; correct?

A   Concerning his workers' compensation claim or -- yeah.

Q   Or STD, yeah.

A   Any of that, yeah.

Q   Okay. So let me show you Number 1 -- which I would consider to be Deposition Exhibit Number 1, but that's okay -- and Neal 0357.

Can you see that? I may be able to...

A   I can see part of it, yeah.

Page 62

Q   All right. That's the document right there. Can you see that?

A   Yes.

Q   All right. And you indicated earlier that you had looked at some off-work slips as part of the preparation for your deposition today; correct?

A   Yes, there were some in there.

Q   Do you remember seeing this off-work slip?

A   Not specifically, no.

Q   All right. Do you know -- well, let -- so this was submitted to -- well, do you know whether this was submitted to Louis Dreyfus?

A   I don't know, no.

Q   All right. I want you to assume for the purpose of my question that this was submitted.

Are you familiar at all with the job description for Jerry's job that he was doing for Louis Dreyfus?

A   In broad generalities, yes.

Q   All right. Do you know whether he was put back to work -- and you may not -- once this off-work slip was provided to Louis Dreyfus in late 2016 or early 2017?

A   I don't have a specific recollection, no.

Page 63

Q   Fine.

Based upon your knowledge of the particular requirements of the job that Jerry was doing, do you believe that he -- that he could have been able to perform that job with the restrictions that are indicated on the Document No. 1?

A   Not in totality. It's entirely possible, though, that he was returned to work, but I don't know.

Q   Okay. I want you to assume for the purpose of my question that he was not returned to work.

A   Okay.

Q   Okay?

Based upon what you know, and again, if there was -- if there were restrictions that were provided, would the company make an attempt to see whether they could accommodate that individual within those restrictions to bring him back to work?

A   Absolutely.

Q   All right. So if we assume -- and I'm asking you to assume -- if we assume that this document was provided to the company, am I correct when I state that the company would then make a

Page 64

determination whether Jerry Neal could perform his job or whether they could put him back in the job by accommodating him with the restrictions that are on this document?

Does that sound reasonable?

A   Yeah, we would take this document and determine whether there was work that he could perform at the facility.

Q   Okay. And for the purpose of my question, if we assume that he was not put back to work, then is it safe to assume that they did that investigation and realized or came to the determination that they could not accommodate him with these restrictions?

A   That's -- at least for that two-week period; correct.

Q   Right. That's reasonable to assume; correct?

A   Right.

Q   Okay. And you would -- you would assume that they will do this every time that they received a document indicating his restrictions, or anybody's restrictions, that they would look and see whether they could accommodate that person and put that

16 (Pages 61 to 64)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 65

person back to work; is that correct?

A   Correct.

Q   All right.  Because that would be the standard policy, as far as you were aware --

A   Correct.

Q   -- at Dreyfus; correct?

A   Correct.  Correct.

Q   By the way, was his job description part of any of the materials that you reviewed in anticipation of your deposition today?

A   I don't recall seeing it, no.

Q   Okay.  I'm going to skip again.  This one is easy because it's the last one.  Should be.  It's actually two pages.  And I'll go -- you see it's LDC0060, Page 136, and LDC0061, Page 137.

So I'm going to go back up, and I'm going to make it smaller just so we can get it on the page because that's pretty bad, isn't it?  That is pretty bad, I agree.

Can you see that, Mr. Stafford?

A   Yeah, I can see that now.

Q   Okay.  And, also, with regard to the second page, did that seem to be an accurate description, as best as you can tell, of what Jerry

Page 66

Neal's job was with Louis Dreyfus --

A   Yeah.

Q   -- as an Operator 1?

A   Yeah.  It's our standard job description for an Operator 1 at the Cahokia facility.

Q   Gotcha.

So if this -- let me go back for a second.

So if Exhibit No. 1, which we just showed you, which was the off-work slip in December of '16, was presented and he was not put back to work, then it's reasonable to assume that somebody looked at this job description and made a determination that they could not accommodate him based upon the requirements in this job description; is that correct?

A   No, I wouldn't say that.  I mean, certainly they would consider what's in the job description.  Whether they specifically looked at the job description, I don't know.  But they also made determinations about what, you know -- just because he couldn't go back to an Operator 1 didn't mean that there weren't some other tasks or duties that might be able to be performed during that two-week period.

Page 67

Q   Sure.  And that makes sense.

So if he wasn't put back to work, then they made a determination he couldn't do anything on the job site; right?

A   That they didn't have any work that fit his restrictions; correct.

Q   Fair enough.

Okay.  Now, I got to go back up.

All right.  So this is Neal 0270, Page 9.  And I can actually increase that one so we can both see it.

Do you see that?

A   I can see the email, yes.

Q   Okay.  And it says that:  (Reading)
Jerry Neal went to his doctor
yesterday, presented the attached
doctor's note.

I'm going to show you that attached doctor's note.  That's 10, Neal 0271.  It's not the easiest thing in the world to read.  And it's -- I don't know if I can --

Okay.  Can you see that a little better?

A   Yeah.

Q   All right.  Now, it's not the easiest

Page 68

thing in the world to read, but it's dated 1/3/17, and it states at the bottom no lifting -- can you see where it says, or something, or carrying over 10 pounds until further evaluation in three weeks?

A   Yeah, I can see no lifting or --

Q   Pushing, I think it says -- I'm sorry: (Reading)
No lifting, no pushing, or carrying
over 10 pounds until further
evaluation in three weeks.

A   Okay.

Q   Does that sound reasonable?

A   That looks reasonable, yeah.  It's hard to read.

Q   Yeah, it's hard to read.

Is this part of the materials that you reviewed when you said that you looked at some off-work slips?

A   Not this specifically, no.

Q   Okay.  I'm going to represent to you, Mr. Stafford, that this was presented -- as you know, it was presented because Scott Becker sent it, and that Mr. Neal was not put back to work after this off-work slip was presented.

17 (Pages 65 to 68)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 69

Are we in agreement that the same kind of procedure would have occurred, where they would have -- the company would have made a determination whether they had a job that he could have done within the restrictions and accommodations. And since he wasn't put back to work, they, apparently, could not find one?

Is that reasonable?

A   Yes.

Q   Okay.  All right.  Going to show you Neal 284, Exhibit 22, and ask you to take a look at that.

A   Okay.

Q   All right.  And that makes reference to an off-work slip, a doctor's note, that was dated 1/23/17.

And I'm going to show you that, which is Exhibit 23, Neal 285 --

A   Yeah.  You don't need to do that, it's clear.

Q   Okay.  Good.  Thank you, I appreciate that.

All right.  So you see where it says: (Reading)

Page 70

Patient can't lift, push or pull
anything for two weeks.

A   That's what it says, right.

Q   Okay.  And, again, you may not know, but I want you to assume for the purpose of my question that after this was presented to the company through Scott Becker, that he was not put back to work.

So the same would apply, that apparently the company did make or would have made some kind of determination whether he could perform the job.  And since he was not put back to work, apparently they could not do so within the restriction; correct?

A   Right.  We couldn't work him safely.

Q   Right.  Let me ask you this.

Was it okay and appropriate for Mr. Neal to take these off-work slips to Mr. Becker?

A   Absolutely.

Q   So if he took them to Mr. Becker and gave it to him, then he was, essentially, giving it to the company; right?

A   Yes.

Q   And then Mr. Becker would forward it to the powers that be in the company?

A   Yes.

Page 71

Q   Which is what he did on this particular instance, he sent it to Meaka Benton.

But Meaka Benton was not in the company, was she?  Are you familiar with that name?

A   I don't know that person.

Q   Okay.  And then he cc'd Mark Nemechek, Marcus Dixon and Gene Loffler.

Those individuals did work -- because we talked about it -- for Louis Dreyfus.

A   Yeah.  Two worked at the Cahokia facility under Mr. Becker.  And Gene Loffler, scott reported directly to Gene.

Q   Okay.  So this is going to sound like a really strange question, so bear with me.

It couldn't be claimed that Jerry didn't provide this information to the company because by giving it to Scott, Scott sitting up-line, it was given to the company; correct?

A   Yeah.  Assuming Jerry gave it to Scott, yeah, that -- yeah.

Q   Okay.  Fair enough.

I should have used that one, that's a better picture of it.  Sorry about that.

All right.  Let me show you what's been

Page 72

marked Neal 286, Exhibit 25, and ask you to take a look at that.

Let me know when you're finished.

A   Yep, okay.

Q   All right.  And that makes reference to a doctor's note dated 3/2/17.

I'm going to show that to you, that's Neal 280 -- I'm sorry, that's Neal 365, Exhibit 26.

Do you see that?

A   Yes.

Q   Now, this one's a little more specific than the other ones, isn't it?

A   Yeah.  It's a different form, yeah.

Q   Right.  And in this one it says that he's to be put on light duty:  (Reading)

Able to return to work on
February 28th, '17 with these
restrictions:  Light duty.  No
lifting greater than 10 pounds.
Must be able to alternate between
sitting and standing as needed.  No
repetitive bending.  No repetitive
lifting.

Is that what you see as well?

18 (Pages 69 to 72)

Keefe Reporting Company

Page 73

A   That's what's checked on the form.

Q   Right. So those would be the restrictions that this doctor, Dr. Gornet, placed on Jerry Neal and he then provided to Scott Becker; correct?

A   Yeah, I assume so.

Q   So the prior document that we just looked at says -- makes reference --

A   Yeah.

Q   -- Jerry dropped this by?

A   Yep.

Q   Okay. And I want you to assume for the purpose of my question, Mr. Stafford, that when the company received this off-work note, they did not put Mr. Neal back to work.

So this too is along the same lines of what we talked about, that the company would look to see whether they could make accommodations within these restrictions and see whether Mr. Neal could perform a job; correct?

A   Correct.

Q   And if they did not put him back to work after receiving these restrictions, then it is reasonable to assume that they made that inquiry and determined that he could not perform a job on the

Page 74

premises; correct?

A   Correct.

Q   All righty, let's go to -- by the way -- it just came to me -- in your job, would you have been contacted in a situation like Jerry Neal's where an individual's coming in with restrictions, and be consulted to see whether that individual could perform a job at that particular site, or was that outside of your responsibility?

A   It occurred from time to time, but not in every instance, no.

Q   Okay. All right. And I'm going to work on the presumption -- you correct if I'm wrong -- that you do not recall ever receiving a call regarding Jerry Neal and whether he could perform a job on the premises; correct?

A   You know, I don't have any specific recollection of such a call. I'm not going to say it didn't happen though.

Q   All right. When calls came in like that, would you -- not necessarily with Jerry Neal's case, but in other instance -- would you make notations in a file or something?

A   Sometimes, not always.

Page 75

Q   Did you have a particular file on a particular individual that you would maintain if there was an existing -- if there was an existing workers' compensation case or short term disability action?

A   We had a personnel file. We had a financial group health file, but that'd be the only files I would have.

Q   Okay. And so you would put something maybe electronically in that particular file?

A   Yeah. I'd -- yeah.

Q   Okay.

A   There are more than one occasion I printed off emails to put in the file.

Q   Gotcha.

And then would you also -- if you made your own notes, you would write like you did --

A   Yeah. Just like I did --

Q   -- on another --

A   -- on the letter.

Q   Gotcha.

A   Yes.

Q   Okay. All right. So let's look at Neal 296, Exhibit 48. And would you just take a

Page 76

quick look at that, please?

A   Okay.

Q   All right. And then it says he dropped -- he dropped this off yesterday --

A   Yeah.

Q   -- which would have been the 23rd of May. And I'm going to show you what is now 297, Exhibit 50. And can you read that document? It's not the easiest to read.

A   Yeah. I mean, I can see the printed, but the type is a little --

Q   Right.

A   -- it's -- yeah, it's hard to make out, yeah.

Q   You see where the date -- the date is 5/11/17?

A   Yeah.

Q   Okay. And in the upper right-hand corner it says a Kaylea Boutwell, M.D.

A   Yeah, okay.

Q   All right. And then where the checkmark is, it says: (Reading)
No change in previous duties per Dr. Gornet.

19 (Pages 73 to 76)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 77

A   I see where that -- yeah, if that's what that -- it's hard to read that line.  But it's certainly checked and has "Dr. Gornet" written in there.

Q   Right.  I tried to make it a little larger.

See where it says "no change in previous duties per" --

A   Yeah.  Again, it's the typeface.  It's just --

Q   Yeah.

A   -- hard to see.

Q   But there's --

A   Yeah, it appears to say "no change previous duties."

Q   Right.  And the previous duties -- and do you recall, maybe you don't, that the off-work slip that I showed you immediately preceding this was that one that had the checkmarks that we just talked about that looked like it was a little more extensive?

MS. HORVATICH:  Object to foundation.

Q   (By Mr. Ezra) All right.  Let's go back. Let's go back to 26 just for a second.

Page 78

So if this is -- this is the one we talked about previously, immediately preceding this last one.  And you see where it says "Dr. Gornet" in the upper right-hand corner?

A   Yeah.

Q   Okay.  So does it seem reasonable to you, Mr. Stafford, that when Dr. Boutwell is stating that no changes in duties that were asserted by Dr. Gornet, this is what he's talking about?

MS. HORVATICH:  Object to foundation.

MR. EZRA:  Yeah, I'm asking whether it sounds reasonable to him.

MS. HORVATICH:  Same objection.

A   So could I see that other document where it says no change?

Q   (By Mr. Ezra) Sure, absolutely.  I got to get the number.  And I'll make it a little bigger.

A   Thank you.

Yeah, I mean, I -- that would be reasonable except I would note that there were like two or three months in between that.  Because that prior document said he was seen in February of '17 and this one is dated May.

So unless there was some intervening

Page 79

medical, I would say that's correct.

Q   And that's fair and reasonable.  I want you to assume for the purpose of my question that there are no other off-work slips between the one in February and the one that you see here in May.

Okay?

A   Accepting that assumption, then okay.

Q   Then it is reasonable that what's being referenced by Dr. Boutwell is the February off-work slip by Dr. Gornet; correct?

A   Okay.

Q   Is it reasonable to assume that?  If I tell you --

A   Yeah, if -- yeah, based on that assumption that there were no intervening documents, yes, that's reasonable to assume.

Q   Okay.  Appreciate that.

Now, I want you to assume for the purpose of my question, Mr. Stafford, that after receiving this, that the company did not put Mr. Neal back to work.  That means that, again, they made a determination that they could not accommodate him within the restrictions in this instance, not only Dr. Boutwell, but referenced back to Dr. Gornet; is

Page 80

that correct, or does that seem reasonable?

A   It's reasonable that, yeah, if he did not return to work, that we didn't have work that fell within his restrictions.

Q   Okay.  All right.  In addition to, apparently, Mr. Neal coming in and actually giving the off work-slip in May to Mr. Becker, which you have previously seen, I want you to take a look at Neal 559, Document 49 -- and take a look at that.

A   Okay.

Q   Have you seen that document and/or was that part of the documents that you reviewed in anticipation of your deposition?

A   Yeah.  Again, there were a lot of documents.  I didn't look at them all.  It may have been included in there --

Q   Okay.

A   -- I don't know.

Q   Yeah.  And those documents, you indicated to me that you have them.  They're just difficult to get ahold of; correct?

A   Yeah.

Q   All right.  If after this deposition you were requested to gather those things up and provide

20 (Pages 77 to 80)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 81

them, would you be able to do so?

A   Yeah.

MS. HORVATICH:  Object to form.

Q   (By Mr. Ezra) Okay.  If you were requested from your attorney -- from the attorney for Dreyfus, Louis Dreyfus, to give them back to them so that they could be submitted, you would have no difficulty in being able to do that, would you?

MS. HORVATICH:  And I object to the extent that calls for attorney/client privileged communication.

A   Yeah.  I mean, I don't have --

Q   (By Mr. Ezra) You can answer.

A   Yeah, I don't have any documents other than what's been provided to me in anticipation.

Q   Understood.

And you would have no difficulty being able to provide those back to the attorneys if they requested them; correct?

A   They've already got them.  So yeah, no, no problem.

Q   Okay.  So in looking at this, Neal 559, Document 49, do you have any understanding as to whom Mr. Kovacs is that's being referenced in this?

Page 82

A   I do now, yes.

Q   Okay.  Who's Mr. Kovacs?

A   He apparently was the attorney hired by the insurance carrier to represent them in the workers' compensation claim.

Q   Well, that's interesting.  So is it your understanding that he was representing the insurance company?

A   That's my understanding, yes.

Q   Did you ever see the actual claim that was filed by Mr. Neal, the workers' compensation claim?

A   I can't say that I have.  I may have seen the employer's Statement of Injury that's filed with Zurich, but beyond that, no.

Q   Okay.  I had an order here, and you're going to make me go out of order, which is really a problem.  Actually, it's not that outrageously out of order.

Before I get there, with regard to the off-work slips -- and we now know that Mr. Neal went and gave them to Scott Becker; correct?  You've seen that on a number of occasions --

A   Yes.

MS. HORVATICH:  Object to form.

Page 83

Q   (By Mr. Ezra) Would it have been appropriate also for him to have given them to his attorney, and his attorney forward those off-work slips to somebody at Louis Dreyfus or the attorney representing the company in the work comp case?

MS. HORVATICH:  Object to form, foundation.

A   Jerry -- Jerry can give those forms to anybody he wants.

Q   (By Mr. Ezra) My question is, would it have been appropriate?  Would you have considered it appropriate, for purposes of being placed on notice about those off-work slips, if Jerry had given it to his attorney, and he had given those off-work slips to the attorney representing Louis Dreyfus in the workers' compensation claim?

MS. HORVATICH:  Object to form.

A   I would answer it this way:  He certainly can do that.  It's not effective, and I would not consider it appropriate in terms of notifying his direct supervisors.

Q   (By Mr. Ezra) Why not?

A   Well, because he's not communicating that information to them, who would -- would be the

Page 84

person on the spot, people involved in making return to work determinations.

Q   But he has given it to his attorney -- under this scenario, he's given it to his attorney, his counsel, who then forwards it to your counsel, or at least counsel that is representing the company in the workers' compensation case.

Would you not expect that counsel to make sure that it got up the line to the people that it needed to get to?

A   Well, again, assuming Mr. Kovacs, in this case, is representing Louis Dreyfus, yes.  But I don't know that he was representing Louis Dreyfus.

Q   Gotcha.

All right.  So let me -- let me show you what's been marked -- or I got to get there -- it's a couple of pages, but this is Neal 475.

Let's talk about that one for the moment, Neal 475.  And I'll try to reduce it a little for you, the best I can.

Can you see that?

A   Yes, I can see the document.

Q   All right.  And it says -- it says the employee is Jerry Neal?

21 (Pages 81 to 84)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 85

A That's -- yeah.

Q And it says that the employer/respondent in this case is Louis Dreyfus Corporation --

A Correct.

Q -- correct?

He didn't sue Zurich, did he?

A Well, I don't know. I -- he's petitioning for work comp benefits.

Q Against his employer --

A Correct.

Q -- correct?

A Right.

Q His employer is Louis Dreyfus; correct?

A Correct.

Q He didn't bring his claim against Zurich; correct?

A Not for workers' compensation, no.

Q All right. He brought his workers' compensation claim against Louis Dreyfus Corporation; is that correct?

A That's what the form says, yes.

Q Right. And are you indicating, Mr. Stafford, that when Louis Dreyfus contracts with an insurance company to defend them in a workers'

Page 86

compensation suit, that it's not Louis Dreyfus that is actually being sued but it's the insurance company?

MS. HORVATICH: Object to form, foundation.

A I have -- I have seen insurance companies sued as well as employers sued.

Q (By Mr. Ezra) Yeah. In a workers' compensation setting?

A Yeah.

Q Yeah. And even if that's the case, that's fine. That's not what I'm asking in this particular instance.

In this particular instance I'm asking that -- and -- that in this case, Mr. Neal brought his claim against Louis Dreyfus Corporation, not against Zurich; isn't that correct?

MS. HORVATICH: Object to form and foundation.

A Yeah, he filed a workers' compensation claim against Louis Dreyfus Corporation, right.

MS. HORVATICH: Jeff, when you're done with this line of questioning, should we take a break? It's been over an hour and a half.

Page 87

MR. EZRA: Yeah. Yeah. Yeah. Hey, I'm just rambling, so by all means.

MS. HORVATICH: If you had a couple other questions in this line, I just wanted to --

MR. EZRA: I might. And I'm still -- I might, and I'm still cognizant enough to be able to remember them. So we can take a break right now if we want to.

(Off the record 11:40 a.m.)

(There was a brief recess.)

(Back on record at 12:09 p.m.)

MS. HORVATICH: Okay. Just for confirmation that we just discussed, that for 30(b)(6) purposes, the questioning is limited to the reason for Mr. Neal's termination from Defendant, and Mr. Stafford has not been designated or requested to be a 30(b)(6) witness for any other topics.

MR. EZRA: And I think that is accurate because that's what the deposition notice says, so I would agree with that.

Q (By Mr. Ezra) All right, Mr. Stafford, we're back.

So let's go back and look at this same

Page 88

document that we were just looking at before we took a break, Number 75 and Neal 475.

And we established that the employer that is being sued here is Louis Dreyfus Corporation; correct?

A Correct.

Q And underneath that it says "employer responded".

Do you see that where it says "employer responded"?

A I do.

Q Okay. So let's go onto the next page, which is the second page of this document, which would be Neal 476 and Page 76.

And in the middle of the page, do you see where it says Respondent's Attorney, on the right-hand side?

A Oh, yeah, yeah, yeah.

Q Okay.

A Yeah, I do.

Q Okay. And do you see where it says -- underneath it has a signature. And then it has it typed out.

Do you see that, the individual?

22 (Pages 85 to 88)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 89

A   Yeah.

Q   And who's that individual?

A   Andrew Kovacs.

Q   Andrew Kovacs?

A   Yeah.

Q   Okay, thanks.

Okay.  You know, I want to go back for a moment on a line of questions that we talked about before.  You had indicated to me -- and I didn't ask it very well -- when you're in -- when you're doing -- when you were doing your job and you sent out correspondence on behalf of Louis Dreyfus -- that's essentially what you were doing if something came out of your office -- and it was work related, it was on behalf of Louis Dreyfus; correct?

A   Yes.

Q   And when Ms. Khatib sent something out in the course of her job, work related, she's doing it on behalf of Louis Dreyfus; is that correct?

A   That would be a reasonable assumption, yes.

Q   Okay.  All right.  Let's go to 42.

All right.  This is Document 42, Neal 366. Would you take a look at that, please?

Page 90

A   Okay.

Q   Have you seen this document as part of the preparation for your deposition today?

A   I have.

Q   All right.  And this particular document has a date stamp of May 25th, 2017.  It was sent on May 23rd, 2017.

Do you know whether -- where it was sent to?

A   I assume to the addressee, Mr. Andrew Kovacs.

Q   The individual that we just talked about that is designated as the respondent's attorney on Mr. Neal's workers' compensation claim; correct?

A   Correct.

Q   All right.  And it says:  (Reading)
    He has been provided work
    restrictions by Dr. Gornet and
    Dr. Boutwell.
    Do you see that?

A   Yep.

Q   Middle of -- middle of the first -- and those are two that we discussed earlier.

Do you recall --

Page 91

A   Right.

Q   -- doing that?

A   Right.

Q   Which is indicating that your client has indicated they cannot accommodate.  Well, what we talked about is that when the work slip was provided, you had indicated that the company would look to see whether the individual would be accommodated within those restrictions.  And if they could, then they'd put him back to work; right?

A   Correct.

Q   Okay.  Do you see there where it says that:  (Reading)
    The client --
    In the second paragraph:  (Reading)
    -- does not plan on abandoning his
    position and wishes to return to
    work once the effects of his work
    injury have remitted.

A   I see where it's written, yes.

Q   Okay.  And then it also says:  (Reading)
    I would ask that you advise your
    client of this issue or let me know
    if I need to forward correspondence

Page 92

    to them directly.
    You see that?

A   I do.

Q   Okay.  So a few minutes ago, Mr. Stafford, I showed you -- and we talked about -- Dr. Boutwell's off-work slip.  That's the one that said that the duties were to remain the same as Dr. Gornet had indicated.

Do you remember that?

A   I do.

Q   And that document was issued on May 11th, 2017, and submitted to Mr. Becker and -- by Mr. Neal's attorney on May 23rd and May 24th.

Do you recall that?  We can go back and check, but...

A   I recall that Dr. Boutwell's note was sent to Scott Becker, yes.

Q   Right.  And we -- if we assume that it was May 23rd when he took it in -- I think the record will indicate that's the case -- would you please assume that for purposes of my question.

Okay?

A   That he took the note in on the 23rd? Okay.

23 (Pages 89 to 92)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 93

Q   Right.  And that Mr. Jerome, then, also forwarded it to Mr. Kovacs on May 23rd or May 24th.
Will you assume that as well?
A   I can assume that, yes.
Q   All right.  If we assume that the May 11th off-work slip was given to Mr. Becker on May 23rd, that is between May 4th, 2017 and June 19th, 2017; Isn't that correct.
A   That is between those two dates, yes.
Q   Yes.  And we just looked at 42 here, and we just looked here at Mr. Jerome's note, and that is dated May 23rd, 2017, and it's date stamped May 25th, 2017; isn't that correct?
A   That's what's on the document, yes.
Q   And that is between May 4th, 2017 and June 19th, 2017, isn't it?
A   Those dates are between those, yes.
Q   So on May 23rd/24th, Mr. Becker, and therefore, the company was made aware of the restrictions that Mr. Neal had with regard to his ability to perform the job at Louis Dreyfus; isn't that correct?
A   He submitted --
MS. HORVATICH:  Objection to form.

Page 94

A   He submitted a form that indicated he had restrictions that did not allow him to do the job at Dreyfus; correct.
Q   (By Mr. Ezra) Right.  And we established that.  And we established that they couldn't provide him a job.  And they would have attempted to look into that to see whether he could have performed the job and he -- and they weren't able to; correct?
A   Right.
Q   Right.
(Reporter clarification.)
(Off-the-record discussion.)
Q   (By Mr. Ezra) So the May 11th off-work slip provided to the company on May 23rd gave indication as to Mr. Neal's physical ability to perform the job; correct?
A   Correct.
Q   And that was provided to the company between May 4th and June 16th -- June 19th, 2017; isn't that correct?
A   It would appear so, yes.
Q   And Mr. Jerome's letter to Mr. Kovacs, provided on May 25th, 2017 to Mr. Kovacs, indicated that he was not going to abandon his job, Mr. Neal;

Page 95

isn't that correct?
A   That's what the letter says.
Q   And that he had every intention -- or wishes to return to work once the effect of his job injury were remitted; correct?
A   That's what the letter says; correct.
Q   And that was provided to the company, or at least Mr. Kovacs between May 4, 2017, and June 19th, 2017; isn't that correct?
A   It would appear so, yeah.
MS. HORVATICH:  Objection; form.
Q   (By Mr. Ezra) All right.  Let me show you what has been marked -- or it is marked Neal 0557 and Document 45 here.  And would you take a look -- you can take a look at it all, but I'm more concerned with what's in the middle of the page.  If you can read that -- maybe you can't, okay -- where it says from Andrew Kovacs, sent Friday, May 26th.
Do you see that?
A   Yeah, I do.
Q   Okay.  And it says to JoJo Magrone, and then it's cc'd a lady by the name of Meaka Benton.
Do you see that?
A   I do.

Page 96

Q   So it says Ms. Magrone -- by the way, am I stating that name -- is it McGrown (phonetic)?
A   Yes.
Q   Okay.  (Reading):
Ms. Magrone, see attached letter from attorney Jerome.
Do you see that?
A   I see that, yes.
Q   And that email is one day after the date stamp on the letter that we just saw that Mr. Jerome sent to Mr. Kovacs; isn't that right?
A   That's the date of the email, one day later, yes.
Q   Right.  And it's reasonable to assume, Mr. Stafford, that the letter from Attorney Jerome, that Mr. Kovacs is referencing here, is the letter that you just saw and we just talked about from Mr. Jerome; isn't that correct?
A   One could make that assumption, yes.
Q   And that went to JoJo Magrone?
A   Correct.
Q   And Ms. Magrone, and I can't remember her position, but she obviously is an employee at Louis Dreyfus; isn't that correct?

24 (Pages 93 to 96)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 97

A    Correct.

Q    So that -- so even if we assume for the purposes of your question that Mr. Kovacs represents Zurich and not Louis Dreyfus, Louis Dreyfus is made aware on May 26th, 2017 of Mr. Neal's desire to come back to his job once his symptoms or whatever problems he has remits; correct?

MS. HORVATICH:  Object to form.

A    We were in receipt of that letter, yes.

Q    (By Mr. Ezra) Right.  Which indicates that, that I just stated, doesn't it?

A    Correct.

Q    And it also indicates that -- that he had -- that the company had been provided the work restrictions from Dr. Gornet and Dr. Boutwell, and that you had not been able to accommodate him with those restrictions, doesn't it?

A    That's what the letter said.

Q    And it also, by the way, indicates that if there's somebody else that should be contacted with the employer, in this case Louis Dreyfus, that Mr. Jerome is asking that he be informed of that; isn't that right?

MS. HORVATICH:  Object to the --

Page 98

A    That's what the --

MS. HORVATICH:  You can answer.

Q    (By Mr. Ezra) Is that what it states?

A    Yeah, that's what the letter states.

Q    Yeah.  Do you know whether anybody got in contact with Mr. Jerome and said, Hey, we need more information?

A    I have no knowledge.  I don't know.

Q    Was it in any of the materials that you reviewed in anticipation of your deposition today?

A    I haven't seen anything.  I don't know, no.

Q    Did anybody factually tell you that that had been done, that actually somebody got in contact with Mr. Jerome --

A    No.  I -- I --

Q    -- and said --

A    Again, nobody's told me that that happened.  But I don't know.

Q    Okay.  And this submission by Mr. Kovacs to Ms. Magrone on May 26th, 2017, is between May 4th, 2017, and June 19th, 2017; isn't that correct?

A    That falls in between those two dates,

Page 99

yes.

Q    Bear with me for a moment.

Okay.  So let's take a look at Neal 241, Document 51.  I'll make it smaller because there's something at the top, but I'm not really going to question you on that -- oh, that's really bad.

Can you see that?

A    I can, yes.

Q    Okay.  Tell me when you're finished reading it, please.

A    Okay, I read it.

Q    Okay.  So toward the bottom of the page there's an indication there from Amber Randall.

You see that?  From --

A    I do.

Q    -- Amber Randall?

A    Yeah.

Q    And it says to Amy Khatib --

A    Yes.

Q    -- and Dave Stafford.

A    Yep.

Q    And it says:  (Reading)

As an FYI, Jerry provided this note yesterday dated 5/11/17, indicating

Page 100

no change in his condition. Remains off work.  This is the employee whose claim was initially short term disability, then workers' comp and is currently under investigation by Zurich.

You see that?

A    I do.

Q    And we already established and talked on a number of occasions regarding the May 11th, 2017, note from Dr. Boutwell.

And this is an indication that Amber Randall has been provided it, and that you and Ms. Khatib have been provided it; isn't that correct?

A    Correct.

Q    And this off-work slip that's been provided to Ms. Randall and you and Ms. Khatib is between May 4th, 2017 and June 19th, 2017; isn't that correct?

A    Correct.

Q    So you were made aware and Ms. Randall was made aware and Ms. Khatib was made aware of the work restrictions that had been provided by Dr. Boutwell

25 (Pages 97 to 100)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 101

in his -- in her reference to Dr. Gornet as of May 24, 2017; isn't that correct?

A   That's correct.  As stated in the email, there's no change in his condition.

Q   Right.  Okay.

So just so that I am aware, as of May 24th, what we've established is that you were aware, Ms. Magrone was aware, Ms. Randall was aware, Mr. Kovacs was aware, and Mr. Becker was aware of these restrictions that had been provided to the company dated May 11th, 2017; isn't that correct?

A   Yeah.  That's fair, yeah.

Q   Okay.  And once you were made aware, and everybody else that we just talked about made aware, we've established that he was not put back to work; isn't that correct?

A   Correct.

Q   All right.  So now I want to go back, if we can, Mr. Stafford, to Document 0406, also Document 72, which is the company's response to Mr. Neal's request for unemployment benefits.

And you read that, but if you want to read it again, please do so.

A   Yeah, I'm fine.

Page 102

Q   All right.  So on May 4th -- let's go to the second paragraph -- on May 4th Mr. Neal was sent a letter notifying him that:  (Reading)

His employment would be terminated on June 19th, unless prior to that date he contacted the company to discuss his employment status, including possible accommodations that may allow him to return to work.

The company also requested Mr. Neal to provide updated medical documentation prior to June 19th.

You see that?

A   I do.

Q   Prior to June 19th, and between May 4th and June 19th, Mr. Neal provided an updated indication of his medical condition, didn't he?

A   Yeah.  He provided additional doctors' notes, yes.

Q   He provided that between the time frames that you indicated that you wanted that kind of information from him; isn't that correct?

A   Correct.

Page 103

MS. HORVATICH:  Object to form.

(Reporter clarification.)

MR. EZRA:  He said correct.

Q   (By Ms. Horvatich) But Mr. Stafford --

A   Yeah; correct.

Q   So the representation that is made in this document to a govern, Illinois governmental agency is incorrect when written; isn't that correct?

If you want to see the date, look at the top, 7/14/2017.

A   I mean, that -- that's correct.  But, I mean, you know, he provided additional notes that continued to keep him off work.

Q   Right.  So --

A   He was unable to perform a job.

Q   Understood.

So I -- and this is important to me, Mr. Stafford, because I just want to make sure that I have this right.

When it indicates here that the company requested Mr. Neal to provide updated medical documentation prior to June 19th, and presumably between May 4th and June 19th, 2017, he did that, didn't he?

Page 104

A   He -- he provided additional doctors' notes, yes.

Q   He did do that; correct?

A   Yes.  Yes.

Q   And so the presentation made in this note to the Illinois governmental agency was wrong.  True?

MS. HORVATICH:  Object to form.

A   Correct.  Could have been stated more clearly?  Correct.

Q   (By Mr. Ezra) I don't know whether it's stated more clearly.  This was an incorrect representation at the time it was submitted; isn't that correct?

MS. HORVATICH:  Object to form.

A   I'll stick with my answer that it could have been stated more clearly, more correctly.

Q   (By Ms. Horvatich) Well, are you indicating that it's accurate?

A   I -- I -- what I would say is that he did not provide a note that changed his status from being unable to work is what the intent there is.

Q   Well, no.  Instead, he established -- he did provide an indication of his --

26 (Pages 101 to 104)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 105

A    That he couldn't continue to work.

Q    -- medical documentation prior to June 19th; isn't that right?

A    That he couldn't continue to work.

Q    That he could not continue to work, that's right.

A    Right.

Q    Because that's what his doctor said, he couldn't continue to work.

A    Right.

Q    Right.

A    Correct.

Q    And it was between the time frames that you have in this letter when he was supposed to provide that information --

A    Correct.

Q    -- correct?

MS. HORVATICH:  Object to form.

Q    (By Mr. Ezra) Okay.  And the notation from May 11th, that was provided on May 23rd and May 24th, provided you and the other individuals we talked about with an indication as to the extent that the accommodations that would have to be made for him because you were aware of his restrictions; correct?

Page 106

A    We were aware of his restrictions, yes.

Q    Yes.  And we just talked about it earlier, that if you're aware of the individual's restrictions, you then look to see what accommodations can be made to see whether that person can be put back in the job; correct?

A    Correct.

Q    So you were aware -- or at least somebody at LDC, if it wasn't you, then it was somebody else, because we established how many other people there were -- were aware of the accommodations that would be required to put him back to work given your knowledge of the restrictions; correct?

MS. HORVATICH:  Object to form.

A    We understood Jerry's limitations, yes, and what accommodations that would have needed to be made, yes.

Q    (By Mr. Ezra) Yes, okay.  Appreciate it.

And in the second -- I'm sorry, it's the third paragraph, right in the middle of it, it says: (Reading)

Mr. Neal failed to properly respond prior to June 19th regarding his return to work.

Page 107

That's incorrect; isn't that right?

A    No.

Q    How is it not incorrect?

A    Well, he -- he failed to respond.  I mean, basically he had indicated to us continuously, all throughout that period, that he was unable to work.

Q    Well, he didn't --

A    And so that letter, I -- my recollection of the letter is it's asking him, you know, for updated medical, but also, you know, Are you coming back to work.

Q    Well, we'll get to that in a second.

It says he failed to properly respond prior regarding his return to work status.

You were aware that as of the -- as of May 23rd, his return to work status was that he could not return to work.

A    Correct.

Q    True?

A    Correct.

Q    And you were also aware, from the letter by Mr. Jerome, that he was not abandoning his job and wanted to return to work --

A    I don't know that, no.

Page 108

Q    Wait, let me ask my -- let me complete my question.  So let's -- let's start over.

And you were aware, pursuant to the letter that had been sent to Mr. Kovacs and forwarded to Ms. Magrone, that he had no intention of abandoning his job and wanted to come back to work after his symptoms remitted; isn't that correct?

MS. HORVATICH:  Object to form.

A    I -- at the time, I don't -- I didn't see that letter that was forwarded to Ms. Magrone from the attorney, from Jerry's attorney, until well after the termination.

Q    (By Mr. Ezra) Well -- well, okay.

A    So I attempted -- to answer your question more specifically, no, I was not aware that Jerry had made any indication, either him or through his attorney, that he did not intend to abandon his job.

Q    Okay.  My question to you is did the corporation know it because it was sent to Ms. Magrone?

A    Yes, I -- assuming that it was sent to Ms. Magrone, which we've gone over.

Q    Right.  And is there a reason why Ms. Magrone -- strike that.

27 (Pages 105 to 108)

Keefe Reporting Company

Page 109

Should Ms. Magrone have sent that to you or to your department?

MS. HORVATICH: Object to form.

A    It -- maybe; maybe not. You'd have to ask her. I don't know.

Q    (By Mr. Ezra) Okay. Well, we've established that the -- that's all right, never mind.

And then it continues: (Reading)

Mr. Neal failed to properly respond prior to June 19th regarding his return to work status or his medical condition.

We've already established that he did provide information regarding his medical condition. True?

A    True.

Q    Okay. So that representation is incorrect; true?

A    Okay.

Q    I'm asking you. You're the one that indicated that this was on behalf of the company. That representation that he did not provide or respond prior to June 19th regarding his medical condition is incorrect. He did; isn't that right?

Page 110

A    That is correct.

Q    Okay.

A    There was no change in his ability to return to work.

(Reporter clarification.)

MS. HORVATICH: Sorry, object to form.

MR. EZRA: Excuse me just for a second. All right. Sorry about that.

Q    (By Mr. Ezra) Okay. Let's go to 68. Would you please take a look at this. This is 68 and Neal 318.

Have you had the opportunity to read it?

A    Yeah, I read it.

Q    Mr. Stafford, do you have any idea as to what is being discussed here?

A    I am assuming -- I am assuming it's the letter that Attorney Jerome sent.

Q    Yes. Is that part -- were those part of the materials that you reviewed in anticipation of your deposition today, a letter that was sent by Mr. Jerome in July?

A    Yeah, they were part of the materials I reviewed.

Q    Okay. And I apologize because that does

Page 111

not seem to be part of the documents, but -- so if you read it, it says: (Reading)

It's my understanding that you have terminated my client based upon an allegation that you were not provided information regarding his off-work status.

I don't want to go into great detail, but do you remember that that's, essentially, what the letter was about?

A    Yeah. I vaguely recall that one, yes.

Q    Okay. If -- and I think -- and we can go into more detail, but do you recall that Mr. Jerome is saying, Hey -- essentially saying, Hey, you fired him, but we did provide some stuff, here you go, and please make a determination whether you're going to hire him back -- or requesting that you hire him back?

A    Yeah, that was the gist of the letter.

Q    Okay. Appreciate that.

So I see here -- we're in the middle of the page -- Mr. Loffler says: (Reading)

We need to discuss this. Does Friday, 8 a.m. work for you?

Page 112

And you write: (Reading)

No need for call. Sent to legal and JoJo --

I guess that's Ms. Magrone?

A    Correct.

Q    -- right? (Reading)

This is a result of his work comp claim, and his attorney communicating with Zurich attorney and not us. We sit tight. will advise after visiting with our attorney.

Now, I don't really want to talk to you about what you discussed with your attorneys, but I do want to ask you, why would you sit tight?

A    Why would we sit tight?

Q    Yeah.

A    Because I felt like the reason for terminating Jerry was sound.

Q    Well, he says: (Reading)

This is a result of his work comp claim and his attorney communicating with Zurich attorney and not us.

Page 113

And I want to make sure that I have an understanding here, Mr. Stafford. Is it your position that any time Louis Dreyfus is represented by an attorney in a work comp case and correspondence goes to that attorney, that they are never ever corresponding directly, in any way, with Louis Dreyfus?

MS. HORVATICH: Object to form and foundation.

A   Well, I think you're asking me to make a legal conclusion. But beyond that, you know, the fact that the letter was sent to the Zurich attorney certainly, at a minimum, creates delays in that getting to decision makers within the company who are LDC employees.

Q   (By Mr. Ezra) Is that your answer? I'm sorry, did you complete your answer?

A   Yes.

Q   All right. Delays in getting the information doesn't mean that the information wasn't provided to Louis Dreyfus; isn't that correct?

MS. HORVATICH: Object to form.

A   I'm sorry, could you re-ask that? I wasn't --

Page 114

Q   (By Mr. Ezra) Sure.

The fact that there may have been delays does not mean that the information was not provided to Louis Dreyfus; isn't that correct?

A   It was -- yeah, it was provided to Louis Dreyfus.

Q   I'm talking generally. You were talking generally.

A   To -- to the corporation, yes.

Q   Yes, exactly.

And, in fact, we know that Mr. Kovacs, when he got Mr. Jerome's letter, sent that the next day, didn't he?

A   It appears so.

MS. HORVATICH: Foundation.

Q   (By Mr. Ezra) Yeah. So at least in this instance, there doesn't seem to be any delay, or very, very little delay, if you want to state between the 25th and the 26th is somehow a delay. It was very, very small, wasn't it?

A   Well, the delay -- again, Ms. Magrone was involved in the work comp claim and not employment decisions, and so talking about wanting to retain his employment may or may not have registered with

Page 115

her.

Q   And we have established that -- and I have to talk to Ms. Magrone, I guess -- you've indicated that whether she should get in contact -- by the way, let me ask you this.

When that was happening, do you know whether this claim was considered a short term disability claim or a workers' compensation claim?

A   When -- when what was happening?

Q   In May of -- in May 24th -- May 23rd, 2017, when Mr. Kovacs forwarded the letter from Mr. Jerome up the chain?

A   I -- my recollection, after looking at the documents, was Jerry was still collecting short term disability because there was some -- I -- if -- if my recollection is correct, he was collecting short term disability because there was some delay in him receiving indemnity payments through workers' comp.

Q   I'm going to go back to my kind of original question.

Are you indicating, Mr. Stafford, that when Louis Dreyfus hires an insurance company to represent them in the defense of a workers' compensation claim, that contacting -- that if the

Page 116

claimant's attorney contacts the defense attorney, that is not contacting the company?

MS. HORVATICH: Object to form.

A   My understanding of how that works is we contract with an insurance company. And then if they deem it necessary to hire an attorney in defense of that workers' compensation claim, they do so. Now --

Q   (By Mr. Ezra) Right. And --

A   -- whether they're working for the company or the -- that's a matter of law that I don't know.

Q   All right. Fair enough.

Although we established early on that you saw that Mr. Kovacs was the respondent's attorney, and that Louis Dreyfus was the respondent in the case; correct?

A   That was on the form; correct.

MR. EZRA: Okay. All right. Sorry, Jan -- I think I got this right.

Q   (By Mr. Ezra) Can you see this document that is on there now? This is designated LDC 349.

A   I see the document on the screen, yes.

Q   Yeah, okay. Could you read that, please?

A   Okay.

29 (Pages 113 to 116)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 117

Q   Is this a document that you had reviewed in anticipation of your deposition today?

A   It is.

Q   Let's talk about your email to Amy.

A   Okay.

Q   It says: (Reading)
Here's a note from Cahokia on Jerry.
That would be Mr. Becker; right because he's the director at -- in Cahokia; right?

A   Correct.

Q   And it says: (Reading)
I'd like to point a couple of items. (A), didn't go to the doctor until Monday after his June 19th deadline to contact us, as noted in his May letter.
I presume that's your May letter you're talking about, the May 4th letter; is that correct?

A   Right. The letter to him.

Q   Okay. So it says: (Reading)
Didn't go to the doctor until Monday after his June 19th deadline to contact us, as noted in his May

Page 118

letter.
We've now established that's incorrect. He did, in fact, go to a doctor between May 4th and June 19th, and provided that information to you; isn't that correct?

A   Yes, the difference being that on June 20th, or some date subsequent to the 19th, and what he dropped off was a different set of restrictions that allowed him to return to work.

Q   But it didn't allow him to return to work immediately; isn't that correct?

A   He had some restrictions.

Q   Right, which you would have -- he had -- not only had some restrictions. He had the same restrictions that he had on the May 11th, 2017, work slip; isn't that correct?

MS. HORVATICH: Object to form and foundation.

A   Possibly.

Q   (By Mr. Ezra) Well, I want you to assume that it was, and you didn't put him back to work in May. And with the same restrictions -- with the same restrictions in the June 22nd document, there's a really good chance that he would not have been able --

Page 119

you guys would not have been able to accommodate him, because you hadn't been able to accommodate him since January, or December of 2016 with the same restrictions; isn't that correct?

MS. HORVATICH: Object to form.

Q   (By Mr. Ezra) You can answer.

A   Possibly, but tasks come up all the time.

Q   Well, they didn't come up in seven months; true?

MS. HORVATICH: Object to form.

A   Five and a half, six months, yeah.

Q   (By Mr. Ezra) Okay. They didn't come up. Okay.
But not withstanding that, he did go to a doctor between May 4th and June 19th; isn't that correct?

A   Correct.

Q   And your line says he didn't go in to a doctor until the Monday after his June 19th deadline.
That's wrong; isn't that correct?

A   That the note he presented was after the June 19th? No, it's not wrong.

Q   He presented the note on May 11th -- the

Page 120

May 11th note, I'm sorry, on May 23rd or May 24th. Therefore, he did to go to a doctor before the June 19th deadline; isn't that correct?

A   Correct. But the note that is being referenced to in this email was after June 19th.

Q   But your representation that he didn't go to the doctor until Monday after the June 19th deadline is incorrect. We agree that there was a June 19th deadline?

A   Yeah. He went to the doctor, but the note --

Q   Right.

A   -- that he's presenting he went after. And that's where there was a change in his restrictions and he was able to start trial after June 3rd. And there was a lot of different information in that note after the 19th.

Q   Right, because he could not work until he went to the doctor again, because he went to the doctor within the time frame that you set up for him, between May 4th and June 19th; isn't that correct?

A   Right. And during that entire time he was not able to return to work under any circumstance

30 (Pages 117 to 120)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 121

with the restrictions given.  And then on June 20th he goes to the doctor and gets a different set of restrictions.

Q   June 22nd, but that's okay.  I get --

A   Okay.

Q   -- I get where you're coming from, yeah.

A   It's after the 19th.

Q   Yeah.

A   Which is what's being referred to in this email.

Q   Right, which --

A   So the statement that he didn't go to the doctor until after the 19th is accurate, just as it's accurate he went to the doctor before.

Q   Okay.  All right.  And then it says -- on -- on (C) it says:  (Reading)

    Is not a full release, not that
    it --
    I presume it says not that it matters:
(Reading)
    -- not that it matters, and is only
    a trial basis after July 3rd.
    What does that matter?

A   It's basically, you know, that he had

Page 122

restrictions.  Not that that matters.  We would still continue to look at that for accommodation. And that it's, you know, there's a trial basis after the July 3rd.

Q   Right.  So you would make the same kind of inquiry between June 22nd and July 2nd that was made prior to that with all the other work-slip restrictions to see whether he could be accommodated; correct?

MS. HORVATICH:  Object to form.

A   Say that again.

Q   (By Mr. Ezra) Sure.  So that -- there -- when he -- when you got the June 22nd work slip, he could not go back to full duty until July 3rd on a trial basis; correct?

A   Well, I don't -- at that point he'd been terminated, so I'm not sure we would have gone through that process at that point in time.

Q   Okay.  If we assume that for -- and I understand that, that he had been terminated.  But if you had gotten that and it was in the time frames that you had set up, the bottom line is that on the 22nd you would have said, Hey, look at these restrictions, his restrictions are going to change

Page 123

on July 3rd, but can we accommodate him between the 22nd and July 3rd, and then can we accommodate him after July 3rd; correct?

MS. HORVATICH:  Object to form.

A   Yeah.  I mean, had -- had that note been presented prior to the 19th -- if I'm understanding what you're asking -- if that note had been, we would have -- we have been -- we -- we often would make -- for lack of a better word, we would make work to help an employee return to work.

And so to say that we would not have accommodated those restrictions at that point in time on a, you know, on a trial basis, you know, trying to get him up to a full duty, I mean, we -- we may have made work for him with those restrictions.  It wouldn't have been a normal job with full expectation that he continues to progress and his medical recovery moves forward.  You know, doctors often provide return to work progressions, and so we try to work with those.

And so in this instance it is entirely possible we could have worked him doing something in a control room or paperwork or something up until the 3rd, when he could have tried returning to his

Page 124

normal duties as a grain operator, if that makes sense.

Q   (By Mr. Ezra) I understand what you're saying, but my question is, the restrictions on the June 22nd slip, as of June 22nd, were the same restrictions that he had had almost from the beginning of when he started bringing in those restrictions and you could not accommodate him; correct?

MS. HORVATICH:  Object; foundation.

A   With the exception of the new information there was that there is a trial basis to go to full time in July.  So within a relatively short period of time, a one to two-week period of time, he'd work in this modified duty that -- that we -- we did accommodate people and make up jobs for short periods of time so that they could return to full duty.

Q   (By Mr. Ezra) Well, I got to ask you, why wouldn't you -- if you could provide that job for short periods of time and get that person back to work, why couldn't you do it for long periods of time and get that person off the work comp rolls and get him back to work?

A   Well, I -- because -- because it would

31 (Pages 121 to 124)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 125

have required us pulling out favorable activities. And by "favorable" I mean sitting in a, you know, in a warm air-conditioned or heated control room doing sedentary type work, that often is, you know, meaning that somebody else is going to have to go out and pick up the more physical natures and doesn't get that relief period in the control room.

So you can do that for a short period of time. But over a long term or on an indefinite period of time, it creates employee relations issues. It appears that that individual is cherrypicking work assignments, if you will.

Q  Well, what do you care if you're getting the person off the work comp rolls and getting them back in the workforce?

A  Well, I'm responsible for the entire site, not just this one thing.

Q  And if you're able to get this person back to work, but it would be for a longer period of time in this -- with these restrictions, your concern is that other people would view that as favoritism or some kind of cherrypicking and, therefore, you wouldn't do it?

A  On an indefinite basis, yeah, that has

Page 126

happened.

Q  What makes you think, if you do, Mr. Stafford, that the May 11th, 2017 note that you guys got on May 23rd or May 24th, 2017, was any kind of indication other than he couldn't work then?

MS. HORVATICH: Object to form.

Q  (By Mr. Ezra) You understand the question?

A  Well, you asked me about a May 11th note, whether it -- he could work -- I -- no, the May 11th note is what the May 11th note was.

Q  Right.

A  It was restrictions. It was indefinite. It was, These are his restrictions.

Q  Because according to the physicians at that time, between May 4th and June 19th, 2017, he couldn't work?

A  Well, he couldn't -- he could work so long as we could accommodate restrictions.

Q  Well, yeah. Understood. I want to make sure that -- you're a hundred percent right. You indicated that you would try to make an inquiry, you know, as to whether he could based on restrictions. But we know that he did not work during that period of time; correct?

Page 127

A  Correct.

Q  So let me ask you this.

If he was already fired on the 19th -- well, no -- was he -- was he fired effective the 19th of June?

A  That was the date of his termination, yes.

Q  Yes. So if he was fired effective the 19th of June, how did he violate the attendance policy by not showing up after June 19th?

A  Well, because, quite honestly, the termination date was the 19th, which is what the date was in the letter that was sent to him notifying him the 26 weeks had expired and he wasn't able to return to work. And so -- I mean, really it's -- that doesn't matter other than he presented the note.

And I think I was pointing out there that that -- the note was dated the 22nd. He didn't show up until after shift on the 26th.

So not only was there no change in his work ability prior to June 19th. He also, to complicate matters, didn't bring that note in on the 22nd. Waited at least three workdays to bring that note in when he could have been working.

Page 128

Q  Well, let's assume all of that is correct. No -- sorry, let's assume all of that is correct. You fired him on the 19th.

If you fired him on the 19th, then showing up on the 22nd or the 23rd or the 26th is a non sequitur because he was already fired, wasn't he?

MS. HORVATICH: Object to form.

A  Yes. As I said earlier, technically it didn't matter. I was just simply pointing that out in this letter because as I recall, it was the morning of the 26th that I actually keyed the termination into the system.

Q  (By Mr. Ezra) Understood.

But when you -- when you wrote your note to the Unemployment Division, you pointed that out, didn't you? That he violated the attendance policy, didn't you?

A  Yeah.

Q  Yeah. Well, he didn't violate the attendance policy because he had already been fired as of the 19th. So coming in on the 22nd, 23rd and 26th, again, was a non sequitur; isn't that right?

A  Yeah, other than he came in. So he

32 (Pages 125 to 128)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 129

presented that note on the 22nd or 26th.

Q   Yeah.  But in support -- in support of you -- and when I mean you, I'm talking about, you know, Louis Dreyfus -- making a defense that he should not have gotten his unemployment benefits, you pointed out that he didn't show up and violated the policy when, in fact, he had already been fired --

A   No, I --

Q   -- correct?

MS. HORVATICH:  Object to form.

A   Yeah, okay.

Q   (By Mr. Ezra) Is that correct?

A   That's what was in the letter.

Q   And is -- I understand that.  I understand that's what was in -- I get where you're coming from, Mr. Stafford.  Please answer my question.

Is that correct?

MS. HORVATICH:  Object to form.

A   Is what correct?

Q   (By Mr. Ezra) That you, in the letter -- no, not you.  When I mean you, in this instance, I'm talking about Louis Dreyfus, represented in the letter that was presented to the Illinois governmental agency

Page 130

for unemployment services, when you were trying to present a position that Mr. Neal should not get unemployment benefits, that he violated the attendance policy by not coming in on July 22nd, 23rd and 26th, when, in fact, he had already been fired on June 19th; isn't that correct?

MS. HORVATICH:  Object to form.

A   Yeah, technically he was fired effective the 19th.  The 22nd -- the dates subsequent to that are immaterial except that he showed up on the 26th to present the note.  And it wouldn't be the first unemployment claim where dates of termination were disputed, so...

Q   (By Mr. Ezra) But you represented -- and, again, you meaning --

A   The company.

Q   -- Louis Dreyfus, represented that he violated that policy.  And he couldn't have violated that policy because he had already been terminated.  True?

MS. HORVATICH:  Object to form.

A   Again, unless there was a dispute over the term date, and he contended that he shouldn't have been termed.

Page 131

Q   (By Mr. Ezra) Yeah.  But you didn't have that dispute.  He was fired as of June 19th; correct?

A   Correct.  But I don't have the absolute say on everything.  So, you know, he can -- he can -- he has a right to say we're wrong.

Q   Well, yeah, he could have done --

A   Which I think he's doing here today.

Q   He could have done that in his response. I don't really care about his response.  I care about your representation to the Division.

To the Division you indicated that he had violated the attendance policy; is that correct?

A   I did represent that, yes.

Q   All right.  And let me -- let me show you what's -- all right, let me show you what's Exhibit 71, Neal 397.

And you can read this in its entirety if you want to, but to be perfectly honest, Mr. Stafford, all I really care about is the, I guess, this second paragraph.

A   Okay.

Q   In the middle of the second paragraph -- this is, by the way, the determination -- strike that.

Page 132

This is the determination by the Illinois Department of Employment Security regarding Mr. Neal's claim for unemployment benefits.

Do you recognize that as such?

A   Yes.

Q   Okay.  And in the middle of it it says: (Reading)

However, correspondence from the Plaintiff's attorney demonstrate that such documentation was provided in a timely matter.

Do you see that?

A   I do.

Q   And based upon your note, that was attempting to stop him or present Louis Dreyfus's position as to why he should not get benefits, when it says "timely fashion", it means that the documents were presented between May 4th and June 19th, 2017.  And they found that, in fact, they had been.

Is that your understanding?

MS. HORVATICH:  Object to form.

A   Yeah.  My reading of this is they found that there was some documents submitted, yes.

33 (Pages 129 to 132)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 133

Q (By Mr. Ezra) Right. So you received this determination -- again, by "you" I'm talking about Dreyfus -- and you know that this governmental agency had indicated that your argument that he hadn't done so was not persuasive, at least in their mind; isn't that correct?

MS. HORVATICH: Object to form.

A Assuming I read this or seen it prior to that, yeah.

Q (By Mr. Ezra) Okay. All right. Mr. Stafford, did you have -- while this was going on with Mr. Neal, did you have any conversations with anyone that provided insight that there might be a wrongful termination suit? Based upon the time frames and the documents that were sent in, that Louis Dreyfus might be setting itself up for a wrongful termination suit?

MS. HORVATICH: Object to form.

A I don't recall any -- any conversations specific to that.

Q (By Mr. Ezra) Okay. Let me show you what's been marked Neal 0309, Page 54 -- Exhibit 54. And if you'd take a gander at that, I'd appreciate it.

MR. EZRA: While you are reading that,

Page 134

Ruth?

MS. HORVATICH: Yeah?

MR. EZRA: I'm going to work on the presumption that we probably aren't going to get to Ms. Khatib today. Is that the story?

MS. HORVATICH: Oh, I don't know. I have not confirmed her availability because I don't know when we would start.

MR. EZRA: Yeah, okay. I don't have a heck of -- I still have stuff to do with Mr. Stafford. I'm not sure it's a heck of a lot, but I still have stuff to do.

MS. HORVATICH: And I don't know how much time you think you need with Amy.

A I finished reading that.

Q (By Mr. Ezra) Okay. Mr. Stafford, on this document is an email that you sent out to Scott Becker and Amber Randall, and you cc'd Loffler and Nemechek and Dixon; correct?

A Correct.

Q And it states: (Reading)
We are paying Jerry under STD and we sent him the LTD application.
"LTD" being long term disability?

Page 135

A Correct.

Q (Reading)
We had -- we sent him the LTD application to complete, or rather Sun Life did. Our approach to this was that work comp would probably end up denying the claim as work related. So in the meantime we'd cover as a personal injury claim and pay that way.
You see that line?

A Uh-huh, I do.

Q Why?

A Why what?

Q Why is your -- why was your approach that way?

A Because the employee didn't have any income.

Q Well, why was it your approach that work comp would probably end up denying the claim as work related?

A I -- for whatever reason, at the time I -- that's what I was led to believe or thought. And so to get money to Jerry, we were processing it under

Page 136

the STD, and we'd subrogate it and work out all the details depending on how it got resolved.

Q Well, what made you believe that work comp would probably end up denying the claim as work related?

A Basically I think because Jerry was indicating that it was personal in nature at the time. I don't recall with specificity.

Q So are you indicating -- and I understand you said you're not indicating -- that you don't remember with specificity.
Are you indicating that as of June 5th, 2017, that Louis Dreyfus thought that Mr. Neal's injuries were not necessarily work related?

A No. What I'm saying is that we were going to pay Jerry -- get him some money under our short term disability plan. That for whatever reason -- and I don't recall the reasons at this point -- that we didn't think it would be picked up as work comp. But in order to get him some money, we're going to process the short term disability just to get funds flowing. And then if it turned out to be a work compensable claim, we could sort that all out in the

34 (Pages 133 to 136)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 137

bookwork in the back.

Q   Why wasn't he just converted over to work comp so he could get -- you could have given him the higher rate?

A   Again, at that point in time, for whatever reason, the work comp carrier wasn't paying it. I don't know what the details are of why he wasn't being paid in June of 2017.

Q   So you just --

A   I just know he wasn't receiving any benefits, and he was an employee out on leave without any income.

Q   And you don't recall what your reasoning was for saying that "work comp would probably end up denying the claim"?

A   Yeah. I mean, if I had to speculate, I'd say because Jerry was -- you know, at some point he had made the statement it was personal.

Q   And if he made the statement that it was personal, then he would have been -- then he should have been on short term disability; correct?

A   Correct.

Q   If it was work comp, then he should not have been on short term disability; correct?

Page 138

A   Yeah.

Q   And I think we established earlier that short term disability would pay less than what he would receive if he was on temporary total disability through workers' compensation; correct?

MS. HORVATICH: Objection --

A   I think that's correct, but it varies by state.

Q   (By Mr. Ezra) Understood.
And what you also stated in here is if, in fact, it turned out to be a work comp claim, that he would then be potentially entitled to the difference between what he got from short term disability and what he presumably should have gotten if it had been designated a workers' compensation claim; correct?

A   Correct.

Q   Did that happen?

A   Did that happen?

Q   Yeah.

A   I don't know. I assume it was, but I don't know.

Q   Okay. And then you continue: (Reading)
Given it appears he's processing or attempting to process an LTD claim,

Page 139

it would appear he doesn't think he'll return to work.
You see that?

A   I do.

Q   Yeah. Now, only a couple of weeks earlier you had received -- the company had received a letter from Mr. Jerome indicating that he had no intention of abandoning his job.
Do you recall that?

MS. HORVATICH: Object to form.

A   Yeah. We've gone over that the letter was sent to -- yeah.

Q   (By Mr. Ezra) Okay. And -- yeah. The standard 26-week letter is exactly that. You have a standard letter form, and you kind of change the names and maybe dates and stuff, but the body of it is essentially the same?

MS. HORVATICH: Object to foundation.

Q   (By Mr. Ezra) Is that fair to say?

A   Yeah. Roughly, yeah. I mean, Amy sent those.

Q   Okay. Yeah. And that was my next question.
That's not something that would be your

Page 140

responsibility. It would be Amy's responsibility?

A   Yeah. She typically -- I mean, she notified us that it was going out, but she'd send them.

Q   Did you have the ability to veto that? If Amy was going to send one out, could you have said, No, let's hold out or let's not do that?

A   Yeah, I could have raised questions. I don't -- I'm not sure --

Q   I'm not talking necessarily about this instance. I'm talking generally. Did you have --

A   Yeah, I could have. But I don't recall ever doing that.

Q   When it says -- going back to that work comp would probably end up denying the claim as work related. Is it possible that you are referencing there that you thought that if it went to arbitration, or actually went to some kind of determination, that the individual making that determination would claim that it was not work related?

A   Yeah.

Q   Is that reasonable?

A   Yeah. That that -- that it -- that there

35 (Pages 137 to 140)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 141

had not been a determination as to the work related nature of the injury. That's what I was trying to say.

Q   Right. And that it would probably end up denying the claim, meaning the individual who would make that determination, an arbitrator for example, you believed that there was a reasonable chance that that would occur; true?

A   Well, yeah.

Q   Okay.

A   It was a possibility. Whether it was a reasonable chance, I don't know, but it was a possibility?

Q   Well, it says "probably end up." That's a little more than a reasonable -- I mean, that's a little more than could. "Probably end up" means you think there's a chance that's going to -- pretty good chance it's going to happen, probably end up, don't you? It's your language, I'm not --

MS. HORVATICH: Form. Object to form.

A   Yeah, probably could or probably couldn't, either/or.

Q   (By Mr. Ezra) Well, it says it probably -- it says, actually, "work comp would probably end up."

Page 142

Doesn't say could, it says would.

A   Yeah.

Q   Yeah. So you believed there was a -- there was a pretty good chance that whoever was going to make that determination was going to determine that it was not work -- his injuries were not work related; correct?

A   I wrote what I wrote. I mean, you know, at that point a determination had not been made. For whatever reason, I thought it'd be denied.

Q   Okay.

A   Doesn't -- I don't get to make that decision.

Q   No, I know. I know. That I know, I get that.

Okay. Let's go to 56. This is Document 56, Neal 0330. And I want to make sure --

Okay, would you take a look at that, please?

A   Okay.

Q   The middle of that document, 56/0330, is an email from you to Scott Becker and Mark Nemechek. Is that accurate?

A   That is. Yeah, that's my --

Page 143

Q   And those are the two gentlemen that ran the Cahokia facility?

A   Correct.

Q   And it says: (Reading)
Please see below. As we are well past June 19th, I want to confirm that neither of you, or anyone else there, has been approached or contacted by Jerry or someone else on his behalf to discuss return to work and possible accommodations, or just indicating a desire to return to work.
Correct? That's what it -- that's what you're inquiring of?

A   That's what my email says.

Q   Did you ask anybody else other than Mr. Becker or Mr. Nemechek about that?

A   No. They were the managers at the site. No, I asked them.

Q   Did you ask Ms. Randall about that?

A   I may have.

Q   Well, it's not in your email. So you may have done it personally, but not through email. Is

Page 144

that what you're indicating?

A   Correct.

Q   Did you ask Jackie about that?

A   Again, I could have verbally, but I don't recall.

Q   Did you ask Ms. Khatib about that?

A   I don't recall. I could have, but I don't recall.

Q   Did you ask Ms. Magrone about that?

A   I don't recall.

Q   Is it fair to say that you don't recall asking anybody else whether they had been approached or contacted by Jerry or someone else on his behalf to discuss return to work or possible accommodation or just indicating a desire to return to work other than Scott Becker and Mark Nemechek?

A   Yeah. Were it not for the email, I probably wouldn't have recalled asking them. But that's correct.

Q   Okay. Did you ask anybody at Zurich about that?

A   No. I rarely spoke to anybody at Zurich.

Q   Understanding that you don't recall whether you spoke to any of these other individuals,

36 (Pages 141 to 144)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 145

would there be anything stopping you from contacting those individuals about that kind of information?

A   No.  Other than Zurich, again, I wouldn't have had the case manager.  I wouldn't normally contact Zurich.  But otherwise, no, more likely than not that I did talk to them.

Q   Right.  And, of course, we already established that there was an email and a letter that had been sent by Mr. Jerome, specifically, that had been sent, at the very least indicating a desire to return to work; isn't that correct?

A   Yeah, there was a letter sent.

Q   Okay.  We'll return to that.  Let's go to -- Mr. Stafford, there's an email that you -- and I don't know where, can't seem to find it -- that's dated June 26th, 2017.  It's from you to Amy Khatib.  And I'm going to read it to you if you don't mind.

It says --

MS. HORVATICH:  Can you tell us -- can you tell me the document --

MR. EZRA:  It's Neal 0336.  And I thought it had been part of the group, but it's not, so I apologize.

Q   (By Mr. Ezra) (Reading)

Page 146

Amy, that's the last contact I was aware of with Mr. Neal, too.  So I'm going to go ahead and key the -- the key termination today and not wait on Mark.  If he were to come back tomorrow, say he had visited with Jerry since June 8th when he dropped off the STD form, then I can always reverse the termination.  But given it's already been a week and Mark is generally  the first to tell us of what's going on in Cahokia, I think we are in good shape and have minimal risk in keying term today.  That said, do I need to return him from leave prior to key termination?  Please advise.

Do you recall reading that email in preparation of your deposition?

A   I do.

Q   All right.  Explain to me what you mean by "I can always reverse the termination."

A   That if the termination was there, that we

Page 147

can go back into our HRIS and reverse it.

Q   So you have the ability to do that?

A   Yeah.

Q   And you can do that, essentially, at any time or for any circumstance that you would like, you would have that ability?

A   Yeah.  For good cause, yeah.  I mean, I didn't have the right unilaterally to do that, yeah.

Q   Yeah, I understand.

But if you thought that there was an issue there that allowed for it, you could reverse the termination?

A   Absolutely.

Q   All right.  Now, I just want to make sure here.  Jerry is terminated on the 19th.  He sends you the document on the 22nd.

Is that --

A   No.

Q   I think we've established that.

A   No.

Q   Oh, no, I'm sorry.  He sends you the document on the 26th.

A   That afternoon; correct.

Q   Right, the 26th.

Page 148

But the work slip is dated June 22nd; correct?

A   That's when he saw the doctor.

Q   Right.  So the 22nd was a Thursday.  Do you know -- are you aware of that?

A   Well, no, but okay.

Q   Well, I'm telling you, for purposes of our discussion and this question, that was the Thursday.

A   Yeah.  I --

Q   Okay?

A   Yeah, I recall that.

Q   All right.  And so the 23rd was a Friday.

A   Correct.

Q   And then we have the 24th and 25th, which were Saturday and Sunday; correct?

A   Correct.

Q   And I'm not going to go into it, but the reason you remember that is because you had inquired about whether work was being performed on the 24th and the 25th.

A   Correct.

Q   Do you recall that?

A   Correct.

MS. HORVATICH:  Object to form.

37 (Pages 145 to 148)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 149

Q   (By Mr. Ezra) And then he comes in on the 26th and provides it to you; correct?

A   The updated medical, yeah.

Q   Right.

A   That afternoon.

Q   You had the opportunity and the ability, if you wanted to, to reverse his termination on the 26th knowing that he had actually gone to the doctor on the 22nd; isn't that correct?

A   Yeah, I could have.

Q   Okay.  You were aware -- or were you aware or made aware -- and I think you were, but -- as of June 23rd, that his long term disability application had been denied?

A   I may or may not have been aware of that.

Q   All right.  I want you to assume for the purpose of my question that it was denied, and that Ms. Khatib, I think, is the one that received information that it had been denied on June 23rd.

Will you accept that for purposes of my next question?

A   Okay, yes.

Q   If we -- if you assume for purposes -- for my purposes of the question that on June 23rd he had

Page 150

been denied long term disability and he had been fired on June 19th, which also ended his short term disability as of at least the 23rd, he had no income whatsoever as far as you're aware; isn't that correct?

A   That -- that'd be correct.

Q   Yeah.  But if he had been on work comp, he would have received temporary total disability at that time; isn't that correct?

MS. HORVATICH:  Object to foundation.

Q   (By Mr. Ezra) As far as you're aware -- I'll ask again.  As far as you're aware, if he had been on work comp during that period of time, he would have received temporary total disability; isn't that correct?

A   Possibly.

MS. HORVATICH:  Foundation.

A   Yeah.  I mean, that's not my call.  It's possible he could have, but it's possible he couldn't have.

Q   (By Mr. Ezra) Yeah.  Well, based upon your knowledge and your experience, individuals -- many of them -- that are on workers' compensation receive temporary total disability; correct?

Page 151

A   Some do, yes.

Q   Yeah.  A large portion of them do, don't they, based upon your knowledge?

A   No.  I think majority are medical leave. But be that as it may, there's a fair number that receive indemnity payments.

Q   Yeah, okay.

MR. EZRA:  Well, let's take a moment please.

(There was a brief recess.)

Q   (By Mr. Ezra) All right.  Mr. Stafford, we're back on the record.  I'm not going to take a heck a lot much longer with you, but I do have a couple of things.  And, unfortunately, again -- and I apologize -- these are not on the page, so I can't share it with you.

But one of the documents is Neal 218.  And it is an email from Daniel Murray to Gene Loffler and Scott Becker, and you're cc'd on it along with Nemechek and Randall and Magrone.

And in it Mr. Murray states, he says: (Reading)

Hi all.  My thoughts are that the back claim would likely be ruled as

Page 152

WC, however, without any specific injury other than general low back pain, perhaps a second opinion could limit our liability on the injured disc.

And that paragraph goes on to talk about a disc injury.

Do you recall seeing that email in the materials that you reviewed?

A   No, not specifically that one.

Q   Fair enough.

And -- but I want you to assume that first line: (Reading)

My thoughts are that the back claim will likely be ruled as WC.

Which I presume is work comp.

(Reading) However, without any specific injury other than a general low back claim, perhaps a second opinion could limit our liability on the injured disc.

So let me ask you this.

First of all, let me ask you this.  Who's Daniel Murray?  I know you told me early on, but who

38 (Pages 149 to 152)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 153

is Daniel Murray?

A   Yeah.  Dan Murray was the head of our health, safety and environment.

Q   Okay.  And so this gentleman is making -- is sending out an email, of which you were included, stating that he believed that the back claim would likely be ruled as a work comp claim.

A   Okay.

Q   Okay.  And with that in mind --

MS. HORVATICH:  Object to form on that question.

Q   (By Mr. Ezra) Well, he says "my thoughts are that the back claim would likely be ruled as WC." That's in the -- if we assume that WC means work comp -- and you are on this email -- is it reasonable to state that at least somebody in the organization thought that this was going to be potentially a successful workers' compensation claim?

A   Yeah.

Q   All right.  And this was on March 19th, 2017.  Okay?  Do you know whether anybody -- I want to make sure -- sorry, March 19th, 2017 -- I think -- if I had the wrong -- March 19th, 2017.

Page 154

Do you know of anybody who at that time indicated that the case should be moved from short term disability to a work comp claim?

A   Am I aware of anybody making that determination?

Q   Yeah.  To asserting, Hey, let's take this out of -- or let's make sure we do whatever's necessary to take this out of short term disability and put it into the work comp?

A   No.  I mean, Dan -- Dan was stating his opinion and -- okay.

Q   All right.  Later on in that same email -- which you are cc'd on -- it says:  (Reading)

JoJo, on a related note, we recently met with Zurich to discuss suspect and challenging claims.  I understand you and I would be part of these case management calls.  It is in our best interest to participate on calls for these types of claims.  Please ensure so going forward.

Mr. Stafford, do you know whether this claim by Mr. Neal was considered a suspect and

Page 155

challenging claim?

A   Not to my knowledge, no.  I -- no.

Q   All right.  And when I say that, do you know one way or the other?

A   I guess my -- no, I don't know one way or the other.  My opinion is it's not necessarily suspect or challenging.

Q   Okay.  And what makes it -- sounds like a strange question -- what makes it not suspect or particularly challenging?

A   Well, and the only confusion was what, you know, stemmed from what Jerry told us at the outset, that it was personal.  That was the only confusion, in my mind, to that claim.  But, again, you know -- I mean, I don't know what that email -- I mean, that email got no informational content to me.

Q   Yeah.  But you just told me that you didn't think that Jerry's claim was suspect or a challenging one; correct?

A   Yeah.  That's my opinion, yeah.

Q   Right.  I understand that.  I get it.

And I'm asking you what about the claim did not make it suspect or challenging?

A   It was just a routine claim.  I mean,

Page 156

other than trying to determine whether it should be processed by our work comp carrier or our group insurance carrier.  Beyond that, it wasn't that -- it wasn't difficult.

Q   Well, would -- are you -- and I don't want to put words in your mouth, so please tell me -- are you indicating that it wasn't suspect or challenging because you believed it to be a non-work related injury?

MS. HORVATICH:  Object to form.

A   I'm sorry, can you ask that again.

Q   (By Mr. Ezra) Absolutely.

All right.  Are you indicating that you believed that it was not a suspect or a challenging claim because when you were dealing with it, you believed that it was a non-work related injury?

MS. HORVATICH:  Object to form.

A   No, that's not what I'm saying.

Q   (By Mr. Ezra) All right.  So I -- I'm trying to --

A   What I am saying is that none of us knew whether it was, at this point, a work comp or personal.  That Jerry had indicated one way, you know, early, and then subsequently said it was work

39 (Pages 153 to 156)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 157

related.

Beyond that confusion, it was a pretty routine work comp claim.

Q   Understood.

What -- this could -- again, kind of an interesting question, I think.

If there was confusion as to whether it was a work comp or non-work injury, why wouldn't it have been suspect or challenging?

A   There --

MS. HORVATICH:  Object to form.

A   It wasn't suspect or challenging.  I mean, it wasn't suspect because there wasn't any information to say it was suspect.  I mean, there was no employee saying, Hey, I saw him doing this, or he's out, you know, lifting weights at the gym after work, or there's -- there's nothing that would make you suspect that it wasn't a legitimate claim.  We just didn't know how it happened.

Q   (By Mr. Ezra) Well, you just -- so we just established a little earlier on that he had said at one point that it may not have been work related.  And then he said -- you indicated that he said later on that it may have been work related.

Page 158

A   Yeah, he --

Q   So how do you know exactly how it did occur?

A   Well, because we asked him.  I mean, he -- he said -- he told us initially it happened at home, or he woke up, or something at home.  And then subsequently he came in -- and I know at one point we said, Please write down how you sustained this injury.

And he wrote it down, and said, you know, it was from shoveling and it got sore.

Okay, so that's fine, it's work -- it's work related.

Q   So as soon as he provided that information in the document that he filled out indicating that it was work related, as far as you were concerned, at least in your position, that it was a work related injury?

A   Yeah.  I mean, at that point we started to process it, sent the information into Zurich, to the work comp carrier, and let them process it.

Q   Okay.  There is another email, it's Neal 338.  It is from you dated May 24th, 2017, and it is sent to Amber Randall and Amy Khatib, and the

Page 159

subject is Jerry Neal.

And it says:  (Reading)

So we sent him the 26-week letter, right?  And his date is June 19th, question mark?  At this point it's a matter of waiting and seeing if he contacts us about either potential accommodations or other return to work options.  We shall see, but my money is on him counting on a work comp settlement, and so won't see him again.

Do you remember seeing that document or reading that in your preparation?

A   Yes.

Q   Explain to me what you meant when you said "we shall see, but my money is on him counting on a work comp settlement and so we -- and so won't see him again."

A   That my experience, that Jerry's actions and behavior at that point indicated he was not interested in returning to work.  That he was more interested in pursuing either long term disability claim or a work comp settlement.

Page 160

And at that point, apparently, it had been determined it was work related.  So I was expressing my opinion that I didn't think he was interested in returning to work.

Q   And that was on May 24th, 2017.  You can't tell, but I'm telling you --

A   Okay.

Q   -- that this -- it says May 24th, 2017. And within a day -- or actually within two days Mr. Kovacs had forwarded to Ms. Magrone, at the very least, Mr. Jerome's letter stating that he had every intention of coming back to work.

Did you subsequently change your position, at all, that your money would be on him counting on a work comp settlement and you wouldn't see him again?

MS. HORVATICH:  Object to form.

A   Had I been aware of that letter at that time?  Yeah, I probably wouldn't have written that.

Q   (By Mr. Ezra) Okay.  There's a Neal 282, and it's an email from Scott Becker to Gene Loffler, and Mark Nemechek, Marcus Dixon, Amber Randall, Scott Cogbill.  And you are on this email.  Again, January 23rd, 2017.

40 (Pages 157 to 160)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 161

And Becker states that:  (Reading)
We'll get these statements from
Jason and Thomas today.  Also,
talked with Meaka Benton on Friday
as well.  They, comma, Zurich, have
discovered several inconsistencies
in several of Jerry's statements.
Will keep you all posted.
Now, again, that was in January of '17.
Am I correct when I state, Mr. Stafford,
that by May of '17, as far as you were concerned,
there was no inconsistency with regard to Mr. Neal's
claims and that the claims were work comp related?
MS. HORVATICH:  Object to form.
Q   (By Mr. Ezra) You can answer.
A   What I knew at that time was Jerry said he
was injured at work.
Q   Okay.  Mr. Stafford, why was Jerry Neal
fired?
A   Because he was unable to return to work
after 26 weeks of leave, and he had made no attempt
to return to work until well after his -- what is
it -- June 19th date.  And that --
Q   Anything else?  I'm sorry, I didn't mean

Page 162

to cut you off.
A   Yeah.  And to exacerbate that behavior,
even when he did make an attempt to have
restrictions that could be accommodated, it was
after the June 19th date, after he had been off work
over six months; 26 weeks.
Q   Why would the 26 weeks deadline apply to
him if, as you just told me, it was a work comp
claim?
A   Because the 26th -- we didn't carry any
employee on leave more than 26 weeks.
Q   So if a work comp individual, without
these issues that, you know, Jerry's saying one way
or the other, but if a -- let me go back.
If a -- strike that.
If a work comp individual, with no issues
as to whether it's a work comp injury or not, is off
for 26 weeks, he would receive that 26-week letter?
A   I don't know whether he received the
26-week letter, but they -- they were terminated,
yeah.
Q   So no matter who the employee is, at the
end of 26 weeks if they do not return to work or
indicate when they might be able to return to work

Page 163

and their job, they're going to get terminated;
correct?
A   Yeah.  I mean, it's not -- at the 26-week
period, we take a look.  As I said earlier, if the
restrictions are such that, you know, that for one
or two weeks they're going to work in a modified
make work-type job before they ramp up to a full
duty, we've done that and gone past the 26 weeks,
but not by much.
Q   And even if the individual has suffered a
work related injury, if the 26 weeks come and go and
there's no ability at that time to give them that
short term job to transition them into the full-time
position, he's going to get terminated?
A   That's correct.
Q   And is that part of your employee
handbook?  Is there something in the employee
handbook that says that?
A   It may.  I'm -- I'd have -- I would have
to go look.
Q   Okay.  Literally one minute.
So, you know, one thing that comes to mind
is that if an individual suffers a work related
injury, and 26 weeks comes and goes and he can't

Page 164

come back to work and can't be transitioned into a
job for a short period of time, he's essentially
being terminated because he has a continuing
workers' compensation claim; correct?
MS. HORVATICH:  Object to form.
A   Well, no.  I mean, it -- he's being
terminated because they're unable to work.
Q   (By Mr. Ezra) But they're unable to work
because --
A   Whether it's work related or personal
doesn't matter.  It's just they're -- after 26 weeks
you're unable to work, you've been off a continuous
26 weeks, barring any return to work-type situation,
yeah, you'd be terminated.
Q   Right.  So I just want to make -- again,
but if the -- if an individual -- if I worked for --
if I worked for Dreyfus and I get hurt, and it's a
significant injury, and 26 weeks comes and goes and
I have a work comp claim because it's a work related
injury, I am going to get fired; is that correct?
MS. HORVATICH:  Object to form.
A   Your employment would be terminated, yes.
Q   (By Mr. Ezra) And I'm going to be terminated
because my work related injury stops me from coming

41 (Pages 161 to 164)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 165

back to work within 26 weeks; is that correct?

MS. HORVATICH: Object to form.

A   Yeah, that you were unable to work.

Q   (By Mr. Ezra) Right.

A   Been unable to work for 26 weeks with no anticipation of being able to work into the future.

Q   Yes. I cannot come back to work because my work related injury and --

A   Yeah, again, you keep --

Q   -- a pending workers' compensation case stops me from being able to come back to work within the 26-week period, therefore, I am going to be terminated; correct?

MS. HORVATICH: Object to form.

A   Yes. I would answer your question by de-emphasizing the word "work". I mean, it was immaterial whether it was work related or personal.

If you were unable to work for 26 weeks continuously and had no prospects of returning, then you were terminated.

Q   (By Mr. Ezra) Okay. Mr. Stafford, do you -- in any of the cases that you were involved in when you were provided a deposition, were you ever called upon to testify in a case where somebody claimed that

Page 166

firing them for having a pending workers' compensation case that required them to go beyond the 26 weeks was a wrongful termination?

MS. HORVATICH: Object to form.

A   I'm sorry, could you -- that was a -- that was a complicated question.

Q   (By Mr. Ezra) Sure.

A   Have I ever --

Q   In any -- let me rephrase it.

In any of the cases in which you have provided a deposition in the past, was there a claim made that the 26-week period that would result in an automatic termination for an individual who suffered an on-the-job injury was wrongful?

A   Just this one. No, no other depositions.

MR. EZRA: I don't think I have anything further. How about that? How about them apples?

THE WITNESS: I won't argue with you.

MS. HORVATICH: Could we take ten minutes, please? I may have a few questions.

(There was a brief recess.)

CROSS-EXAMINATION

QUESTIONS BY MS. HORVATICH:

Page 167

Q   Well, very briefly -- hopefully this will be short -- I wanted to just revisit the May 4th letter, Dave, which is marked Neal 0402. And I don't think we need to pull it up.

But Dave, I wanted to ask you, did you send that letter to Mr. Neal?

A   I don't recall whether I sent it specifically. Typically those came from Amy Khatib out of our Wilton office.

Q   And to that end, was it -- was it part of your job to send those letters?

A   Not typically, although I won't say that we never sent one of the letters. We may have.

Q   Okay. And for this particular letter, was that sent by Amy Khatib?

A   I believe so.

Q   With respect to that letter, from your recollection, what were you asking Mr. Neal to provide the company?

MR. EZRA: I'll object. The document speaks for itself.

You can answer, Mr. Stafford, by all means.

A   Yeah. I mean, basically we were asking

Page 168

him, you know, for his anticipated plans, whether he thought he'd be able to return to work in the future, what his doctors were telling him. We were basically asking him to communicate with us and that we wanted him to come back to work.

Q   (By Ms. Horvatich) And did you make the decision for Mr. Neal's termination?

A   I did, yes.

Q   At the time you made the decision, did you believe that the May 11th doctor's note, which is marked Neal 0297, satisfied the "ask" in the May 4th letter?

A   No. As I recall, that simply -- it provided no new information other than what had already been provided.

Q   And there's been some discussion about the attorney letter that's marked Neal 0366. And I believe you testified that at the time you made the decision, you had never seen that letter from Mr. Neal's attorney.

A   Yeah. That's absolutely correct.

Q   Upon review of that letter, would it have changed your termination decision?

A   I can't -- no, I can't say it would have,

42 (Pages 165 to 168)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 169

that letter in and of itself, because the information we had still indicated that he was not able to return to work before June 19th. And he hadn't provided any information by June 19th to the contrary.

Q   So as you stated, he did not provide any information, including the May 11th doctor's note and that attorney letter, that would give any indication that he could return to work with or without accommodations as of June 19th?

A   That's correct.

MR. EZRA: Now, that -- and I'll object to mischaracterization of the letter, and a mischaracterization of his testimony.

You can -- you can answer, Mr. Stafford.

A   Yeah. I mean, it's -- it's -- I would agree with that statement, that, you know, that as of June 19th, he had not provided us with any information that he could or wanted to return to work, to my knowledge, at that time.

Q   (By Ms. Horvatich) And, also, at the time you made the decision, was that on the morning of June 26th, to your knowledge?

A   Yeah, it was.

Page 170

Q   And at that time, when you made the decision, did you also believe that he -- let me back up. Strike that.

After you had made the decision the morning of June 26th, I believe we established that Mr. Neal did bring in a revised doctor's note in the afternoon; is that correct?

A   Right, after shift at Cahokia.

Q   And based on that doctor's note provided on June 26th, did you believe at that time that Mr. Neal had also violated the company's three-day no call/no show policy?

MR. EZRA: Objection. And it's speculation and a mischaracterization.

You can -- you can answer, Mr. Stafford.

A   Based upon the information I had at the time, you know, understanding that there -- there can always be a dispute over a termination date, that yes, that he -- that, you know, had he provided that note on the 22nd, it's entirely possible that we would have found him work for a short period of time until he could transition to full duty work.

MS. HORVATICH: I don't have any further questions.

Page 171

MR. EZRA: I just have a few.

REDIRECT EXAMINATION

QUESTIONS BY MR. EZRA:

Q   Mr. Stafford, you don't know that you would have been able to find him work if he had provided that information to you on the 22nd.

A   As I --

Q   You don't know; isn't that correct?

A   No, I wouldn't say that. I would say that it's more likely than not we could have for a short period of time. I mean, we -- we, as a routine, took what I would consider extraordinary steps to get employees back to work. I mean, we hired them in the first place. We don't want to fire them.

Q   Well, I mean, you fired them routinely after 26 weeks if they couldn't come back to work; correct?

A   Correct.

MS. HORVATICH: Object to form.

Q   (By Mr. Ezra) That was part of it, that's part of the company policy. They don't come back within 26 weeks, for whatever reason, whether its work related or not work related, they're gone; correct?

MS. HORVATICH: Object to form.

Page 172

A   Again, provided that there's, you know -- had we had information that a return to duty was imminent within a reasonable amount of time, we could take additional steps to accommodate that for short periods of time.

Q   (By Mr. Ezra) I understand that.

A   Had we had that information on the 19th, it would have made a difference as to his termination.

Q   Wasn't my question. And I appreciate where you're coming from, but that wasn't my question.

My question was, after 26 weeks, work related or not work related injury, the employee did not -- or is not able to come back, and there's no indication that he's going to be able to come back, he's gone, he's fired, he's out; correct?

MS. HORVATICH: Object to form.

A   Again, you know, it -- what I have a problem with --

Q   (By Mr. Ezra) I understand, Mr. Stafford, I understand where you're coming from.

A   -- is saying, you know, with no exception at 26 weeks an employee's terminated. That's not

43 (Pages 169 to 172)

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 173

true, but we followed a 26-week policy that typically, you know, absent any mitigating information, you know, that an employee would be able to return to work if they were off, had been off for more than 26 weeks, they were terminated, regardless of the reason.

Q   Understood.

And so what I -- so other than the fact that there might be the prospect -- or you coming into information of a prospect of that individual being able to come back to work, if they were unable to after 26 weeks, they're gone; correct?

A   Correct.

Q   All right.  And I -- you just said something that was interesting to me.  The decision to -- and I'm trying to clarify this.  You made the termination to officially fire him on June 26th in the morning?

A   No.  No.  That decision, basically, had been made when we, you know -- I actually took the steps to terminate him in the system on the morning of the 26th.

Q   Okay.

A   It should have been done on the 19th.  It

Page 174

was, for whatever reason, not done; overlooked.  And so I was -- if I remember --

Q   So you were -- you were taking care of business that --

A   Yes, new business.

Q   -- should have been taken care of a week before?

A   Correct.

Q   Okay.  So you didn't fire him on the 26th.  You just put it into the system on the 26th?

A   Correct.

Q   He was already fired as of the 19th?

A   Correct.

Q   And that's what the letter said, You're going to be fired as of the 19th?

A   That was the effective date of the termination; correct.

Q   Correct, okay.

Now, you put -- now, the letter that was sent, the May 4th letter, does it say anything about anticipated plans in it?

A   It talks about, you know, possibly coming -- you know, having -- having restrictions that we can accommodate.  Yes, it talks about that.

Page 175

Q   No.  Does it use the term "we would like to see your anticipated plan"?

MS. HORVATICH:  Object to --

Q   (By Mr. Ezra) You indicated to counsel -- hold on.  You indicated to counsel that that's what the letter was intended to do, to see an individual's anticipated plans in terms of coming back.

I'm asking you, does the document specifically say, We would like to see your anticipated plans for coming back?

MS. HORVATICH:  Object to form.

A   I'd have to look at the letter to be absolutely certain.  But whether it has those specific words, I don't know.  I don't think so, but I don't know.

Q   (By Mr. Ezra) Okay.  Well -- okay.  Does it specifically say that, We want to know specifically what the doctors were telling you?

A   It asks for updated medical information, yes.

Q   Not my question, Mr. Stafford.  My question was, does it specifically --

A   Does it have the words --

Q   -- say we would like -- well, let me

Page 176

complete the question.

MS. HORVATICH:  Object on the document speaks for itself.

MR. EZRA:  Yeah.  I made that one too.  All right.

MS. HORVATICH:  Right.  You can put it up on the screen and ask him referring to it.

MR. EZRA:  That's good.

Q   (By Mr. Ezra) So Mr. Stafford, my question is, does the document -- that you didn't create, by the way, but I understand that it does go out -- does it specifically say that doctors -- that we want to know what the doctors were telling you, or are telling you about your medical condition?

MS. HORVATICH:  Object --

A   It does not contain the words specifically "we want to know what the doctors are telling you," period.

Q   (By Mr. Ezra) Yeah.  Have you ever -- are there -- have you come across claims, workers' compensation claims, that were, in your mind, challenging or a potential problem -- potentially problematic?

MS. HORVATICH:  Object to form.

44 (Pages 173 to 176)

Keefe Reporting Company

Jerry Neal, Jr. v. Louis Dreyfus Company Services LLC
David Stafford 12/1/2022

Page 177

A   Yeah.  I've been involved in a lot of workers' compensation claims.

Q   (By Mr. Ezra) No.  That were --

A   Some of them are problematic and some are a little more difficult, yes.

Q   So, yeah, the language that was used -- and I don't have it in front of me -- said challenging and -- I don't think the word "speculative" was, but something along those lines.

And what would constituent, for you -- just give me an example of one that happened that you considered to be challenging or problematic.

A   We had a claim early in my career where a guy was alleging a back injury and offered to re-roof one of my co-manager's house while he was receiving TTD.

There was another instance where an employee was captured on video, was supposedly off on a back injury, was helping -- crawling in and about a semi truck, you know.

So those were difficult problematic claims.

Q   Do you guys authorize surveillance of workers' compensation claimants?

Page 178

A   I don't ever recall ever doing so at Dreyfus.

Q   Okay.  I'm not going to talk about Cargill, but okay -- so all right.  Let me take one minute.

MR. EZRA:  I don't think I have anything further, let me just take a minute.

Mr. Stafford, I do not have anything further.  How about that?

THE WITNESS:  I like that.

MR. EZRA:  Actually, I kind of like it too, to be perfectly honest.  So I'm good with it too.

THE WITNESS:  Okay.

MR. EZRA:  I know a deposition is not the greatest of situations, but it was a pleasure talking to you.

THE WITNESS:  It was pleasure meeting you too.

MS. HORVATICH:  We'll read and sign.

(Going off the record at 2:41 p.m.)

Page 179

CERTIFICATE

I, Doris A. Eby, CCR, CSR, within and for the State of Illinois, do hereby certify that pursuant to notice, on the 1st day of December, 2022, in the offices of all parties appearing remotely by video conference;

DAVID STAFFORD,

came before me, who was by me first duly sworn to testify to the whole truth of his knowledge touching and concerning the matters in controversy aforesaid; that he was examined on the day, between the hours and at the place in that behalf first aforesaid; and his examination was taken in shorthand and later reduced to typewriting; and now his deposition is now being herewith returned.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 20th day of December, 2022.

_____

Doris A. Eby, CSR
Illinois License No 084-004140

Page 180

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JERRY NEAL, JR.,    )
                    )
     Plaintiff,     )
                    )
     -vs-           ) Case No: 3:21-cv-00820-GCS
                    )
LOUIS DREYFUS COMPANY )
SERVICES LLC,       )
                    )
     Defendant.    )

DEPONENT'S CERTIFICATE

I, DAVID STAFFORD, do hereby state that I have read the transcript of the deposition which I gave in the above cause on the 1st day of December, 2022, all parties appearing remotely by video conference; that I find it to be a true and correct record of said proceedings, with any changes I have made on the following correction pages.

_____
DAVID STAFFORD

I, _____, Notary Public in and for said County and State, do hereby acknowledge that_____, personally known to me, did appear before me on the _____ day of _____, _____, and signed the above certificate in the presence.

WITNESS my hand and seal on this _____ day of _____, _____.

_____
NOTARY PUBLIC
My commission Expires: _____.

45 (Pages 177 to 180)

Keefe Reporting Company

Page 181

**KEEFE REPORTING COMPANY**
11 North 44th St.
Belleville, IL 62226
(618)277-0190

December 20, 2022

Ruth A. Horvatich, Esq.
Mcgrath North Mullin & Kratz, PC LLO
1601 Dodge Street
Omaha, NE 68102

In Re: Jerry Neal, Jr. Vs. Louis Dreyfus Co.
No. 3:21-cv-00820-GCS

Dear Ms. Horvatich:
    Enclosed is a copy of the transcript of your client David Stafford taken on December 1st, 2022. Please have your client read the transcript, and if there are any corrections to be made, use the errata sheet(s) also enclosed.  Please have your client sign the original signature page before a Notary Public and return the signature page and correction sheet(s) to Jeff Ezra at Byron, Carlson, Petri & Kalb, P.O. Box 527, 411 St. Louis Street, Edwardsville, IL 62025.
    If the signature page is not returned within thirty (30) days, the transcript may be filed without changes.  If you have any questions, please feel free to call my office at (618)277-0190.

Sincerely,

Doris A. Eby, CCR, CSR (MO, IL)
CC:  All parties of record

46 (Page 181)

| 6/29/2017 | 03:41 pm | DJEROME | E-Mail | | | |

From: DAVID JEROME
To: Andrew James Kovacs
CC:
Subject: RE: Neal 2240308214
Date Sent: 6/29/2017 3:41:25 PM

Do I have your permission to contact them directly?

From: Andrew James Kovacs [mailto:andrew.kovacs@zurichna.com]
Sent: Thursday, June 29, 2017 3:40 PM
To: David Jerome
Subject: Re: Neal 2240308214

Nothing I can do. I'm not getting into hot water over this. Sorry.

Sent from my iPhone

On Jun 29, 2017, at 3:31 PM, David Jerome <DJerome@BrownLawOffice.com <mailto:DJerome@BrownLawOffice.com> > wrote:
My client called HR and they said that they had no idea who you were and they had not received any letter….anything we can do to resolve?

From: Andrew James Kovacs [mailto:andrew.kovacs@zurichna.com <mailto:andrew.kovacs@zurichna.com> ]
Sent: Thursday, June 29, 2017 11:52 AM
To: David Jerome
Subject: FW: Neal 2240308214

I sent this to them myself on May 26, 2017.

From: Andrew James Kovacs
Sent: Friday, May 26, 2017 4:11 PM
To: JoJo Magrone (MARYJO.MAGRONE@ldc.com <mailto:MARYJO.MAGRONE@ldc.com> )
Cc: Meaka Benton
Subject: Neal 2240308214

Ms. Magrone,

See attached letter from attorney Jerome.

_____
Andrew J. Kovacs
The Law Offices of Craig A Hansen
Zurich Staff Legal
3660 S Geyer St. Ste 340
St Louis MO 63127

**EXHIBIT**

**6**

1

NEAL 0555

| 6/29/2017 | 03:26 pm | | DJEROME | | E-Mail | | | |

From: DAVID JEROME
To: Andrew James Kovacs
CC:
Subject: RE: Neal 2240308214
Date Sent: 6/29/2017 3:25:53 PM

My client called HR and they said that they had no idea who you were and they had not received any letter….anything we can do to resolve?

From: Andrew James Kovacs [mailto:andrew.kovacs@zurichna.com]
Sent: Thursday, June 29, 2017 11:52 AM
To: David Jerome
Subject: FW: Neal 2240308214

I sent this to them myself on May 26, 2017.

From: Andrew James Kovacs
Sent: Friday, May 26, 2017 4:11 PM
To: JoJo Magrone (MARYJO.MAGRONE@ldc.com <mailto:MARYJO.MAGRONE@ldc.com> )
Cc: Meaka Benton
Subject: Neal 2240308214

Ms. Magrone,

See attached letter from attorney Jerome.

_____
Andrew J. Kovacs
The Law Offices of Craig A Hansen
Zurich Staff Legal
3660 S Geyer St. Ste 340
St Louis MO 63127
Direct Dial: 314-588-2278
Fax: 314-835-9422
andrew.kovacs@zurichna.com <mailto:andrew.kovacs@zurichna.com>

E-MAIL CONFIDENTIALITY: The information contained in this transmission is confidential, proprietary or privileged and may be subject to protection under the law, including the Health Insurance Portability and Accountability Act (HIPAA) or may be protected by attorney-client privilege. The message is intended for the sole use of the individual or entity to whom it is addressed If you are not the intended recipient, you are notified that any use, distribution of copying of the message is strictly prohibited and may subject you to criminal or civil penalties. If you received this transmission in error, please contact the sender immediately by replying to this e-mail and by deleting the material from your computer.

The Missouri Bar Disciplinary Counsel requires all Missouri Lawyers to notify all recipients of e-

3

| 5/23/2017 | 12:45 pm | TMCKEAN | E-Mail | | | |

From: Tammy McKean
To: andrew.kovacs@zurichna.com
CC:
Subject: Jerry Neal v Louis Dreyfus Corporation
Date Sent: 5/23/2017 12:45:02 PM

Good afternoon Mr. Kovacs,

Attached please find the work status slip for our client Jerry Neal from Dr. Boutwell.

Thank you for your time and attention,


Tamara McKean
Paralegal for Attorneys David Jerome and Richard Salmi
Brown & Brown LLP
5440 North Illinois, Suite 101
Fairview Heights, IL 62208
(618) 888-8888
Fax (618) 234-4818


Attachments: WSS Dr. Boutwell (051117).pdf

NEAL 0559

3



The
ORTHOPEDIC
CENTER
OF ST. LOUIS

Matthew F. Gornet, M.D.

Patient Name _Jerry Neal, Jr_

Patient was seen on _6/22/17_

The above named patient is **unable** to work beginning

_____ through _____.

The above named patient is **able** to return to work as of _6/22/17_ .

_✓_ FULL DUTY NO RESTRICTIONS – begining 7/3/17

_✓_ LIGHT DUTY – until 7/2/17

_✓_ no lifting greater than _10_ pounds

_✓_ must be able to alternate between sitting and standing as needed

_✓_ no repetitive bending

_✓_ no repetitive lifting

_____ may not work over 40 hours per week

_____ may not work over 8 hours per day

_____ no overhead work

_____ no pushing or pulling

other _"Total" – begining 7/3/17_

_____

_____

Dr. Matthew F. Gornet _Matthew F. Gornet_

**EXHIBIT**

**7**

14825 N. Outer Forty Rd. • Suite 200 • Chesterfield, MO 63017 • (314) 336-2555 • Fax (314) 336-2557

NEAL 0193

## ILLINOIS WORKERS' COMPENSATION COMMISSION
## SETTLEMENT CONTRACT LUMP SUM PETITION AND ORDER

ATTENTION. Please type or print. Answer all questions. File four copies of this form. Attach a recent medical report.

Workers' Compensation Act ✔ Occupational Diseases Act ___    Fatal case? No ✔ Yes ___ Date of death _____

**Jerry Neal**
Employee/Petitioner

Case # **17 WC 2629**

v.

**Louis Dreyfus Corp.**
Employer/Respondent

Setting **Collinsville**

To resolve this dispute regarding the benefits due the petitioner under the Illinois Workers' Compensation or Occupational Diseases Act, we offer the following statements. We understand these statements are not binding if this contract is not approved.

| **Jerry Neal, Jr.** | **532 St. James,** | **Cahokia, IL  62206** |
|---|---|---|
| Employee's name | Street address | City, State, Zip code |
| **Louis Dreyfus Corp.** | **46 Cargill Elevator Road,** | **Cahokia, IL  62206** |
| Employer's name | Street address | City, State, Zip code |

State Employee?  Yes ____  No ✔    Male ✔ Female ____    Married ✔ Single ____

# Dependents under age 18 **5**    Birthdate **10/26/81**    Average weekly wage $ **894.67**

Date of accident **11/26/16**

How did the accident occur? **Sweeping, shoveling overhead**

What part of the body was affected? **Neck, shoulders**

What is the nature of the injury? **Sprain/strain**

The employer was notified of the accident orally ✔ in writing ____ .    Return-to-work date **11/27/16**

Location of accident **Cahokia, IL**    Did the employee return to his or her regular job? Yes ___ No ✔
If not, explain below and describe the type of work the employee is doing, the wage earned, and the current employer's name and address.
**Terminated**

TEMPORARY TOTAL DISABILITY BENEFITS: Compensation was paid for _____ weeks at the rate of $ _____ /week.

The employee was temporarily totally disabled from _____ through _____

MEDICAL EXPENSES: The employer has ____ has not ✔ paid all medical bills. List unpaid bills in the space below.

Petitioner agrees to pay medical bills out of monies added to settlement.

PREVIOUS AGREEMENTS: Before the petitioner signed an *Attorney Representation Agreement*, the respondent or its agent offered

in writing to pay the petitioner $ **N/A** as compensation for the permanent disability caused by this injury.

An arbitrator or commissioner of the Commission previously made an award on this case on **N/A** regarding

TTD **N/A**    Permanent disability **N/A**    Medical expenses **N/A**    Other **N/A**

IC5 5/12  100 W. Randolph Street #8-200 Chicago, IL 60601  312/814-6611    Toll-free 866/352-3033    Web site: www.iwcc.il.gov
Downstate offices: Collinsville 618/346-3450  Peoria 309/671-3019  Rockford 815/987-7292  Springfield 217/785-7084

EXHIBIT
8

NEAL 0475

**TERMS OF SETTLEMENT:**   Attach a recent medical report signed by the physician who examined or treated the employee.

Respondent agrees to pay and Petitioner agrees to accept $25,578.91, representing 14 1/2% of the MAW at the neck in full and final settlement of all claims under the Workers' Compensation Act or otherwise for accidental injuries allegedly incurred on 11/26/16, and including all developments and sequale, fatal or non-fatal, resulting from such accidental injuries. Issues exist between the parties as to whether the Petitioner has incurred injures or to the degree alleged and whether or not such injuries are compensable. This settlement is entered into to resolve these issues. Petitioner agrees to pay all reasonable and related medical bills. Respondent specifically retains its rights of recovery.

Petitioner agrees that has not applied for Social Security Disability and has no reasonable expectation of becoming eligible for Medicare within the next 30 months.

| | | |
|---|---|---|
| Total amount of settlement | $ | 25,578.91 |
| Deduction: Attorney's fees | $ | 5,115.78 |
| Deduction: Medical reports, X-rays | $ | 302.25 |
| Deduction: Other (explain) | $ | 7,019.41 |
| Amount employee will receive | $ | 13,141.47 |

**PETITIONER'S SIGNATURE.** *Attention, petitioner. Do not sign this contract unless you understand all of the following statements.* I have read this document, understand its terms, and sign this contract voluntarily. I believe it is in my best interests for the Commission to approve this contract. I understand that I can present this settlement contract to the Commission in person. I understand that by signing this contract, I am giving up the following rights:

1. My right to a trial before an arbitrator;
2. My right to appeal the arbitrator's decision to the Commission;
3. My right to any further medical treatment, at the employer's expense, for the results of this injury;
4. My right to any additional benefits if my condition worsens as a result of this injury.

| | | | |
|---|---|---|---|
| *Signature of petitioner* | **Jerry Neal**<br>Name of petitioner (please print) | Telephone number | 3/9/2019<br>Date |

**PETITIONER'S ATTORNEY.** I attest that any fee petitions on file with the IWCC have been resolved. Based on the information reasonably available to me, I recommend this settlement contract be approved.

Signature of attorney                              5/9/19
                                                   Date
**David Jerome**
Attorney's name and IC code # (please print)
**Jerome, Lindsay & Salmi      6296**
Firm name
**331 Salem Place, Suite 260**
Street address
**Fairview Heights, IL  62208**
City, State, Zip code
**618/726-2222          djerome@jlslawoffice.com**
Telephone number              E-mail address
Tax ID# 83-4632218

**RESPONDENT'S ATTORNEY.** I attest that any fee petitions on file with the IWCC have been resolved. The respondent agrees to this settlement and will pay the benefits to the petitioner or the petitioner's attorney, according to the terms of this contract, promptly after receiving a copy of the approved contract.

Signature of attorney or agent                     5/8/2019
                                                   Date
**Andrew Kovacs**
Attorney's name and IC code # or agent (please print)
**Law Offices of Craig A. Hansen**
Firm name
**1299 Zurich Way, Suite 480**
Street address
**Schaumburg, IL  60196**
City, State, Zip code
**314/588-2278          andrew.kovacs@zurichna.com**
Telephone number              E-mail address
**Zurich Insurance Company**
Name of respondent's insurance or service company (please print)

**ORDER OF ARBITRATOR OR COMMISSIONER:**
Having carefully reviewed the terms of this contract, in accordance with Section 9 of the Act, by my stamp I hereby approve this contract, order the respondent to promptly pay in a lump sum the total amount of settlement stated above, and dismiss this case.

APPROVED BY AUTHORITY OF THE
ILLINOIS WORKERS' COMPENSATION COMMISSION
pursuant to the provisions of the
Workers' Compensation and Workers'
Occupational Diseases Acts

MAY 1 7 2019

By. Edward M. Lee, Arbitrator

IC5  page 2