**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JERRY NEAL, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:21-cv-00820-GCS** |
| | ) | |
| **LOUIS DREYFUS COMPANY** | ) | |
| **SERVICES, LLC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM & ORDER</u>**

**SISON, Magistrate Judge:**

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. 50). Defendant filed its Motion for Summary Judgment along with an Exhibit and Memorandum of Support on February 17, 2023. (Doc. 50, 51, 52). In its motion, Defendant argues that Plaintiff's retaliatory discharge claim in violation of the Illinois Workers' Compensation Act, 820 ILL. COMP. STAT. § 305/4(h), should be dismissed because "there is no probative evidence that . . . [Defendant] retaliated against Plaintiff for pursuing workers' compensation benefits." (Doc. 52, p. 1). Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment along with his own Exhibit and Memorandum of Support on March 20, 2023. (Doc. 55, 56, 57). Plaintiff asserts that questions of material fact exist as to Defendant's motives in terminating Plaintiff and that summary judgment should therefore be denied. (Doc. 56, p. 19). Defendant then filed a Reply Brief in Support of its Motion for Summary Judgment on April 3, 2023. (Doc. 58).

Ultimately, the Court agrees with Plaintiff's assessment of the record and **DENIES** Defendant's Motion for Summary Judgment. (Doc. 50).

FACTUAL BACKGROUND

Defendant, Louis Dreyfus Company Services, LLC ("LDC"), operates a grain elevator in Cahokia, Illinois, where Plaintiff, Jerry Neal, Jr. ("Neal") was employed. (Doc. 51, Exh. 1, p. 13:5-15:7). Neal was hired as an Operator at the Cahokia facility in August 2015 and was responsible for assisting with loading and unloading grain transported by railcars and barges. *Id.* at p. 12:17-24; 13:22-15:16.

On Saturday, November 26, 2016, Neal spent the day shoveling and sweeping heavy wet grain. (Doc. 57, Exh. 2, p. 39:17-40:11; 50:8-24). Neal estimated that roughly 100 rail cars had arrived that day and that he felt tightness in his lower back after the workday concluded. *Id.* at p. 40:2-11; 52:12-16. Neal did not report an injury to his supervisors, Scott Becker ("Becker") or Marcus Dixon ("Dixon"), at this time because "no one was there at the end of the day" as Saturdays were not regular working days. *Id.* at p. 44:4-6.

On Sunday, November 27, 2016, Neal noticed that his back was hurting when he got out of bed. (Doc. 57, Exh. 2, p. 46:20-47:5). On Monday, November 28, 2016, Neal reportedly told Becker and Dixon that his back was feeling tight and that he thought it would go away. *Id.* at p. 45:22-46:4. Neal was taking Aleve for pain relief. *Id.* at p. 46:1. On December 8, 2016, Dixon reported the conversation that took place with Neal to LDC management, noting that Neal had indicated his stiffness was from his bed. (Doc. 57, Exh. 1, p. 55). Dixon also indicated that Neal denied hurting his back at work. *Id.* In response to Neal's complaint, Becker advised Neal "not to bend, lift or put tension on [his] lower

back and that if [his back] did start to bother him anymore to let [Becker] know so that he can go see a doctor." *Id.*

Neal saw his family physician, Dr. Nidal Shawahin on Wednesday, December 14, 2016. (Doc. 57, Exh. 1, p. 31-32). Neal complained of lower back pain that had persisted for the past two weeks. *Id.* at p. 31. During his exam, Neal indicated that he did "not recall certain injury or trauma" but that "he does heavy lifting sometimes at work and he cannot rule that out as a possible cause." *Id.* Dr. Shawahin diagnosed Neal with back pain, proscribed baclofen, and told Neal that he could not lift or carry anything for two weeks. *Id.* at. p. 31-33. Neal provided Dr. Shawahin's note to a supervisor on December 16, 2016. *Id.* at p. 13-14.

Neal's supervisor allowed him to work on a computer with no lifting or pulling on December 16 and 19, 2016. (Doc. 57, Exh. 1, p. 13). On December 19, Becker completed an injury reporting form and sent it to LDC's Human Resources Department ("HR") and Zurich (LDC's worker's compensation insurer). (Doc. 57, Exh. 3, p. 3). On December 21, 2016, Becker filled out an "Incident Investigation Report" and emailed it to Gene Loffler ("Loffler") and Amber Randall ("Randall"). *Id.* at p. 11-13. Becker also filled out an Illinois Form 45: Employer's First Report of Injury. (Doc. 57, Exh. 1, p. 27). In the report, Becker wrote that Neal never reported a work injury, and disciplinary action was needed "regarding not reporting injur[ie]s." *Id.*; (Doc. 57, Exh. 3, p. 12-13).

In response, HR placed Neal on short-term disability ("STD"). *See, e.g.*, (Doc. 57, Exh. 3, p. 20) (noting that "HR was informed on 12/19/2016 and it was decided to place Jerry on STD."). On December 20, 2016, Neal was given the Sun Life STD paperwork so

that it could be completed by his treating physician. *Id.* Neal brought the form to his doctor on January 3, 2017. (Doc. 57, Exh. 1, p. 15-21). Dr. Shawahin noted Neal could return to work but that he should not push or carry over ten pounds. *Id.* Dr. Shawahin checked a box stating that it was unknown whether Neal's injury arose out of Neal's employment. *Id.* at p. 15.

On January 10, 2017, Neal drafted an injury statement, which was subsequently emailed to Randall, Dave Stafford ("Stafford") and Loffler. (Doc. 57, Exh. 3, p. 15-17). The injury statement was then forwarded to Amy Khatib ("Khatib"), LDC's Health and Insured Benefits Manager. *Id.* at p. 18. On January 11, 2017, Khatib emailed HR and stated the STD claim would be closed and that only a worker's compensation claim would be filed. *Id.*

Later that morning, Becker spoke to Neal about his pending benefits claims. (Doc. 57, Exh. 3, p. 20). Neal wanted STD benefits until his worker's compensation kicked in because he had been without a paycheck for a while. *Id.* During the conversation, Becker informed Neal he had delayed the disbursement of benefits "due to his changing story" about the cause of his injury. *Id.* Additionally, Becker informed Neal that LDC was closing his STD claim and filing only the worker's compensation claim. *Id.*

On January 12, 2017, Zurich, LDC's worker's compensation carrier, learned that Neal had retained the Brown & Brown law firm for his back injury. (Doc. 57, Exh. 3, p. 22). Brown & Brown also represented Neal in a pending claim against LDC where he injured his hand when a barge cable snapped. *Id.* at p. 23. Becker wrote "Date of injury depending on what day Neal was asked is now 11-26-2016." *Id.*

On January 19, 2017, LDC requested that Sun Life re-open the STD claim. (Doc. 57, Exh. 1, p. 25). Khatib stated that LDC did not need to contact Neal about this decision because they received notice that Neal was represented by counsel. *Id.* at p. 26. After speaking with JoJo Magrone ("Magrone"), the Director of Insurance and the Work Comp Examiner, LDC decided to file the STD claim and let both the STD and the worker's compensation investigations take their course. *Id.* Khatib was advised to continue the STD claim by Magrone. (Doc. 57, Exh. 4, p. 39:5-40:4).

Neal was initially sent to physical therapy by Dr. Shawahin and was then seen by Orthopedic Surgeon, Dr. Matthew Gornet, on February 28, 2017.  (Doc. 57, Exh. 1, p. 34-40). Dr. Gornet ordered an MRI that demonstrated an obvious annual tear centrally and to the right at L5-S1. *Id.* at p. 40. After Dr. Gornet's evaluation of Neal, he released Neal for "light duty," specifying the following additional work limitations: "no lifting greater than 10 pounds; must be able to alternate between sitting and standing as needed; no repetitive bending; and no repetitive lifting." *Id.* at p. 41. Dr. Gornet also referred Neal to chiropractic and physical therapy and requested that Neal be administered a single epidural injection as a conservative measure of treatment. *Id.* at p. 40. Neal subsequently dropped off Dr. Gornet's recommendations of accommodation to LDC on March 2, 2017. *Id.* at p. 38. According to Stafford, when Neal brought in his doctor's restrictions, someone at LDC should have evaluated whether Neal's job could be performed within those restrictions or if other accommodations could be made. (Doc. 57, Exh. 5, p. 73:11-74:2; 70:4-13). Neal was not put back to work at this time.

Following Neal's injury, several internal discussions concerning the legitimacy of

Neal's claims circulated around LDC. Beginning in January 2017, emails exchanged between LDC staff, Zurich, and Sun Life referenced Neal's claim as containing "several inconsistencies" and was described as "another problematic claim." (Doc. 57, Exh. 3, p. 24); (Doc. 57, Exh. 1, p. 64). In March 2017, Daniel Murray ("Murray"), LDC's Regional Head of Safety, Health and Environmental, stated that after meeting with Zurich to discuss "suspect and challenging claims" that there were "case handling decisions to be made" with Neal's claim. (Doc. 57, Exh. 3, p. 2). Shortly thereafter, Loffler stated in reference to Neal's claim, that "we were surprised when he hooked up with an attorney on this one. Guess I shouldn't be surprised." *Id.* at. p. 3. These discussions continued through April 2017, with Becker stating that "in most cases the claimant is just looking for an easy buck." *Id.* at p. 6.

On March 21, 2017, Khatib wrote to Sun Life that "worker's comp is denying Neal's claim. We would like you to go ahead and approve his STD and begin payments." (Doc 57, Exh. 1, p. 54). Sun Life then approved Neal's STD benefits on March 22, 2017, effective from December 20, 2016, and continuing through April 20, 2017. *Id.* at p. 50-53. In the letter approving the claim, Sun Life specified that "if [Neal] does not return to work by the aforementioned date and would like to be considered for additional benefit review, a medical update should be submitted . . . . Specifically, the employee should have the treating physician submit a copy of the most recent examination reports and any accompanying test results and surgical notes." *Id.*

On May 4, 2017, Khatib sent a certified letter to Neal that he received on May 10, 2017. (Doc. 57, Exh. 1, p. 29-30). The letter advised Neal that "pursuant to Company

policy, [his] employment and all Company provided benefits [would] end on June 19, 2017, unless [he was] able to return to work." *Id.* at p. 29. The letter further indicated that if Neal "would like to discuss potential accommodations that may allow [him] to continue [his] employment" to contact Randall on or before June 19, 2017. *Id.* The letter also noted that current medical documentation regarding Neal's condition would need to be provided at the meeting with Randall. *Id.* The letter concluded by noting that if Neal "did not contact [Randall], the Company [would] presume that [Neal] do[es] not intend to return to work and [his] employment separation [would] be deemed effective as of June 19, 2017." *Id.*

Neal then saw Dr. Boutwell on May 11, 2017, to receive the epidural steroidal shot proscribed by Dr. Gornet. (Doc. 57, Exh. 1, p. 47-48). At the visit, Dr. Boutwell provided Neal with an updated doctor's note consistent with Dr. Gornet's prior February 28, 2017, orders. *Id.* at p. 43. Neal gave a copy of the updated restrictions from Dr. Boutwell to Becker on May 23, 2017. *Id.* at p. 42-43. Becker forwarded the updated doctor's note to Randall and Loffler. *Id.*

Neal subsequently provided the May 4, 2017, letter he had received from Khatib to his attorney. During his deposition, Neal stated that he did not understand from the letter that a company policy existed which would operate to terminate him if he did not come back to work within a specific time frame. (Doc. 57, Exh. 2, p. 63:19-64:17). On May 23, 2017, David J. Jerome (Neal's attorney at Brown & Brown) wrote Andrew J. Kovacs (LDC's attorney) and informed him that Neal "does not plan on abandoning his position and wishes to return to work once the effects of this work injury have remitted." (Doc.

57, Exh. 1, p. 71). Jerome also advised Kovacs that LDC had not accommodated the restrictions proscribed by Dr. Gornet or Dr. Boutwell and that Neal was completing injections to determine whether or when he will be released from care or whether additional treatment will be recommended. *Id.* He also requested that Kovacs advise LDC of this letter response, or to let him know if he needed to forward the correspondence directly. *Id.* Kovacs emailed Jerome's letter to Magrone at LDC on May 26, 2017. (Doc. 57, Exh. 6, p. 2).

On May 24, 2017, in response to the updated information provided by Neal to Becker, Randall wrote "AS FYI . . . Neal provided this note yesterday (dated 5/11/17) indicating no change in his condition . . . remains off work. This is the employee whose claim was initially Short-Term Disability, then Worker's comp & is currently under investigation by Zurich." (Doc. 57, Exh. 1, p. 42). Later that same morning, Stafford wrote to Randall and Khatib "So we sent him the 26-week letter, right? And his date is June 19? At this point it's a matter of waiting and seeing if he contacts us about either potential accommodations or other return to work options. We shall see but my money is on him counting on a W/C settlement and so won't see him again." *Id.* at p. 44.

On Thursday, June 22, 2017, Neal saw Dr. Gornet in Chesterfield, Missouri. Neal left the office about 7 p.m. that evening. (Doc. 57, Exh. 2, 87:18-21). Dr. Gornet's updated work restrictions stated Neal could work light duty with a 10-pound lifting restriction until July 2, 2017, and Neal could attempt a trial of full duty with no restrictions starting on July 3, 2017. (Doc. 57, Exh. 7, p. 1). Neal brought Dr. Gornet's note to LDC on Friday, June 23, 2017. However, Neal was told by Assistant Manager, Mark Nemechek

("Nemechek") that Becker was not working and to return on Monday. (Doc. 57, Exh. 2, 88:15-90:3).

On Friday, June 23, 2017, Sun Life mailed a letter to Neal advising that his STD benefits could not be approved because "the information [he] provided [did] not demonstrate that [he was] "Totally Disabled"[1] beyond April 20, 2017. (Doc. 57, Exh. 1, p. 58). Sun Life advised LDC of this decision in emails to Khatib on June 19 and June 23, 2017. *Id.* at p. 56-57. In the June 19th email, Sun Life indicated that it did "not have sufficient clinical support of ongoing Total Disability or reasonable restrictions and/or limitations as of 4/21 (after his current last pay date) through the present. Mr. Neal was not seen by a provider since February and although he did receive an injection on 5/11, we are unable to support disability during the gap from 4/21 to 5/11." *Id.* at p. 56.

On Monday, June 26, Khatib emailed Stafford and Randall to let them know Sun Life had issued a denial of Neal's STD benefits beyond April 20, 2017. (Doc. 57, Exh. 1, p. 63). Khatib noted that Neal can "appeal the denial but we should go ahead and terminate him as of June 19, unless he has requested an accommodation." *Id.* Stafford then emailed Becker and Nemechek less than an hour later asking if either employee had spoken with Neal about a possible return to work. *Id.* Becker stated he had not spoken with Neal, but Nemechek was on vacation, so he was not able to ask Nemechek if he had spoken with Neal. *Id.* Becker did however note that Neal had dropped off an STD form on June 5, 2017.

---

[1]     For purposes of the Sun Life STD Plan, "Totally Disabled" means "because of your Injury or Sickness, you are unable to perform all of the material and substantial duties of your own occupation and you are not engaged in any occupation for wage or profit." (Doc. 57, Exh. 1, p. 58-59).

*Id.* In response to Khatib, Stafford stated he was not going to wait on Nemechek, and he was going to terminate Neal. *Id.* He wrote that he could reverse the termination, but "I think we are in good shape and have minimal risk in keying term today." *Id.*

At approximately 2 pm on June 26, Neal provided the June 22nd Note [2] from Dr. Gornet to Becker who emailed it to Stafford at approximately 2:23 p.m. (Doc. 57, Exh. 1, p. 45-46). Becker stated he advised Neal to call Stafford if he had any questions. *Id.* at p. 45. In response, Stafford wrote to Amy Khatib noting the following:

A) [Neal] Didn't go to the doctor until Monday AFTER his June 19 deadline to contact us as noted in his May letter.

B) Release effective immediately on the 22nd but was not presented to us until today at noon (1 week later).

C) Is not a full release, not that matters, and is only on a trial basis after July 3.

The site and myself would prefer to hold to the June 19 date given the fact that this appears to only have come about as a result of Sun Life's decision not to pay STD benefits and he didn't even present the release in a timely manner delayed from the 22nd until today and our grain elevators do work weekend.

(Doc. 57, Exh. 1, p. 45).

On June 28, 2017, Stafford emailed Becker and Nemechek to inform them that LDC would be terminating Neal and that he would return Neal's phone call and inform him of the termination. (Doc. 57, Exh. 3, p. 5). Stafford attached the termination to the email – wherein the subject line was "J. Neal – 26 weeks of Disability Termination." *Id.* Stafford sent Neal the June 28 Termination Letter which stated, in relevant part:

---

[2]    The legible copy of the June 22nd note from Dr. Gornet is contained in Plaintiff's Exhibit 7. (Doc. 57, Exh. 7, p. 1).

This letter will confirm that your employment with Louis Dreyfus Company Services, LLC (the "Company") has been terminated effective June 19, 2017.

You were on a leave of absence with the Company that extended beyond six months. On May 4, 2017, you were advised that you needed to contact the Company on or before June 19, 2017, to discuss your employment status including any potential accommodations that may allow you to return to work. You were also instructed to submit current medical documentation. Although you were provided several weeks to comply with this request, you did not contact the Company or see a doctor prior to this deadline. The medical paperwork you recently provided indicates that you were released to return to work as of June 22, 2017, however, you did not report to work or contact the Company until late in the day on June 26, 2017.

The Company has terminated your employment effective June 19, 2017, based on your failure to timely respond to the May 4, 2017 letter as well as your violation of the Company's Attendance Policy. As you know, a failure to report to work without notifying the Company for three consecutive workdays is considered a job abandonment.

(Doc. 57, Exh. 3, p. 31). At 11:40 am, on June 28, Stafford left Neal a voicemail indicating that Neal should call him back to discuss his employment with LDC. *Id.* Neal returned Stafford's call at 10:00 am on June 29th. *Id.* During the call, Stafford indicated that he read Neal the second paragraph of the termination letter when explaining the cause of his termination with LDC. *Id.* Neal reportedly informed Stafford that his attorney would contact LDC once he received the official letter of termination. *Id.* Neal then called Stafford back again at 11:55 am and advised Stafford that his attorney had responded to the May 4 letter by writing to "Andy Colfax"[3]  *Id.* at p. 32.

---

[3]      Plaintiff's Counsel did write to LDC Attorney Andrew J. Kovacs on May 23, 2017. *See* supra p. 7-8.

On June 29, 2017, Neal's attorney Jerome, contacted LDC's attorney, Kovacs regarding Neal's termination. (Doc. 57, Exh. 6, p. 1). Kovacs responded to Jerome's email by forwarding him an email that demonstrated that Kovacs had forwarded Jerome's May 23rd letter to LDC's JoJo Magrone on May 26, 2017. *Id.* at p. 2. Kovacs further noted that there was "Nothing [he could] do" and that he was "not getting into hot water over this. Sorry." *Id.*

Jerome then sent a letter directly to LDC on July 14, 2017. (Doc. 57, Exh. 3, p. 27). The letter was received by Becker on July 20, 2017. *Id.* at p. 26. In the July 14th letter, Jerome attached a correspondence slip representing that he had contacted Kovacs on May 23, 2017, with Neal's updated work status. *Id.* at p. 27. Jerome requested that LDC review Neal's termination process and reinstate Neal's employment. *Id.* Jerome then indicated that if his client's employment was not reinstated that he would seek civil redress for retaliation on his behalf. *Id.* Jerome concluded by requesting that LDC notify him within 14 days as to how LDC wished to proceed. *Id.* In response to Jerome's email, Stafford wrote "No need for call . . . will send to legal and JoJo [Magrone] . . . this is a result of his w/c claim and his attorney communicating with Zurich attorney and not us. We sit tight. Will advise after visiting with our attorneys." *Id.* at p. 28.

During his deposition, Stafford testified that he had the ability to reverse Neal's termination for good cause. (Doc. 57, Exh. 5, p. 145:13-147:24). Specifically, Stafford acknowledged that he had the ability to reverse Neal's termination knowing Neal had gone to the doctor on June 22. *Id.* at p. 149:6-10. Stafford also noted there were prior instances when the 26-week period had passed that LDC allowed workers to return to

work with accommodations for one or two more weeks without terminating them. *Id.* at p. 162:22-163:15.

Khatib was also deposed for the purposes of this litigation. (Doc. 57, Exh. 4). Khatib asserted that "the 26-week policy applies to all employees regardless of whether their leave of absence is from a work-related injury or an injury that is non-occupational." (Doc. 57, Exh. 4, p. 12:11-17).

After Neal was terminated, he applied for unemployment benefits. (Doc. 57, Exh. 1, p. 6-11). LDC protested the requested benefits. *Id.* at p. 10. LDC stated "Neal was terminated effective June 19, 2017, for failing to notify the Company of his absence from work, failing to keep [LDC] informed as to his ability to return to work as requested." *Id.* Following a hearing, the Illinois Department of Employment Security found that LDC was chargeable with the unemployment benefits. *Id.* at p. 6. The Department noted "[t]he evidence shows that the claimant was discharged . . . because he did not respond to employer's request for information regarding his off-work status in a timely manner. However, correspondence directly from claimant's attorney demonstrated that such documentation was provided in a timely manner." *Id.*

Neal's filed a back injury worker's compensation claim with LDC which was resolved in May 2019. (Doc. 57, Exh. 8, p. 1-2). The worker's compensation claim for his right hand was also resolved on July 5, 2017. (Doc. 57, Exh. 1, p. 67-68).

## Legal Standards

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. Proc. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). While the Court may not "weigh evidence and determine the truth of the matter [,]" it must ascertain whether a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

No issue remains for trial "unless there is sufficient evidence favoring the nonmoving party to [rule in favor of] that party . . . if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient[.]"). Instead, the nonmoving

party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

### DISCUSSION

LDC argues that Neal's retaliatory discharge claim "fails as a matter of law because there is no evidence that [Neal's] discharge was causally related to his worker's compensation claim" as is required under the Illinois Worker's Compensation Act. (Doc. 52, p. 7). Neal responded by providing the Court with a variety of documentation concerning his termination, which included:

> (1)    internal LDC emails discussing the viability of Neal's injury claims and eventual termination;

> (2)    LDC's correspondence with both its worker's compensation insurer (Zurich) and short-term disability coverage provider (Sun Life Financial) concerning the recommended approaches in handling Neal's disability claims;

> (3)    communications between Neal's former attorney David Jerome and LDC's attorney Andrew Kovacs regarding LDC's receipt of Neal's updated medical information which was required to assess Neal's ability to return to work and/or to provide Neal with work accommodations; and

> (4)    the letters of correspondence Neal received from LDC communicating the discontinuance of his company benefits (May 4th Letter) and his termination (June 28th Letter).

(Doc. 57). When the above evidence is viewed in the light most favorable to the non-movant, *i.e.*, Neal, and considering the other evidence in the record, the Court finds that

questions of material fact exist regarding LDC's motivation for terminating Neal. Thus, LDC's Motion for Summary Judgment is **DENIED**.[4]

## I.      Plaintiff's Retaliatory Discharge Claim

Neal claims that he was discharged in retaliation for pursuing a worker's compensation claim. (Doc. 1, p. 1). The case was removed to this Court by Defendant under 28 U.S.C. § 1332, which provides federal courts with original jurisdiction over civil actions between citizens of different states where the alleged matter in controversy exceeds $75,000, excluding interests and costs. *See* 28 U.S.C. § 1332(a). Accordingly, a federal court sitting in diversity applies the law of the forum state if there is no dispute about the choice of applicable law. *See FutureSource, LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002); *Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co.*, 712 F.3d 336, 341 (7th Cir. 2013) (citing *Citadel Group Ltd. v. Washington Regional Medical Center*, 692 F.3d 580, 587 n.1 (7th Cir. 2012)). As the parties have both sought to apply Illinois law, so shall the Court. *See generally* (Doc. 52, 55).

---

[4]      LDC also submitted supplementary evidentiary materials in support of its Motion for Summary Judgment. (Doc. 59). LDC's supplementary exhibits include an Employee Termination Report from its Human Resources Information System, *i.e.*, Workday, a declaration from Amy Khatib affirming the authenticity of the Workday Employee Termination Report, and Neal's Notice of Deposition of David Stafford individually and pursuant to Rule 30(b)(6) as a corporate designee. *Id.* Neal subsequently filed a Motion to Strike the Employee Termination Report and Khatib's Declaration on the basis that he did not have the opportunity to "verify, cross examine, investigate or respond to the supplemental evidence provided by [LDC] in its reply." (Doc. 61, p. 3). The Court did not rely on these exhibits in its decision. As such, Neal's Motion to Strike is denied as **MOOT**. (Doc. 61). Any dispute regarding the admissibility of the exhibits at trial will be addressed during the final pre-trial conference to be held on September 6, 2023.

Under the Illinois Workers' Compensation Act, it is unlawful for "any employer individually or through any insurance company or service or adjustment company, to discharge or threaten to discharge an employee because of the exercise of his or her rights or remedies granted to him or her by [the Workers' Compensation] Act." 820 ILL. COMP. STAT. § 305/4(h). Accordingly, the act "plainly prohibits a retaliatory discharge for the exercise of workers' compensation rights." *Smith v. Waukegan Park District*, 896 N.E.2d 232, 237 (Ill. 2008) (as modified on denial of reh'g on Sept. 22, 2008). *See also Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 358 (Ill. 1978) (noting that "retaliatory discharge is offensive to the public policy of this State as stated in the Workmen's Compensation Act.").

To establish a retaliatory discharge claim, a plaintiff must prove that: (1) he was an employee before the injury; (2) he exercised a right granted by the Workers' Compensation Act; and (3) that he was discharged and that the discharge was causally related to his filing a claim under the Workers' Compensation Act. *See Clemons v. Mechanical Devices Co.*, 704 N.E.2d 403, 406 (Ill. 1998); *Phillips v. Continental Tire The Americas, LLC*, 743 F.3d 475, 477 (7th Cir. 2014). LDC does not dispute the first two elements. (Doc. 52, p. 7). However, LDC believes Neal cannot prove the third element, *i.e.*, causation. *Id.*

Illinois courts have "repeatedly emphasized that '[w]hen deciding the element of causation [for a retaliatory discharge claim under the Workers' Compensation Act], the ultimate issue is the employer's motive in discharging the employee." *Matros v. Commonwealth Edison Co.*, 136 N.E.3d 83, 107 (Ill. App. Ct. 1st Dist. 2019) (citing *Michael v. Precision Alliance Group, LLC.*, 21 N.E.3d 1183, 1189 (Ill. 2014)); *see also Siekierka v. United*

*Steel Deck, Inc.*, 868 N.E.2d 374, 380 (Ill. App. Ct. 3rd Dist. 2007) (citing *Clemons*, 704 N.E.2d at 406). The plaintiff bears the burden of establishing causation. *See Michael,* 21 N.E.3d at 1188 (citing *Dixon Distributing Co. v. Hanover Insurance Co.*, 641 N.E.2d 395 (Ill. 1994)).

 "[A]n employer is not required to come forward with an explanation for the employee's discharge." *Matros*, 136 N.E.3d at 107. If the employer, however, offers a reason for the discharge, "the plaintiff must establish . . . [that] the employer's explanation is pretextual." *Basil v. CC Services, Inc.*, 116 F. Supp.3d 880, 893 (N.D. Ill. 2015) (citing *Casanova v. American Airlines, Inc.*, 616 F.3d 695, 698 (7th Cir. 2010)). Pretext has been defined as "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs." *Marin v. American Meat Packing Co.*, 562 N.E.2d 282, 285 (Ill. App. Ct. 1st Dist. 1990) (quoting *Wayne v. Exxon Coal USA, Inc.*, 510 N.E.2d 468, 471 (Ill. App. Ct. 5th Dist. 1987)).

LDC stated that "Neal was terminated because after 26 weeks of leave he was unable to return to work with or without reasonable accommodations, consistent with the Company's policies." (Doc. 52, p. 8). Further, LDC stated the "policy applies to all employees regardless of whether their leave of absence arises from a work-related injury." *Id.* at p. 8-9.  In support, LDC cited Illinois authority indicating that an employer may fire an employee for "excessive absenteeism, even if the absenteeism is caused by a compensable injury." *Finnerty v. Personnel Board of City of Chicago*, 707 N.E.2d 600, 605 (Ill. App. Ct. 1st Dist. 1999). *See also Hartlein v. Illinois Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992) (finding that "Illinois law does not obligate an employer to retain an at-will employee who is medically unable to return to his assigned position" and "an employer may fire

an employee for excess absenteeism, even if absenteeism is caused by a compensable injury"). LDC's statements of law are correct. However, based on the evidence in the record, a reasonable jury could find that LDC's stated reasons for terminating Neal were pretextual.

Because LDC has offered a reason for the discharge, Neal must point to evidence in the record demonstrating that LDC's stated reason is pretextual. Neal relies on the May 4th notice letter issued by LDC to Neal as evidence of pretext. Neal first argues that the May 4th letter makes no reference to a 26-week policy. It is true that the May 4th letter does not specifically reference a 26-week policy. However, this policy is implicit from the potential termination date of June 19, 2017. This is six months or 26 weeks from the time that Neal left work, which was on or about December 19, 2016.

Next, Neal points to LDC's answer in response to his amended complaint to demonstrate pretext. In his amended complaint, Neal alleged the following:

> That on or about June 28, 2017, Louis Dreyfus Company wrote a letter to Plaintiff advising him that his employment with Louis Dreyfus Company Services LLC was terminated effective June 19, 2017. Defendant accused Plaintiff of not responding to the letter of May 4, 2017, not providing Defendant with an update of his condition and prospective return to work date. Defendant also accused Plaintiff of violating its attendance policy and abandoning his job by failing to report to work for three consecutive days without notifying the company. These reasons, assuming such could be assumed as reasons, were pre-textual.

(Doc. 21, ¶ 13). In its Answer, LDC responded to the paragraph as follows:

> Defendant admits that Plaintiff was terminated from his employment with the Company effective June 19, 2017, for failing to respond to the Company's May 4th correspondence and failing to report to work or contact

the Company in violation of the Company's attendance policy but denies
the remaining allegations in Paragraph 13.

(Doc. 24, ¶ 13). LDC's answer does constitute a binding judicial admission, and it can

serve to withdraw the question of the reason for Neal's termination for purposes of

summary judgment. *See Crest Hill Land Development, LLC v. City of Joliet*, 396 F.3d 801, 805

(7th Cir. 2005). Neal believes that LDC's answer contradicts its stated reason in its

summary judgment motion. However, that is not the case because as noted previously,

the 26-week policy is implicit from the termination date stated in the May 4th letter. That

being said, LDC's answer notes that Neal was terminated for failing to respond to the

May 4th letter. It also offered an additional reason for termination, *i.e.*, job abandonment

by failing to report to work for three days.[5] Thus, LDC's stated reason in its summary

judgment motion is not entirely consistent with its previous answer.

Indeed, LDC asserted the same reasons stated in its answer in a prior legal

proceeding relating to Neal's unemployment insurance benefits claim. (Doc. 57, Exh. 1,

p. 10). LDC again reiterated that "Mr. Neal was terminated effective June 19, 2017, for

failing to notify the Company of his absence from work, failing to keep us informed as to

his ability to return to work as requested." *Id.* However, following a hearing, the Illinois

Department of Employment Security found LDC chargeable with Neal's unemployment

benefits because "the evidence show[ed] that the claimant . . . [provided such

documentation as requested] . . . in a timely manner." *Id.* at p. 6.

---

[5]     According to LDC's attendance policy as stated in Neal's June 28, 2017, termination letter,
"a failure to report to work without notifying the Company for three consecutive workdays is
considered job abandonment." (Doc. 57, Exh. 1, p. 74).

Ultimately, the evidence relating to Neal's attempts to respond to the May 4th letter is sufficient to defeat summary judgment. Neal presented evidence that he did, in fact, timely respond. After receiving the May 4th letter, Neal saw Dr. Boutwell and obtained an updated physician's note, which he provided to LDC personally on May 23, 2017. (Doc. 57, Exh. 1, p. 42-43). Prior to the deadline in the May 4th letter, Neal's former attorney, David Jerome, also informed LDC that Neal intended to return to work. *Id.* at p. 71. He also updated LDC on Neal's treatment progress and noted that no accommodations had been made for Neal that followed his treating physicians' recommendations. *Id.* Despite this specific and timely request for an accommodation, none was forthcoming, and Neal did not return to work. Indeed, the record indicates that LDC should have evaluated whether Neal's job could have been performed within those restrictions or if other accommodations could have been made. (Doc. 57, Exh. 5, p. 73:11-74:2).

Neal also made another attempt to comply with the May 4th letter's notification requirements after the June 19th deadline. Neal went to the doctor on June 22nd and received an updated set of restrictions along with a recommendation for an initial return to work with light duty followed by a trial of full duty with no restrictions. (Doc. 57, Exh. 7, p. 1). Neal delivered these updated restrictions to LDC on June 26th. (Doc. 57, Exh. 2, 88:15-90:3). Stafford indicated in his deposition testimony that in certain circumstances that he had the right to circumvent the 26-week rule "for good cause." (Doc. 57, Exh. 5, p. 147:7-8). Further, Stafford agreed that "if [he] had wanted to . . . reverse [Neal's] termination on the 26th knowing that he had actually gone to the doctor on the 22nd" that

"he could have" done so. *Id.* at 149:6-10. In *Jones v. Burkart Foam, Inc.*, the court concluded that "termination seem[ed] [like] a rather harsh punishment for an employee's mere failure to inform the employer of his continued unavailability to work *only a few days* beyond a disputed deadline. Such a drastic measure for a minor infraction *could suggest an inference that defendants had a different motive than that which they professed.*" 596 N.E.2d 882, 883-884 (Ill. App. Ct. 5th Dist. 1992) (emphasis added).

In fact, the inference of a different motive is stronger here than in *Jones* because Stafford noted prior instances when the 26-week period elapsed, but where LDC allowed workers to return and work with accommodations for a brief period without terminating them. This furthermore single handedly calls into question LDC's stated reason for termination, *i.e.*, a blanket 26-week policy that applies regardless of whether one is able return to work with or without accommodations. When this evidence is considered in the context of the various negative statements LDC made regarding Neal's worker's compensation claim, a reasonable jury could readily conclude that Neal, was, in fact, terminated for exercising his worker's compensation rights.

## II.   Punitive Damages

LDC asserts that Neal is not entitled to punitive damages because "there is no evidence that Neal's discharge was the result of willful or wanton action on the part of [LDC]." (Doc. 52, p. 11). Neal, however, asserts that denying punitive damages where "the record and reasonable inferences support that Neal was terminated for exercising his rights under the Illinois Workers' Compensation Act . . . would [leave] nothing to discourage the practice of retaliatory discharge[.]" (Doc. 56, p. 19) (citing *Kelsay v.*

*Motorola, Inc.*, 384 N.E.2d 353, 359-360 (Ill. 1978)). Ultimately, the Court finds that based on the evidence in the record, a jury could find that LDC acted in such a manner that would justify an award of punitive damages.

Punitive damages are only appropriate in a retaliatory discharge case where there is evidence that the employer acted willfully, with actual malice or with such gross negligence as to indicate a wanton disregard for the rights of others. *See Kelsay*, 384 N.E.2d at 359. *See also Knierim v. Izzo*, 174 N.E.2d 157, 165 (Ill. 1961) (finding that punitive damages may be justified by actions "characterized by wantonness, malice, [and] oppression."). "[W]hile the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of damages is properly a matter of law." *Kelsay*, 384 N.E.2d at 359. Because punitive damages are penal in nature, they are "not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Id.* at p. 360.

There is sufficient evidence in the record for a reasonable jury to conclude that LDC acted willfully and with malice with respect to Neal's exercise of his workers' compensation rights. Neal was originally placed on STD when he left work in December 2016. (Doc. 57, Exh. 3, p. 20). But in January 2017, Neal drafted an injury statement to file a worker's compensation claim. (Doc. 57, Exh. 3, p. 15-17). Neal also retained an attorney to handle the claim. As a result, LDC informed Neal that his STD claim would be closed and only a worker's compensation claim would be filed. *Id.* at p. 18. Neal wanted STD benefits until his worker's compensation claim kicked in because he had been without a

paycheck since he left work. *Id.* at p. 20. Becker, one of Neal's supervisors, however, informed him that he had delayed the disbursement of benefits because he had changed his story. *Id.* In late February 2017, Dr. Gornet released Neal for light duty with various limitations. (Doc. 57, Exh. 1, p. 34-40). Neal dropped off Dr. Gornet's recommendations for accommodations to LDC in early March 2017. *Id.* at p. 38. Neal, however, did not return to work even though LDC should have evaluated whether Neal's restrictions could have been accommodated. (Doc. 57, Exh. 5, p. 73,11-74:2, 70:4-13). From this sequence of events, a reasonable jury could readily conclude that LDC acted willfully and punished Neal by denying him benefits and by refusing to accommodate his restrictions.

This notion is further reinforced by the internal discussions between LDC, Zurich, and Sun Life from January to April 2017. *See generally,* (Doc. 57, Exh. 3, p. 24); (Doc. 57, Exh. 1, p. 64). Neal's worker's compensation claim was described as "problematic" and "suspect." *Id.*; *see also,* (Doc. 57, Exh. 3, p. 2). Loffler also appeared to be taken aback by Neal's decision to hire an attorney for the claim. (Doc. 57, Exh. 3, p. 3). Becker again expressed his skepticism of Neal's claim as one where the claimant was just looking to make an "easy buck." *Id.* at p. 6. A reasonable jury could construe these comments as evidencing a certain hostility towards Neal because he filed his worker's compensation claim.

The statements are also critical in examining LDC's response to Neal's attempts to comply with the conditions set forth in LDC's letter of May 4, 2017. (Doc. 57, Exh. 1, p. 29-30). As discussed previously, the letter required Neal to contact LDC prior to June 19, 2017, to discuss potential accommodations and to provide updated medical

documentation. *Id.* Neal gave a copy of his updated restrictions to Becker on May 23, 2017, which was well within the time frame provided for in the May 4th letter. (Doc. 57, Exh. 1, p. 42-43). Becker, in turn, forwarded the updated doctor's note to Randall and Loffler. *Id.* Despite complying with LDC's request, however, LDC seemed ready to proceed with Neal's termination on June 19, 2017. Internal discussions asked whether Neal had received the 26-week letter. Those discussions also seemed to indicate that LDC was expecting Neal to rely on a worker's compensation settlement and not seek out accommodations from LDC. (Doc. 57, Exh. 1, p. 44).

 During this same time, Neal's attorney reached out to LDC's attorney stating that Neal fully intended to return to work and that LDC had not accommodated the restrictions indicated by his doctors. (Doc. 57, Exh. 1, p. 71). LDC's attorney, in turn, forwarded the letter to Magrone at LDC. (Doc. 57, Exh. 6, p. 2). It is true that this evidence could be construed as a simple miscommunication or lack of communication between the key players at LDC regarding Neal's intentions. However, given the internal LDC discussions and Becker's and Loffler's previous statements on the matter, it could also readily be inferred that LDC acted with willful intent and was dead set on terminating Neal as of June 19, 2017.

Indeed, a reasonable jury could readily arrive at this conclusion based on Neal's attempt to provide updated restrictions a few days after the June 19th deadline. (Doc. 57, Exh. 7, p. 1). The updated restrictions would have allowed Neal to work light duty with restrictions then full duty with no restrictions on a trial basis, but Neal's attempt to return was simply cast aside as untimely. *Id.* LDC stated that Neal's late attempts to provide

these restrictions were due to Sun Life denying STD benefits. (Doc. 57, Exh. 1, p. 56-57). However, Neal obtained the updated restrictions from Dr. Gornet one day before Sun Life mailed a letter to Neal informing him that STD benefits were not approved. *Id.* at p. 58.

LDC also apparently had no intention of accommodating Neal as LDC noted that his updated restrictions were not for a full work release, but that it did not matter. This again seems to indicate that Neal's attempt to return to work was doomed from the start. LDC furthermore faulted Neal for not providing the updated restrictions earlier noting that Neal could have worked over the weekend as the grain elevators were open. However, when Neal tried to bring the note to LDC on Friday, June 23, 2017, he was told to return on Monday, June 26, 2017, because his main supervisor was not working. (Doc. 57, Exh. 2, 88:15-90:3). LDC later used Neal's three-day absence during this period as an additional reason for his termination, noting that it amounted to job abandonment. (Doc. 57, Exh. 3, p. 31).

Finally, the Court finds it significant that LDC could have reversed Neal's termination for good cause and that LDC had previously accommodated others without terminating them. (Doc. 57, Exh. 5, p. 145:13-147:24). The fact that LDC chose not to reverse the termination or to accommodate Neal again reinforces the notion that LDC fully intended to terminate Neal no matter what attempts he had made to return. In light of the above, the Court will allow the jury to consider an award of punitive damages.

CONCLUSION

For the foregoing reasons, the Court **DENIES** LDC's Motion for Summary Judgment. (Doc. 50). The final pre-trial conference and trial in this matter remain set as scheduled.

**IT IS SO ORDERED.**

**DATED:  September 5, 2023.**

Digitally signed
by Judge Sison
Date: 2023.09.05
13:05:58 -05'00'

_____
**GILBERT C. SISON**
**United States Magistrate Judge**